**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

MADELINE KRASNO,

          Plaintiff,

   v.

BOARD OF REGENTS OF UNIVERSITY OF WISCONSIN; REBECCA BLANK in her official capacity as Chancellor for the University of Wisconsin-Madison; CHARLES HOSLET, in his official capacity as Vice Chancellor for University Relations for the University of Wisconsin-Madison; JOHN LUCAS in his official capacity as Assistant Vice Chancellor for University Communications for the University of Wisconsin-Madison; MIKE KLEIN in his official capacity as Director for News Content and Editorial Projects for the University of Wisconsin-Madison; and NATE MOLL in his official capacity as Social Media Specialist for the University of Wisconsin-Madison,

          Defendants.

Civil Action No.  21-99

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

### INTRODUCTION

1.    The University of Wisconsin-Madison operates social media accounts to provide a central forum for the public to obtain news and information about it. The University's Instagram account, @uwmadison, and Facebook Page, which publish messages, images, and photos that elicit comments from visitors, have become important public fora. Students, alumni, or the general public can directly address university staff, students, and administrators about issues ranging from

diversity and inclusion to university sports to voting. Seeking to limit the discourse among participants in these fora, the University has excluded all comments from an alumna of their university critical of their highly publicized, controversial, and unlawful research on nonhuman primates. The University's practice of excluding critical commentary, done to silence speech on the basis of viewpoint, violates the First Amendment.

2.      Social media sites like Instagram and Facebook "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  It is within the "'vast democratic forums of the Internet'" and "social media in particular" where the most important place for the exchange of views can be found. *Id*. at 1735 (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)).

3.      Described as the "[o]fficial Instagram account" and the "official Facebook page" of the University, the @uwmadison account and the University's Facebook Page respectively constitute public fora for purposes of the First Amendment. The accounts are accessible to any member of the public—even those without an Instagram or Facebook account. The University has relied on this breadth of audience to disseminate information to students, alumni, and the public about significant events related to the university, and invited them to rely on the accounts for accurate and representative information regarding its operation. The University also allows any Instagram or Facebook user to interact with its content by commenting on each post, as well as by subscribing to its accounts to receive all posts that the University generates. Users take advantage of the fora created in the University's Instagram and Facebook accounts, with each post generating comments from other platform users who speak directly to the University or in reply to each other on limitless topics and subjects of debate.

4.      Within the public fora created by the University's Instagram and Facebook accounts, the University effectively discriminates based on viewpoint by excluding discussion and criticism of its invasive research on primates. The University's experimentation on primates is a matter of public concern, and recently led to a $74,000 fine by the United States Department of Agriculture (USDA) for serial violations of the Animal Welfare Act (AWA) that resulted in at least one primate dying from dehydration and at least twenty primates needing amputations of their hands, feet, digits, and tongues due to improper handling by University personnel.

5.      As a result of the criticism Plaintiff Madeline Krasno voiced urging the University to end this decades-old practice of controversial research on primates, she was banned from further participation on the @uwmadison Instagram account and the University's UWMadison Facebook Page. Her viewpoint, expressed in the otherwise publicly accessible space associated with each of the University's public accounts, prompted the University, acting under color of state law, to promptly and permanently remove her from all conversation *on any topic* within the fora. Because Krasno's comments will not be seen by any member of the public, she will also be unable to participate in any discussions among other commenters in either fora. Further, other Instagram and Facebook users and members of the public will be deprived of the ability to listen to the discussions generated by her views.

6.      As a result of the University's censorship, the Court should declare that Krasno's viewpoint-based exclusion violates the First Amendment. The Court should further order the University to reestablish Krasno's right to participate in those fora.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

8.      Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b), because the University of Wisconsin is located in Madison, Wisconsin and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

9.      Plaintiff Madeline Krasno ("Krasno") is a citizen of Oakland, California, where she advocates for humane treatment of animals. Krasno is an alumna of the University of Wisconsin-Madison, where she worked at the University's Harlow Center for Biological Psychology ("Harlow Center"). Krasno operates an Instagram account under the username @madeline_krasno and a Facebook account under the username madeline.krasno.

10.     Defendant Board of Regents of University of Wisconsin System ("the Board") is, pursuant to Wis. Stat. § 36.07(1), a public corporation of the State of Wisconsin that governs the University of Wisconsin System, including the University of Wisconsin-Madison (the "University") campus. The University conducts invasive research on animals, including invasive research on nonhuman primates at both the Harlow Center and the Wisconsin National Primate Research Center (the "Primate Research Center"). The University oversees and/or operates an official Instagram account under the username @uwmadison as well as its official Facebook Page at facebook.com/UWMadison ("@UWMadison"). The University has deleted and/or removed and barred Plaintiff Krasno's comments from its Instagram accounts and Facebook Page's posts.

11.     Defendant Rebecca Blank is Chancellor for the University. Defendant Blank oversees the University's social media communications, including its Instagram and Facebook accounts. Her office is located in Madison, Wisconsin. Defendant Blank is sued in her official capacity.

12.     Defendant Charles Hoslet is Vice Chancellor for University Relations. Defendant Hoslet oversees the University's social media account communications, including its Instagram and Facebook accounts. His office is located in Madison, Wisconsin. Defendant Hoslet is sued in his official capacity.

13.     Defendant John Lucas is Assistant Vice Chancellor for University Communications. Defendant Lucas oversees the University's social media account communications, including its Instagram and Facebook accounts. His office is located in Madison, Wisconsin. Defendant Lucas is sued in his official capacity.

14.     Defendant Mike Klein is Director for News Content and Editorial Projects at the University. Defendant Klein operates and/or oversees the University's social media account communications, including its Instagram and Facebook accounts. His office is located in Madison, Wisconsin. Defendant Klein is sued in his official capacity.

15.     Defendant Nate Moll is a Social Media Specialist who operates the University's social media accounts, including its Instagram and Facebook accounts. His office is located in Madison, Wisconsin. Defendant Moll is sued in his official capacity.

## FACTUAL BACKGROUND

**Instagram**

16.     Instagram is a social media platform that facilitates interactions between users by allowing them to share photos and videos, and to comment on and to reply to other users' shared content. Like Facebook or Twitter, Instagram allows users to disseminate content such as messages and photos on virtually any topic, personal or public, and receive comments, replies, and messages from other users on the platform. In the U.S. alone, Instagram is used by over 140 million individuals.

17.     **Users.** Instagram "users" are individuals or institutions that have created an account on the platform. When users create accounts, Instagram provides them with a unique username or "handle," such as "@uwmadison." Other users or members of the public can find a particular account by searching for its unique handle on Instagram's website. By searching for a handle, anyone can then retrieve the unique webpage associated with that handle's Instagram account and see any posted photos, videos, and text by that account.

18.     **Webpage**. Each handle has its own unique webpage associated with the user's account where they can "post" or publish images and videos for others to view. Each user's webpage contains its handle, a description of the user's account, and account-specific data including the amount of posts the account user has generated.  There is also a blue button next to each user's handle that allows another Instagram user to "follow" the account. When a user follows another user's account, they subscribe to automatically receive posts from that account that will automatically populate the first screen or "feed" that they see when they login to Instagram. Below is a screenshot of the public Instagram webpage associated with the University's @uwmadison account taken on February 2, 2021.



19.   **Posts.** Each post created by a user is displayed as an icon on the user's webpage. By default, the posts are organized chronologically, so that a new photo or video will be accessible on the top left of a user's webpage.

20.   When a user posts a new photo or video on Instagram, they may include text that will be displayed next to or below the image or video it is associated with. By selecting any particular image, a close-up of the image will pop into view enabling a visitor to the webpage to access this accompanying content. The content includes the user's handle with an option to "follow" their handle, a space for the user to include text describing the post and/or referencing

other users' handles, and the ability for other users to comment on the post and reply to comments made by other Instagram users.  An example of a post and its associated content is below.



21.   **Comment Thread.** Each time someone selects a posted image or video, beneath the accompanying text included by the user they can access the "comment thread," the space displaying any comments made on the post by other Instagram users.

22.   The comment thread is interactive. It is here that another Instagram user can participate in public debate and discourse by commenting both to the user who posted the image or video and in response to other users' comments. The Instagram user who published the post can, in turn, reply to all comments or even post their own standalone comment if they wish to. An example of comments to a post and replies within the comment thread among Instagram users is below.

8



23.     Though some Instagram accounts can limit who can comment on their posts, by default for public accounts—accounts open to the public—there are no content or viewpoint-based restrictions on what commenters can write in the comment thread outside of Instagram's general community guidelines.

24.     Users can also interact in comment threads by "liking" the comments of other users.

25.     **Public Accounts.** Instagram accounts are public by default and viewable to any visitor to the account's webpage. An Instagram user can choose to make their account and webpage private and accessible only to users who request permission to view it.

26.     When a user's webpage is public, any visitor to the page can see each post made by the user by scrolling through the icons showing prior photo and video posts on the user's webpage.

27.     Posts made by public accounts are visible to anyone who visits their unique webpage on Instagram, even if the visitor does not have an Instagram account. Members of the public without an Instagram account are limited to the number of posts they can see without having an account and will only be able to view the photo or video of the posts they have access to. To

view all posts and associated content, such as the comment threads, a non-member must create an Instagram account and log in to the site.

28.    **Following.** In addition to visiting a user's unique webpage, Instagram users can also "follow" or subscribe to other users' accounts so that they automatically receive posts from those accounts when they login to Instagram. The posts from these "followed" accounts are generated in a "feed" that populates the first page a user will see when they log in to Instagram. Each feed displays a post from a followed account, as well as a preview of the comment thread associated with the post's photo or video. An example of a post automatically sent to an Instagram feed is below.



29.     **Block Comments Function.** An Instagram user may limit another user's interactions with their otherwise public account by "blocking" a user's comments on their posts. *See*

https://web.archive.org/web/20210126120043if_/https://help.instagram.com/426700567389543.

By enabling the "Block Comments" option on Instagram, an account can automatically bar all comments by specific users it designates from making comments on any of the account's posts. The function is automatic after it is first selected for a user and applies prospectively to all comments the blocked user attempts to make in the future.

30.     **Restricting.** An Instagram user may also limit another user's interactions with an otherwise public account by "restricting" the user's comments on their posts. *See* https://web.archive.org/web/20210126120043if_/https://help.instagram.com/426700567389543.

Restriction allows an Instagram account to hide all comments on the account's posts by specific users it chooses to restrict. Unlike blocking, restriction allows the user to choose whether to "approve" the restricted users' posts after prescreening its content and consequently allow the comment to be publicly viewable, or to continue to hide the comments from others' view. If the Instagram account restricts a user and does not affirmatively approve their comments, each future comment to the account's posts will remain unseen by any other Instagram user, including the account imposing the restriction.

31.     Neither restriction nor the block comments function provides notice to the designated user that their comments will be unseen by others. This "shadow ban" effectively silences all users from participation in the comment thread in which they are blocked or restricted, as they can continue to post comments that will remain unseen by anyone but themselves.

32.     As a blocked or restricted user's comments on an account's posts are not visible to any other user, they will not receive any replies or responses from any other Instagram user and will be unable to participate in any discussions held within the comment threads for that account.

**Facebook**

33.     Facebook is a social networking platform that, like Instagram, allows users to connect with other members of the site and the general public by sharing messages, photos, videos, and information. Facebook has approximately 190 million United States-based users.

34.     **Account**. As with Instagram, when someone creates a Facebook account, they are given a webpage to display their posted content as well as display comments and interactions they have with other users.

35.     Atop a given Facebook page is an information section showing a picture chosen by the user as well as links to view content they publish, such as videos and photos, events, and a description of the account. Within this section a member of the public can send a direct message to an account, "like" a Facebook page, and search for content within its posts. Under the information section are two columns: a left-sided column detailing more information about an account user's location, the date its Facebook page was created, who operates the page, and type of organization (if one); and a right-sided column containing posts by the account listed in reverse chronological order. A screenshot of this portion of the University's Facebook page taken February 2, 2021 is included below.



36.     **Posts and Comment Thread**. Under a Facebook account's information section, the right portion of the Facebook page displays all of its posts. Like Instagram posts, Facebook posts made by an account can contain photos or videos and associated text. Like Instagram, each Facebook post contains an interactive space for other users with Facebook accounts to comment on an account's posts, reply to each other's comments, and for the original poster to reply to them in turn.

37.     **Public accounts**. Organizations like the University often operate their accounts as "Pages." Unlike a private Facebook account that allows a user to tailor who may visit and access posted content, Pages are public spaces that allow an entity, such as a business or organization, to interact with the general public by affording all visitors to the page access to its content—even those without a Facebook account.

38.     When creating a Page, an organization can choose to create a username associated with that page, such as "@UWMadison."

39.     Organizations use Pages to communicate with the public by inviting other Facebook users to "like" or follow its Page, providing a means for them to contact the organization itself by sending both public and private messages, and providing information and announcements through its posts.

40.     As public spaces, a Page's posts are by default open to the public to comment on, to post their own content to the Page, and to send private messages to the Page's account operator. An organization operating a Page can change the default setting to either disable all comments by all users, or keep comments open to the public and hide or delete comments from specific users if it so chooses.

41.     **Liking.** A Facebook user can "like" an account's page as a whole. Liking a page subscribes the user to the account's posts so that the posts are included in the News Feed of that user. Users can also "like" another user's individual post, comment, or reply, which places a small "thumbs up" icon on the bottom of the box containing the liked text.

42.     **Hiding and Deleting Comments.** A Facebook account operating a Page can choose to individually hide or delete comments on its posts. Hiding a comment removes it from view for everyone except the original commenter and their friends, while deleting it removes it from permanent display to anyone who visits the post's comment thread.

**The University's @uwmadison Instagram Account**

43.     The University's @uwmadison Instagram account is presented to the public as the "[o]fficial Instagram account of UW-Madison" and is described as a "[c]ollection of your #UWMadison pics and those of University Communications staff."

14

44.     The University has used the account since at least September 22, 2012 when it posted its first photo featuring the university's football field. Other Instagram users replied to the post in its comment thread, and the University responded in turn to some of those comments.

45.     The University, through Defendants and those they supervise, updates the posts daily if not multiple times a day.

46.     The University's Instagram account provides a public forum for purposes of the First Amendment because it is here that members of the public can receive information from the University, and any Instagram user can communicate directly with the University through comments and replies in each post's comment thread.

47.     The account is accessible to any member of the public—even those without an Instagram account. Though users can follow @uwmadison, they are not required to do so to view its posts or participate in the posts' comment threads.

48.     The University has relied on this breadth of audience to engage with students, alumni, and the public about significant events related to the University. Its over 2,400 posts feature announcements from university students and staff as well as letters to the campus from university administrators providing updates and information impacting campus life—from COVID-19 protection measures employed by the University, to announcements of university closures, to the medical care provided by its veterinary or engineering schools to featured animals.

49.     The content included in the University's posts is represented as the official voice of the University so that any viewer can read statements by its Chancellor or announcements of official university policy, for example, as statements from the University itself.

50.     The University's account does not purport to limit the topics or speakers permitted to participate in the forum or to preapprove or screen the content of the messages other users post.

51.     While the University has an official statement on social media posted to its website, that statement expressly disavows that Defendants regularly review posts to curate the submitted content permissible under that policy.[1] The University does not reference or otherwise incorporate the policy on its Instagram page.

52.     Students and the public routinely petition the University through comments on its Instagram account, with a representational example shown in a user's comment made to the University's January 8, 2021 post announcing the start of in-person classes, which complains: "Nothing about this is normal, give us in-person or give us back our tuition."

53.     Comments to these posts appear to be unmonitored, with general disagreements and even obscenities relating to University decision-making allowed in the comment thread. For example, a post made on @uwmadison on December 14, 2020 that announced the University's receipt of COVID-19 vaccines included a reply by one user to another user's comment which read "fuk u" [sic]. The comment thread associated with another post made on @uwmadison on December 15, 2020 shows a reply by one user to another commenter that directly critiqued the University, stating "bold of you to assume the university cares about the quality of their students [sic] education."

54.     The University's @uwmadison Instagram webpage was intended to serve as a forum where the University could reach and interact with the public. As the University itself states, "[s]ocial media platforms provide a tremendous opportunity to promote the UW–Madison brand. Never before has there been such an immediate (and public) way for the university to reach key

---

[1] The University's policy states, in relevant part, "While UW-Madison does not regularly review content posted to social media sites, it shall have the right to remove any content for any reason, including but not limited to, content that it deems threatening, profane, obscene, a violation of intellectual property rights or privacy laws, off-topic, commercial or promotion of organizations or programs not related to or affiliated with the university, or otherwise injurious or promotion of organizations or programs not related to or affiliated with the university, or otherwise injurious or illegal." *See* https://www.wisc.edu/social-media-statement/?fbclid=IwAR0JFLvkpK3h1Br9J34kcvvTFJztbwsM3Q4MIz5zeDgzb5DgdNjw5Xc4bYI.

audiences      and      for      stakeholders      to      access      the      university."
https://web.archive.org/web/20201128070413/https://uc.wisc.edu/resources/social-media-guide/.

55.     @uwmadison has become an important forum for the University's engagement with the public and provides Instagram users with a space in which each can become a "'town crier with a voice that resonates farther than it could from any soapbox.'" *Packingham*, 137 S. Ct. at 1737 (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997)). Members of the public who have a generally available Instagram account can directly communicate with the University and each other in the comment threads associated with each of the University's posts, exchanging views and discussing topics with one another, and receiving official information from the University.

**The University's @UWMadison Facebook Page**

56.     Defendants also operate a public Facebook Page that is presented as "[t]he official Facebook page for the University of Wisconsin–Madison. Managed by staff of University Communications, a unit located within the Office of University Relations."

57.     Created on March 9, 2009, the Facebook page is verified, meaning "that this is an authentic Page for this public figure, media company or brand." The University's Facebook Page features posts containing university announcements and developments, news following the work or achievements of its student body and faculty, and public health and safety announcements for its student body and the general public.

58.     As with the @uwmadison Instagram account, members of the public routinely interact with the University's Facebook posts. Facebook users have congratulated students on their graduation, commented on the expense associated with the University's online courses, critiqued fees paid by the University to invited speakers, debated the willingness of the campus community

17

to wear face masks, and posed questions about ongoing research announced in a University post. The public discussions contained in the comment thread associated with each Facebook post involve politics, campus life, public safety, and a range of other topics unlimited by the Facebook account's description or linked social media policy.

59.    The public has freely used the University's Facebook Page and the opportunity to engage in robust and seemingly uninhibited discussions. In response to a Facebook post made by the University on December 15, 2020 describing its mobile COVID-19 testing facility, over 50 comments and replies were made debating the necessity, rationale, and efficacy of the University's testing as well as comments alluding to the University's ability to track the whereabouts of its students. A screenshot of a portion of this interaction taken February 2, 2021 is below.



60.    In general, the University does not remove or restrict criticisms from the comment threads associated with its Facebook posts, even when directed to university policy or practices on topics such as holding in-person classes or expenditures on guest speakers or art. Comments critiquing the University's spending in response to its solicitation of donations from members of the public to fund student fees, for example, remain visible to anyone who accesses the Page.

61.    Controversy surrounding its research programs, such as the use of stem cells, can be seen in discussions on the University's comment threads in response to its posts, where generally commenters engage with one another on topics including politics to science to morality to religion. An excerpt of a representative comment thread is shown below.



62.    Many comments contain apparent misinformation, such as exhortations to use herbal remedies to treat cancer or posting links to third-party websites, and yet remain within many of the University's Facebook comment threads.

63.    Comments previously permitted on the Page relate even to the University's use of primates in research, such as one urging "[c]lose down UW primate labs!" written in response to

a post made by the University on June 29, 2016 promoting its use of monkeys in studying the zika virus.

**The University's Controversial Research on Primates**

64.     The University's Primate Research Center and Harlow Center (together, the "Centers") are the primary facilities at the University that use primates for experimentation.

65.     The Primate Research Center is part of the National Primate Research Centers program funded by the National Institutes of Health ("NIH"). The Primate Research Center conducts research on nonhuman primates. Its mission is to "to increase our understanding of basic primate biology and to improve human and animal health and quality of life through research." In 2017, the University's Primate Research Center kept 1865 non-human primates at its facility for use in experimentation.

66.     The Harlow Center's primate research is borne from the work of Harry Harlow, a primate researcher who was infamous for his maternal deprivation studies conducted at the University in the 1960s. The researchers intentionally separated newborn primates from their mothers, kept them alone with only inanimate objects for companionship, and inflicted a series of experiments to provoke and document their (deteriorated and distressed) psychological state. Experiments included attaching spikes to and blasting cold air from the lifeless surrogates that the newborns would use as their only source of physical comfort, allowing the newborns to harm themselves in their attempt to gain contact with the object. This research drew controversy when its nature became public, including results detailing socially isolated newborns dying of self-induced starvation, and for those who survived childhood, adult primates who engaged in rocking, head-banging, and who chewed off their fingers in distress. *See* Lauren Slater, *Monkey love: Harry Harlow's classic primate experiments suggest that to understand the human heart you must be*

20

*willing to break it*, THE BOSTON GLOBE, Mar. 21, 2004, available at http://archive.boston.com/news/globe/ideas/articles/2004/03/21/monkey_love/?page=3. Peter Singer prominently featured the maternal deprivation studies in his landmark book *Animal Rights*.

67.     The Harlow Center's maternal deprivation studies have given rise to substantial and longstanding criticism of the University for its animal experimentation, both by the primary federal regulatory agencies responsible for overseeing animal welfare at the Centers, and by organizations and former employees dedicated to exposing the reality of the experimentation conducted by the University.

68.     Part of the criticism is rooted in the continued cruelty of the experiments the Centers inflict on their primates. The maternal deprivation studies that elicited horror 5 decades ago were reborn in 2014, when newborn primates were separated at birth from their mothers, raised alone, and subjected to tests intended to induce stress and anxiety—all as a form of research into depression and anxiety in humans. *See* Noah Phillips, *University of Wisconsin renews controversial maternal deprivation research on monkeys*, THE CAP TIMES, July 31, 2014, https://web.archive.org/web/20210202004011/https://madison.com/ct/news/local/health_med_fit/university-of-wisconsin-renews-controversial-maternal-deprivation-research-on-monkeys/article_993e9566-172f-11e4-9063-001a4bcf887a.html. The protocol for passage of the experiment was approved after an initial rejection by the oversight committee over the objection of the University's bioethicist, who stated "we're killing baby monkeys." *Id*.

69.     Another portion of the criticism the University's primate experimentation has received has come from the inept and inadequate care provided to the nearly 2,000 primates held at the Centers. In 2014, the University entered into a settlement agreement with the USDA for its violations of the Animal Welfare Act, including violations directly implicating the welfare of

animals used in its research program. *See Summary Abstract of UW-Madison/USDA Settlement Agreement*, University of Wisconsin-Madison News, Mar. 17, 2004, available at https://web.archive.org/save/https://news.wisc.edu/summary-abstract-of-uw-madisonusda-settlement-agreement/. Among these were violations related to a botched surgery on a female rhesus monkey, and chemical hand warmer that slipped onto and burned an anesthetized cat. *Id.* Each stemmed from an apparent lack of training, inappropriate handling, and complete lack of appropriate care for the animals used in the University's research.

70.     In April 2020, the USDA issued a $74,000 fine for the University's violation of another 28 standards governing care for animals used in research under the Animal Welfare Act, from 2015 to 2019. *See* USDA, *Citation and Notification of Penalty to University of Wisconsin-Madison*,          April          15,          2020,          available          at https://web.archive.org/web/20210202004250/https://www.aphis.usda.gov/enforcement/university-wisconsin-madison.pdf.  Among these were deaths from the failure to provide potable drinking water to a group of primates for at least four days, and a traumatic injury one primate sustained from its cage mates after the University returned the primate to the same cage following a previous attack. Additionally, the University was cited for 22 serial incidents of improper handling over the last four years that caused at least 20 primates to have their hands, feet, digits, or tongues amputated due to serious injuries that they sustained as a result of the improper handling.

71.     Organizations dedicated to exposing the University's experimentation and institutionalized incompetency in caring for animals have repeatedly brought its primate research into the center of public debate. In 2020 alone, the organization Stop Animal Exploitation NOW! ("SAEN") filed a complaint with the USDA alleging that the Primate Research Center continued to violate the Animal Welfare Act after learning of four additional primate mishandling violations

that occurred following the incidents implicated by the USDA's April 2020 fine. *See* SAEN, *Letter to USDA-APHIS*, August 3, 2020, https://web.archive.org/save/https://saenonline.org/news-media-news-2020/University-of-Wisconsin-Federal-Complaint-8-3-20.pdf. Each involved animal care personnel failing to properly separate primates or secure their safety in their enclosures, each resulting in injuries requiring veterinary care.

72.     Most recently, the Centers' experimentation on and inadequate care of primates were highlighted in an undercover investigation by People for the Ethical Treatment of Animals ("PETA"). A video and website released by PETA in September 2020, which was based upon a six-month investigation, revealed a culture of death, neglect, and severe psychological distress at the Primate Research Center. The investigation uncovered even more primate deaths then those implicated in the USDA's April 2020 fine, including one primate who was run through a high-temperature cage washer while trapped inside. Also revealed through the investigation were more traumatic injuries suffered by primates as a result of continued incompatible animal grouping and the inability of the employees to safely house and transport the primates. Primates mutilating their limbs and pulling out their hair, engaging in rocking and stereotypic behaviors indicative of profound distress, and clutching their dead babies provide just a glimpse of the conditions revealed by the investigation.

73.     Based on this investigation, on September 2, 2020, PETA filed a complaint with the USDA and NIH urging an inquiry into the conditions of the animals at the Primate Research Center. The investigations are ongoing.

**The University's Censorship of Krasno on Instagram**

74.     Krasno, an acknowledged animal rights advocate, has devoted considerable time on Instagram exposing the animal abuse she encountered firsthand as an undergraduate employee at the University's Harlow Center.

75.     Krasno frequently comments on the University's Instagram posts on a wide range of general topics exhorting them to "stop testing on monkeys."

76.     The University has barred Krasno's criticisms of its animal experimentation—and all other comments she attempts to make—by restricting or blocking[2] her comments on its posts.

77.     The University had taken action to silence Krasno's participation on its page as early as September 28, 2020, after a comment she made on the University's post that referenced her time in the Harlow Center remained hidden from everyone but herself. *Compare* https://www.instagram.com/p/CFscuT8HjOh/ (public view of post and no comments by Krasno); *with* below screenshots of Krasno's own view of the post and her comment.

---

[2] Because an Instagram user who is "block[ed]" from commenting or restricted does not receive notice that they have been blocked or restricted, it is unclear at this time which limitation Krasno has been placed on by the University. Regardless of the type, however, the result is the same—Krasno's comments to the University's public posts will never be seen or engaged with by any other Instagram users.



78.     On Oct. 22, 2020, Krasno commented "stop testing on monkeys!" in response to a post by the University. The comment does not appear in the publicly-available comment thread, though Krasno can view it through her Instagram account. *Compare* https://www.instagram.com/p/CGsrbshH16z/ (public view of post showing 4 comments and no comment by Krasno); *with* below screenshot of Krasno's view of the same post with 5 comments.



79.     On November 11, 2020, Krasno commented on Instagram again to "Close down the primate labs!!" in response to a post by the University related to its COVID-19 measures. Her comment similarly does not appear. *Compare* https://www.instagram.com/p/CHgOAChntvA/?igshid=1jmkxfn82ure8 (public view of post showing no comment by Krasno and 12 comments total), *with* below screenshot of Krasno's view of the same post with 13 comments.



80.     The University similarly restricted or blocked Krasno from participating in the comment threads on its Instagram page on posts dated September 30, October 3, November 23, and December 22, 2020.

81.     The University limited Krasno's ability to comment on its Instagram posts so that no comments she makes will ever appear on the forum until the university removes the restriction or disables the blocking of her account.

82.     In limiting Krasno's ability to comment on its Instagram posts, Defendants were acting under color of state law in their official capacities as employees in charge of public communications, including social media platforms such as Instagram and Facebook, for a state-funded University.

83.     Each comment made by Krasno on the University's @uwmadison Instagram posts since her account was blocked from commenting or restricted will also never be viewed by any other Instagram users, including other commenters on the same posts on which Krasno's comments were hidden. Because her comments will never be seen, no other Instagram users can respond to Krasno nor view the responses that other users could have made to her comments had her participation not been excluded by the University.

84.     Even if the University removed the restriction, none of Krasno's prior comments will repopulate on the posts she attempted to participate in. They will never be viewed by anyone but Krasno, nor will they ever be responded or replied to.

85.     Because these posts are automatically sent to the feeds of users who follow the University's @uwmadison account, whether a comment appears in a post's comment thread is important for purposes of visibility and reach as each comment would be featured in a portion if not all of the feeds of @uwmadison's 148,000 followers.

86.     The University's @uwmadison Instagram page serves as a public forum where Instagram users are invited to comment on, reply, and respond to the University and each other in the comment thread associated with each post.

87.     Despite making the @uwmadison Instagram page accessible to all members of the public without restriction for commenting on any topic, the Defendants have picked Krasno out to exclude her from the forum created within the comment threads of the @uwmadison Instagram page.

88.     Defendants' limitation on Krasno's ability to comment on the University's @uwmadison posts is based on the viewpoint of Krasno's speech. As a result of the limitation, no Instagram users can view Krasno's comments, reply to her comments, or view the University's

response, if any, to her comments. Krasno's participation in the University's comment thread is completely barred.

89.     Defendants' actions in excluding Krasno from fully participating in the University's Instagram page constitute viewpoint discrimination in violation of Krasno's First Amendment rights. Their actions unconstitutionally bar Krasno's participation in public fora. Defendants have unconstitutionally limited Krasno's ability to petition the University for a redress of her grievances.

**The University's Censorship of Krasno on Facebook**

90.     Plaintiff Krasno has similarly used the public space created within the University's Facebook Page to communicate her thoughts and opinions about the University's primate experimentation.

91.     The University has barred Krasno's criticisms of its animal experimentation—and all other comments she attempts to make—by deleting or hiding her comments on its Facebook Page.

92.     On December 9, 2020, Krasno commented on a University Facebook post directed to its graduates and alumni on the "barbaric treatment of monkeys" in its research laboratories. The comment was promptly hidden from all visitors to the post and the University's Facebook Page. *Compare* https://www.facebook.com/UWMadison/posts/10158858464948114 (public view of post with no comment by Krasno); *with* below screenshot taken on December 13, 2020 of the post with Krasno's comment and displaying "likes" of her comment by her Facebook friends, the only people who can see her posts.



93.     On December 13, 2020, Krasno again commented on the University's Facebook Page, referencing both her time working in its primate research laboratory and condemning its animal testing. The comment was again promptly hidden from all visitors to the post. *Compare* https://www.facebook.com/UWMadison/videos/2864564040493693 (public view of post with no comment by Krasno); *with* below screenshot taken on December 13, 2020 of the post with Krasno's comment.



94.     By limiting Krasno's ability to comment on its Facebook Page, Defendants were acting under color of state law in their official capacities as employees in charge of communications, including social media platforms such as Instagram and Facebook, for the state-funded institution, the University.

95.     Each comment made by Krasno on the University's @UWMadison Facebook Page since her comments were hidden or deleted will also never be viewed by anyone other than Facebook users Krasno is friends with on the platform, including other commenters on the same posts on which Krasno's comments were hidden.[3] As a result, no other Facebook users can respond to Krasno's posts nor view anyone else's response to her comments.

96.     Because these posts are automatically sent to the feeds of users who follow the University's @UWMadison Facebook Page, whether a comment appears in a post's comment

---

[3] Unlike Facebook, in which a user's friends can still view the comments of a user whose account is restricted (such as Krasno), on Instagram blocking from commenting or restricting hides a user's comments from all other users and members of the public—hiding them from everyone except the excluded user themself.

thread is important for purposes of visibility and reach because each comment would be featured in a portion if not all of the feeds of @UWMadison's over 300,000 followers.

97.     The University's @UWMadison Facebook Page serves as a public forum where Facebook users are invited to comment on, reply, and respond to the University and each other in the comment thread associated with each post.

98.     Despite making the @UWMadison Facebook Page accessible to all members of the public without restriction for commenting on any topic, the Defendants have picked Krasno out to exclude her from the forum created within the comment threads of the @UWMadison Facebook Page.

99.     Defendants' limitation on Krasno's ability to comment on the University's @UWMadison Facebook Page is based on the viewpoint of Krasno's speech. As a result of the limitation, no members of the public aside from Krasno's Facebook friends can view Krasno's comments, nor can they reply to her comments or view the University's response, if any, to her comments. Krasno's participation in the University's public comment thread is so limited as to be completely barred.

100.    Defendants' actions in limiting Krasno through her censorship on the University's Facebook Page constitute viewpoint discrimination in violation of Krasno's First Amendment rights. Defendants have unconstitutionally limited Krasno's ability to petition the University for a redress of her grievances.

### CLAIMS FOR RELIEF

### First Claim for Relief
### Violation of First Amendment of the U.S. Constitution
### (Declaratory and Injunctive Relief)

101.    Plaintiff repeats the allegations set forth above as if set forth in full.

102.    Defendants' restricting of Krasno from the comment threads associated with @uwmadison's Instagram account violates the First Amendment by imposing a viewpoint-based restriction on Krasno's participation in a designated public forum.

103.    Defendants' restricting of Krasno from the comment threads associated with @UWMadison's Facebook Page violates the First Amendment by imposing a viewpoint-based restriction on Krasno's participation in a designated public forum.

**Second Claim for Relief**
**Violation of First Amendment of the U.S. Constitution**
**(Declaratory and Injunctive Relief)**

104.    Plaintiff repeats the allegations set forth above as if set forth in full.

105.    Defendants' restricting of Krasno from the comment threads associated with @uwmadison's Instagram account violates the First Amendment by hindering her ability to petition the government for redress of grievances.

106.    Defendants' restricting of Krasno from the comment threads associated with @UWMadison's Facebook Page violates the First Amendment by hindering her ability to petition the government for redress of grievances.

**WHEREFORE**, Plaintiff Madeline Krasno requests that this Court:

a.      Declare Defendants' viewpoint-based restriction on Krasno's speech unconstitutional under the First and Fourteenth Amendments;

b.      Enter an injunction requiring Defendants to remove the restriction on Krasno's ability to participate in comments on the University's Instagram and Facebook accounts;

c.      Award Plaintiff's costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988; and

d.      Grant any additional relief as may be just and proper.

Dated: February 10, 2021                  Respectfully submitted,

/s/ Caitlin Foley

Caitlin M. Foley
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
Tel: (707) 795-2533 ext. 1043
Fac: (707) 795-7280
Email: cfoley@aldf.org

Christopher A. Berry
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
Tel: (707) 795-2533 ext. 1041
Fax: (707) 795-7280
Email: cberry@aldf.org

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
LAFFEY, LEITNER & GOODE
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003
(414) 755-7089 (facsimile)
jgoode@llgmke.com
mleitner@llgmke.com
jfarley@llgmke.com