

# Transcript of John Lucas

**Date:** March 11, 2022
**Case:** Krasno -v- Board of Regents of University of Wisconsin, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE WESTERN DISTRICT OF WISCONSIN
3        -------------------------X
4    MADELINE KRASNO,           :
5            Plaintiff,         : Case No.:
6         v.                    :  21-CV-00099-SLC
7    BOARD OF REGENTS OF THE    :
8    UNIVERSITY OF WISCONSIN,   :
9    et al.,                    :
10          Defendants.         :
11       -------------------------X
12
13            VIDEOTAPED DEPOSITION
14                 JOHN LUCAS
15           CONDUCTED VIRTUALLY
16          FRIDAY, MARCH 11, 2022
17              10:05 a.m. CST
18
19
20
21
22   Job No.:  436365
23   Pages 1 - 149
24   Reported by:  APRIL REID
25
```

**Page 2**

```
1           Videotaped Deposition of JOHN LUCAS held
2    virtually.  All appeared remotely.
3
4             A P P E A R A N C E S
5
6         ON BEHALF OF THE PLAINTIFF MADELINE
7    KRASNO:
8            JESSICA L. FARLEY, ESQ.
9            LAFFEY LEITNER & GOODE
10           325 E. Chicago Street
11           Suite 200
12           Milwaukee, WI  53202
13           (414) 312-7003
14       and
15           CHRISTOPHER A. BERRY, ESQ.
16           ANIMAL LEGAL DEFENSE FUND
17           525 E. Cotati Avenue
18           Cotati, CA  94931
19           (707) 795-2533 ext. 1041
20
21
22
23
24
25
```

**Page 3**

```
1              A P P E A R A N C E S
2
3         ON BEHALF OF DEFENDANTS BOARD OF REGENTS
4    OF THE UNIVERSITY OF WISCONSIN, et al.:
5            LYNN LODAHL, ESQ.
6            STEVEN C. KIRKPATRICK, ESQ.
7            Assistant Attorney Generals
8            Wisconsin Department of Justice
9            409 E. Main Street
10           Madison, WI  53703
11           (608) 257-0040
12
13   ALSO PRESENT:
14           MADELINE KRASNO, Plaintiff
15           CRAIG FISHER, ESQ., UW
16           JOSEPH TORREZ, Remote Technician
17           ROBERT LEONARD, Videographer
18
19               -  -  -  -  -
20
21
22
23
24
25
```

**Page 4**

```
1                I N D E X
2
3    JOHN LUCAS.                        PAGE
4    Examination by Ms. Farley            10
5    Examination by Ms. Lyndahl          147
6
7
8              E X H I B I T S
9    Plaintiff        DESCRIPTION        PAGE
10   Exhibit 50    E-mail chain, Bates No.    22
11               UW0066-'72
12   Exhibit 51    E-mail chain, Bates No.    25
13               UW0082
14   Exhibit 52    E-mail chain, Bates No.    27
15               UW0039-'40
16   Exhibit 53    E-mail chain, Bates No.    30
17               UW0525-'26
18   Exhibit 54    E-mail chain, Bates No.    32
19               UW0029(1)
20   Exhibit 55    E-mail chain, Bates No.    35
21               UW0021-'23
22   Exhibit 56    Text chats, Bates No. UW0455   39
23
24
25
```

**Page 5**

E X H I B I T S

| Plaintiff | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 57 | Screenshot of the page settings for Facebook, Bates No. UW0002 | 45 |
| Exhibit 58 | University of Wisconsin Social Media Statement, Bates No. UW0001 | 50 |
| Exhibit 59 | Memo regarding interim social media moderation guidance, Bates No. UW0076 | 56 |
| Exhibit 60 | E-mail chain, Bates No. UW0397-'398 | 70 |
| Exhibit 61 | E-mail chain, Bates No. UW0657 | 80 |
| Exhibit 62 | E-mail chain, Bates No. UW0026 | 87 |
| Exhibit 63 | E-mail chain, Bates No. UW0626 | 95 |
| Exhibit 64 | Instagram comments, Bates No. UW0341 | 101 |
| Exhibit 65 | Instagram comments, Bates No. UW0313 | 106 |

**Page 7**

E X H I B I T S

| Plaintiff | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 76 | Microsoft Teams chat message, Bates No. UW0415 | 139 |
| Exhibit 77 | Microsoft Teams chat message, Bates No. UW0774 | 141 |
| Exhibit 78 | Microsoft Teams chat message, Bates No. UW0378 | 143 |
| Exhibit 79 | Microsoft Teams chat message, Bates No. UW0696 | 145 |
| Exhibit 80 | Microsoft Teams chat message, Bates No. UW0719 | 146 |

- - - - -

**Page 6**

E X H I B I T S

| Plaintiff | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 66 | Facebook comments, Bates No. UW0297 | 108. |
| Exhibit 67 | Facebook comments, Bates No. UW0317 | 109 |
| Exhibit 68 | Facebook comments, Bates No. UW0218 | 114 |
| Exhibit 69 | Email chain, Bates No. UW0730 | 118 |
| Exhibit 70 | Microsoft Teams Chat texts, Bates No. UW0429 | 120 |
| Exhibit 71 | Text message, Bates No. UW0396 | 123 |
| Exhibit 72 | Microsoft Teams message, Bates No. UW0449 | 126 |
| Exhibit 73 | Microsoft Teams message, Bates No. UW0688 | 132 |
| Exhibit 74 | Memo Regarding Interim Social Media Moderation Guidance, dated 2-7-22 | 134 |
| Exhibit 75 | Text messages, Bates No. UW0716 | 136 |

**Page 8**

PROCEEDINGS

1 THE VIDEOGRAPHER: Here begins video
2 file number 1 in the video deposition of John
3 Lucas in the matter of Krasno vs. Board of
4 Regents of -- Board of Regent University of
5 Wisconsin, et al., in the United States
6 District Court for the District -- for the
7 Western District of Wisconsin, Case No.
8 21-CV-00099 SLC.
9 Excuse me. One moment. Excuse me.
10 I'm -- I apologize. It's SLC.
11 Today's date is March 11, 2022. The
12 time on me video monitor is 10:05 a.m.
13 Central Time.
14 My name is Robert Leonard. I'm the
15 video specialist. I represent Planet Depos.
16 This deposition is being taken via Zoom
17 online.
18 Will counsel please identify themselves
19 verbally and state who they represent.
20 MS. FARLEY: Jessica Farley, on behalf
21 of plaintiff, Madeline Krasno.
22 MS. LODAHL: Assistant Attorney General
23 Lynn Lodahl, on behalf of defendants. I'm
24 representing the witness, John Lucas.

**9**

1          MR. BERRY:  Christopher Berry on behalf
2   of plaintiff.
3          THE VIDEOGRAPHER:  The court reporter
4   today is April Reid.  She also represents
5   Planet Depos.
6          Will the court reporter please swear in
7   the witness.
8          THE COURT REPORTER:  Good morning,
9   Mr. Lucas.  If you will please raise your
10  right hand.
11  THEREUPON:
12          JOHN LUCAS
13          being first duly sworn or affirmed to
14  testify to the truth, the whole truth, and
15  nothing but the truth, was examined and
16  testified as follows:
17          THE COURT REPORTER:  Thank you, sir.
18  We may begin.
19          EXAMINATION
20  BY MS. FARLEY:
21      Q.  Good morning, Mr. Lucas.  My name is
22  Jessica Farley, and I represent Plaintiff Madeline
23  Krasno in this matter.
24          Now, you have just been sworn in.  Do
25  you understand that you are under oath?

**10**

1      A.  I do.
2      Q.  And that this has the same significance
3   as if you were testifying in a court of law before
4   a judge or a jury?
5      A.  Yes.
6      Q.  Okay.  Have you ever been deposed
7   before?
8      A.  I have.
9      Q.  How many times?
10     A.  I believe once or twice.
11     Q.  Okay.  Okay.  Just to refresh your
12  memory, I'm going to go over some of the
13  deposition ground rules.
14          As the technician mentioned, please
15  allow me to finish my question before you start an
16  answer, and I'll try to let you finish before
17  proceeding with the next question, just so that we
18  don't talk over each other; and it helps the court
19  reporter when she's transcribing.
20          Please answer in yes or no form instead
21  of uh-huh or uh-uh or by moving your head, shaking
22  your head, as that won't be picked up on the
23  transcript.
24          And if I ask a question and you don't
25  understand it, please ask me to rephrase.

**11**

1   Otherwise, I will assume that you have understood
2   the question.
3          And lastly, please let me know if you
4   need to take a break, use the restroom.  The only
5   thing I ask is that if there's a question pending,
6   you finish answering the question before we take
7   that break.
8      A.  I understand.
9      Q.  Do you understand these rules?
10     A.  Yes.
11     Q.  Okay.  Great.
12          Did you review any documents in
13  preparation for your testimony today?
14     A.  Yes.
15     Q.  And just very generally, what did you
16  review?
17     A.  I was given a box/folder of documents
18  that related to mainly e-mail records.
19     Q.  Okay.  Okay.  I'd like to go over your
20  background and your employment history.
21          And I know you've worked for UW for
22  quite some time, so let's start before -- you
23  know, let's start with your first position after
24  college.
25     A.  Prior to my UW employment?

**12**

1      Q.  Yes.
2      A.  Yes.
3          So my first job, I was a newspaper
4   reporter at a newspaper outside Chicago called the
5   Aurora Beacon.
6          Following that, I was a newspaper
7   reporter in Memphis, Tennessee at a newspaper
8   called the Commercial Appeal.
9          And then I joined UW Madison in 2001.
10     Q.  Okay.  Okay.
11          And what was your position at UW Madison
12  in 2001?
13     A.  It was called the University Relations
14  Specialist in the office of University
15  Communications.
16     Q.  Okay.  And what did your job duties
17  entail in that position?
18     A.  Mainly, working with media, writing news
19  releases, and covering student issues and student
20  affairs.
21     Q.  Did it have any relationship to social
22  media?
23     A.  There really wasn't social media in
24  2001.
25     Q.  Okay.  Okay.  And then, what was your

13

1  next position at UW Madison?
2  **A. I mean, technically, then I -- I gained**
3  **a different title, called Senior University**
4  **Relations Specialist, which had, you know, added**
5  **responsibilities with many of the same things that**
6  **I had just described.**
7  Q. Okay. Okay.
8  And what were the added
9  responsibilities?
10  **A. Working on more complex issues and media**
11  **requests and more service to the vice chancellors**
12  **and the -- the chancellor.**
13  Q. Okay. Okay.
14  And then, what was your next position?
15  **A. So there were a series.**
16  **I served in a role where I managed**
17  **internal communications for UW Madison.**
18  **Basically, you know, sending newsletters to -- to**
19  **faculty and staff, would have been the next one.**
20  Q. Okay. And then, moving along to the
21  next position?
22  **A. From there, then I added duties that**
23  **included photo and video oversight. And then,**
24  **around that time, was sort of the early beginnings**
25  **of social media, which we were starting at the**

14

1  **institution; and at that point, I think I became**
2  **an assistant director of communications.**
3  Q. Okay. And approximately, what date was
4  that?
5  **A. Roughly, like 2008, I think.**
6  Q. Okay. Okay.
7  And then, moving along from there.
8  **A. Yeah.**
9  **Moving on, then the next role would have**
10  **been the Director of News & Media Relations, which**
11  **was sort of overseeing mainly our content that we**
12  **produce, you know, at the institution; working**
13  **with media more closely, overseeing, you know,**
14  **responses to media, records requests and other**
15  **complex issues.**
16  Q. Okay. Okay.
17  And did that involve social media as
18  well?
19  **A. At that time, that would have over --**
20  **continued to oversee social media.**
21  Q. Okay. And when you say "oversee social
22  media," like were you someone that was consulted
23  on moderation decisions?
24  **A. I would have been in that time period,**
25  **yes.**

15

1  Q. Okay. Okay.
2  And then, moving along to your next
3  position.
4  **A. Sure.**
5  **I became an Interim Director of**
6  **Communications and then sort of full Director of**
7  **Communications, overseeing university**
8  **communications.**
9  Q. Okay. And is that your current
10  position?
11  **A. Somewhere along the way, then they**
12  **changed my title, then, to Assistant Vice**
13  **Chancellor of Communications and Chief**
14  **Communications Officer.**
15  Q. Okay. Okay.
16  Can you describe for me your day-to-day
17  job duties?
18  **A. Sure.**
19  **I mean, similar to the things that I**
20  **described before, I oversee the production of news**
21  **content, research communications, internal**
22  **communications, issues, media relations, crisis**
23  **communications, photo, social, video production,**
24  **our Alumni Magazine and then our executive**
25  **communications function.**

16

1  Q. Okay. Okay.
2  So, yeah, you've got quite a few hats
3  that you're filling, it sounds like.
4  And right now in your current position,
5  are you in charge of social media moderation
6  decisions?
7  **A. I oversee the staff that conduct**
8  **those -- that -- those activities.**
9  Q. Okay. And who would that be?
10  **A. Sure.**
11  **Mike Klein and then Nate Moll.**
12  Q. Okay. Thank you.
13  So how many employees report directly to
14  you?
15  **A. I oversee a staff of about 25, but I**
16  **have, I think, seven staff that report directly to**
17  **me.**
18  Q. Okay. And would Nate Moll report
19  directly to you?
20  **A. No.**
21  Q. Okay. And what about Mike Klein?
22  **A. Yes.**
23  Q. Okay. Okay.
24  Now, which departments in -- at the
25  University have responsibility for overseeing the

---

17

1  University's social media accounts on Facebook and
2  Instagram?
3     **A. University Communications.**
4     Q.  Okay.  Okay.
5       Does each department have its own page
6  on Facebook or Instagram, however?
7     **A. Like departments across the university?**
8     Q.  Yes.
9     **A. Many do, yes.**
10     Q.  Are they responsible, the departments
11  themselves, for moderating those communications on
12  the -- their pages?
13     **A. That's correct.**
14     Q.  Okay.  Now, switching back to your
15  position, who do you report to?
16     **A. My supervisor is Charles Hoslet, who is**
17  **the Vice Chancellor for University Relations.**
18     Q.  Okay.  Now I want to go back and kind of
19  dig in a little bit to your job duties,
20  specifically as it relates to overseeing social
21  media moderation.
22       Do you ever -- does your position ever
23  entail you reviewing social media posts?
24     **A. That other staff would have made**
25  **essentially?  Like, reviewing their posts or --**

---

18

1     Q.  Or --
2     **A. Can you clarify a little bit?**
3     Q.  Sure.  Absolutely.
4       That other staff would have made or that
5  the public would have commented on in terms of on
6  the specific post made by the staff.
7     **A. My role would mainly be consulting with**
8  **staff on what types of content were going to be**
9  **shared on what types of accounts.**
10     **It would be very rare that I would go**
11  **back into a post and then actively review comments**
12  **and moderate them.**
13     Q.  Okay.  So if Nate Moll had a question on
14  moderating a post, or Mike Klein, would that be
15  something they would bring to you?
16     **A. It would be much more frequent that I**
17  **would consult with them about the types of content**
18  **and the different posts that we would be making**
19  **and deciding which accounts to -- to place them**
20  **on.**
21     **I could be asked those questions about**
22  **moderation, but I would say it's very rare.**
23     Q.  Okay.  Okay.
24       And if a moderation needs to be made,
25  you're not the one who is pushing the actual

---

19

1  button, so to speak, to -- to hide a comment or to
2  block a user, for example?
3     **A. I have access to the university's**
4  **Facebook account.  I don't think I currently have**
5  **access to the university's Instagram account.  And**
6  **it would be very rare that I would moderate a**
7  **specific comment on a post.**
8     Q.  Okay.  Have you ever had occasion to
9  elevate decision making on whether or which
10  posts -- I should say, which comments by the
11  public should be moderated to your superiors?
12       Have you ever had occasion to do that?
13     **A. No.**
14     Q.  Okay.  And who would you get involved if
15  you had to do -- if you had a question on
16  moderating a specific comment?
17     **A. I -- I wouldn't typically need to**
18  **consult the vice chancellor or the chancellor**
19  **about moderating a -- a specific post, if that**
20  **answers your -- your question.**
21     Q.  Okay.  So, in essence, you would be able
22  to make that decision?
23     **A. I would make it or if I felt like I had**
24  **a question, I would probably consult with our**
25  **attorneys.**

---

20

1     Q.  Okay.  Okay.
2       Has your oversight of content moderation
3  changed at all as a result of this lawsuit?
4     **A. No.**
5     Q.  Okay.  And has -- in your opinion, has
6  comment moderation, in general, by the university
7  changed as a result of this lawsuit?
8     **A. No.**
9     Q.  Okay.  And why would you say that?
10     **A. I mean, over time we followed guidelines**
11  **that the university has created around content**
12  **moderation.**
13     **More recently, and I don't recall how**
14  **long ago it was, but we were given additional**
15  **interim guidance by our Office of Legal Affairs,**
16  **that provided new guidance for us to follow.**
17     Q.  Okay.  Okay.
18       Now, switching gears a bit -- we'll talk
19  about that guidance a little bit later, but I
20  wanted to talk about:  What are the
21  responsibilities of the Director of Research
22  Communications?
23     **A. Sure.**
24     **Kelly Tyrrell is -- or up until**
25  **recently -- we just had a small change in**

21

1  staffing -- is the Director of Research
2  Communications. She would generally be
3  responsible for working with faculty members, in
4  creating news releases and posts about, you know,
5  papers or studies that were conducted about the
6  institution, answering media requests about the
7  research enterprise, and dealing with any issues
8  that occurred in that space.
9      Q. Okay. And does that position fall under
10 the Communications Department?
11     A. Yes.
12     Q. Does Ms. Tyrrell report to you?
13     A. Yes.
14     Q. Okay. Now, when you say that research
15 commun- -- you said Research Communications. Is
16 that an umbrella for things that involve animal
17 research?
18     A. Yes.
19     Q. Okay. Does Ms. Tyrrell have any role in
20 moderating social media postings or comments by
21 the public?
22     A. Not in a day-to-day way, no.
23     Q. Okay. What about her staff?
24     A. Also not in a day-to-day capacity.
25     Q. Okay. And when I refer to her "staff,"

22

1  I -- I believe Chris Barncard is another
2  individual. Is he a direct report to Ms. Tyrrell?
3      A. Yes.
4      Q. Okay. And what is his official title?
5      A. I'm sorry. We just changed all of our
6  titles.
7      I believe his -- his official title is
8  science writer or communications specialist.
9      Q. Okay. Okay. But he generally falls
10 under the Research Communications umbrella?
11     A. Correct.
12     Q. Okay.
13     MS. FARLEY: Joe, could you pull up
14 UW0066, please.
15     REMOTE TECHNICIAN: Please stand by.
16 Counselor, that was 0006?
17     MS. FARLEY: 0066.
18     REMOTE TECHNICIAN: 0066. I apologize.
19     (Exhibit 50 was marked for
20     identification and is attached to the
21     transcript.)
22 BY MS. FARLEY:
23     Q. Okay. We have in front of us a
24 document. It looks like it's been marked --
25     MS. FARLEY: If you could scroll up a

23

1  little bit.
2      Q. I believe this is Exhibit 50.
3      And it looks like the title here of the
4  e-mail is regarding a PFP comment moderation
5  issue. And it relates to the moderation of
6  comments on social media.
7      Would that be a fair characterization of
8  what you see here on the screen?
9      A. Yes.
10     Q. Okay. And in response to receiving this
11 e-mail -- you can see in the second chain there --
12 you forward it to Kelly Tyrrell who, as we spoke
13 before, is the Director of Research
14 Communications; is that correct?
15     A. Correct.
16     Q. So you looped her in on a discussion
17 about social media moderation. And why is that?
18     A. I -- I don't specifically recall the --
19 the context of this issue.
20     Q. Do you typically loop her in on things
21 to do with potential moderation discussions?
22     A. I mean, she generally does not conduct
23 moderation, but we share information through our
24 office on a variety of issues.
25     Q. Okay. Okay.

24

1      It looks like -- so it kind of looks
2  like, from this e-mail, that the Research
3  Communications group does have some role or some
4  need to know to be looped in on moderation; is
5  that fair?
6      A. The Research Communications office had
7  supported our COVID response, and Kelly was a key
8  person who functioned as sort of our number 2 or
9  number 3 person in dealing with anything from
10 promotion of vaccines to mask wearing.
11     So, again, I don't specifically recall
12 what this issue was, but it would not have
13 necessarily exclusively been a Research
14 Communications discussion.
15     Q. Okay.
16     A. Especially in this time period.
17     Q. Okay. Now, just in general, how is the
18 Research Communications group involved in
19 responding to, for instance, social media comments
20 that are critical of animal testing?
21     A. I think that's a better question for --
22 for probably Mike and Nate, whether they're
23 consulted.
24     Again, I think we shared, you know,
25 information across a small office with some

---

**Page 25**

1  regularity, but it's not my sense that they would
2  be conducting that activity on a regular basis.
3      Q. Okay. Okay.
4          MS. FARLEY: Joe, could you pull up
5  UW0082, please.
6          REMOTE TECHNICIAN: Stand by.
7          (Exhibit 51 was marked for
8          identification and is attached to the
9          transcript.)
10         MS. LODAHL: Okay. Could we make the
11  image just a bit bigger. I'm having trouble
12  reading it on my screen.
13         MS. FARLEY: Absolutely.
14         Is that a little bit better --
15         MS. LODAHL: Yes.
16         MS. FARLEY: -- or should we zoom in
17  more?
18         MS. LODAHL: That's fine. Thank you.
19         MS. FARLEY: Sure.
20 BY MS. FARLEY:
21     Q. So, okay, right in front of us looks
22  like we have an e-mail that says, forward,
23  "Primate Research-Facebook Complaint."
24         Is that correct?
25     A. Yes.

---

**Page 26**

1      Q. And it looks like Meredith receives this
2  from a Danielle -- I'm sorry, Denise Hickey, but
3  then forwards it to both yourself and Kelly
4  Tyrrell to address; is that correct?
5      A. Yes.
6      Q. Now, what happened with this particular
7  response, do you recall?
8      A. I don't recall, and nor do I -- I'm
9  sorry, I don't recall what this complaint was.
10     Q. Okay. I'll represent to you it was a
11  complaint on Reddit that UW was hiding comments
12  critical of primate research.
13         Does that jog your memory at all?
14     A. No. I'm sorry.
15     Q. Okay. Okay.
16         Does your team ever communicate about
17  the plaintiff in this suit, Ms. Madeline Krasno?
18     A. I'm aware at a certain point that there
19  was communication about Ms. Krasno. I don't
20  recall whether there was anything in this specific
21  post that would have related to her or not.
22     Q. Okay. Does your team ever communicate
23  about Ms. Krasno with the Research Communications
24  group at all, such as about, like, moderating a
25  post?

---

**Page 27**

1      A. I recall in a more specific context that
2  Ms. Krasno held either an event or events
3  advancing her views of animal research that the
4  research community would have been apprized of and
5  potentially shared -- I'm sorry, that the Research
6  Communications group would have been apprized of
7  and potentially shared out further to people who
8  manage animal research on campus.
9      Q. Okay. Okay.
10         MS. FARLEY: Joe, could you pull up
11  UW0039, please.
12         REMOTE TECHNICIAN: Counselor, there is
13  a 39(1) and a 39 without a (1). So, there is
14  a 39 with a 1 in parentheses and one without.
15         MS. FARLEY: Oh. Just the first one.
16  Just the 0039 without the 1.
17         REMOTE TECHNICIAN: Yes, ma'am. Thank
18  you.
19         (Exhibit 52 was marked for
20         identification and is attached to the
21         transcript.)
22         MS. FARLEY: Thank you.
23 BY MS. FARLEY:
24     Q. Now, here is -- it looks like an e-mail
25  forward. The title is "Madeline Krasno's

---

**Page 28**

1  Newspaper Coverage."
2         Is that correct?
3      A. Yes.
4      Q. And it looks like it's from Nadine P.
5  Connor, and she forwards it to Rachel Jeris in the
6  Office of Legal Affairs, and she then forwards
7  that then to yourself and Kelly Tyrrell; is that
8  correct?
9      A. Correct.
10     Q. So it looks like Ms. Tyrrell was looped
11  in on conversation regarding Ms. Krasno and
12  potential, you know, media coverage; is that fair?
13     A. Yes.
14     Q. Okay. Now, why would Ms. Tyrrell need
15  to be looped in on something like this?
16     A. So when the suit was brought, it
17  generated publicity. And so I would say
18  university communications was in the position of
19  not only being responsible for the, you know,
20  Facebook and Instagram accounts at issue in the
21  suit, but we also worked closely with researchers
22  who are both involved in animal research
23  activities and then, as you can see, Professor
24  Connor, and those who are involved in the
25  infrastructure for the research of animal research

29

1 community.
2      So when there was publicity and media
3 attention about the suit, people were asking,
4 particularly Kelly and Chris Barncard who you
5 mentioned earlier, for information about what was
6 happening.
7    Q.  Okay.  So, fair to say, that when it
8 involves something relating to animal testing or
9 something scientific related to, for instance,
10 crit- -- criticism of the animal testing, that
11 Kelly Tyrrell is looped in?
12    A.  Yes.
13    Q.  Okay.  Does Ms. Tyrrell have any
14 particular training in social media moderation?
15    A.  I'm not aware that there is training
16 generally offered in social media moderation.
17    Q.  Okay.  Any -- have you ever had any
18 discussions with her about the social media
19 statement that appears on UW Madison's web page?
20    A.  No.
21    Q.  Okay.  Let's see.
22      MS. FARLEY:  Joe, could you bring up
23 UW0525, please.
24      REMOTE TECHNICIAN:  Please stand by.
25      (Exhibit 53 was marked for

30

1      identification and is attached to the
2      transcript.)
3    Q.  Okay.  And this is an e-mail chain.  It
4 begins with some -- Cherise, M. Caradine, and
5 she's at the WNPRC.
6      MS. FARLEY:  Joe, could you scroll down
7      a little bit.  It actually begins with
8      Jordana Lenon at the WNPRC.
9      And then if you want to scroll up,
10      actually.
11    Q.  It appears that the WNPRC received some
12 negative or perhaps even "inciteful" comments.  Is
13 that what this appears to be discussing?
14    A.  I'm not actually on this e-mail chain.
15    Q.  Right.  And I -- I recognize that.
16      I just wanted to confirm that this
17 document is discussing that there's -- I guess,
18 I'll just say:  The subject line of Cherise's
19 e-mail is regarding, quote, "not a direct threat
20 but inciteful language on our WNPRC Facebook
21 page."
22      Is that accurate?
23    A.  That's what the subject line says, yes.
24    Q.  Okay.
25      MS. FARLEY:  And then, Joe, if you want

31

1      to scroll up just a little bit more to the
2      middle e-mail.
3 BY MS. FARLEY:
4    Q.  And Kelly Tyrrell responds, "Thank you
5 for sharing this, Jordana.  And I'm sorry you have
6 to deal with this kind of language and content.
7 You might consider reporting this to Facebook for
8 a possible violation of community standards," and
9 then the web page, the web URL.  "And barring
10 that, I think you'd be well within reason to
11 delete posts that advocate or suggest violence."
12      Did I read that correctly?
13    A.  Yes.
14    Q.  Okay.  So it appears Ms. Tyrrell, in the
15 chain, suggests a potential moderation of a
16 comment relating to animal research.  Is that
17 correct?
18    A.  Again, I'm not on the -- the e-mail
19 chain.
20    Q.  Is it a fair summary of Ms. Tyrell's
21 e-mail that she's suggesting a moderation of a
22 Facebook post?
23    A.  Yes, I guess.
24    Q.  Okay.
25      MS. FARLEY:  Now, Joe, could you pull up

32

1      UW0029, please.
2      REMOTE TECHNICIAN:  Please stand by.
3      And, counselor, there is a 0029(1) and a
4      0029(2).
5      MS. FARLEY:  Either one.  They're both
6      the same.  Whenever you see that, it's just
7      duplicate.
8      REMOTE TECHNICIAN:  Thank you.
9      MS. FARLEY:  Uh-huh.
10      (Exhibit 54 was marked for
11      identification and is attached to the
12      transcript.)
13      MS. FARLEY:  Do you mind zooming in on
14      this a little bit.
15 BY MS. FARLEY:
16    Q.  We have what's been marked as
17 Exhibit 54.  This appears to be a snippet of a
18 Microsoft Teams discussion, I believe.  And it
19 says, "Post by John Lucas, February 18th, 2021."
20      And you ask Meredith -- I'm assuming --
21 is that Meredith McGlone?
22    A.  Correct.
23    Q.  Okay.
24      -- that you'd like to be notified of
25 anything else coming in media-wise on the ALDF

33

1 suit, and you'd also like Kelly to be notified.
2        Why would you like Kelly to be notified?
3     **A.  So this is back to my earlier comment,**
4  **that both -- you know, we were named as defendants**
5  **in the suit, but we have continuing**
6  **responsibilities to the UW Madison research**
7  **community, and specifically those affiliated with**
8  **the animal program.**
9        **I think the idea here was to ensure**
10 **that -- you know, we would give short statements**
11 **about the suit, particularly in the media, on**
12 **advice of counsel, but we were reserving the**
13 **ability to continue to provide information in**
14 **support of our animal program, which is very**
15 **important to the institution.**
16    Q.  Okay.  So in this instance, you wanted
17 to amplify or promote the animal program or pro
18 animal testing, I would say, in support of the UW
19 animal program; is that fair?
20    **A.  Yes.**
21       **I mean, we want to continue to provide**
22 **accurate information about UW Madison's animal**
23 **program even -- or to internal audiences or to the**
24 **media as it even -- again, following the advice of**
25 **counsel in how to respond to the media on the**

34

1  suit, if that makes sense.
2     Q.  Yes.
3        Is it fair to say that you wanted to
4  ensure that the discussion of the animal program
5  and the animal testing was positive?
6     **A.  I would say that it's our goal to always**
7  **ensure that discussion about the animal program is**
8  **truthful and accurate.**
9     Q.  Okay.  Would you say you were supporting
10 and promoting the animal program?
11       I guess, in your words -- it says you
12 were making comments in support of the animal
13 program overall; is that correct?
14    **A.  Yes.**
15    Q.  And that's versus the viewpoint of, you
16 know, anti-animal testing, such as views held by
17 plaintiff Madeline Krasno; is that correct?
18    **A.  I would say, again, trying to be --**
19 **provide accurate information to the public in**
20 **relation to anything else that's shared.**
21    Q.  Okay.  Would you characterize your
22 statement here as being pro animal testing?
23    **A.  Again, I would characterize my statement**
24 **in support of accurate information.**
25    Q.  Okay.  Okay.

35

1        MS. FARLEY:  Joe, could you pull up the
2  document entitled Binder 1-0021.
3        REMOTE TECHNICIAN:  Counselor, I have --
4  Counselor, I have binder 1-21.  Is that the
5  one you're referring to?
6        MS. FARLEY:  Yes.  Thank you.
7        (Exhibit 55 was marked for
8        identification and is attached to the
9        transcript.)
10 BY MS. FARLEY:
11    Q.  Okay.  This has been marked as Exhibit
12 55, and it looks like an e-mail chain entitled,
13 "Re:  Request for Comment Campus Reform."
14       Is that accurate?
15    **A.  Yes.**
16    Q.  Okay.  And Rebecca Blank, the Chancellor
17 of the University, asks Charles Hoslet to
18 formulate a response from the Request for Comment
19 from Campus Reform.
20       And then Mr. Hoslet forwards it to you
21 and asks you to take care of it; is that correct?
22    **A.  Yes.**
23    Q.  Okay.  And in response, you communicate
24 about Kelly Tyrrell and Chris Barncard.  And I
25 guess, we've already discussed who Mr. Barncard

36

1  is.
2        So you kind of loop in and elevate this
3  request to two people that are assigned to
4  research matters at the University; is that
5  correct?
6     **A.  Yes.**
7     Q.  Now, at the end of the chain,
8  Ms. Tyrrell states that the statement is going out
9  by request and on behalf of the chancellor.
10       Is that accurate?
11    **A.  This would be how a media request is**
12 **handled.  Whoever receives it, we would typically**
13 **have a statement or some information that we would**
14 **provide to the requester.**
15    Q.  Okay.  And then --
16    **A.  I don't -- I don't know if this was, you**
17 **know, specifically in the chancellor's name or**
18 **voice.  This would just be an institutional**
19 **statement.**
20    Q.  Okay.  But according to Kelly, she said
21 it was on behalf of the chancellor here?
22    **A.  That's what she represents.**
23       **Again, this would be sort of standard if**
24 **a media member sent a request for comment about a**
25 **particular issue.**

37

1    Q.  Okay.  Now let's take a look at the
2 actual statement.
3        MS. FARLEY:  So, Joe, if you could
4 scroll down a couple of pages.
5        Okay.  And here's the actual statement.
6 Thank you for zooming in.
7    Q.  Now, in this statement, it says that the
8 presence of all these valuable animals and people
9 on campus is vital to research that can help
10 improve the lives of so many.  And that's in the
11 second paragraph.
12       Do you see that?
13   **A.  Yes.**
14   Q.  Okay.  And, in fact, the statement on
15 behalf of the chancellor says that it would be
16 unethical to ignore the many ways animal research
17 can help people and animals.
18       Is that accurate?
19   **A.  Yes.**
20   Q.  The third paragraph.
21       Okay.  Would you characterize this
22 statement as being pro animal testing?
23   **A.  We would believe that this is accurate**
24 **information about the animal program that is**
25 **conducted at the University.  I guess, you know,**

38

1 **accurate, and it would support the continued use**
2 **of animal model at UW Madison, yes.**
3    Q.  Okay.  So is it -- it's fair to say that
4 based on this e-mail exchange and, you know, the
5 process of coming up with this statement, that
6 Ms. Tyrrell and Chris Barncard, from the research
7 arm of things, assists you in providing
8 information to respond to, for instance, critiques
9 of the animal program; is that accurate?
10   **A.  Yes.**
11   Q.  Okay.  And is it fair to say that their
12 job is to support, provide a statement or
13 communications on behalf of the university that
14 support the university's animal testing program?
15   **A.  Yes.**
16   Q.  Okay.
17       MS. FARLEY:  Joe, could you please pull
18 up UW0039, please.
19       REMOTE TECHNICIAN:  Please stand by.
20       MS. FARLEY:  Actually, scratch that.
21 Could we go to UW0455.  Apologies.
22       REMOTE TECHNICIAN:  That was 0455?
23       MS. FARLEY:  Yes.
24       REMOTE TECHNICIAN:  Okay.  Stand by.
25       Counselor, I have 054 and then to 05 --

39

1 I'm sorry -- 0454 to 0456, but I do not have
2 0455.
3        MS. FARLEY:  Oh, okay.  I believe --
4 let's try that 0454, and I believe that
5 should contain 455.
6        No.  This is not actually the document.
7        Do you mind if I chat you the document?
8        REMOTE TECHNICIAN:  Yes.  Yes, ma'am.
9 That's totally fine.
10       MS. FARLEY:  Okay.
11       REMOTE TECHNICIAN:  You can send it
12 directly to me via chat.
13       MS. FARLEY:  Okay.  It should be in the
14 chat.  I think this is the one.
15       REMOTE TECHNICIAN:  Please stand by.
16       (Exhibit 56 was marked for
17       identification and is attached to the
18       transcript.)
19       MS. FARLEY:  Okay.  Yes, this is
20 correct.  Thank you very much.
21       REMOTE TECHNICIAN:  Uh-huh.
22 BY MS. FARLEY:
23   Q.  Okay.  So what we have here, it looks
24 like a screenshot of a -- and I'll note for the
25 record this has been marked Exhibit 56.

40

1        We have a screenshot of a Microsoft
2 Teams chat and there's 11 participants, it looks
3 like, but on the screen you can see comments from
4 Mike Klein, yourself, and Nate Moll; is that
5 correct?
6    **A.  Yes.**
7    Q.  Okay.  Now, you mentioned that you once
8 started a conversation with some of the pro badger
9 people in the UK, and it's incredibly intense,
10 political issue that involves animal rights.  And
11 then you use an emoji that's kind of a grimace; is
12 that correct?
13   **A.  Yes.**
14   Q.  Why did the mention of animal rights
15 cause you to grimace and use that emoji?
16   **A.  Yeah.**
17   **What I was describing was an instance**
18 **from several years ago when I would have operated**
19 **the institutional Twitter account, and I believe**
20 **there was an issue in the UK that involved what I**
21 **believe was described at that point as a badger**
22 **cull, which I think was essentially -- and I'm --**
23 **I don't recall all these details, but sort of a**
24 **widespread kind of herding of -- of badgers in**
25 **England because of a disease that they carried.**

41

1  And I remember engaging in a conversation with
2  someone who was a -- a person who is a badger
3  supporter in England which, at the time, I didn't
4  understand or know very much about the issue.
5        UW Madison -- obviously, its mascot is
6  badger.  And so, you know, this would have been
7  several years ago.  But we engaged in a social
8  media direct message exchange that explained what
9  their situation was.
10        But as I mentioned, it -- it's,
11  obviously, extremely political in England and
12  extremely intense.
13        And I remember after, you know, just
14  asking a question or two, getting dozens of direct
15  messages from the -- the person that I was
16  corresponding with.
17     Q.  Okay.  So based on this, would you say
18  that animal -- animal rights are -- you know, in
19  this instance, animal badger killing, is a
20  political issue, as you state here?
21     A.  This specific instance in the UK over
22  this particular badger cull, yes, it was a -- a
23  political issue there.
24     Q.  Would you say that animal testing is a
25  political issue or a topic of public concern?

42

1     A.  Yes.
2     Q.  Okay.  Does the topic of animal rights
3  make you uncomfortable or do you have a negative
4  view of it?
5     A.  No, I don't -- I do not personally.
6     Q.  Do you have any personal beliefs
7  about -- or opinions about the testing at -- on
8  animals at UW institutions or elsewhere?
9     A.  I am generally supportive of UW
10  Madison's animal program because, you know, I
11  understand the information that we share to the
12  public as being accurate and true.
13     Q.  Okay.  So is it fair to say that you're
14  pro animal testing?
15     A.  I guess that's fair.
16     Q.  Okay.  And UW Madison, it's fair to say,
17  is a pro animal testing institution; is that also
18  correct?
19     A.  I think that's fair, yes.
20     Q.  Okay.  And back to the document itself.
21  In Exhibit 56, it looks like towards the end of
22  the chat, Mike Klein says that, quote, "Chris
23  Barncard cleaned [sic] out those animal rights
24  messages for us."
25        If you know, what did Mike mean by

43

1  "cleared out"?
2     A.  I -- I don't know in this instance.
3     Q.  Could it perhaps refer to some sort of
4  moderation?
5     A.  Best to ask Mike.  I wouldn't want to
6  speculate.
7     Q.  Okay.  And in this instance, it looks
8  like Chris Barncard was involved in moderating
9  social media on behalf of the university; is that
10  accurate?
11     A.  That appears to be what the -- the chat
12  would suggest, yes.
13     Q.  Okay.  And again, he's in the Research
14  division of the Department of Communications?
15     A.  Correct.
16     Q.  Okay.  Do you know if those messages
17  were targeted for moderation because they were
18  about the topic of animal rights?
19     A.  I -- I don't know what messages we're --
20  we're referring to here.  No.
21     Q.  Okay.  Okay.
22        It seems like Mike Klein here is saying,
23  "I haven't dived into our direct messages in a
24  week, but I see the animal rights folks haven't
25  let up a bit."

44

1        And Chris Barncard -- and then he also
2  then states, "Chris Barncard cleared out those
3  animal rights messages for us."
4        So, fair to say that the moderation was
5  directed at animal rights comments?
6     A.  I -- again, best to ask Mike.
7     Q.  Okay.
8        MS. FARLEY:  Joe, could you go ahead and
9  pull up 0 -- UW002, please.
10        (Exhibit 57 was marked for
11        identification and is attached to the
12        transcript.)
13     Q.  Okay.  This document has been marked as
14  Exhibit 57.  And this appears to be a screenshot
15  of the page settings for Facebook.  And is this
16  for the UW Madison account, presumably, if you
17  know?
18     A.  I'm having kind of a hard time seeing
19  it.  If it can be magnified.
20        REMOTE TECHNICIAN:  Which area of the
21  document would you like magnified?
22        THE WITNESS:  The -- sort of the middle.
23     A.  Yeah.  So to your question, yes, this
24  looks like these are account settings from the
25  UW Madison Facebook page.

**45**

1    Q.  Okay.  Now, for instance, is this a -- a
2  list of topics that UW Madison automatically
3  moderates?
4      For instance, you know, it says, "Hash
5  tag Fire Chief Roman, Biden, evers, Walker, Trump,
6  Donald Trump, Jr., animal testing, testing on
7  animals, animal research," et cetera.
8    **A.  So it's my memory of this area that**
9  **users would frequently -- in support of different**
10  **causes or topics, would essentially spam the page**
11  **with such a high number of comments on certain**
12  **topics that it would essentially prevent other**
13  **users from -- you know, on-topic posts, from**
14  **asking questions or engaging otherwise with the**
15  **university.**
16    Q.  Okay.  But are these topics that are
17  automatically moderated as off limits, for
18  example?
19    **A.  Yes.**
20    Q.  Okay.  Would you agree that these
21  automatic moderations prevent someone from
22  commenting on these topics?
23    **A.  Yes.**
24    Q.  Okay.  Can you explain to me how auto
25  moderation works, in your own words?

**46**

1    **A.  I am not an expert in auto moderation,**
2  **no.**
3    Q.  Okay.  Okay.
4      Would that be something that is more
5  appropriate for Nate Moll?
6    **A.  I -- yeah, I would defer to Nate on --**
7  **on how those specific processes work.**
8    Q.  Okay.  Now, who came up with the topics
9  that are listed -- or the content that's listed
10  here?
11    **A.  I don't specifically recall how this**
12  **list was built.**
13    Q.  Is it possible it was left up to Nate
14  Moll's discretion on handling the moderation for
15  the university?
16    **A.  My belief is probably that these were**
17  **topics that were off topic to post but were**
18  **frequently essentially spamming the page with some**
19  **frequency, in an effort -- so you can see some of**
20  **the different sites or petitions that were being**
21  **shared, to essentially allow us to, you know,**
22  **continue normal use of the page when these were**
23  **being spread on top of it.**
24    Q.  Okay.  So practically speaking, would
25  these auto moderations also block comments that

**47**

1  were on topic if they used any of these words?
2    **A.  I believe so, yes.**
3    Q.  Okay.  So practically speaking, how can
4  people express their views on animal testing if
5  the words "animal testing" are automatically
6  blocked?
7    **A.  I -- yeah, I don't really have an**
8  **answer.**
9    Q.  Is it fair to say that they could not
10  express their views on animal testing if the words
11  are automatically blocked?
12    **A.  Again, I defer to sort of Nate on how**
13  **the auto moderation would work.**
14    Q.  Do you think that this list of auto
15  moderation words gives people much room to
16  advocate their views on particular topics, such as
17  primates or animal testing when "primates,"
18  "experimenting," "animal testing," are all
19  automatically blocked?
20    **A.  I think people have many different**
21  **routes to express their views on these topics with**
22  **the institution.**
23    Q.  Are you referring to non-social media
24  ways to express their views?
25    **A.  I mean, I -- I think both through social**

**48**

1  media and non-social media routes.
2    Q.  If the words "animal testing" or
3  "testing on animals" are blocked, how could a
4  particular user post a comment on UW's site, even
5  if it was on topic, for example?
6    **A.  Again, I would defer all the auto**
7  **moderation specifics to Nate.**
8    Q.  Is it your understanding that auto
9  moderation prevents these words from appearing in
10  a particular post?
11    **A.  Yes.**
12    Q.  Okay.  I want to switch gears a little
13  bit and talk about your training.
14      MS. FARLEY:  We can remove the exhibit.
15    Q.  What relevant training have you received
16  about social media, specifically?
17    **A.  I'm not really aware that there is a lot**
18  **of training offered for social media.**
19    Q.  Okay.  And when you say "a lot of," is
20  there any?
21    **A.  I have not received formal training in**
22  **social media.**
23    Q.  Okay.  Have you received any formal
24  training in the First Amendment?
25    **A.  Not that I can recall.**

49

```
1     Q.  Okay.  I'd like to move on to the social
2  media policies or -- I shouldn't say "policies" --
3  statement, the university's official statement.
4         MS. FARLEY:  If, Joe, you could pull up
5     UW001, please.
6         REMOTE TECHNICIAN:  Please stand by.
7         (Exhibit 58 was marked for
8         identification and is attached to the
9         transcript.)
10        MS. FARLEY:  Thank you.
11 BY MS. FARLEY:
12    Q.  And this document has been marked
13 Exhibit 58.  So what you see in front of you
14 appears to be a screenshot of the university's
15 social media statement.
16        Is that accurate?
17    A.  Correct.
18    Q.  Okay.  Are you familiar with this
19 statement?
20    A.  Yes.
21    Q.  Okay.  Would you say that it accounts
22 for the university's official policy on social
23 media?
24    A.  The university doesn't have what we
25 would consider an official policy on social media.
```

50

```
1  The university has, like, a guiding statement on
2  social media, which is what you're -- you're
3  referencing.
4     Q.  Okay.  Do you know why there is no
5  policy?
6     A.  In my time sort of overseeing social
7  media, we've essentially put focus into
8  creating content, sharing content, building a
9  social media community, but policy development is
10 complex and time consuming and rather than go
11 through, like, a -- a lengthy process that was
12 essentially kind of overwhelming to the small
13 staff that we had in place, we worked with our
14 legal office to create a -- a guiding statement.
15    Q.  Okay.  And is the guiding statement what
16 you are referring to?
17        Is that on the screen here as
18 Exhibit 58?
19    A.  Yes.
20    Q.  Okay.  And is this how you -- is this
21 what you use or is this what your staff uses, I
22 should say, to ensure, when moderating comments,
23 that no persons or comments are singled out for
24 moderation based on a particular viewpoint?
25    A.  Until recently, this would have been the
```

51

```
1  guidance that we -- we used for content
2  moderation.
3     Q.  Okay.  And when you say "until
4  recently," are you referring to a memo issued by
5  the Office of Legal Counsel or Legal Affairs?
6     A.  Correct.
7     Q.  Okay.  Okay.
8         Do you believe that this statement
9  provides adequate notice to the public of what --
10 which comments may or may not be permissible or
11 deleted?
12    A.  I worked with -- we all worked with our
13 Office of Legal Affairs to create this statement.
14    Q.  Okay.  And would you agree that it
15 allows UW Madison to remove, quote, "any content
16 for any reason"?
17    A.  Correct.
18    Q.  Okay.  Now, did you ever provide a copy
19 of this statement to those that you supervise?
20    A.  I don't specifically recall training or
21 onboarding with Nate or Mike, but I believe we
22 would have discussed this approach before they
23 engaged in moderation.
24    Q.  Now, when you say "discussed this
25 approach," can you kind of describe for me what
```

52

```
1  you mean by that?
2     A.  I mean, we would have discussed this
3  statement as they moved into roles that oversaw
4  social media.
5     Q.  Okay.  Can you recall any specific
6  conversations about this?
7     A.  I mean, just that we would have
8  discussed, you know, the social media statement
9  and the approach to content moderation as part of
10 their onboarding as employees in social media.
11    Q.  Okay.  Have there been any revisions to
12 this statement since you've been with the
13 university?
14    A.  There is the additional interim guidance
15 from the Office of Legal Affairs.  That would have
16 come across, I believe, in the last year.
17    Q.  Does that supersede the social media
18 statement?
19    A.  That would be the -- the practice of our
20 office, to follow guidance from our Office of
21 Legal Affairs.
22    Q.  Okay.  In lieu of following the social
23 media statement or would you follow both?
24    A.  I mean, I -- again, we would sort of
25 defer to interim guidance that we received.
```

53

1     Q.  Okay.  Okay.  To your knowledge, has the
2  university ever considered revising this
3  statement?
4     A.  I don't recall.
5     Q.  What about adding to it or replacing it?
6     A.  I -- I don't have a recollection of
7  that, no.
8     Q.  And just switching gears a little bit.
9        Are there university employees that are
10 dedicated to reviewing the content of social media
11 posts?  Like, for instance, Nick Heynen.  I think
12 his title is social media and website specialist.
13    A.  Because of the -- the wide range of
14 demands on Nate's time, we started a group chat of
15 others who had posting responsibilities or
16 otherwise had some expertise in social media.
17 They would generally consult together on different
18 posts and strategies for where we would share
19 content.
20    Q.  Okay.  Would you say Mr. Heynen was
21 response -- one of those persons responsible for
22 looking at the content of social media postings or
23 social media comments?
24    A.  I would say that he was a participant in
25 a group chat.  He was not, and is not, a

54

1  university communications employee.  So he -- he
2  participated, I think, in those discussions.  It
3  wouldn't have been his formal job duty.
4     Q.  Okay.  What is Mr. Heynen's department?
5     A.  I believe he works in the Division of
6  Diversity.
7     Q.  Okay.  Okay.
8        Now, would you say -- is Nate Moll
9  responsible for reviewing the content of social
10 media comments on the university's institutional
11 web pages?
12    A.  Yes.
13    Q.  Okay.  Now, in this social media
14 statement, it says that the university can remove
15 speech that is injurious.  What does that mean to
16 you, if you know?
17    A.  I would defer to -- to Nate and how he
18 specifically applied that term.
19    Q.  So it's more up to his discretion?
20    A.  Again, I -- I don't think I've
21 specifically discussed the word "injurious" with
22 him.
23    Q.  Did you ever ask anyone to clarify
24 anything about the statement for you or what any
25 part of the statement meant?

55

1     A.  Not that I recall.
2     Q.  Did anyone ever ask you to clarify what
3  any part of the statement meant?
4     A.  Not that I recall.
5     Q.  Okay.
6        MS. FARLEY:  You guys want to take a
7  quick 10-minute bathroom break and we can go
8  back on the record at 11:22?
9        THE WITNESS:  Sure.
10       MS. LODAHL:  That sounds good.
11       MS. FARLEY:  Okay.  Great.
12       THE VIDEOGRAPHER:  We're going off the
13 record at 11:12 a.m. Central Time.
14       (Recess in proceedings.)
15       THE VIDEOGRAPHER:  We're going back on
16 the record at 11:22 a.m. Central Time.
17       MS. FARLEY:  Thank you.
18 Welcome back, Mr. Lucas.
19 Joe, if you could go ahead and pull up
20 UW0076, please.
21       REMOTE TECHNICIAN:  Okay.
22       (Exhibit 59 was marked for
23       identification and is attached to the
24       transcript.)
25       MS. FARLEY:  Okay.  Thank you.

56

1  BY MS. FARLEY:
2     Q.  We see here what has been marked as
3  Exhibit 59.  It's entitled -- it's a memo, and it
4  is regarding interim social media moderation
5  guidance.
6        Is that accurate?
7     A.  Correct.
8     Q.  Okay.  And I believe this is what you
9  were referencing a little bit earlier to when you
10 were talking about the -- when we were in the
11 context of discussions regarding the social media
12 statement; is that accurate?
13    A.  That's accurate, yes.
14    Q.  Okay.  Now, we -- this was addressed to
15 you and Charles Hoslet.
16       Are you familiar with this statement?
17    A.  Yes.
18    Q.  Okay.  Now, it's entitled "Interim
19 Social Media Moderation Guidance."
20       Is there permanent social media
21 moderation guidance that's going to be
22 forthcoming?
23    A.  It's -- I think a plan in the future
24 to -- to create permanent social media guidance,
25 yes.

57

1    Q.  And would that be a policy of some sort
2  or would it be more along the lines of another
3  memo?
4    A.  It hasn't been formulated yet, so I
5  can't answer that specifically.
6    Q.  Okay.  Okay.
7       So as with the social media statement,
8  in conjunction with the social media statement and
9  this interim social media moderation guidance, do
10  you believe that employees have enough assistance
11  in determining what is constitutionally
12  permissible in terms of social media moderation of
13  postings by the public?
14    A.  I believe this guidance is -- is helpful
15  for people to both accomplish their function and
16  also observe the First Amendment.
17    Q.  Okay.  So you believe it's -- it's
18  adequate to ensure protection of the public's
19  First Amendment rights?
20    A.  Yes.
21    Q.  Now, do you recall why you received this
22  memo?
23    A.  Not specifically.
24       I know, you know, this topic has,
25  obviously, been one that's been in the air, you

58

1  know, since the -- the filing of the suit; and,
2  you know, I believe there had been additional
3  requests that had come from either our office or
4  from other campus accounts to the office of legal
5  affairs for additional guidance.
6    Q.  Okay.  Okay.
7    A.  I did not specifically make a request
8  for it, I believe, but I believe they were
9  responsive to what they -- they had been
10  receiving.
11    Q.  Okay.  Okay.
12       So, perhaps, the social media statement
13  wasn't quite broad enough to cover some of the
14  situations they were encountering in particular
15  moderation instances?
16    A.  I think that's your own conjecture.
17    Q.  You had mentioned there had been
18  requests for additional guidance.  Is that a fair
19  statement of your testimony?
20    A.  I believe the Office of Legal Affairs
21  received questions, yes.
22    Q.  Okay.  Okay.
23       Now, did you provide a copy of this
24  guideline to those over whom you supervised?
25    A.  Yes.

59

1    Q.  And who was that?
2    A.  Nate and Mike.
3    Q.  Okay.  Do you recall having any
4  discussions with them about it?
5    A.  Yes.
6    Q.  And what were the nature of those
7  discussions?
8    A.  I think it centered around the -- sort
9  of the locus of the -- the guidance on topic and
10  off topic.
11    Q.  Okay.  Okay.
12       And were they asking for clarification
13  or what was -- what was discussed?
14    A.  I think simply sharing the document
15  and -- and talking about the "on topic" versus
16  "off topic" approach to content moderation.
17    Q.  Okay.  Was that something that was new
18  to Nate or Mike?
19    A.  I mean, obviously, we had applied --
20  they had applied the criteria that was in the
21  social media statement.  I think this gave a -- a
22  rule of thumb that was easy to -- to apply.
23    Q.  Okay.  Has this guideline undergone any
24  revisions, to your knowledge?
25    A.  Yes, I believe there is an additional

60

1  revision that was shared from the Office of Legal
2  Affairs within just the last few months.  And I
3  believe it specifically dealt with blocking users
4  on Twitter, if I recall.
5    Q.  Okay.  Okay.
6       MS. FARLEY:  Counsel, do you know if
7  that was produced in this litigation?  I
8  don't recall reviewing such a document.
9       MS. LODAHL:  I don't recall either.  I
10  suppose if it's related to -- I don't --
11  I'm -- I don't believe it has been produced.
12       I'd have to take a look at this document
13  that John is referencing to see if it's
14  responsive to any of your requests.
15       MS. FARLEY:  Okay.  Would you mind doing
16  that at -- whenever you get a chance?
17       MS. LODAHL:  You bet.
18       MS. FARLEY:  Okay.  Great.  Thank you.
19  BY MS. FARLEY:
20    Q.  Were you consulted or otherwise -- yeah,
21  I should just say consulted, in the creation of
22  this guidance?
23    A.  No.
24    Q.  Okay.  Now, this is entitled "Guidance."
25       Is -- to your knowledge, is compliance

61

1 mandatory?
2  A.  We would follow guidance from the Office
3 of Legal Affairs; but, again, it's guidance, and
4 it isn't -- it hasn't gone through sort of a
5 formal policy review, which would be a more formal
6 kind of statement or document.
7  Q.  Okay.  And when this guideline refers
8 to, quote, "social media managers," who is that
9 referring to?
10  A.  In -- my most direct view would be the
11 direct reports that I have who oversee social
12 media accounts for UW Madison.
13  Q.  Okay.  So primarily Mike and Nate, would
14 that be --
15  A.  Yes.
16  Q.  Could it also be referring to managers
17 of, like, the page for the Department of History,
18 for example, or other department pages?
19  A.  Yes.
20  Q.  Okay.  Now, the guideline indicates that
21 the purpose of each media page is, quote, "to
22 discuss information and developments related to a
23 specific department, lab, organization, and
24 et cetera."
25      Is that an accurate statement of what

62

1 the document says?
2  A.  Yes.
3  Q.  So if a post does not discuss
4 information or developments related to a specific
5 department, lab, or organization, is it your
6 understanding that the post must be removed?
7  A.  I'm sorry.  I don't understand your
8 question.
9  Q.  Sure.  Let me rephrase it.
10      So each page exists for a designated
11 purpose, according to this policy, and it's to
12 discuss information related to that department or
13 organization or lab.
14      Is your understanding that if the
15 post or -- I'm sorry, I should use the word
16 "comment."
17      If the comment that is made by a -- for
18 instance, a member of the public does not relate
19 to that purpose, is it your understanding that
20 comment must be removed?
21  A.  I see.
22      I see the second line as saying, social
23 media managers may remove posts --
24  Q.  Okay.
25  A.  -- or comments.

63

1  Q.  Okay.  So it's not -- is compliance
2 then -- it's not mandatory that the post be
3 removed, but it's at the discretion of maybe the
4 individual media -- social media moderator?
5  A.  That's correct.
6  Q.  Now, either before or after this
7 guidance was issued, have you ever contacted
8 anyone in the Office of Legal Affairs to discuss a
9 specific social media post?
10  A.  I have not.
11  Q.  Have you ever contacted anyone else,
12 like Charles Hoslet, to discuss a specific social
13 media comment?
14  A.  No.
15  Q.  Okay.  To your knowledge, has anyone you
16 supervised ever contacted the Office of Legal
17 Affairs regarding a specific social media comment?
18  A.  Again, better for -- for Nate and Mike
19 to -- to answer that question directly.
20  Q.  To your knowledge, are you aware that
21 they have or have not?
22  A.  I -- we've sought advice from the Office
23 of Legal Affairs on, like, a wide range of -- of
24 different questions, so it's -- yes, it's entirely
25 possible that we -- we might have sought guidance

64

1 from them on this as well.
2  Q.  Okay.  Now, what does -- the guideline
3 here, or the guidance here references viewpoint.
4 And what does that mean to you in this context?
5  A.  I'm sorry.  Can you point to the
6 specific paragraph?
7  Q.  Yeah.
8      MS. FARLEY:  Maybe we need to scroll
9 down a little bit.
10  Q.  So this particular paragraph that starts
11 with, "While social media managers may
12 moderate..." "...they may not moderate..." and
13 "...based on the viewpoint it expresses."
14      What does the word "viewpoint" in that
15 context mean to you?
16  A.  Yes.
17      I -- I think it means whether or not we
18 would specifically agree with the point of view
19 being expressed by the -- the commenter.
20  Q.  Okay.  Okay.
21      And in this guideline, it refers to
22 removing social media posts and hiding social
23 media posts.
24      MS. FARLEY:  I don't think it's visible
25 on the screen here.  Maybe we can zoom out a

65

1   little bit.
2        REMOTE TECHNICIAN:  I'm sorry,
3   Counselor.  Is there a location that you
4   would like me to zoom in on?
5        MS. FARLEY:  I'm looking for where it's
6   talking about removing or hiding social media
7   posts.  And it says -- I think it's the
8   paragraph that starts -- the fourth paragraph
9   down, "While social media managers may
10  moderate a post because it is off topic..."
11       Thank you.
12  BY MS. FARLEY:
13       Q.  This paragraph discusses the fact that a
14  social media manager may hide a post saying
15  "Taylor Swift is the B0mB," but cannot hide a post
16  that states, "Taylor Swift agrees that all
17  universities should stop torturing animals and
18  [sic] using them for research."
19       And it also -- you know, there's a
20  difference between hiding and removing a post.
21  And how is that done, in your experience?
22       What is the difference between the two?
23       A.  I -- I am not the one pushing the button
24  on these particular comments, so I would defer to
25  Nate in terms of how that's -- that's actually

66

1   managed.
2        Q.  Okay.  Okay.
3        I want to ask a little bit about auto
4   moderation.  And that is discussed --
5        MS. FARLEY:  If you wouldn't mind
6   scrolling down, Joe, a little bit.  Just to
7   the auto moderation section.  Perfect.
8        Q.  Has auto moderation changed after the
9   issuance of this guideline?
10       A.  No.  I believe auto moderation -- excuse
11  me -- auto moderation has stayed the same.
12       And I believe we were advised by counsel
13  to basically not change our -- our broad practices
14  after the -- the filing of the -- the lawsuit.
15       MS. LODAHL:  And I'm going to interject,
16  just to caution the witness that any
17  conversations with counsel are privileged, so
18  please do not provide answers that include
19  that content.
20       THE WITNESS:  Understood.
21  BY MS. FARLEY:
22       Q.  Yes.  And I will just also reiterate, I
23  do not want to hear about any attorney-client
24  privileged communications.  So just with that
25  understanding, as I go over this memo with you.

67

1        So in terms of auto moderation -- so
2   you -- you basically said it hasn't changed after
3   the issuance of the guideline.  Do you know
4   whether any new terms have been added to the auto
5   moderation feature?
6        A.  I don't know.
7        Q.  Okay.  Now, the second sentence in the
8   auto moderation sentence says, "If social media
9   managers are using auto moderation tools to filter
10  content other than profanity, please have them
11  contact Rachel Jeris or Craig Fischer in OLA."
12       Is that correct?
13       A.  Yes.
14       Q.  Would you agree that the -- Nate Moll
15  and the university's settings are auto moderating
16  content other than just profanity?
17       A.  Yes.
18       Q.  Do you know whether Nate Moll or Mike
19  Klein sought guidance from Rachel Jeris or Craig
20  Fischer in OLA?
21       A.  We're typically in touch with Rachel
22  Jeris and Craig Fischer in OLA, although I didn't
23  specifically participate in that conversation
24  about auto moderation with them.
25       Q.  Okay.  Do you know if Nate Moll inquired

68

1   about auto moderation?
2        A.  Best question for Nate.
3        Q.  Okay.  So -- let's see.
4        MS. FARLEY:  If you could scroll up a
5   little bit, Joe, that would be helpful.  I'm
6   sorry, scroll down.  Thank you.
7        Q.  Okay.  So this section is entitled
8   "Providing additional information."
9        And it says that, you know, "To the
10  extent that users post on-topic content that is
11  inaccurate, misleading or critical of UW Madison
12  or its sub units, social media managers may
13  respond with a reply or make a separate post."
14       Do you know if you have ever, or Nate or
15  Mike ever, responded to a critique of the animal
16  testing program with a reply or a separate post?
17       A.  So I -- I would think yes, that they
18  have probably replied in the past with accurate
19  information to a critique of the animal program,
20  yes.
21       Q.  Okay.  So this is an option -- the
22  university has the option of directly engaging or
23  putting out its viewpoint on animal testing by
24  replying to the comment or putting a separate
25  post; is that accurate?

---

**69**

1    A.  Yes.

2    Q.  Okay.  Do you use any third-party

3  resources or guidelines or anything similar that

4  guide your handling of social media in addition to

5  the social media statement and this policy -- I'm

6  sorry, this guidance memo?

7    A.  No.

8    Q.  Okay.  And other than what we've

9  discussed, and perhaps that document relating to

10  Twitter that you mentioned previously, is there

11  any other writing that in any way contributes to

12  your moderation decisions for social media posts?

13    A.  No.

14    Q.  Okay.

15    MS. FARLEY:  Joe, if you could pull up

16  UW0397, please.

17    REMOTE TECHNICIAN:  Please stand by.

18    (Exhibit 60 was marked for

19    identification and is attached to the

20    transcript.)

21    MS. FARLEY:  Okay.  This document has

22  been marked as Exhibit 60.

23    And Joe, if you could zoom in maybe on

24  the top couple e-mail chains, that would be

25  helpful.  Maybe a little more.  Yeah.  That

---

**70**

1  would be great.  It's a little small.

2  BY MS. FARLEY:

3    Q.  Mr. Lucas, can you see that okay?

4    A.  Better now, yeah.

5    Q.  Okay.  Now, this is an e-mail chain that

6  you are not, I don't believe, copied on here, but

7  I just wanted to ask you about it and get your

8  take.

9    Now, just going back, circling back to

10  our discussion regarding Kelly Tyrrell and Chris

11  Barncard.  Does Chris Barncard directly report to

12  you or to Ms. Tyrrell?

13    A.  To Ms. Tyrrell.

14    Q.  Okay.  Okay.

15    Now, it looks like Chris Barncard is

16  discussing a moderation decision on Facebook and

17  talking about, quote, "We do remove Facebook

18  comments that are threatening, abusive and

19  indecent -- and apply those standards more

20  strictly if the content of a comment is unrelated

21  to the post on which it was made."

22    Did I read that correctly?

23    A.  Yes.

24    Q.  So according to this, the university

25  applies a different standard based on the content

---

**71**

1  of the comment that was made?

2    A.  My reading of that is whether it was on

3  topic or off topic.  It's saying "unrelated to the

4  post on which it was made."

5    Q.  Okay.  Okay.

6    Is this standard a different one that

7  is -- than the one that's set forth in the

8  guidance memo or the social media statement?

9    A.  I believe that this is consistent with

10  the social media statement that we discussed

11  earlier.

12    Q.  Okay.  Okay.

13    And applying the standards more

14  stringently or strictly, if the content of the

15  comment is unrelated, do you believe that's

16  consistent with the statement and the Social Media

17  Guidance?

18    A.  I didn't write the comment from Chris

19  Barncard, but -- and I am not looking at the

20  social media statement in front of me, but I

21  believe that threatening, abusive, indecent and

22  off topic are all included in the social media

23  statement.

24    Q.  Okay.  Okay.

25    Now, just --

---

**72**

1    MS. FARLEY:  We can remove this exhibit

2  from the screen.  Thank you, Joe.

3  BY MS. FARLEY:

4    Q.  In general, do you view that the social

5  media statement and the Interim Social Media

6  Moderation Guidance Memo, do you think that those

7  are adequate to ensure that moderation is

8  viewpoint neutral in the eyes of a layperson?

9    A.  Yes.

10    Q.  Okay.  And do you view it as adequate to

11  ensure that particular comments aren't restricted

12  because of the content that they are expressing or

13  the viewpoint that they express?

14    A.  Yes.

15    Q.  Okay.  Have you received any -- any

16  training on how to define off topic or how to

17  define spam?

18    A.  Again, I'm not aware of what training

19  is -- is available on those topics or that there

20  is training available on those topics.

21    Q.  So do you know what standards that UW

22  employees use to determine when something is off

23  topic or spam?

24    A.  I would apply the -- you know, the

25  social media statement or the -- the interim

---

73

1  guidance policies.
2      Q.  Okay.
3      Q.  Now, I am not aware of another resource
4  that specifically defines those in, you know, a
5  more granular way.
6      Q.  I'm sorry, I cut you off a little bit.
7  Did you say you weren't aware of --
8      A.  I'm not aware of an additional document
9  or resource that would -- would provide more
10 guidance on that, no.
11     Q.  Okay.  Okay.
12         How would you personally define spam?
13     A.  I mean, off topic comments, you know,
14 is -- is defined in the interim guidance.  I don't
15 know.
16         I guess, I -- I have not really thought
17 of a -- a definition of spam.  It's one of these
18 things where I think typically we evaluate on a
19 case-by-case -- case-by-case basis and try to
20 apply our best judgment.
21     Q.  Okay.  Okay.
22         And the guidelines themselves, they do
23 not define spam; is that correct?
24     A.  That's correct.
25     Q.  Okay.  So you mentioned case-by-case

74

1  basis and using the best judgment.  It's -- it's
2  up to the individual employee who's doing the
3  moderation to make that decision and
4  determination?
5      A.  I guess, just to clarify, are you asking
6  about how to determine whether something is -- is
7  on or off topic?
8      Q.  I was referring more to spam.
9      A.  Right.
10         Yeah, I -- I think it would be up to
11 the -- the employee to judge on a case-by-case
12 basis.
13     Q.  Okay.  Okay.
14         Now, switching gears a little bit, I
15 want to talk a little bit about compliance.
16         Who is responsible for ensuring that the
17 social media statement or the interim guidance is
18 complied with?
19     A.  I mean, generally that would be my
20 responsibility or the responsibility of University
21 Relations as a whole.
22     Q.  Okay.  And how does University Relations
23 fit in?
24     A.  Charles Hoslet is the Vice Chancellor
25 for University Relations.  That's the umbrella

75

1  that oversees University Communications.
2      Q.  Okay.  Okay.
3          And do you know if there are any audits
4  of how the social media statement or interim
5  guidance are applied or enforced?
6      A.  No, I -- I don't believe that there have
7  been audits.
8      Q.  Okay.  Any compliance reviews?
9      A.  No.
10     Q.  Can you give an example of a time, for
11 whatever reason, a social media comment by the
12 public was improperly moderate or blocked?
13     A.  No, I personally can't, no.
14     Q.  Okay.  Do you know if there have been
15 posts that have ever been inappropriately
16 moderated or blocked?
17     A.  I don't spend time directly on
18 content -- you know, review of content moderation,
19 so I would defer to Nate or Mike.
20     Q.  So it hasn't come to your attention that
21 there's been any improper blocking?
22     A.  No.
23     Q.  Have you ever had any occasion to have
24 to speak with or otherwise communicate with a
25 subordinate about their moderation practices being

76

1  inconsistent with the policy or guidance?
2      A.  No.
3      Q.  Has Nate Moll or Mike Klein -- have they
4  ever expressed to you that they are running into
5  any situations in terms of moderation that they
6  don't feel comfortable handling because they don't
7  have enough guidance?
8      A.  No.
9      Q.  Okay.  And if anything, what more could
10 University of Wisconsin-Madison do to help ensure
11 that you and those under your supervision do not
12 improperly moderate a social media comment?
13     A.  I think that's what has been challenging
14 about the social accounts.  Over a period of time,
15 it's just both the -- the high degree of -- or the
16 large number of comments that were being received
17 and the fact that the university was in the middle
18 of trying to communicate with the public and
19 stakeholders about the pandemic, about, you know,
20 racial justice issues across, you know, 2020 and
21 2021.  So the team, I'll say, has been -- is
22 probably overwhelmed by the -- the amount of tasks
23 that they were being asked to do.  And then, you
24 know, the number of -- the sheer number of
25 comments that have kind of been applied onto the

77

1   accounts.
2       Q.  Okay.  Is it fair to say that based on
3   the social media guidance memo we looked at
4   earlier, that a post that's off topic does not
5   have to be moderated, it can be moderated, but
6   it's up to the discretion of the individual
7   reviewing the post?
8       A.  That's correct.
9       Q.  Okay.  Is it your understanding that a
10  public comment on the university's social media
11  pages on Instagram or Facebook could constitute
12  constitutionally-protected speech?
13      A.  Yes.
14      Q.  Okay.  And, to your knowledge, are your
15  employees, your direct reports, aware that
16  moderating social media posts could conceivably
17  violate the First Amendment?
18      A.  I think my employees are aware of the
19  First Amendment and their obligations to preserve
20  the speech rights of people who engage with us on
21  social media, yes.
22      Q.  Okay.  Now, to -- to the best of your
23  layperson's knowledge, what does the First
24  Amendment prohibit you from doing in relation to
25  moderation of social media?

78

1           MS. LODAHL:  I object to the extent that
2   it calls for a legal conclusion.
3           But the witness can answer as to his
4   layperson's understanding.
5       A.  I mean, I -- I generally understand the
6   First Amendment and the rights of free speech,
7   free expression, assembly, religion, redress of
8   grievances to the government.
9       Q.  In terms of specifically as it relates
10  to moderation, what's your understanding of how
11  the First Amendment impacts that?
12      A.  My understanding is that -- that posts
13  and comments, on-topic comments would constitute,
14  like, a limited public forum to engage with the
15  university and post comments.
16      Q.  Okay.  Now, switching gears, I want to
17  talk a little bit about the plaintiff in this
18  lawsuit, Ms. Madeline Krasno.
19          Do you know who Ms. Krasno is?
20      A.  I am aware of who she is, yes.
21      Q.  And have you ever communicated directly
22  with Ms. Krasno?
23      A.  I have not.
24      Q.  Okay.  Have you ever personally made a
25  decision to moderate anything that Ms. Krasno has

79

1   posted on any UW site?
2       A.  Not that I recall.
3       Q.  Before Ms. Krasno filed suit, did you
4   ever engage in any communication or were you
5   ever -- did you ever receive any communications
6   about Ms. Krasno?
7       A.  Not that I recall.
8       Q.  Okay.  Were you aware of Ms. Krasno
9   before she started posting on UW's main Facebook
10  and Instagram accounts?
11      A.  No.
12      Q.  Okay.
13          MS. FARLEY:  Joe, could you please pull
14  up UW0657.
15          REMOTE TECHNICIAN:  Stand by.
16          (Exhibit 61 was marked for
17          identification and is attached to the
18          transcript.)
19  BY MS. FARLEY:
20      Q.  This is -- has been marked as
21  Exhibit 61, and it's an e-mail exchange.  And you
22  are not involved in the e-mail exchange.
23  Ms. Tyrrell and Mr. Barncard are, along with
24  Allyson Bennett and Nadine Connor.
25          Do you know -- oh.  And -- I

80

1   apologize -- as well, Jon Levine.
2           Do you know who Allyson, Nadine and Jon
3   are?
4       A.  Yes.
5       Q.  Could you give a brief description of
6   their roles?
7       A.  Sure.
8           I believe Jon Levine directs the primate
9   center, Nadine Connor directs the animal program
10  and the Office of the Vice Chancellor for Research
11  and Graduate Education, and Allyson Bennett has
12  served as a communications lead and spokesperson
13  in educating the public about the animal program.
14      Q.  Okay.  Okay.  Now, this particular
15  e-mail chain at the top from Christopher Coe --
16  and who is Christopher Coe?
17      A.  I don't know, actually.  I believe a
18  faculty member.
19      Q.  Okay.  Mr. Coe writes an e-mail on
20  September 16th, 2020, and it looks like this chain
21  is regarding Madeline Krasno and her time as a
22  student when she worked at the primate lab.
23          Do you know what current comments --
24  they're talking about Ms. Krasno's recent public
25  comments in the third -- I'm sorry, in the fourth

81

1  paragraph down.  It says, "Her recent public
2  comments have been more general about the ethics
3  of keeping animals in captivity rather than
4  specific incidents."
5       Do you see that?
6  **A.  Yes.**
7  Q.  Do you know what recent public comments
8  this e-mail is referring to?
9  **A.  Not specifically, no.**
10  Q.  Okay.  I'll represent to you that in
11  UW's sworn responses to interrogatories, number --
12  Interrogatory No. 3, UW responded that the first
13  time it restricted Ms. Krasno's account on
14  Instagram was in late September of 2020.
15      So it looks like, to me, this particular
16  communication about Ms. Krasno occurred before
17  late September.  So there was some chatter about
18  Ms. Krasno prior to the moderation decision on her
19  Instagram account.
20      Does that sound fair?
21  **A.  I wasn't involved in either that**
22  **specific moderation decision or this thread that**
23  **you are asking about.**
24  Q.  Okay.  Okay.
25      Is -- so was Ms. Krasno's account -- we

82

1  spoke earlier in the week to Mr. Moll.  I'm sure
2  you're aware that he was deposed.  And he said
3  that Ms. Krasno's account was restricted on
4  Instagram based on her repeated off-topic
5  comments.
6       Did he ever discuss this with you before
7  placing Ms. Krasno's account on restricted basis?
8  **A.  Not that I recall.**
9  Q.  Has Ms. Krasno been restricted based on
10  her past comments on social media or comments in
11  the media?
12  **A.  Again, I -- I don't recall discussing**
13  **Ms. Krasno's account restrictions.**
14  Q.  Okay.  So fair to say, you really have
15  no involvement in Ms. Krasno's particular
16  restrictions or moderating her comments?
17  **A.  The only -- well, the only piece that I**
18  **can say specific to Ms. Krasno is I -- I recall a**
19  **conversation about our Instagram and the way that**
20  **we were being tagged in her posts and how that --**
21  **they were surfacing -- I believe it's called,**
22  **like, the Instagram grid, and they were surfacing**
23  **and appearing in front of a wider number of users.**
24  **I don't recall specifically when that**
25  **occurred.**

83

1  Q.  Okay.  And was there concern about her
2  tagging UW in her Instagram posts?
3  **A.  I would say yes, because I believe that**
4  **they were off-topic comments and they were**
5  **surfacing in front of a wide number of users.**
6  Q.  Okay.  Do you recall what was done about
7  that in that situation?
8  **A.  I -- I don't recall any specific account**
9  **restriction discussion.**
10  Q.  Was -- were the posts untagged, if you
11  know?
12  **A.  I -- I don't know.**
13  Q.  Okay.  As far as you're aware, does the
14  University Communications Department approve of
15  Ms. Krasno's criticism of the animal labs and UW's
16  animal testing program?
17  **A.  I mean, the office doesn't have an**
18  **opinion about Ms. Krasno or her activism.**
19  Q.  Are you generally familiar with
20  Ms. Krasno's posts on social media, the nature of
21  them?
22  **A.  Yes.**
23  Q.  Do you consider Ms. Krasno's
24  comments on Facebook or Instagram to be
25  inappropriate?

84

1  **A.  I believe there were comments that were**
2  **made that were off topic and where the -- both the**
3  **social media statement or the interim guidance**
4  **were applied.**
5  Q.  Okay.  Do you consider them to be -- do
6  you consider her comments to be in any way
7  unprofessional?
8  **A.  What is like the -- I don't know what**
9  **"unprofessional" means.**
10  Q.  Well, let's go at it from this way:
11  What -- would you consider any of her comments to
12  have been spam?
13  **A.  I know that -- and, I guess, I wouldn't**
14  **restrict this opinion just to Ms. Krasno, but I**
15  **know that there were a large number of off-topic**
16  **posts that were -- I'm sorry -- off-topic comments**
17  **that were posted across a wide range of university**
18  **communications posts on Facebook and Instagram,**
19  **and that the volume of those posts, you know,**
20  **prevented other users from engaging with the**
21  **university or receiving information about our**
22  **programs or services.**
23  Q.  Has Ms. Krasno ever made a threatening
24  post on Facebook or Instagram?
25  **A.  I don't know.**

**85**

1    Q.  What about a profane post?

2    **A.  I -- I don't know.**

3    Q.  Okay.  How about obscene?

4    **A.  I -- I didn't review her individual**

5 **posts or content, so I can't really speak to it.**

6    Q.  Okay.  What about injurious or illegal?

7    **A.  Again, I don't know the answer to that.**

8    Q.  Okay.  In violation of intellectual

9 property rights or privacy laws?

10    **A.  I don't know.**

11    Q.  And what about commercial or promotion

12 of organizations or programs not related to or

13 affiliated with the university?

14    **A.  Again, I don't know.**

15    Q.  Okay.  Okay.  Have you ever had an

16 occasion to be in contact with a student newspaper

17 group about Ms. Krasno?

18    **A.  I believe our office would have**

19 **responded to questions from the media, including**

20 **student newspapers.**

21    Q.  Okay.  Could you elaborate on that a

22 little bit?

23    **A.  Again, the function of our office would**

24 **be to answer questions from the media, you know,**

25 **whether it's about, you know, this particular**

**86**

1 **lawsuit or whether it was about Ms. Krasno's**

2 **activism.**

3    Q.  Okay.  Okay.

4       MS. FARLEY:  Joe, could you go ahead and

5 pull up Exhibit UW0026, please.

6       (Exhibit 62 was marked for

7       identification and is attached to the

8       transcript.)

9 BY MS. FARLEY:

10    Q.  Okay.  This document has been marked as

11 Exhibit 62, and it's an e-mail exchange.  It says,

12 "Re: Rise for animals-UW-Madison Social Media

13 Workshop."

14       Is that accurate?

15    **A.  Yes.**

16    Q.  And the bottom chain is from Allyson

17 Bennett and it looks like to you, among other

18 recipients, including Chris Barncard and Kelly

19 Tyrrell.  And it's -- it says, "FWIW from AMP." I

20 assume, that's "for what it's worth from AMP."

21       What does AMP stand for, if you know?

22    **A.  I don't know exactly what that acronym**

23 **is.**

24    Q.  Okay.  So it seems to be that this

25 e-mail is forwarding something put out by Madeline

**87**

1 Krasno talking about how excited she is to be

2 co-hosting a workshop with Rise for Animals.

3       MS. FARLEY:  And, Joe, if you could

4 scroll up a little bit, please.  Thank you.

5    Q.  So here, essentially Ms. Bennett is

6 alerting the Communications department by, you

7 know, forwarding this to Kelly Tyrrell, and you

8 and others on the e-mail chain, that Ms. Krasno

9 will be hosting an on-line workshop.  Is that

10 accurate?

11    **A.  Yes.**

12    Q.  Okay.  And Kelly Tyrrell then thanks

13 Ms. Bennett for bringing it to the group's

14 attention; and she says she's going to copy Nate

15 Moll, who runs a number of our institutional

16 accounts and also helps us monitor and respond to

17 campaigns.

18       So what exactly does that entail, when

19 you monitor and respond to campaigns?

20    **A.  Sure.**

21       **So it's been my experience over time,**

22 **whether with this group or others, like PETA, that**

23 **there are different campaigns or sort of**

24 **particular areas of focus that they have that**

25 **would manifest themselves, either from press**

**88**

1 **releases or things that they would send into the**

2 **media, or, you know, in other cases, you know,**

3 **campaigns that would, you know, basically try to**

4 **generate a large number of users to, you know, tag**

5 **our posts.  In other cases, we received, you know,**

6 **a large amount of unsolicited e-mail, for**

7 **instance.**

8       **So generally, the institution likes to**

9 **be aware of these different campaigns from, you**

10 **know, not only animal groups but others so,**

11 **ideally, we can prepare and provide information**

12 **about our activities in answer to their questions**

13 **or, frequently, in an effort to clarify**

14 **misinformation that's being spread about the**

15 **institution.**

16    Q.  Okay.  Are any posts hidden simply

17 because they are part of a campaign, for instance?

18    **A.  I don't believe so, no.**

19    Q.  Are you of the opinion that Ms. Bennett

20 is an animal testing advocate, would you say?

21    **A.  I'm aware that she has been active on**

22 **animal testing issues, yes.**

23    Q.  Okay.  And I'll represent to you that

24 her most recent Twitter post was promoting a

25 roundtable discussion in which she was to

89

1  participate to, quote, "Learn how to effectively
2  advocate for your work in the face of increasing
3  threats to responsible primate research."
4          And I'll represent to you --
5      **A. I'm sorry. Just to clarify, who -- who**
6  **are we speaking of specifically, Ms. Krasno?**
7      Q. No. Ms. Bennett, Allyson Bennett.
8      **A. Oh, yes. Okay. Sorry.**
9          **Just to revise, Allyson Bennett is a**
10 **faculty member and a spokesperson for the animal**
11 **program at UW Madison. So, yes, she is an**
12 **advocate for the animal model here.**
13     Q. Okay. Okay.
14         And I'll represent to you she's a
15 chief -- chief contributor to the International
16 Animal Research Advocacy Group, speaking of
17 research, and those articles used to be regularly
18 retweeted by UW-Madison Science's official Twitter
19 handle.
20         Do you ever recall anyone approaching
21 the Communications Department and requesting that
22 you more carefully scrutinize or moderate
23 Ms. Bennett's posts about animal testing?
24     **A. Not that I recall, no.**
25     Q. Do you agree that viewpoint neutrality

90

1  is important?
2      **A. Yes.**
3      Q. Okay.
4          MS. FARLEY: Let's go ahead and pull up,
5      Joe, Exhibit UW0525, please.
6          REMOTE TECHNICIAN: Stand by.
7      Q. Okay. And this is what has been marked
8  as Exhibit 53. And it looks like an exchange here
9  that -- another exchange that you are not copied
10 on, but it involves Ms. Tyrrell and Chris Barncard
11 and Jordana Lenon and Cherise M. Caradine.
12         MS. FARLEY: And, Joe, if you could
13     scroll down a bit, that would be helpful.
14     Q. So it looks like Jordana Lenon is the
15 senior editor of Public Information and Outreach
16 for the WNPRC; is that right?
17     **A. Yes.**
18     Q. Okay.
19         MS. FARLEY: And you can zoom out again,
20     Joe. Thank you.
21     Q. So it looks like Ms. Lenon forwarded or
22 sent an e-mail to some folks, Cherise Caradine and
23 Mark Lovicott, who are both with the UW Madison
24 Police Department.
25         MS. FARLEY: Could you, Joe, scroll up a

91

1  little bit.
2      Q. So it says, "Jordana, thank you for
3  forwarding this on. We have had our intelligence
4  detectives monitoring activity and I have
5  forwarded this to them. I have requested
6  additional information on the person who posted.
7  Since it is the weekend, they are out of the
8  office, but I will link you in when I get
9  additional information. Mark is the expert in the
10 social media area, so I will let him discuss that
11 side of it."
12         So, basically, Ms. Lenon is telling
13 people -- and telling the police, I should say,
14 that people are being inappropriate on the WNPRC's
15 Facebook and Twitter pages relating to inciteful
16 comments, and she also had relate -- mentioned it
17 was related to PETA allegations.
18         MS. FARLEY: Joe, could you scroll down
19     a little bit.
20     Q. So is that a fair characterization of
21 the situation that's going on in this e-mail
22 exchange?
23     **A. I mean, yes, with the caveat that I**
24 **wasn't on this thread and I'm not actually seeing**
25 **the -- the comments or the attachments of what**

92

1  **she's -- she's talking about.**
2      Q. Okay. Fair enough.
3          So -- and Ms. Lenon states in the bottom
4  paragraph here, "As the manager of a public
5  university's center's social media sites, we are
6  not in the habit of selectively deleting comments
7  we don't like. Most of the likes and shares, even
8  on this issue, have been supportive ones, because
9  we posted the university's response, and it
10 generated the most likes and shares when compared
11 to animal-rights-toned comments."
12         She then states that back in 2017
13 negative comments became so frequent on an issue
14 that she felt it was harassment, and so she banned
15 the comments. And she appears to say that she may
16 do it again.
17         It sounds, to me, here that there are a
18 bunch of advocates on opposite sides of an issue
19 with one side getting unhappy and banning the
20 other side when the negativity becomes too in- --
21 too frequent.
22         Do you agree with that?
23     **A. I -- I mean, I can't really speak to the**
24 **practice of a -- you know, another manager in a**
25 **different arm of the institution.**

93

1    I -- I mean, the context to this
2  exchange, though -- I guess, I could say that I'm
3  personally aware of a number of instances where
4  activists have, you know, harassed and abused
5  university scientists, you know, probably both on
6  social media and in person, in real life, but
7  it's -- you know, it's caused the account manager
8  at the primate center to be in direct touch with
9  the University Police Department, you know, to
10 consult on safety and security.
11    Q.  Okay.  Has your department, to your
12 knowledge, ever used the police to investigate
13 individuals who have posted or commented on the
14 UW's official social media sites?
15    A.  I -- I don't recall a specific instance,
16 but if we received what appeared to be a directed
17 threat or harassment, that -- that could be an
18 option, to -- to ensure the safety and security of
19 either scientists or -- or people at the
20 institution.
21    Q.  Okay.  Do you believe the manner in
22 which Jordana handled this, you know, banning
23 comments because it was harassment, do you believe
24 that that was proper?
25    A.  Again, I don't see the posts.  I don't

94

1  really have the -- the sort of full thread to know
2  what she was reacting to.
3       But, in general, again, the consultation
4  between the animal program and our -- our security
5  has been important for the -- the protection of
6  our -- our faculty and staff.
7    Q.  Okay.  Okay.
8       MS. FARLEY:  Let's move on to UW0626,
9  please.
10      (Exhibit 63 was marked for
11       identification and is attached to the
12       transcript.)
13 BY MS. FARLEY:
14    Q.  Okay.  This has been marked as
15 Exhibit 63.  It's a -- an e-mail with the subject
16 line "Social comment management update," and it's
17 from Nate Moll.
18      Do you see that?
19    A.  Uh-huh.  Yes.
20    Q.  Okay.  Now, I'll represent to you the
21 lawsuit in this case was filed on February 10th of
22 2021, and here this e-mail is dated February 11th
23 of 2021.
24      And Nate Moll e-mails Jason Gohlke,
25 Kristina LeVan and Nick -- Nick Heynen saying that

95

1  he'd like to simplify things within the team and
2  reassign all Facebook and Instagram comment
3  moderation duties to himself.  And he says they're
4  receiving this message because they're a current
5  account manager for @UWMadison.
6       What does it mean to be a current
7  account manager?
8    A.  Yeah.  So during the period of the
9  pandemic, like I referenced earlier, the
10 institution not only had the obligation to
11 provide, you know, a wide -- or a large amount of
12 public information, which we disseminated over
13 social media, but we also received, likely, you
14 know, thousands -- or tens of thousands of
15 comments, you know, related to, you know,
16 different issues in the news in 2020; the
17 pandemic, George Floyd, Jacob Blake situation in
18 Kenosha, the election.  And so we -- there was a
19 point, and I don't recall specifically when this
20 was, but that, you know, we basically understood
21 that it was unmanageable for just a person or two
22 to, you know, fully deal with the things that
23 needed to be posted across our social properties
24 but also handle, you know, response, you know,
25 when there were specific questions about our

96

1  policies with regard to the pandemic or
2  moderation.
3       And so the solution to this problem was
4  to give access to the account to the three
5  individuals on the "to" line of this e-mail
6  message, and basically expand their duties to
7  occasionally pitch in and assist Nate.
8       And so I think what this -- this e-mail
9  is saying is that they could continue to post, but
10 in the occasions where they were being asked to do
11 any content moderation, he's directing them to no
12 longer do so.
13    Q.  Okay.  Okay.
14       And what departments are Jason Gohlke,
15 Kristina LeVan and Nick Heynen a part of?
16    A.  So Jason and Kristina are both also in
17 University Communications.
18       As I mentioned previously, Nick Heynen
19 is a social media specialist who works in the
20 division of Diversity, Equity and Educational
21 Achievement.
22    Q.  Okay.  Now, did the lawsuit raise
23 concerns within the department that employees
24 responsible for moderation had been doing it
25 inappropriately and that's why they limited --

97

1    wanted to limit it to Mr. Moll going forward?
2        A. You know, I think at this point Nate was
3    trying to, as he suggests in the message, simplify
4    things. So those were not duties or
5    responsibilities that anyone else would need to
6    take on, other than himself.
7        Q. Was the social media statement being
8    enforced uniformly, to your knowledge?
9        A. You know, again, we received tens of
10   thousands of comments, you know, and many of which
11   may have come from animal advocates. I believe on
12   a best-effort basis, that they -- you know, they
13   did the best they could to -- to uniformly
14   moderate comments.
15       Q. Okay. Okay.
16           Now, why was Mr. Moll selected to be the
17   one to moderate the comments, and then with you
18   and Mike as backup support?
19       A. I mean, his primary function is to be
20   the -- the social media manager.
21           Mike is responsible for a wider range of
22   duties that involve news distribution and editing,
23   and I have a wider range of duties beyond that to
24   communicate on, you know, any number of topics,
25   including with the -- the media or public.

98

1        Q. Okay. Okay.
2            So what did it mean that you would
3    provide, quote, "backup support" to -- to Nate?
4        A. The three of us, I think, are -- you
5    know, had the most experience and sort of the most
6    knowledge on the accounts, so we opted to, you
7    know, again, simplify and leave most of that duty
8    with him.
9        Q. Okay. So if he needed something, he
10   could come to you for backup support?
11       A. Yeah, with a -- a question or, you know,
12   a -- or if -- you know, frequently there would be
13   cases where -- I think, you know, nights and
14   weekends or things where he asked Mike to -- to
15   conduct either posting or moderation on his
16   behalf.
17       Q. Okay.
18           MS. FARLEY: Joe, could we pull up
19   UW0341, please.
20           MS. LODAHL: Counsel, I wonder if now
21   might be a good time to take a lunch break
22   for the group. I'm not sure where you are at
23   in your outline. We're getting on to 12:30
24   here in Wisconsin.
25           MS. FARLEY: Sure. Sure. Yeah. That

99

1    would be fine. How long would you like to
2    take?
3            MS. LODAHL: Well, I do want to look
4    into the document that we discussed earlier
5    and, you know, see if that's something that
6    should be provided before we wrap up this
7    deposition today.
8            Would 45 minutes be appropriate?
9            MS. FARLEY: Yeah.
10           Does that work for you, Mr. Lucas?
11           THE WITNESS: Yep.
12           MS. FARLEY: Okay. Great.
13           Well, why don't we round up and say 1:15
14   Central that we resume.
15           MS. LODAHL: Perfect.
16           THE VIDEOGRAPHER: We're going -- are
17   you going off now?
18           MS. FARLEY: Yes.
19           THE VIDEOGRAPHER: We're going off the
20   record at 12:26 p.m. Central Time.
21           (Luncheon Recess.)
22           THE VIDEOGRAPHER: We're going back on
23   the record at 1:16 p.m. Central Time.
24   BY MS. FARLEY:
25       Q. All right. Good afternoon, Mr. Lucas.

100

1    Back on the record here.
2            MS. FARLEY: Joe, could you go ahead and
3    pull up UW0341, please.
4            REMOTE TECHNICIAN: 3-4-1, Counselor?
5            MS. FARLEY: Yes.
6            REMOTE TECHNICIAN: Thank you.
7            (Exhibit 64 was marked for
8            identification and is attached to the
9            transcript.)
10           MS. FARLEY: Okay. Thank you.
11   BY MS. FARLEY:
12       Q. Okay. So this document has been marked
13   as Exhibit 64. And, generally speaking, it
14   appears that we're looking at a comment section to
15   an Instagram post by the UW Madison.
16           Is that correct?
17       A. Yes.
18       Q. Okay. Now, some of the comments are
19   grayed-out or hidden. Is that correct as well?
20       A. Yes.
21       Q. I'll represent to you that the
22   university produced these comment sections as
23   instances of comments that were moderated by
24   university employees.
25           So the yellow box means that they were

101

1 auto-moderated by the auto moderation feature as
2 opposed to manually hidden, for example.
3        So we're looking here at -- in the
4 yellow box at a couple comments, one from
5 therealandrewpeterson and one from CFacktor. Take
6 a moment to familiarize yourself with these
7 comments.
8        Have you had a chance to read them?
9    **A. Yes.**
10   Q. Okay. Are those comments considered
11 off topic, in your opinion?
12   **A. I -- I mean, I generally am not the one**
13 **making, you know, those moderation decisions, so I**
14 **would defer to Nate and Mike.**
15   Q. But you have read the off-topic legal
16 guidance memo; is that correct?
17   **A. Yes.**
18   Q. So if you had to apply it here, in this
19 instance, would you say that they're off topic or
20 on topic?
21   **A. I guess, if I was going to apply**
22 **these -- I mean, sometimes it's very difficult to**
23 **tell what specifically, you know, the -- the**
24 **posters are referencing.**
25        **So I guess -- I mean, I guess Andrew**

102

1 **Peterson and CFacktor are -- yeah, I -- I don't**
2 **have an opinion on Andrew Peterson. I guess**
3 **CFacktor looks like it would be on topic because**
4 **it's referencing a protest.**
5    Q. Okay.
6    **A. I have a hard time sort of understanding**
7 **Steve_go_wild and sort of -- that seems like**
8 **that's referencing a previous comment and not the**
9 **actual post itself.**
10   Q. Yeah, we can -- I -- apparently, the
11 blue box doesn't reflect any moderation decision.
12 It's just the yellow box that would reflect that
13 the comments were moderated.
14        In terms of determining what's on or off
15 topic, he said it's sometimes kind of hard to tell
16 what the posters are getting at.
17        Is it kind of a discretionary decision
18 in terms of on or off topic?
19   **A. Well, very much so in the fact that, you**
20 **know, again, the staff is trying to moderate,**
21 **like, literally hundreds or thousands of -- of**
22 **comments and, you know, apply consistently a**
23 **standard of -- of on or off topic.**
24   Q. And going back to that memo, that
25 guidance memo that we had referenced and spoken

103

1 about earlier, it's true that if a comment is off
2 topic, it does not have to be moderated; is that
3 correct?
4    **A. That's correct.**
5    Q. Okay. Is the fact that a post is
6 political, is that enough to remove the -- and I
7 should say "comment," not "post."
8        Is the fact that a -- a comment is
9 political enough to have it moderated?
10   **A. No.**
11   Q. There has to be something more?
12   **A. It would have to comply with the -- the**
13 **social media statement or the interim guidance**
14 **most recently.**
15   Q. Is being critical of the university
16 enough for the UW Madison to remove the post?
17   **A. No.**
18   Q. And would you say that
19 therealandrewpeterson's post was critical of the
20 university?
21   **A. I guess, I can't make a value judgment**
22 **on that. It's -- it's really kind of hard to**
23 **parse to my eye. Yeah.**
24   Q. He's saying he's so glad that he forever
25 left the UW -- "this place," I should say, which

104

1 presumably refers to the UW.
2    **A. He's so glad that he left with a degree**
3 **and that he had a positive experience. I mean, I**
4 **guess I -- it sort of illustrates the challenge**
5 **that I see with -- with trying to -- you know, in**
6 **making these decisions.**
7    Q. Right.
8    **A. "I'm so glad I graduated," positive**
9 **statement.**
10   Q. Okay. So it -- fair to say that it --
11 lots of comments are open to interpretation?
12   **A. Yes.**
13   **And they're evaluated on a case-by-case**
14 **basis.**
15   Q. In general, under UW's social media
16 statement, though, the university has the right to
17 remove a post for any reason; is that correct?
18   **A. Yes.**
19   Q. Okay.
20        MS. FARLEY: Now, let's go to UW0313,
21 Joe, please.
22        REMOTE TECHNICIAN: Please stand by.
23        (Exhibit 65 was marked for
24        identification and is attached to the
25        transcript.)

105

1  BY MS. FARLEY:
2      Q.  Okay.  This has been marked as
3  Exhibit 65, and it appears to be an Instagram post
4  by the University of Wisconsin-Madison with a
5  couple comments beneath it.  Is that accurate?
6      **A.  Yes.**
7          THE WITNESS:  Could -- could you magnify
8  the -- the grayed-out box is hard to read.
9  Thank you.
10         MS. FARLEY:  And, Joe, if you could just
11 zoom out a little bit so we can see the
12 original post as well, that would be great.
13 BY MS. FARLEY:
14     Q.  Okay.  So it looks like the post here --
15 well, first of all, do you recall ever reviewing
16 the specific post or comment by Ms. Krasno?
17     **A.  I did not.**
18     Q.  Okay.  So Ms. -- excuse me.
19         The post is talking about Scout, a
20 7-year-old Golden Retriever, and his oncologist at
21 the University School of Veterinary Medicine, who
22 had a very rare form of canine cancer and he was
23 treated by UW.
24         And then Ms. Krasno's post says, "It is
25 really quite hypocritical the compassion shown to

106

1  this dog while thousands of animals languish in
2  laboratories at UW Madison.  I really wish you
3  would acknowledge this and do something about"
4  that -- "about it."
5          Did I read that correctly?
6      **A.  Yes.**
7      Q.  Now, is Ms. Krasno's comment on topic or
8  off topic, in your opinion?
9      **A.  I would judge Ms. Krasno's comment here**
10 **to be on topic.**
11     Q.  Okay.  And, yet, it was still hidden in
12 this instance; is that correct?
13     **A.  That appears correct, yes.**
14     Q.  So it appears that the on-topic and
15 off-topic criterium are not necessarily uniformly
16 enforced; is that accurate?
17     **A.  Again, I, you know, would probably point**
18 **to the overall scale of the endeavor and just, you**
19 **know, thousands of comments that are received.  I**
20 **wouldn't expect that we would, you know, perfectly**
21 **apply that standard, although I know they -- they**
22 **try to do so in every case.**
23         MS. FARLEY:  Joe, let's move on to
24 UW0297, please.
25         (Exhibit 66 was marked for

107

1          identification and is attached to the
2          transcript.)
3          MS. FARLEY:  Okay.  Thank you.
4  BY MS. FARLEY:
5      Q.  Here we've got a document that's been
6  marked as Exhibit 66, and it appears to be a
7  Facebook -- a screenshot of a portion of a
8  Facebook post by UW Wisconsin-Madison and a
9  portion of the comment section as well.  Is that
10 accurate?
11     **A.  Yes.**
12     **I can't actually read the comments,**
13 **though, at that size.**
14     Q.  Okay.
15         MS. FARLEY:  Joe, if you could zoom in a
16 little bit.
17     Q.  Before you do, though, the title of the
18 post is "COVID-19 Model Quantifies of
19 Region-Specific Social Distancing Orders."
20         MS. FARLEY:  Yeah.  Now we
21 can actually zoom in on the actual grayed-out
22 portions, which are a little harder to read.
23     Q.  Now, actually, I want to focus on the --
24 so it looks like there were yellow boxes around
25 some grayed-out comments that were auto moderated

108

1  and then we have a long post here that was not
2  moderated, by Hani Hosain, and he asks, "Do you
3  have experience certificates equivalencies with a
4  university degree?"
5          Is that accurate?
6      **A.  Yes.**
7      Q.  In your opinion, is this post on topic
8  or off topic?
9      **A.  This would appear to be off topic.**
10     Q.  Okay.  And, yet, it was not moderated?
11     **A.  That appears correct, yes.**
12     Q.  Okay.  And in this instance, in fact,
13 the posting about animal testing was moderated?
14     **A.  Yes.**
15     Q.  Okay.
16         MS. FARLEY:  If we could move on to
17 UW0317.
18         REMOTE TECHNICIAN:  Please stand by.
19         (Exhibit 67 was marked for
20         identification and is attached to the
21         transcript.)
22 BY MS. FARLEY:
23     Q.  Okay.  We are looking at what has been
24 marked as Exhibit 67.  And this appears to be a
25 screenshot of a Facebook post by the University of

109

1  Wisconsin-Madison and a portion of the comment
2  section. Is that accurate?
3      A. Correct.
4      Q. Okay. And this particular Facebook post
5  is entitled "Badger Talks, Vaccine Arrival is
6  First Step."
7          Is that accurate?
8      A. Yes.
9      Q. Okay. And I -- I don't know if you
10 recall this specific post or having seen this
11 post.
12     A. I do not.
13     Q. Okay. And then down below, Lucky Dave
14 comments, "Can't believe the UW still practices in
15 the dark ages with coal power and styrofoam cups.
16 Much better schools out there than these
17 dinosaurs."
18         Now, would you consider that to be on
19 topic or off topic?
20     A. It would appear to be a negative
21 off-topic post.
22     Q. Okay. And I notice you specifically
23 said negative. Is that important when moderating?
24 Is that an important consideration?
25     A. No. I -- it's an off-topic post.

110

1      Q. Okay. And, yet, it was not moderated in
2  this instance. Is that accurate?
3      A. Correct.
4      Q. Okay. And, in fact, it appears that a
5  post regarding animal testing, specifically on
6  monkeys, was, in fact, moderated in this instance.
7  Is that accurate?
8      A. Yes.
9      Q. Okay. So the best efforts you were
10 talking about with respect to the university
11 trying to use its best efforts to moderate
12 whenever possible given the volume of comments, it
13 is, in reality, just kind of a discretionary
14 decision up to the individual moderator on any
15 given day; is that fair to say?
16     A. I mean, they use their -- their best
17 effort.
18         I mean, I -- I guess the one point that
19 I would make is that it's kind of impossible to
20 know, like -- I -- I guess as a point of
21 clarification, can you tell me about the gold box?
22 Is that auto moderation or is that manual
23 moderation? I'm not familiar with the color
24 codes.
25     Q. The gold -- yeah, the gold refers to

111

1  auto moderation.
2      A. So, I mean, the -- the point that I was
3  going to make is just it's hard to know because
4  these posts are sort of living things that -- you
5  know, if and when a staff member would come
6  through and review it and do a manual moderation,
7  if somebody would then post additional afterwards,
8          I guess this case is an auto moderation
9  and it appears that, you know, Lucky Dave was not
10 moderated when he should have been.
11     Q. Okay. But again, I guess, going back to
12 the -- this interim social media guidance memo
13 that we discussed earlier, the fact that something
14 is off topic doesn't mean that it has to be
15 necessarily removed or moderated; is that fair?
16     A. That's correct.
17     Q. Okay. So the efforts of the -- of an
18 individual moderator on any given day, their best
19 efforts, do you think that constitutes best
20 efforts for the university as a whole?
21     A. I'm sorry. I don't understand your
22 question.
23     Q. It -- it seems like moderation in terms
24 of off topic versus on topic in -- for example,
25 kind of depends on the individual's whims or

112

1  specific, you know, discretion or judgment on any
2  given day.
3      A. I mean, I would argue that, you know,
4  people have a number of different tasks that they
5  perform on any sort of shift when they're working
6  on social media and that, you know, it would be
7  everyone's goal to, you know, uniformly apply the
8  standard. You know, there may be some cases
9  where, you know, people are -- are busy with other
10 activities on a particular day and, you know,
11 they -- they may not get to -- to moderation as --
12 you know, as much as they should or could on any
13 given post or day.
14     Q. Do you think the university is trying to
15 do too much by moderating off topic versus on
16 topic?
17     A. I think the university is trying to do
18 the best it can do, and the staff are trying to do
19 the best they can do under the circumstances,
20 which -- you know, the scale of which I don't
21 think is -- is replicated here of the number of
22 comments or posts that we would have been
23 receiving, you know, in any given time period.
24     Q. Okay. Okay.
25         MS. FARLEY: Let's go to Exhibit UW0218,

113

1  please.
2       (Exhibit 68 was marked for
3       identification and is attached to the
4       transcript.)
5  BY MS. FARLEY:
6    Q.  Okay.  This document has been marked as
7  Exhibit 68.  It appears to be a Facebook
8  screenshot of the University of Wisconsin-
9  Madison's Facebook page and a posting.  We don't
10 see the original post here.  We just see a comment
11 area, and it looks like the yellow box indicates
12 auto moderation and the gray box apparently does
13 not mean anything or nothing relevant to our
14 purposes, apparently.
15      So this particular animal rights posting
16 was allowed to remain.  Is that accurate?
17     MS. LODAHL:  Point of clarification,
18 Counsel.  You just represented in your
19 question -- and I -- I don't know if you did
20 that on the previous question either, but you
21 said that a yellow box indicates auto
22 moderation.
23      In the updated information that we
24 provided to you about the color-coding system
25 on Facebook, the yellow or red boxes don't

114

1  indicate auto versus manual.
2      MS. FARLEY:  Oh, that's right.  I'm
3  sorry.  Versus Instagram.
4      MS. LODAHL:  Right.
5      MS. FARLEY:  I apologize.  Yes.
6      MS. LODAHL:  Yep.  So --
7      MS. FARLEY:  Okay.
8      MS. LODAHL:  So the post is moderated,
9  but we don't know if it is auto or manually.
10     MS. FARLEY:  Okay.
11     THE WITNESS:  All right.
12     MS. FARLEY:  Thank you for clarifying
13 that.
14     MS. LODAHL:  Sure.
15 BY MS. FARLEY:
16   Q.  Did you get that, Mr. Lucas?
17   A.  Yes, I understand.
18   Q.  Okay.  So in this situation, it -- the
19 post by Jesper Espére has been moderated in some
20 fashion, auto or manually, and the post by Ryan
21 Hartkopf has not.
22      Are you familiar with a Ryan Hartkopf?
23   A.  I have heard his name in relation to
24 Ms. Krasno.
25   Q.  Okay.  Can you give a little bit more

115

1  detail about that?
2    A.  I believe he's also posted content
3  related to animal research, along with Ms. Krasno.
4    Q.  Okay.  And how did you first become
5  aware of Mr. Hartkopf?
6    A.  I don't specifically know, but I
7  remember hearing his name mentioned, potentially
8  around the same time period, as -- as someone who
9  frequently posted.
10   Q.  Okay.  Okay.  Was Mr. Hartkopf ever
11 banned from the -- UW's Facebook page, if you
12 know?
13   A.  I don't know.
14   Q.  Okay.  What about UW's Instagram?
15   A.  I don't know the answer to that either.
16   Q.  If an individual were to banned or to
17 be -- I think the right word is "restricted" from
18 an account, would you be notified?
19   A.  So I believe those are two separate
20 terms that -- account restrictions, in my
21 understanding, are that people are able to
22 continue to post and then have their posts -- or,
23 I'm sorry, specifically approved by a moderator.
24 I assume users also can be banned, but in -- in
25 all cases, I -- I don't think I would be

116

1  specifically notified.
2    Q.  Okay.  That might be up to the
3  discretion of Mr. Moll or Mr. Klein?
4    A.  Correct.
5    Q.  Okay.  Okay.
6        Do you know if there is a list of people
7  anywhere that have been either -- what is the
8  correct term here?  And not just banned, but --
9  not moderated, but what is the term you just used?
10   A.  I believe it's -- well, at least on
11 Instagram, I believe it's to have their account
12 restricted.
13   Q.  Restricted.  Thank you.  Yes.  Tip of my
14 tongue.
15      Is there a list anywhere of those
16 people, who have been restricted or banned?
17   A.  No, not that I've ever seen.
18   Q.  Okay.  To your knowledge, has Ms. Krasno
19 ever been banned from Facebook or Instagram?
20   A.  I am not aware.
21   Q.  Okay.  Are banned people mostly those
22 whose posts or comments express views that are,
23 for whatever reason, critical of the university?
24   A.  I -- I don't think that there's a --
25 well, first, I don't think there's a list.  I've

117

1 never seen a list of people, and -- so I -- you
2 know, I would be hard-pressed to describe, you
3 know, people who were on something that I -- I'm
4 not aware of.
5    Q.  Okay.
6       MS. FARLEY:  Let's go to UW0730, please.
7       (Exhibit 69 was marked for
8       identification and is attached to the
9       transcript.)
10       MS. FARLEY:  Okay.  Thank you, Joe.
11 BY MS. FARLEY:
12    Q.  If you could scroll all the way down --
13 or -- first of all, this has been marked as
14 Exhibit 69.  And this is an e-mail chain with the
15 title "Re:  Draft statement on Facebook comments."
16       MS. FARLEY:  And then, Joe, if you could
17       scroll down to the bottom, to the first
18       e-mail in the chain.
19    Q.  Do you see a message from Jordana Lenon
20 at the WNPRC stating that there have been some
21 posts by Ryan Hartkopf and Madeline Krasno today
22 on their Facebook page regarding hiding comments
23 on social media?
24       Is that accurate?
25    A.  Yes.

118

1    Q.  And Ms. Lenon says that she prepared a
2 draft statement that she wanted to address about
3 these publicly-voiced concerns about our page
4 head-on and openly.
5       Ultimately --
6       MS. FARLEY:  If you scroll up a little
7       bit, Joe.
8    Q.  -- Chris Barncard forwards this to Legal
9 with a copy to you and Kelly Tyrrell.
10       And then, if you scroll all the way up,
11 you'll see, you know, further communication about
12 this, assuming this proposed statement.
13       MS. FARLEY:  If you could continue
14       scrolling up, Joe, please.  Thank you.
15    Q.  It's kind of a long chain here.
16       But ultimately, do you know -- since
17 we -- we can't see -- and we don't want to know
18 any privileged material, but do you know what the
19 outcome of Ms. Lenon's state- -- proposed
20 statement was?
21    A.  I do not.
22       And clearly I was, I think off --
23 somehow got dropped off the chain before it was --
24 whatever issue was settled.
25    Q.  Do you remember reviewing Ms. Lenon's

119

1 proposed statement?
2    A.  I do not.
3    Q.  Okay.  And this is another instance of
4 Ms. Tyrrell, the Director of Research
5 Communications, being involved in and addressing
6 speech critical of the animal testing program at
7 the WNPRC; is that correct?
8    A.  This would be consistent with her role
9 in sharing information about the animal program,
10 yes.
11    Q.  Okay.
12       MS. FARLEY:  Let's go to UW0429, please.
13       (Exhibit 70 was marked for
14       identification and is attached to the
15       transcript.)
16 BY MS. FARLEY:
17    Q.  This document has been marked as
18 Exhibit 70.  And here it appears we have a
19 screenshot of a Microsoft Teams chat with 11
20 participants.  And the participants that we can
21 see chatting here are Nick H., presumably Nick
22 Heynen; John L., I'm assuming that's you -- is
23 that accurate?
24    A.  Yes.
25    Q.  And Nate M., which is -- I'm assuming

120

1 that's Nate Moll; is that correct?
2    A.  Yes.
3    Q.  And here, Mr. Heynen asks you whether 13
4 posts about Betsy Schoeller over a couple of days
5 meant the poster should be banned; is that
6 correct?
7    A.  Yes.
8    Q.  And you then say "ban, pls," please.
9       What were your reasons for ordering the
10 ban?
11    A.  I don't remember this specific instance.
12 It could have been that she was -- Betsy Schoeller
13 was posting some sort of content that may have
14 been abusive or -- yeah.  I don't actually
15 remember this one.
16    Q.  Okay.  But you were consulted on a
17 particular banning decision in this instance; is
18 that correct?
19    A.  Yes.
20    Q.  And then, further in the chain, someone
21 asks, "Are there specific things on what to ban
22 for, or is it case-by-case?  I see another spam
23 comment promoting cheating for pay ('academic
24 writing services')."
25       And Mr. Moll responds, "More of a

121

1 case-by-case. The one you just brought up is
2 grounds for banning."
3      Is that accurate?
4    **A. Yes.**
5      Q. So here, this particular poster was
6 asking for guidance on banning, and he was not
7 directed to any particular guidance, but it was a
8 case-by-case determination in Mr. Moll's words.
9 Is that accurate?
10   **A. Yes.**
11     Q. Okay. Are there any factors that you
12 look to when determining whether to ban a
13 particular user?
14   **A. Again, I'm generally not making**
15 **decisions about it.**
16    **I see that I'm on this thread, and I can**
17 **only imagine that there was some sort of violence**
18 **or abuse of content here that sort of resulted in**
19 **it being escalated to me.**
20     Q. Okay. So there aren't really any
21 specific factors that you look for in determining
22 this?
23   **A. Again, I think we just considered it on**
24 **a case-by-case basis.**
25     Q. So how do you ensure uniformity in

122

1 banning across all public comments?
2    **A. I think that the staff, on a best-effort**
3 **basis, tries to apply the policy; and if there are**
4 **people who are, you know, frequently or**
5 **egregiously in violation of the -- I'm sorry --**
6 **rather, the statement or the interim guidelines,**
7 **that, you know, they -- they may have their**
8 **account restricted.**
9     Q. Okay.
10    MS. FARLEY: Let's move on to UW0396,
11 please.
12    (Exhibit 71 was marked for
13    identification and is attached to the
14    transcript.)
15    MS. FARLEY: And what exhibit number is
16 this, Joe?
17    REMOTE TECHNICIAN: Please stand by.
18 It will be marked as Exhibit 71.
19    MS. FARLEY: Pardon? I didn't hear you.
20    REMOTE TECHNICIAN: I apologize. It
21 will be marked as Exhibit 71.
22    MS. FARLEY: 71. Thank you.
23 BY MS. FARLEY:
24     Q. So we're looking here at Exhibit 71, and
25 it appears to be a snippet of a Microsoft Teams

123

1 chat portion between yourself and Nate Moll on May
2 13th, 2021. Is that accurate?
3    **A. Yes.**
4     Q. And he says, "Heads up that we're
5 getting 'Free Palestine' comments on Facebook.
6 Due to their off-topic and political nature, I've
7 been hiding them."
8     You say, "Okay - Keep us updated,
9 thanks."
10    Is the fact that a topic is political in
11 nature sufficient to hide it or to remove the
12 post?
13   **A. I see him citing off-topic nature.**
14     Q. If -- if a topic is political in nature,
15 is that a reason to hide a post on Facebook or
16 Instagram?
17   **A. Not if it's on topic.**
18     Q. So what if a post was related to voting
19 and someone then post -- tried to post something
20 about pro -- vote for Donald Trump, and Trump is
21 an auto moderated word, how would they express
22 their viewpoint in that instance?
23   **A. We wouldn't generally post information**
24 **about candidates or choices in the election.**
25     Q. If a post was about get out and vote,

124

1 here's your polling place, sign up here, register
2 to vote, and someone wanted to advocate for their
3 particular viewpoint on a candidate, would they be
4 able to do so?
5    **A. I -- I have a hard time answering that**
6 **in a hypothetical, without seeing the post or**
7 **the -- the specific comment in that situation.**
8     Q. You can do your best to answer the
9 question.
10   **A. Yeah, I'm really sorry, I don't know how**
11 **I would do that without seeing the actual post in**
12 **question.**
13     Q. It's a hypothetical.
14   **A. Yeah.**
15    **I mean, I -- again, I would -- I think**
16 **you might construe a difference between, you know,**
17 **the actual information we would be trying to**
18 **provide about polling or a voter ID or voter**
19 **registration as different than someone advocating**
20 **about a specific candidate and -- you know, again,**
21 **because I'm trying to answer in a hypothetical --**
22 **I think we might be able to see that advocacy for**
23 **a specific candidate as a comment on the post**
24 **would be off topic from information about how to**
25 **obtain a ballot or a voter ID.**

125

1    Q.  Okay.
2        MS. FARLEY:  Let's go to UW0449, please.
3        (Exhibit 72 was marked for
4        identification and is attached to the
5        transcript.)
6        MS. FARLEY:  Okay.  Thank you.
7    BY MS. FARLEY:
8    Q.  We are looking at what has been marked
9    as Exhibit 72.  It appears to be another
10   screenshot of Microsoft Teams chat with 11
11   participants.  And the chat includes posts by Nate
12   Moll and then another unidentified individual.  Is
13   that accurate?
14   A.  Yes.
15   Q.  Now, one of the things Mr. Moll mentions
16   is that today they're featuring something
17   regarding "chimpanzee sanctuary mystery disease."
18       Is that accurate?
19   A.  Yes.
20   Q.  US -- UW news published an article on
21   2/10/21 titled "Mystery Disease at Sierra Leon
22   Chimpanzee Sanctuary Linked to Bacterial
23   Infection," and it discussed the findings of UW
24   researchers who identified a mystery illness that
25   killed a bunch of chimps.

126

1        Does that ring a bell?
2    A.  That -- I don't recall that
3    specifically, but that does sound like, yes,
4    content that we would publish.
5    Q.  Now, are PETA comments about UW
6    researchers killing primates off topic in that
7    situation?
8    A.  I guess it's hard to know specifically,
9    like, what the PETA comment is in this case that
10   was being referenced.
11   Q.  Okay.  Mr. Moll references a wave of
12   50-plus PETA comments on the Instagram post, and
13   he restricted all accounts and deleted the posts.
14       Does it sound like he performed, you
15   know, a careful case-by-case analysis of each
16   comment in this instance?
17   A.  I couldn't say without sort of
18   understanding more of, you know, was it posted on
19   the Vile (phonetic) List Associate's Award or
20   other posts that were off topic?
21   Q.  Okay.  If it was posted on the
22   chimpanzee sanctuary mystery disease, would it be
23   on topic?
24   A.  That's a good question.  I mean, was the
25   PETA post about cats?  Was it about vegan

127

1    activities?  Was it -- you know, PETA posts many
2    different topics, many thousands of different
3    comments on UW content.
4    Q.  If -- assume it was -- if it was about
5    UW researchers killing chimpanzees, for example,
6    would that be on topic?
7    A.  If it was specifically about chimpanzees
8    and specifically on the chimpanzee sanctuary
9    mystery disease post, I would guess that it was on
10   topic.
11   Q.  Okay.  Now, at the bottom of the chat,
12   whoever is the social media lead that day says
13   that the plan includes, quote, "monitor" animal --
14   "anti-animal research comments (big thanks to Nate
15   for covering this this morning)."
16       Why is there a specific bullet point for
17   monitoring anti-animal research comments here?
18   A.  I don't know.  I did not post this
19   comment.
20   Q.  Is it fair to say the University
21   specifically pays attention to anti -- anti-animal
22   research comments?
23   A.  To the extent that they're off topic on
24   posts, yes.
25   Q.  But there's no special attention paid to

128

1    anti-animal research postings?
2    A.  I would probably judge that comments
3    related to animal research would be the highest
4    traffic comment that we receive across the
5    accounts.
6    Q.  Okay.  And is that why it warranted a
7    separate bullet point of monitoring in this
8    instance?
9    A.  I -- I mean, I -- I could think that
10   the -- the volume would be one factor that could
11   explain that, yes.
12   Q.  Is it fair to say the university
13   specifically pays attention to animal rights
14   campaigns?
15   A.  Yes.  As we discussed earlier today, I
16   think in support of trying to provide accurate
17   information and combat misinformation provided by
18   certain groups, I would say that we are interested
19   in -- I mean, comments and campaigns that would,
20   you know, be on a wide range of topics, but I
21   think, you know, given the -- the prevalence of
22   anti-research or anti-animal model comments, yes.
23   Q.  You've talked a little bit today about
24   the importance of combating, you know, inaccurate
25   information and providing accurate information to

129

1   the public about animal research.
2       Have you done any of your own research
3   to determine what information is or is not, in
4   fact, accurate?
5       A.  I don't have to do my own research
6   because we employ hundreds, if not thousands of
7   people who do that work here for the institution.
8       Q.  But it's your job to monitor those who
9   moderate comments, and they're making a
10  determination whether a comment is -- is or is not
11  accurate.
12      So what research have they or have you
13  done to ensure that when you're making that
14  decision, you're not blocking accurate
15  information?
16      A.  I'm sorry.  I don't follow.  Could you
17  repeat the question?
18      MS. FARLEY:  Madam Court Reporter, could
19  you repeat back the question.
20      THE COURT REPORTER:  Yes, ma'am, just a
21  moment.
22      (Record read back by Stenographer.)
23      THE WITNESS:  Thank you.
24      A.  Yes.  I mean, I would expect that the
25  staff that are, you know, posting particular

130

1   pieces of content are sort of aware of what that
2   content is and, you know, to the extent that, you
3   know, there are, you know, questions that are
4   posted about the specific content, you know,
5   sometimes those are directly answered, and I would
6   expect that they -- you know, they understand
7   the -- the information that -- that's being
8   shared.
9       Q.  Is it fair to say that Kelly Tyrrell and
10  Chris Barncard are the ones who spearhead
11  defending the university's animal research program
12  against criticism from outside groups?
13      A.  They, among others, yes.
14      Q.  Okay.  And who -- who would those others
15  be, in general?
16      A.  Allyson Bennett, I think you mentioned
17  previously Nadine Connor.  You know, others who
18  are sort of leaders on campus in the research
19  enterprise.
20      Q.  Okay.  All right.
21      MS. FARLEY:  Let's go to UW -- UW688,
22  please.
23      (Exhibit 73 was marked for
24      identification and is attached to the
25      transcript.)

131

1       MS. FARLEY:  Okay.  Thank you.
2   BY MS. FARLEY:
3       Q.  We are looking at what has been marked
4   Exhibit 73, and it is another Microsoft Teams
5   screenshot of a chat involving 11 participants.
6       Is that accurate?
7       A.  Yes.
8       Q.  So we see a chat here between, I believe
9   it's Mike Klein, yourself and Nate Moll.  Is that
10  accurate?
11      A.  Yes.
12      Q.  And in this chat, you instruct Mr. Klein
13  to ban an Andrew Clemens for posting "Shame on you
14  WM, free the apes now," on 20 different posts.
15      Is that accurate?
16      A.  Yes.
17      Q.  Was there a lesser-restrictive
18  alternative to outright banning that you could
19  have considered?
20      A.  Not aware in this particular case, no.
21      Q.  Could you have hidden his comments, for
22  example, instead of banning him from the forum?
23      A.  Yeah.  I mean, I guess that's possible
24  in this case.  I'm not a hundred percent sure how
25  the -- the mechanics on the Facebook restriction

132

1   worked, but it's possible that there was a -- a
2   way to hide those posts.
3       Q.  Do you have any concerns, personally,
4   about the practice of banning a user from Facebook
5   or Instagram?
6       A.  I mean, in what record?
7       Q.  Probably in regard to the First
8   Amendment.
9       A.  You know, again, I would say that the
10  team does the best that it can do on a daily basis
11  in sort of evaluating these decisions and making
12  them in the moment, you know, in the face of just
13  thousands and thousands of comments that are sort
14  of being, you know -- that are being kind of
15  posted on a regular basis.
16      Q.  Okay.
17      MS. FARLEY:  Now, let's go to UW0716.
18      And we're getting near the end, just --
19      just to let people know.  We can -- Lynn,
20      should we take a break in a few minutes?
21      Is that document ready or --
22      MS. LODAHL:  Yeah.  I was just going to
23  suggest that.  That would be perfect.
24      MS. FARLEY:  Okay.
25      MS. LODAHL:  Great.  I just want to be

133

1    able to send it over by e-mail.
2        MS. FARLEY: Okay. Yeah. Let's go
3    to -- actually, we can take a break now, if
4    that works. And we can keep it to about ten
5    minutes, if you guys want.
6        MS. LODAHL: Perfect.
7        THE WITNESS: Sure.
8        MS. FARLEY: Okay. Thanks.
9        THE VIDEOGRAPHER: We're going off the
10   record at 2:07 p.m. Central Time.
11       (Recess in proceedings.)
12       THE VIDEOGRAPHER: We're going back on
13   the record at 2:22 p.m. Central Time.
14 BY MS. FARLEY:
15   Q.  Welcome back, Mr. Lucas. Joe is pulling
16 up for us our next exhibit, and we'll be marking
17 that.
18       (Exhibit 74 was marked for
19       identification and is attached to the
20       transcript.)
21 BY MS. FARLEY:
22   Q.  Your counsel has just produced to us
23 Exhibit 74, which is a memo regarding Interim
24 Social Media Moderation Guidance, dated February
25 7th, 2022.

134

1        Is that accurate?
2    A.  Correct.
3    Q.  Okay. And you had mentioned earlier
4    that this was more regarding Twitter, it was
5    pertaining more towards Twitter; is that right?
6    A.  That's correct.
7    Q.  Was an individual who was blocked
8    making -- after making comments or certain
9    postings on Twitter?
10   A.  So the situation with this was related
11   to another account on campus, an account manager
12   who had a specific question. I believe that they
13   had blocked a user on Twitter, who then was
14   petitioning to be reinstated and have their
15   account unrestricted. And they had asked us for
16   guidance. And then we had asked for additional
17   guidance from Office of Legal Affairs.
18   Q.  Okay. And do you know what content they
19   had been posting that led them to be banned in the
20   first instance?
21   A.  I don't recall specifically, no.
22   Q.  Okay. Were they an animal rights
23   activist?
24   A.  No.
25       It -- I believe it was -- it was in

135

1    relation to an athletics account and an athletics
2    issue. I guess that's the one piece that I'm
3    aware of.
4    Q.  Okay. Did they complain or ever
5    threaten to sue the university for being banned or
6    blocked?
7    A.  Not that I'm aware of, no.
8    Q.  Okay. Now we can go back to --
9        MS. FARLEY: Joe, if you wouldn't mind
10   pulling up UW0716.
11       (Exhibit 75 was marked for
12       identification and is attached to the
13       transcript.)
14 BY MS. FARLEY:
15   Q.  I apologize, it's hard to read. This
16 is -- this is how it was produced to us, so it
17 must be how it was processed.
18       MS. FARLEY: So, yeah, thank you for
19       Zooming in, Joe.
20   Q.  If you look towards the bottom of the
21 page with the asterisks, you can see it says,
22 "Subject re: Article in today's paper."
23       Do you see that towards the bottom of
24 the page?
25   A.  The URL of, like, Madison.com, is that

136

1    what you're refer- --- referencing?
2    Q.  Yes. Yes.
3        It says, "Subject, article in today's
4    paper. Hi Meredith, you have likely seen this
5    article."
6    A.  Yes, I see this.
7    Q.  Okay. And it says "UW Madison Sued for
8    Allegedly Hiding Critical Comments From its Social
9    Media Accounts." That's the name of the article.
10       Do you see that?
11   A.  Yes.
12   Q.  Okay. And if you look at the e-mail
13 message from you at 11:02 a.m. --
14       MS. FARLEY: It's towards the middle of
15       the page, Joe. Perfect. Okay.
16   Q.  -- you send a message to Tina Nielsen
17 and Meredith McGlone, and say that "Any media
18 questions or requests can come up to me directly,"
19 and then you say, if you see towards the middle
20 right there, it says, "I suspect at the end of
21 this process, we'll be providing additional social
22 media guidance to campus account managers on
23 content moderation."
24       Do you see that?
25   A.  Yes.

137

1    Q.  Did you think at the time that the
2  current guidance on account moderation was
3  inadequate in some way?
4    **A.  As I stated earlier, I -- I said it's**
5  **possible that in the future we would provide**
6  **additional interim guidance, finalize the interim**
7  **guidance or create a social media policy in the**
8  **future.**
9    Q.  And do you believe that what exists now
10 is adequate to inform social media managers about
11 what is appropriate under the First Amendment?
12   **A.  Yes.**
13   Q.  Did you have any fear, when you made
14 that comment, that social media managers could be
15 moderating UW accounts in a way that was not
16 permissible?
17   **A.  No.**
18   Q.  Okay.  Would you say it's the purpose of
19 the Communications Department to promote the
20 university and, you know, promote its virtues and
21 show it in a positive light?
22   **A.  To share information about the**
23 **university, but to the extent that -- yeah, it's**
24 **sharing its virtues or those are positive things,**
25 **yes.**

138

1    Q.  Okay.  So along with that would go
2  promotion of the university?
3    **A.  Generally, yes.**
4    Q.  Okay.  Now, I promise we're nearing the
5  end here.  I think we only have a couple documents
6  left.
7      MS. FARLEY:  But let's go to UW0415
8    please.
9    Q.  It's probably a lot easier to read, too.
10     REMOTE TECHNICIAN:  Please stand by.
11     (Exhibit 76 was marked for
12     identification and is attached to the
13     transcript.)
14     MS. FARLEY:  Okay.  Thank you.
15 BY MS. FARLEY:
16   Q.  Here we have what has been marked as
17 Exhibit 76.  This appears to be a snippet of a
18 Microsoft Teams chat with -- and the person who is
19 posting in this is Peter Kleppin.
20     Is that accurate?
21   **A.  Yes.**
22   Q.  Okay.  And he says, "Just an FYI...
23 getting lots of negative comments on YouTube about
24 the rock removal, so I conferred with John and
25 decided to disable comments."

139

1      Is that accurate?
2    **A.  Yes.**
3    Q.  Now, it says -- he says the university
4  is getting a lot of negative comments.
5      First of all, are you the "John" that he
6  mentioned?
7    **A.  Yes.**
8    Q.  Okay.  And is it fair to say that the
9  university tries to limit comments critical of the
10 university on its social media pages?
11   **A.  No.  I think this one is missing**
12 **additional context.**
13   **This was a case where the university had**
14 **opted to remove or -- something that was once a**
15 **monument in the institution and decided to move it**
16 **off campus because of its -- there was a name that**
17 **was associated with it that was extremely racist.**
18   **We publicized the fact that we were**
19 **doing so.  And then I think we were featured on**
20 **Fox News or additional media sites -- media**
21 **outlets.  And I think -- my memory of this**
22 **situation was that it was understated and that**
23 **they were not negative comments, but they were**
24 **actually racist, abusive, and actively-threatening**
25 **comments toward the institution because of where**

140

1  **this news was featured.**
2    Q.  Okay.  So setting aside this particular
3  instance, then, does the university -- do the
4  social media managers try to limit and moderate
5  comments that are critical of the university?
6    **A.  I believe people who are charged with**
7  **operating social media accounts attempt to follow**
8  **the guidance of the policy to the extent that**
9  **they're able in a case-by-case basis.**
10   Q.  And would the policy allow them to
11 remove comments that are critical of the
12 university?
13   **A.  I mean, if the comments were off topic**
14 **or otherwise counter to the -- the interim**
15 **guidance.**
16   Q.  Okay.
17     MS. FARLEY:  Can we pull up UW0774.
18     REMOTE TECHNICIAN:  Please stand by.
19     (Exhibit 77 was marked for
20     identification and is attached to the
21     transcript.)
22     MS. FARLEY:  Thank you.
23 BY MS. FARLEY:
24   Q.  Okay.  We are now looking at what has
25 been marked as Exhibit 77, and it appears to be a

141

1  screenshot of a portion of a Microsoft Teams chat
2  between yourself and another individual and Nick
3  Heynen.
4       Is that accurate?
5    **A.  Yes.**
6    Q.  Now, it says here that the person you're
7  chatting with is going to be monitoring a PETA
8  protest at noon.
9       Would you consider a protest to be
10 political activity?
11   **A.  Potentially, yes.**
12   Q.  And it sounds like the PETA protest
13 would be presumably animal rights-related.  Is
14 that accurate?
15   **A.  Generally so, yes.**
16   Q.  Is there a reason that this individual
17 would be monitoring the political activity of PETA
18 activists?
19   **A.  Yes, for the reason that I stated**
20 **earlier.**
21   Q.  Can you please elaborate?
22   **A.  Sure.**
23      **The comment that I had earlier, that,**
24 **again, PETA frequently has campaigns that misstate**
25 **or misinform about the nature of the animal**

142

1  **research that takes place at the institution and**
2  **so it's in the institution's interest, in this**
3  **case and others, to ensure that there's accurate**
4  **information being provided about its activities.**
5    Q.  And in terms of determining and who
6  determines what information is accurate, would
7  that be left to Kelly Tyrrell and Chris Barncard?
8    **A.  Informed by subject matter experts at**
9  **the institution, correct.**
10   Q.  Okay.
11      MS. FARLEY:  Let's go to UW0378, please.
12      (Exhibit 78 was marked for
13      identification and is attached to the
14      transcript.)
15   Q.  Okay.  We're now looking at what has
16 been marked as Exhibit 78.  This appears to be a
17 snippet of a Microsoft Teams chat between
18 yourself, Nate Moll, and Kelly Tyrrell.
19      Is that accurate?
20   **A.  Yes.**
21   Q.  And in the first post you say, "It's
22 Monkey Day, apparently," and you refer to a
23 Twitter link to PETA's Twitter page; is that
24 correct?
25   **A.  Yes.**

143

1    Q.  Were you monitoring PETA's Twitter
2  account?
3    **A.  Again, for the -- the reasons I just**
4  **stated, it's in the interest of UW Madison to**
5  **understand the information that's being shared**
6  **about it and its activities.**
7    Q.  So is that a "yes"?
8       Were you monitoring the PETA's Twitter
9  account?
10   **A.  Yes.  I mean, to the extent that**
11 **monitoring is subscribed to their**
12 **publicly-available feeds.**
13   Q.  Okay.  Okay.
14      Were you alerting Nate Moll and Kelly
15 Tyrrell to be on alert for any negative animal
16 comments?
17   **A.  So without seeing the post here, I can't**
18 **speak to it, but it's entirely possible that PETA**
19 **had declared it Monkey Day or that PETA had said**
20 **something that it's, you know, support of monkeys**
21 **in UW Madison labs.  So -- so I believe it was**
22 **germane to our activities in either of those ways.**
23   Q.  In the sense that they should be alert
24 to potential comments on social media?
25   **A.  Yeah, that people were -- you know, PETA**

144

1  **and others may be talking about the university,**
2  **its animal research or labs.**
3    Q.  Okay.
4       MS. FARLEY:  Let's go to UW0696.
5       (Exhibit 79 was marked for
6       identification and is attached to the
7       transcript.)
8  BY MS. FARLEY:
9    Q.  Okay.  So we're looking at what has been
10 marked as Exhibit 79.  This appears to be a
11 snippet or a screenshot of a Microsoft Teams chat
12 with 11 participants, among them Nate Moll,
13 yourself, and Nick Heynen.
14      Is that correct?
15   **A.  Yes.**
16   Q.  Okay.  And it looks like, in response to
17 Ms. -- Mr. Moll's question to you, you want to
18 make him aware of "new PETA inbound today."
19      Can you describe what you meant by that?
20   **A.  Yes.  In the same way as the -- the last**
21 **post, that PETA was either sharing information**
22 **about UW Madison or something relevant to UW**
23 **Madison research on this particular day.**
24   Q.  In the sense that this particular
25 content may need to be moderated?

145

1    A.  Reviewed for accuracy and the likelihood
2  that, you know, any time PETA would post or tag us
3  in particular posts, that it would result in
4  mentions or, you know, other comments to UW
5  Madison.
6    Q.  Okay.
7    A.  I would just say in relation to Twitter,
8  though, because it's a different platform, there
9  is not moderation on -- on Twitter.
10   Q.  Okay.
11       MS. FARLEY:  And let's go to UW0719,
12  please.
13       (Exhibit 80 was marked for
14       identification and is attached to the
15       transcript.)
16  BY MS. FARLEY:
17   Q.  Okay.  This document has been marked as
18  Exhibit 80, and it looks like a portion -- a
19  screen snippet of a portion of Microsoft Teams
20  chat as well from Amy Gill.
21       Do you know who Amy Gill is?
22   A.  Amy Gill is a video producer in
23  University Communications.
24   Q.  And what is her relationship to comment
25  moderation on social media?

146

1    A.  I don't know what -- what she's
2  particularly referencing.  The only platform that
3  she would generally be posting on might be
4  YouTube.
5    Q.  Okay.  Okay.
6       MS. FARLEY:  All right.  Lynn, well,
7  that is basically all I have, unless you have
8  anything on your end.
9       MS. LODAHL:  I just have one, maybe two
10  questions on a limited point.
11       MS. FARLEY:  Okay.
12       MS. LODAHL:  Should I go ahead?
13       MS. FARLEY:  Yeah, go for it.
14       MS. LODAHL:  Okay.
15           EXAMINATION
16  BY MS. LODAHL:
17   Q.  All right.  So, John, I want to refer
18  back to what was marked as Exhibit 74.  I don't --
19       MS. LODAHL:  0we could -- we could pull
20  it up, I suppose.
21       REMOTE TECHNICIAN:  Please stand by.
22   Q.  Okay.  John, this memorandum is dated
23  February 7th, but that's not the date you received
24  it; correct?
25   A.  That's correct.

147

1    Q.  You actually received it from the Office
2  of Legal Affairs on February 23rd; is that right?
3    A.  Yes, that's correct.
4    Q.  Okay.  All right.
5       MS. LODAHL:  Counsel, I have no further
6  questions.
7       MS. FARLEY:  Okay.  Thank you,
8  Mr. Lucas.
9       THE VIDEOGRAPHER:  If there are no
10  questions, this marks the end of the video
11  deposition of John Lucas.  We are going off
12  the record and ending his deposition at 2:43
13  p.m. Central Time.
14       (Off Video Record.)
15       THE COURT REPORTER:  Counsel, if you
16  want to let me know what your orders are,
17  please.
18       MS. LODAHL:  Sure.  This is Attorney
19  Lodahl.  We'll take an electronic version of
20  the transcript and a condensed format.
21       THE COURT REPORTER:  Thank you.
22       MS. FARLEY:  And this is Attorney
23  Farley.  We will do the same as well.
24       THE COURT REPORTER:  Thank you.
25       REMOTE TECHNICIAN:  Ms. Lodahl and

148

1  Ms. Farley, would you like the exhibits
2  attached to the transcript?
3       MS. LODAHL:  Yes, please.
4       REMOTE TECHNICIAN:  That was Ms. Lodahl.
5       And Ms. Farley?
6       MS. FARLEY:  Yes.
7       REMOTE TECHNICIAN:  Thank you.
8
9
10       AND FURTHER THIS DEPONENT SAITH NOT.
11          SIGNATURE RIGHTS RESERVED.
12  (Videotaped Deposition concluded at 2:44 p.m.
13       Central Standard Time.)
14
15           * * * * *
16
17
18
19
20
21
22
23
24
25

149

1  STATE OF NORTH CAROLINA:
2  COUNTY OF MECKLENBURG  :
3       I, April Reid, Court Reporter and Notary
4  Public in and for the State of North Carolina,
5  and whose commission expires March 4, 2025,
6  do certify that the aforementioned appeared
7  before me, was sworn by me, and was thereupon
8  examined by counsel; and that the foregoing is a
9  true, correct, and full transcript of the
10 testimony adduced.
11      I further certify that I am neither
12 related to nor associated with any counsel or
13 party to this proceeding, nor otherwise interested
14 in the event thereof.
15      Given under my hand and notarial seal in
16 Charlotte, North Carolina, this 22nd day of March,
17 2022.
18
19
20 _____
21      April Reid, RPR, CRR, Notary Public
22 State of North Carolina, County of Mecklenburg
23   Notary Registration No. 20012210079
24
25

# A

**ability**
33:13
**able**
19:21, 115:21,
124:4, 124:22,
133:1, 140:9
**absolutely**
18:3, 25:13
**abuse**
121:18
**abused**
93:4
**abusive**
70:18, 71:21,
120:14, 139:24
**access**
19:3, 19:5,
96:4
**accomplish**
57:15
**according**
36:20, 62:11,
70:24
**account**
19:4, 19:5,
40:19, 44:16,
44:24, 81:13,
81:19, 81:25,
82:3, 82:7,
82:13, 83:8,
93:7, 95:5,
95:7, 96:4,
115:18, 115:20,
116:11, 122:8,
134:11, 134:15,
135:1, 136:22,
137:2, 143:2,
143:9
**accounts**
17:1, 18:9,
18:19, 28:20,
49:21, 58:4,
61:12, 76:14,
77:1, 79:10,
87:16, 98:6,
126:13, 128:5,

136:9, 137:15,
140:7
**accuracy**
145:1
**accurate**
30:22, 33:22,
34:8, 34:19,
34:24, 35:14,
36:10, 37:18,
37:23, 38:1,
38:9, 42:12,
43:10, 49:16,
56:6, 56:12,
56:13, 61:25,
68:18, 68:25,
86:14, 87:10,
105:5, 106:16,
107:10, 108:5,
109:2, 109:7,
110:2, 110:7,
113:16, 117:24,
119:23, 120:18,
121:3, 121:9,
123:2, 125:13,
125:18, 128:16,
128:25, 129:4,
129:11, 129:14,
131:6, 131:10,
131:15, 134:1,
138:20, 139:1,
141:4, 141:14,
142:3, 142:6,
142:19
**achievement**
96:21
**acknowledge**
106:3
**acronym**
86:22
**across**
17:7, 24:25,
52:16, 76:20,
84:17, 95:23,
122:1, 128:4
**active**
88:21
**actively**
18:11

**actively-threate-
ning**
139:24
**activism**
83:18, 86:2
**activist**
134:23
**activists**
93:4, 141:18
**activities**
16:8, 28:23,
88:12, 112:10,
127:1, 142:4,
143:6, 143:22
**activity**
25:2, 91:4,
141:10, 141:17
**actual**
18:25, 37:2,
37:5, 102:9,
107:21, 124:11,
124:17
**actually**
30:7, 30:10,
30:14, 38:20,
39:6, 65:25,
80:17, 91:24,
107:12, 107:21,
107:23, 120:14,
133:3, 139:24,
147:1
**added**
13:4, 13:8,
13:22, 67:4
**adding**
53:5
**addition**
69:4
**additional**
20:14, 52:14,
58:2, 58:5,
58:18, 59:25,
68:8, 73:8,
91:6, 91:9,
111:7, 134:16,
136:21, 137:6,
139:12, 139:20
**address**
26:4, 118:2

**addressed**
56:14
**addressing**
119:5
**adduced**
149:10
**adequate**
51:9, 57:18,
72:7, 72:10,
137:10
**advancing**
27:3
**advice**
33:12, 33:24,
63:22
**advised**
66:12
**advocacy**
89:16, 124:22
**advocate**
31:11, 47:16,
88:20, 89:2,
89:12, 124:2
**advocates**
92:18, 97:11
**advocating**
124:19
**affairs**
12:20, 20:15,
28:6, 51:5,
51:13, 52:15,
52:21, 58:5,
58:20, 60:2,
61:3, 63:8,
63:17, 63:23,
134:17, 147:2
**affiliated**
33:7, 85:13
**affirmed**
9:13
**aforementioned**
149:6
**after**
11:23, 41:13,
63:6, 66:8,
66:14, 67:2,
134:8
**afternoon**
99:25

**afterwards**
111:7
**again**
24:11, 24:24,
31:18, 33:24,
34:18, 34:23,
36:23, 43:13,
44:6, 47:12,
48:6, 52:24,
54:20, 61:3,
63:18, 72:18,
82:12, 85:7,
85:14, 85:23,
90:19, 92:16,
93:25, 94:3,
97:9, 98:7,
102:20, 106:17,
111:11, 121:14,
121:23, 124:15,
124:20, 132:9,
141:24, 143:3
**against**
130:12
**ages**
109:15
**ago**
20:14, 40:18,
41:7
**agree**
45:20, 51:14,
64:18, 67:14,
89:25, 92:22
**agrees**
65:16
**ahead**
44:8, 55:19,
86:4, 90:4,
100:2, 146:12
**air**
57:25
**al**
1:9, 3:4, 8:6
**aldf**
32:25
**alert**
143:15, 143:23
**alerting**
87:6, 143:14

**all**
2:2, 20:3,
22:5, 26:13,
26:24, 37:8,
40:23, 47:18,
48:6, 51:12,
65:16, 71:22,
95:2, 99:25,
105:15, 114:11,
115:25, 117:12,
117:13, 118:10,
122:1, 126:13,
130:20, 139:5,
146:6, 146:7,
146:17, 147:4
**allegations**
91:17
**allegedly**
136:8
**allow**
10:15, 46:21,
140:10
**allowed**
113:16
**allows**
51:15
**allyson**
79:24, 80:2,
80:11, 86:16,
89:7, 89:9,
130:16
**along**
13:20, 14:7,
15:2, 15:11,
57:2, 79:23,
115:3, 138:1
**already**
35:25
**also**
3:13, 9:4,
21:24, 28:21,
33:1, 42:17,
44:1, 46:25,
57:16, 61:16,
65:19, 66:22,
87:16, 91:16,
95:13, 95:24,
96:16, 115:2,

115:24
**alternative**
131:18
**although**
67:22, 106:21
**alumni**
15:24
**always**
34:6, 50:7
**amendment**
48:24, 57:16,
57:19, 77:17,
77:19, 77:24,
78:6, 78:11,
132:8, 137:11
**among**
86:17, 130:13,
144:12
**amount**
76:22, 88:6,
95:11
**amp**
86:19, 86:20,
86:21
**amplify**
33:17
**amy**
145:20, 145:21,
145:22
**analysis**
126:15
**andrew**
101:25, 102:2,
131:13
**animal**
2:16, 21:16,
24:20, 27:3,
27:8, 28:22,
28:25, 29:8,
29:10, 31:16,
33:8, 33:14,
33:17, 33:18,
33:19, 33:22,
34:4, 34:5,
34:7, 34:10,
34:12, 34:22,
37:16, 37:22,
37:24, 38:2,

38:9, 38:14,
40:10, 40:14,
41:18, 41:19,
41:24, 42:2,
42:10, 42:14,
42:17, 42:23,
43:18, 43:24,
44:3, 44:5,
45:6, 45:7,
47:4, 47:5,
47:10, 47:17,
47:18, 48:2,
68:15, 68:19,
68:23, 80:9,
80:13, 83:15,
83:16, 88:10,
88:20, 88:22,
89:10, 89:12,
89:16, 89:23,
94:4, 97:11,
108:13, 110:5,
113:15, 115:3,
119:6, 119:9,
127:13, 128:3,
128:13, 129:1,
130:11, 134:22,
141:13, 141:25,
143:15, 144:2
**animal-rights-to-ned**
92:11
**animals**
37:8, 37:17,
42:8, 45:7,
48:3, 65:17,
81:3, 87:2,
106:1
**animals-uw-madis-on**
86:12
**another**
22:1, 57:2,
73:3, 90:9,
92:24, 119:3,
120:22, 125:9,
125:12, 131:4,
134:11, 141:2
**answer**
10:16, 10:20,

47:8, 57:5,
63:19, 78:3,
85:7, 85:24,
88:12, 115:15,
124:8, 124:21
**answered**
130:5
**answering**
11:6, 21:6,
124:5
**answers**
19:20, 66:18
**anti**
127:21
**anti-animal**
34:16, 127:14,
127:17, 127:21,
128:1, 128:22
**anti-research**
128:22
**any**
11:12, 12:21,
21:7, 21:19,
29:13, 29:17,
42:6, 47:1,
48:20, 48:23,
51:15, 51:16,
52:5, 52:11,
54:24, 55:3,
59:3, 59:23,
60:14, 66:16,
66:23, 67:4,
69:2, 69:11,
72:15, 75:3,
75:8, 75:21,
75:23, 76:5,
79:1, 79:4,
79:5, 83:8,
84:6, 84:11,
88:16, 96:11,
97:24, 102:11,
104:17, 110:14,
111:18, 112:1,
112:5, 112:12,
112:23, 118:18,
121:7, 121:11,
121:20, 129:2,
132:3, 136:17,

137:13, 143:15,
145:2, 149:12
**anyone**
54:23, 55:2,
63:8, 63:11,
63:15, 89:20,
97:5
**anything**
24:9, 26:20,
32:25, 34:20,
54:24, 69:3,
76:9, 78:25,
113:13, 146:8
**anywhere**
116:7, 116:15
**apes**
131:14
**apologies**
38:21
**apologize**
8:11, 22:18,
80:1, 114:5,
122:20, 135:15
**apparently**
102:10, 113:12,
113:14, 142:22
**appeal**
12:8
**appear**
108:9, 109:20
**appeared**
2:2, 93:16,
149:6
**appearing**
48:9, 82:23
**appears**
29:19, 30:11,
30:13, 31:14,
32:17, 43:11,
44:14, 49:14,
92:15, 100:14,
105:3, 106:13,
106:14, 107:6,
108:11, 108:24,
110:4, 111:9,
113:7, 119:18,
122:25, 125:9,
138:17, 140:25,

142:16, 144:10
**applied**
54:18, 59:19,
59:20, 75:5,
76:25, 84:4
**applies**
70:25
**apply**
59:22, 70:19,
72:24, 73:20,
101:18, 101:21,
102:22, 106:21,
112:7, 122:3
**applying**
71:13
**apprized**
27:4, 27:6
**approach**
51:22, 51:25,
52:9, 59:16
**approaching**
89:20
**appropriate**
46:5, 99:8,
137:11
**approve**
83:14
**approved**
115:23
**approximately**
14:3
**april**
1:24, 9:4,
149:3, 149:21
**area**
44:20, 45:8,
91:10, 113:11
**areas**
87:24
**aren't**
72:11, 121:20
**argue**
112:3
**arm**
38:7, 92:25
**around**
13:24, 20:11,
59:8, 107:24,

115:8
**arrival**
109:5
**article**
125:20, 135:22,
136:3, 136:5,
136:9
**articles**
89:17
**aside**
140:2
**asked**
18:21, 76:23,
96:10, 98:14,
134:15, 134:16
**asking**
29:3, 41:14,
45:14, 59:12,
74:5, 81:23,
121:6
**asks**
35:17, 35:21,
108:2, 120:3,
120:21
**assembly**
78:7
**assigned**
36:3
**assist**
96:7
**assistance**
57:10
**assistant**
3:7, 8:23,
14:2, 15:12
**assists**
38:7
**associate's**
126:19
**associated**
139:17, 149:12
**assume**
11:1, 86:20,
115:24, 127:4
**assuming**
32:20, 118:12,
119:22, 119:25
**asterisks**
135:21

**athletics**
135:1
**attached**
22:20, 25:8,
27:20, 30:1,
32:11, 35:8,
39:17, 44:11,
49:8, 55:23,
69:19, 79:17,
86:7, 94:11,
100:8, 104:24,
107:1, 108:20,
113:3, 117:8,
119:14, 122:13,
125:4, 130:24,
133:19, 135:12,
138:12, 140:20,
142:13, 144:6,
145:14, 148:2
**attachments**
91:25
**attempt**
140:7
**attention**
29:3, 75:20,
87:14, 127:21,
127:25, 128:13
**attorney**
3:7, 8:23,
147:18, 147:22
**attorney-client**
66:23
**attorneys**
19:25
**audiences**
33:23
**audits**
75:3, 75:7
**aurora**
12:5
**auto**
45:24, 46:1,
46:25, 47:13,
47:14, 48:6,
48:8, 66:3,
66:7, 66:8,
66:10, 66:11,
67:1, 67:4,

67:8, 67:9,
67:15, 67:24,
68:1, 101:1,
107:25, 110:22,
111:1, 111:8,
113:12, 113:21,
114:1, 114:9,
114:20, 123:21
**auto-moderated**
101:1
**automatic**
45:21
**automatically**
45:2, 45:17,
47:5, 47:11,
47:19
**available**
72:19, 72:20
**avenue**
2:17
**award**
126:19
**aware**
26:18, 29:15,
48:17, 63:20,
72:18, 73:3,
73:7, 73:8,
77:15, 77:18,
78:20, 79:8,
82:2, 83:13,
88:9, 88:21,
93:3, 115:5,
116:20, 117:4,
130:1, 131:20,
135:3, 135:7,
144:18

---
**B**
---

**b0mb**
65:15
**back**
17:14, 17:18,
18:11, 33:3,
42:20, 55:8,
55:15, 55:18,
70:9, 92:12,
99:22, 100:1,
102:24, 111:11,

129:19, 129:22,
133:12, 133:15,
135:8, 146:18
**background**
11:20
**backup**
97:18, 98:3,
98:10
**bacterial**
125:22
**badger**
40:8, 40:21,
41:2, 41:6,
41:19, 41:22,
109:5
**badgers**
40:24
**ballot**
124:25
**ban**
120:8, 120:10,
120:21, 121:12,
131:13
**banned**
92:14, 115:11,
115:16, 115:24,
116:8, 116:16,
116:19, 116:21,
120:5, 134:19,
135:5
**banning**
92:19, 93:22,
120:17, 121:2,
121:6, 122:1,
131:18, 131:22,
132:4
**barncard**
22:1, 29:4,
35:24, 35:25,
38:6, 42:23,
43:8, 44:1,
44:2, 70:11,
70:15, 71:19,
79:23, 86:18,
90:10, 118:8,
130:10, 142:7
**barring**
31:9

**based**
38:4, 41:17,
50:24, 64:13,
70:25, 77:2,
82:4, 82:9
**basically**
13:18, 66:13,
67:2, 88:3,
91:12, 95:20,
96:6, 146:7
**basis**
25:2, 73:19,
74:1, 74:12,
82:7, 97:12,
104:14, 121:24,
122:3, 132:10,
132:15, 140:9
**bates**
4:13, 4:15,
4:17, 4:19,
4:21, 4:23,
4:25, 5:6, 5:9,
5:13, 5:14,
5:16, 5:18,
5:20, 5:22,
5:24, 6:3, 6:5,
6:7, 6:9, 6:11,
6:12, 6:15,
6:17, 6:21, 7:4,
7:6, 7:8, 7:10,
7:12
**bathroom**
55:7
**beacon**
12:5
**became**
14:1, 15:5,
92:13
**because**
40:25, 42:10,
43:17, 53:13,
65:10, 72:12,
76:6, 83:3,
88:17, 92:8,
93:23, 95:4,
102:3, 111:3,
124:21, 129:6,
139:16, 139:25,

145:8
**become**
115:4
**becomes**
92:20
**been**
9:24, 10:6,
13:19, 14:10,
14:24, 22:24,
24:13, 27:4,
27:6, 32:16,
35:11, 39:25,
41:6, 44:13,
49:12, 50:25,
52:11, 52:12,
54:3, 56:2,
57:4, 57:25,
58:2, 58:9,
58:17, 60:11,
67:4, 69:22,
75:7, 75:14,
75:15, 75:21,
76:13, 76:21,
76:25, 79:20,
81:2, 82:9,
84:12, 86:10,
87:21, 88:21,
90:7, 92:8,
94:5, 94:14,
96:24, 100:12,
105:2, 107:5,
108:23, 111:10,
112:22, 113:6,
114:19, 116:7,
116:16, 116:19,
117:13, 117:20,
119:17, 120:12,
120:14, 123:7,
125:8, 131:3,
134:19, 138:16,
140:25, 142:16,
144:9, 145:17
**before**
10:3, 10:7,
10:15, 10:16,
11:6, 11:22,
15:20, 23:13,
51:22, 63:6,

79:3, 79:9,
81:16, 82:6,
99:6, 107:17,
118:23, 149:7
**begin**
9:18
**beginnings**
13:24
**begins**
8:2, 30:4, 30:7
**behalf**
2:6, 3:3, 8:21,
8:24, 9:1, 36:9,
36:21, 37:15,
38:13, 43:9,
98:16
**being**
8:17, 9:13,
28:19, 34:22,
37:22, 42:12,
46:20, 46:23,
64:19, 75:25,
76:16, 76:23,
82:20, 88:14,
91:14, 96:10,
97:7, 103:15,
119:5, 121:19,
126:10, 130:7,
132:14, 135:5,
142:4, 143:5
**belief**
46:16
**beliefs**
42:6
**believe**
10:10, 22:1,
22:7, 23:2,
32:18, 37:23,
39:3, 39:4,
40:19, 40:21,
47:2, 51:8,
51:21, 52:16,
54:5, 56:8,
57:10, 57:14,
57:17, 58:2,
58:8, 58:20,
59:25, 60:3,
60:11, 66:10,

66:12, 70:6,
71:9, 71:15,
71:21, 75:6,
80:8, 80:17,
82:21, 83:3,
84:1, 85:18,
88:18, 93:21,
93:23, 97:11,
109:14, 115:2,
115:19, 116:10,
116:11, 131:8,
134:12, 134:25,
137:9, 140:6,
143:21
**bell**
126:1
**below**
109:13
**beneath**
105:5
**bennett**
79:24, 80:11,
86:17, 87:5,
87:13, 88:19,
89:7, 89:9,
130:16
**bennett's**
89:23
**berry**
2:15, 9:1
**best**
43:5, 44:6,
68:2, 73:20,
74:1, 77:22,
97:13, 110:9,
110:11, 110:16,
111:18, 111:19,
112:18, 112:19,
124:8, 132:10
**best-effort**
97:12, 122:2
**bet**
60:17
**betsy**
120:4, 120:12
**better**
24:21, 25:14,
63:18, 70:4,

109:16
**between**
65:20, 65:22,
94:4, 123:1,
124:16, 131:8,
141:2, 142:17
**beyond**
97:23
**biden**
45:5
**big**
127:14
**bigger**
25:11
**binder**
35:2, 35:4
**bit**
17:19, 18:2,
20:18, 20:19,
23:1, 25:11,
25:14, 30:7,
31:1, 32:14,
43:25, 48:13,
53:8, 56:9,
64:9, 65:1,
66:3, 66:6,
68:5, 73:6,
74:14, 74:15,
78:17, 85:22,
87:4, 90:13,
91:1, 91:19,
105:11, 107:16,
114:25, 118:7,
128:23
**blake**
95:17
**blank**
35:16
**block**
19:2, 46:25
**blocked**
47:6, 47:11,
47:19, 48:3,
75:12, 75:16,
134:7, 134:13,
135:6
**blocking**
60:3, 75:21,

129:14
**blue**
102:11
**board**
1:7, 3:3, 8:4, 8:5
**both**
26:3, 28:22, 32:5, 33:4, 47:25, 52:23, 57:15, 76:15, 84:2, 90:23, 93:5, 96:16
**bottom**
86:16, 92:3, 117:17, 127:11, 135:20, 135:23
**box**
11:17, 100:25, 101:4, 102:11, 102:12, 105:8, 110:21, 113:11, 113:12, 113:21
**boxes**
107:24, 113:25
**break**
11:4, 11:7, 55:7, 98:21, 132:20, 133:3
**brief**
80:5
**bring**
18:15, 29:22
**bringing**
87:13
**broad**
58:13, 66:13
**brought**
28:16, 121:1
**building**
50:8
**built**
46:12
**bullet**
127:16, 128:7
**bunch**
92:18, 125:25
**busy**
112:9

**button**
19:1, 65:23

**C**

**ca**
2:18
**called**
12:4, 12:8, 12:13, 13:3, 82:21
**calls**
78:2
**came**
46:8
**campaign**
88:17
**campaigns**
87:17, 87:19, 87:23, 88:3, 88:9, 128:14, 128:19, 141:24
**campus**
27:8, 35:13, 35:19, 37:9, 58:4, 130:18, 134:11, 136:22, 139:16
**can't**
57:5, 75:13, 85:5, 92:23, 103:21, 107:12, 109:14, 118:17, 143:17
**cancer**
105:22
**candidate**
124:3, 124:20, 124:23
**candidates**
123:24
**canine**
105:22
**cannot**
65:15
**capacity**
21:24
**captivity**
81:3

**caradine**
30:4, 90:11, 90:22
**care**
35:21
**careful**
126:15
**carefully**
89:22
**carolina**
149:1, 149:4, 149:16, 149:22
**carried**
40:25
**case**
1:5, 8:8, 94:21, 106:22, 111:8, 126:9, 131:20, 131:24, 139:13, 142:3
**case-by-case**
73:19, 73:25, 74:11, 104:13, 120:22, 121:1, 121:8, 121:24, 126:15, 140:9
**cases**
88:2, 88:5, 98:13, 112:8, 115:25
**cats**
126:25
**cause**
40:15
**caused**
93:7
**causes**
45:10
**caution**
66:16
**caveat**
91:23
**center**
80:9, 93:8
**center's**
92:5
**centered**
59:8

**central**
8:14, 55:13, 55:16, 99:14, 99:20, 99:23, 133:10, 133:13, 147:13, 148:13
**certain**
26:18, 45:11, 128:18, 134:8
**certificates**
108:3
**certify**
149:6, 149:11
**cetera**
45:7, 61:24
**cfacktor**
101:5, 102:1, 102:3
**chain**
4:13, 4:15, 4:17, 4:19, 4:21, 4:23, 5:14, 5:16, 5:18, 5:20, 6:9, 23:11, 30:3, 30:14, 31:15, 31:19, 35:12, 36:7, 70:5, 80:15, 80:20, 86:16, 87:8, 117:14, 117:18, 118:15, 118:23, 120:20
**chains**
69:24
**challenge**
104:4
**challenging**
76:13
**chance**
60:16, 101:8
**chancellor**
13:12, 15:13, 17:17, 19:18, 35:16, 36:9, 36:21, 37:15, 74:24, 80:10
**chancellor's**
36:17

**chancellors**
13:11
**change**
20:25, 66:13
**changed**
15:12, 20:3,
20:7, 22:5,
66:8, 67:2
**characterization**
23:7, 91:20
**characterize**
34:21, 34:23,
37:21
**charge**
16:5
**charged**
140:6
**charles**
17:16, 35:17,
56:15, 63:12,
74:24
**charlotte**
149:16
**chat**
6:10, 7:3, 7:5,
7:7, 7:9, 7:11,
39:7, 39:12,
39:14, 40:2,
42:22, 43:11,
53:14, 53:25,
119:19, 123:1,
125:10, 125:11,
127:11, 131:5,
131:8, 131:12,
138:18, 141:1,
142:17, 144:11,
145:20
**chats**
4:25
**chatter**
81:17
**chatting**
119:21, 141:7
**cheating**
120:23
**cherise**
30:4, 90:11,
90:22

**cherise's**
30:18
**chicago**
2:10, 12:4
**chief**
15:13, 45:5,
89:15
**chimpanzee**
125:17, 125:22,
126:22, 127:8
**chimpanzees**
127:5, 127:7
**chimps**
125:25
**choices**
123:24
**chris**
22:1, 29:4,
35:24, 38:6,
42:22, 43:8,
44:1, 44:2,
70:10, 70:11,
70:15, 71:18,
86:18, 90:10,
118:8, 130:10,
142:7
**christopher**
2:15, 9:1,
80:15, 80:16
**circling**
70:9
**circumstances**
112:19
**citing**
123:13
**clarification**
59:12, 110:21,
113:17
**clarify**
18:2, 54:23,
55:2, 74:5,
88:13, 89:5
**clarifying**
114:12
**cleaned**
42:23
**cleared**
43:1, 44:2

**clearly**
118:22
**clemens**
131:13
**closely**
14:13, 28:21
**co-hosting**
87:2
**coal**
109:15
**codes**
110:24
**coe**
80:15, 80:16,
80:19
**college**
11:24
**color**
110:23
**color-coding**
113:24
**com**
135:25
**combat**
128:17
**combating**
128:24
**come**
52:16, 58:3,
75:20, 97:11,
98:10, 111:5,
136:18
**comfortable**
76:6
**coming**
32:25, 38:5
**comment**
19:1, 19:7,
19:16, 20:6,
23:4, 31:16,
33:3, 35:13,
35:18, 36:24,
48:4, 62:16,
62:17, 62:20,
63:13, 63:17,
68:24, 70:20,
71:1, 71:15,
71:18, 75:11,

76:12, 77:10,
94:16, 95:2,
100:14, 100:22,
102:8, 103:1,
103:7, 103:8,
105:16, 106:7,
106:9, 107:9,
109:1, 113:10,
120:23, 124:7,
124:23, 126:9,
126:16, 127:19,
128:4, 129:10,
137:14, 141:23,
145:24
**commented**
18:5, 93:13
**commenter**
64:19
**commenting**
45:22
**commercial**
12:8, 85:11
**commission**
149:5
**commun**
21:15
**communicate**
26:16, 26:22,
35:23, 75:24,
76:18, 97:24
**communicated**
78:21
**communication**
26:19, 79:4,
81:16, 118:11
**communications**
12:15, 13:17,
14:2, 15:6,
15:7, 15:8,
15:13, 15:14,
15:21, 15:22,
15:23, 15:25,
17:3, 17:11,
20:22, 21:2,
21:10, 21:15,
22:8, 22:10,
23:14, 24:3,
24:6, 24:14,

24:18, 26:23,
27:6, 28:18,
38:13, 43:14,
54:1, 66:24,
75:1, 79:5,
80:12, 83:14,
84:18, 87:6,
89:21, 96:17,
119:5, 137:19,
145:23
**community**
27:4, 29:1,
31:8, 33:7, 50:9
**compared**
92:10
**compassion**
105:25
**complain**
135:4
**complaint**
25:23, 26:9,
26:11
**complex**
13:10, 14:15,
50:10
**compliance**
60:25, 63:1,
74:15, 75:8
**complied**
74:18
**comply**
103:12
**conceivably**
77:16
**concern**
41:25, 83:1
**concerns**
96:23, 118:3,
132:3
**concluded**
148:12
**conclusion**
78:2
**condensed**
147:20
**conduct**
16:7, 23:22,
98:15

**conducted**
1:15, 21:5,
37:25
**conducting**
25:2
**conferred**
138:24
**confirm**
30:16
**conjecture**
58:16
**conjunction**
57:8
**connor**
28:5, 28:24,
79:24, 80:9,
130:17
**consider**
31:7, 49:25,
83:23, 84:5,
84:6, 84:11,
109:18, 141:9
**consideration**
109:24
**considered**
53:2, 101:10,
121:23, 131:19
**consistent**
71:9, 71:16,
119:8
**consistently**
102:22
**constitute**
77:11, 78:13
**constitutes**
111:19
**constitutionally**
57:11
**constitutionally-
-protected**
77:12
**construe**
124:16
**consult**
18:17, 19:18,
19:24, 53:17,
93:10
**consultation**
94:3

**consulted**
14:22, 24:23,
60:20, 60:21,
120:16
**consulting**
18:7
**consuming**
50:10
**contact**
67:11, 85:16
**contacted**
63:7, 63:11,
63:16
**contain**
39:5
**content**
14:11, 15:21,
18:8, 18:17,
20:2, 20:11,
31:6, 46:9,
50:8, 51:1,
51:15, 52:9,
53:10, 53:19,
53:22, 54:9,
59:16, 66:19,
67:10, 67:16,
68:10, 70:20,
70:25, 71:14,
72:12, 75:18,
85:5, 96:11,
115:2, 120:13,
121:18, 126:4,
127:3, 130:1,
130:2, 130:4,
134:18, 136:23,
144:25
**context**
23:19, 27:1,
56:11, 64:4,
64:15, 93:1,
139:12
**continue**
33:13, 33:21,
46:22, 96:9,
115:22, 118:13
**continued**
14:20, 38:1
**continuing**
33:5

**contributes**
69:11
**contributor**
89:15
**conversation**
28:11, 40:8,
41:1, 67:23,
82:19
**conversations**
52:6, 66:17
**copied**
70:6, 90:9
**copy**
51:18, 58:23,
87:14, 118:9
**correct**
17:13, 22:11,
23:14, 23:15,
25:24, 26:4,
28:2, 28:8,
28:9, 31:17,
32:22, 34:13,
34:17, 35:21,
36:5, 39:20,
40:5, 40:12,
42:18, 43:15,
49:17, 51:6,
51:17, 56:7,
63:5, 67:12,
73:23, 73:24,
77:8, 100:16,
100:19, 101:16,
103:3, 103:4,
104:17, 106:12,
106:13, 108:11,
109:3, 110:3,
111:16, 116:4,
116:8, 119:7,
120:1, 120:6,
134:2, 134:6,
142:9, 142:24,
144:14, 146:24,
146:25, 147:3,
149:9
**correctly**
31:12, 70:22,
106:5
**corresponding**
41:16

cotati
2:17, 2:18
could
18:21, 22:13,
22:25, 25:4,
25:10, 27:10,
29:22, 30:6,
31:25, 35:1,
37:3, 38:17,
38:21, 43:3,
44:8, 47:9,
48:3, 49:4,
55:19, 61:16,
68:4, 69:15,
69:23, 76:9,
77:11, 77:16,
79:13, 80:5,
85:21, 86:4,
87:3, 90:12,
90:25, 91:18,
93:2, 93:17,
96:9, 97:13,
98:10, 98:18,
100:2, 105:7,
105:10, 107:15,
108:16, 112:12,
117:12, 117:16,
118:13, 120:12,
128:9, 128:10,
129:16, 129:18,
131:18, 131:21,
137:14, 146:19
couldn't
126:17
counsel
8:19, 33:12,
33:25, 51:5,
60:6, 66:12,
66:17, 98:20,
113:18, 133:22,
147:5, 147:15,
149:8, 149:12
counselor
22:16, 27:12,
32:3, 35:3,
35:4, 38:25,
65:3, 100:4
counter
140:14

county
149:2, 149:22
couple
37:4, 69:24,
101:4, 105:5,
120:4, 138:5
court
1:1, 8:7, 9:3,
9:6, 9:8, 9:17,
10:3, 10:18,
129:18, 129:20,
147:15, 147:21,
147:24, 149:3
cover
58:13
coverage
28:1, 28:12
covering
12:19, 127:15
covid
24:7, 107:18
craig
3:15, 67:11,
67:19, 67:22
create
50:14, 51:13,
56:24, 137:7
created
20:11
creating
21:4, 50:8
creation
60:21
crisis
15:22
crit
29:10
criteria
59:20
criterium
106:15
critical
24:20, 26:12,
68:11, 103:15,
103:19, 116:23,
119:6, 136:8,
139:9, 140:5,
140:11

criticism
29:10, 83:15,
130:12
critique
68:15, 68:19
critiques
38:8
crr
149:21
cst
1:17
cull
40:22, 41:22
cups
109:15
current
15:9, 16:4,
80:23, 95:4,
95:6, 137:2
currently
19:4
cut
73:6
cv
8:9
cv--slc
1:6

---
D
---

daily
132:10
danielle
26:2
dark
109:15
date
8:12, 14:3,
146:23
dated
6:20, 94:22,
133:24, 146:22
dave
109:13, 111:9
day
110:15, 111:18,
112:2, 112:10,
112:13, 127:12,
142:22, 143:19,

144:23, 149:16
day-to-day
15:16, 21:22,
21:24
days
120:4
deal
31:6, 95:22
dealing
21:7, 24:9
dealt
60:3
decided
138:25, 139:15
deciding
18:19
decision
19:9, 19:22,
70:16, 74:3,
78:25, 81:18,
81:22, 102:11,
102:17, 110:14,
120:17, 129:14
decisions
14:23, 16:6,
69:12, 101:13,
104:6, 121:15,
132:11
declared
143:19
dedicated
53:10
defendants
1:10, 3:3,
8:24, 33:4
defending
130:11
defense
2:16
defer
46:6, 47:12,
48:6, 52:25,
54:17, 65:24,
75:19, 101:14
define
72:16, 72:17,
73:12, 73:23
defined
73:14

defines
73:4
definition
73:17
degree
76:15, 104:2,
108:4
delete
31:11
deleted
51:11, 126:13
deleting
92:6
demands
53:14
denise
26:2
department
3:8, 17:5,
21:10, 43:14,
54:4, 61:17,
61:18, 61:23,
62:5, 62:12,
83:14, 87:6,
89:21, 90:24,
93:9, 93:11,
96:23, 137:19
departments
16:24, 17:7,
17:10, 96:14
depends
111:25
deponent
148:10
depos
8:16, 9:5
deposed
10:6, 82:2
deposition
1:13, 2:1, 8:3,
8:17, 10:13,
99:7, 147:11,
147:12, 148:12
describe
15:16, 51:25,
117:2, 144:19
described
13:6, 15:20,

40:21
describing
40:17
description
4:12, 5:3, 6:2,
7:2, 80:5
designated
62:10
detail
115:1
details
40:23
detectives
91:4
determination
74:4, 121:8,
129:10
determine
72:22, 74:6,
129:3
determines
142:6
determining
57:11, 102:14,
121:12, 121:21,
142:5
development
50:9
developments
61:22, 62:4
difference
65:20, 65:22,
124:16
different
13:3, 18:18,
45:9, 46:20,
47:20, 53:17,
63:24, 70:25,
71:6, 87:23,
88:9, 92:25,
95:16, 112:4,
124:19, 127:2,
131:14, 145:8
difficult
101:22
dig
17:19
dinosaurs
109:17

direct
22:2, 30:19,
41:8, 41:14,
43:23, 61:10,
61:11, 77:15,
93:8
directed
44:5, 93:16,
121:7
directing
96:11
directly
16:13, 16:16,
16:19, 39:12,
63:19, 68:22,
70:11, 75:17,
78:21, 130:5,
136:18
director
14:2, 14:10,
15:5, 15:6,
20:21, 21:1,
23:13, 119:4
directs
80:8, 80:9
disable
138:25
discretion
46:14, 54:19,
63:3, 77:6,
112:1, 116:3
discretionary
102:17, 110:13
discuss
61:22, 62:3,
62:12, 63:8,
63:12, 82:6,
91:10
discussed
35:25, 51:22,
51:24, 52:2,
52:8, 54:21,
59:13, 66:4,
69:9, 71:10,
99:4, 111:13,
125:23, 128:15
discusses
65:13

discussing
30:13, 30:17,
70:16, 82:12
discussion
23:16, 24:14,
32:18, 34:4,
34:7, 70:10,
83:9, 88:25
discussions
23:21, 29:18,
54:2, 56:11,
59:4, 59:7
disease
40:25, 125:17,
125:21, 126:22,
127:9
disseminated
95:12
distancing
107:19
distribution
97:22
district
1:1, 1:2, 8:7,
8:8
dived
43:23
diversity
54:6, 96:20
division
43:14, 54:5,
96:20
document
22:24, 30:17,
35:2, 39:6,
39:7, 42:20,
44:13, 44:21,
49:12, 59:14,
60:8, 60:12,
61:6, 62:1,
69:9, 69:21,
73:8, 86:10,
99:4, 100:12,
107:5, 113:6,
119:17, 132:21,
145:17
documents
11:12, 11:17,

138:5
**dog**
106:1
**doing**
60:15, 74:2,
77:24, 96:24,
139:19
**donald**
45:6, 123:20
**done**
65:21, 83:6,
129:2, 129:13
**down**
30:6, 37:4,
64:9, 65:9,
66:6, 68:6,
81:1, 90:13,
91:18, 109:13,
117:12, 117:17
**dozens**
41:14
**draft**
117:15, 118:2
**dropped**
118:23
**due**
123:6
**duly**
9:13
**duplicate**
32:7
**during**
95:8
**duties**
12:16, 13:22,
15:17, 17:19,
95:3, 96:6,
97:4, 97:22,
97:23
**duty**
54:3, 98:7

**E**

**e-mail**
4:13, 4:15,
4:17, 4:19,
4:21, 4:23,
5:14, 5:16,

5:18, 5:20,
11:18, 23:4,
23:11, 24:2,
25:22, 27:24,
30:3, 30:14,
30:19, 31:2,
31:18, 31:21,
35:12, 38:4,
69:24, 70:5,
79:21, 79:22,
80:15, 80:19,
81:8, 86:11,
86:25, 87:8,
88:6, 90:22,
91:21, 94:15,
94:22, 96:5,
96:8, 117:14,
117:18, 133:1,
136:12
**e-mails**
94:24
**each**
10:18, 17:5,
61:21, 62:10,
126:15
**earlier**
29:5, 33:3,
56:9, 71:11,
77:4, 82:1,
95:9, 99:4,
103:1, 111:13,
128:15, 134:3,
137:4, 141:20,
141:23
**early**
13:24
**easier**
138:9
**easy**
59:22
**editing**
97:22
**editor**
90:15
**educating**
80:13
**education**
80:11

**educational**
96:20
**effectively**
89:1
**effort**
46:15, 88:13,
110:17
**efforts**
110:9, 110:11,
111:17, 111:19,
111:20
**egregiously**
122:5
**either**
27:2, 32:5,
58:3, 60:9,
63:6, 81:21,
87:25, 93:19,
98:15, 113:20,
115:15, 116:7,
143:22, 144:21
**elaborate**
85:21, 141:21
**election**
95:18, 123:24
**electronic**
147:19
**elevate**
19:9, 36:2
**else**
32:25, 34:20,
63:11, 97:5
**elsewhere**
42:8
**email**
6:9
**emoji**
40:11, 40:15
**employ**
129:6
**employee**
54:1, 74:2,
74:11
**employees**
16:13, 52:10,
53:9, 57:10,
72:22, 77:15,
77:18, 96:23,

100:24
**employment**
11:20, 11:25
**encountering**
58:14
**end**
36:7, 42:21,
132:18, 136:20,
138:5, 146:8,
147:10
**endeavor**
106:18
**ending**
147:12
**enforced**
75:5, 97:8,
106:16
**engage**
77:20, 78:14,
79:4
**engaged**
41:7, 51:23
**engaging**
41:1, 45:14,
68:22, 84:20
**england**
40:25, 41:3,
41:11
**enough**
57:10, 58:13,
76:7, 92:2,
103:6, 103:9,
103:16
**ensure**
33:9, 34:4,
34:7, 50:22,
57:18, 72:7,
72:11, 76:10,
93:18, 121:25,
129:13, 142:3
**ensuring**
74:16
**entail**
12:17, 17:23,
87:18
**enterprise**
21:7, 130:19
**entirely**
63:24, 143:18

entitled
35:2, 35:12,
56:3, 56:18,
60:24, 68:7,
109:5
equity
96:20
equivalencies
108:3
escalated
121:19
especially
24:16
espére
114:19
esq
2:8, 2:15, 3:5,
3:6, 3:15
essence
19:21
essentially
17:25, 40:22,
45:10, 45:12,
46:18, 46:21,
50:7, 50:12,
87:5
et
1:9, 3:4, 8:6,
45:7, 61:24
ethics
81:2
evaluate
73:18
evaluated
104:13
evaluating
132:11
even
30:12, 33:23,
33:24, 48:4,
92:7
event
27:2, 149:14
events
27:2
ever
10:6, 17:22,
19:8, 19:12,

26:16, 26:22,
29:17, 51:18,
53:2, 54:23,
55:2, 63:7,
63:11, 63:16,
68:14, 68:15,
75:15, 75:23,
76:4, 78:21,
78:24, 79:4,
79:5, 82:6,
84:23, 85:15,
89:20, 93:12,
105:15, 115:10,
116:17, 116:19,
135:4
evers
45:5
every
106:22
everyone's
112:7
exactly
86:22, 87:18
examination
4:5, 4:7, 9:19,
146:15
examined
9:15, 149:8
example
19:2, 45:18,
48:5, 61:18,
75:10, 101:2,
111:24, 127:5,
131:22
exchange
38:4, 41:8,
79:21, 79:22,
86:11, 90:8,
90:9, 91:22,
93:2
excited
87:1
exclusively
24:13
excuse
8:10, 66:10,
105:18
executive
15:24

exhibits
148:1
exists
62:10, 137:9
expand
96:6
expect
106:20, 129:24,
130:6
experience
65:21, 87:21,
98:5, 104:3,
108:3
experimenting
47:18
expert
46:1, 91:9
expertise
53:16
experts
142:8
expires
149:5
explain
45:24, 128:11
explained
41:8
express
47:4, 47:10,
47:21, 47:24,
72:13, 116:22,
123:21
expressed
64:19, 76:4
expresses
64:13
expressing
72:12
expression
78:7
ext
2:19
extent
68:10, 78:1,
127:23, 130:2,
137:23, 140:8,
143:10
extremely
41:11, 41:12,

139:17
eye
103:23
eyes
72:8

**F**

face
89:2, 132:12
facebook
5:6, 6:3, 6:5,
6:7, 17:1, 17:6,
19:4, 28:20,
30:20, 31:7,
31:22, 44:15,
44:25, 70:16,
70:17, 77:11,
79:9, 83:24,
84:18, 84:24,
91:15, 95:2,
107:7, 107:8,
108:25, 109:4,
113:7, 113:9,
113:25, 115:11,
116:19, 117:15,
117:22, 123:5,
123:15, 131:25,
132:4
fact
37:14, 65:13,
76:17, 102:19,
103:5, 103:8,
108:12, 110:4,
110:6, 111:13,
123:10, 129:4,
139:18
factor
128:10
factors
121:11, 121:21
faculty
13:19, 21:3,
80:18, 89:10,
94:6
fair
23:7, 24:5,
28:12, 29:7,
31:20, 33:19,

34:3, 38:3,
38:11, 42:13,
42:15, 42:16,
42:19, 44:4,
47:9, 58:18,
77:2, 81:20,
82:14, 91:20,
92:2, 104:10,
110:15, 111:15,
127:20, 128:12,
130:9, 139:8
**fall**
21:9
**falls**
22:9
**familiar**
49:18, 56:16,
83:19, 110:23,
114:22
**familiarize**
101:6
**far**
83:13
**fashion**
114:20
**fear**
137:13
**feature**
67:5, 101:1
**featured**
139:19, 140:1
**featuring**
125:16
**february**
32:19, 94:21,
94:22, 133:24,
146:23, 147:2
**feeds**
143:12
**feel**
76:6
**felt**
19:23, 92:14
**few**
16:2, 60:2,
132:20
**file**
8:3

**filed**
79:3, 94:21
**filing**
58:1, 66:14
**filling**
16:3
**filter**
67:9
**finalize**
137:6
**findings**
125:23
**fine**
25:18, 39:9,
99:1
**finish**
10:15, 10:16,
11:6
**fire**
45:5
**first**
9:13, 11:23,
12:3, 27:15,
48:24, 57:16,
57:19, 77:17,
77:19, 77:23,
78:6, 78:11,
81:12, 105:15,
109:6, 115:4,
116:25, 117:13,
117:17, 132:7,
134:20, 137:11,
139:5, 142:21
**fischer**
67:11, 67:20,
67:22
**fisher**
3:15
**fit**
74:23
**floyd**
95:17
**focus**
50:7, 87:24,
107:23
**folder**
11:17
**folks**
43:24, 90:22

**follow**
20:16, 52:20,
52:23, 61:2,
129:16, 140:7
**followed**
20:10
**following**
12:6, 33:24,
52:22
**follows**
9:16
**foregoing**
149:8
**forever**
103:24
**form**
10:20, 105:22
**formal**
48:21, 48:23,
54:3, 61:5
**format**
147:20
**formulate**
35:18
**formulated**
57:4
**forth**
71:7
**forthcoming**
56:22
**forum**
78:14, 131:22
**forward**
23:12, 25:22,
27:25, 97:1
**forwarded**
90:21, 91:5
**forwarding**
86:25, 87:7,
91:3
**forwards**
26:3, 28:5,
28:6, 35:20,
118:8
**fourth**
65:8, 80:25
**fox**
139:20

**free**
78:6, 78:7,
123:5, 131:14
**frequency**
46:19
**frequent**
18:16, 92:13,
92:21
**frequently**
45:9, 46:18,
88:13, 98:12,
115:9, 122:4,
141:24
**friday**
1:16
**front**
22:23, 25:21,
49:13, 71:20,
82:23, 83:5
**full**
15:6, 94:1,
149:9
**fully**
95:22
**function**
15:25, 57:15,
85:23, 97:19
**functioned**
24:8
**fund**
2:16
**further**
27:7, 118:11,
120:20, 147:5,
148:10, 149:11
**future**
56:23, 137:5,
137:8
**fwiw**
86:19
**fyi**
138:22

**G**

**gained**
13:2
**gave**
59:21

**gears**
20:18, 48:12,
53:8, 74:14,
78:16
**general**
8:23, 20:6,
24:17, 72:4,
81:2, 94:3,
104:15, 130:15
**generally**
11:15, 21:2,
22:9, 23:22,
29:16, 42:9,
53:17, 74:19,
78:5, 83:19,
88:8, 100:13,
101:12, 121:14,
123:23, 138:3,
141:15, 146:3
**generals**
3:7
**generate**
88:4
**generated**
28:17, 92:10
**george**
95:17
**germane**
143:22
**getting**
41:14, 92:19,
98:23, 102:16,
123:5, 132:18,
138:23, 139:4
**gill**
145:20, 145:21,
145:22
**give**
33:10, 75:10,
80:5, 96:4,
114:25
**given**
11:17, 20:14,
110:12, 110:15,
111:18, 112:2,
112:13, 112:23,
128:21, 149:15
**gives**
47:15

**glad**
103:24, 104:2,
104:8
**go**
10:12, 11:19,
17:18, 18:10,
38:21, 44:8,
50:10, 55:7,
55:19, 66:25,
84:10, 86:4,
90:4, 100:2,
104:20, 112:25,
117:6, 119:12,
125:2, 130:21,
132:17, 133:2,
135:8, 138:1,
138:7, 142:11,
144:4, 145:11,
146:12, 146:13
**goal**
34:6, 112:7
**gohlke**
94:24, 96:14
**going**
10:12, 18:8,
36:8, 55:12,
55:15, 56:21,
66:15, 70:9,
87:14, 91:21,
97:1, 99:16,
99:17, 99:19,
99:22, 101:21,
102:24, 111:3,
111:11, 132:22,
133:9, 133:12,
141:7, 147:11
**gold**
110:21, 110:25
**golden**
105:20
**gone**
61:4
**good**
9:8, 9:21,
55:10, 98:21,
99:25, 126:24
**goode**
2:9

**government**
78:8
**graduate**
80:11
**graduated**
104:8
**granular**
73:5
**gray**
113:12
**grayed-out**
100:19, 105:8,
107:21, 107:25
**great**
11:11, 55:11,
60:18, 70:1,
99:12, 105:12,
132:25
**grid**
82:22
**grievances**
78:8
**grimace**
40:11, 40:15
**ground**
10:13
**grounds**
121:2
**group**
24:3, 24:18,
26:24, 27:6,
53:14, 53:25,
85:17, 87:22,
89:16, 98:22
**group's**
87:13
**groups**
88:10, 128:18,
130:12
**guess**
30:17, 31:23,
34:11, 35:25,
37:25, 42:15,
73:16, 74:5,
84:13, 93:2,
101:21, 101:25,
102:2, 103:21,
104:4, 110:18,

**government**
110:20, 111:8,
111:11, 126:8,
127:9, 131:23,
135:2
**guidance**
5:12, 6:19,
20:15, 20:16,
20:19, 51:1,
52:14, 52:20,
52:25, 56:5,
56:19, 56:21,
56:24, 57:9,
57:14, 58:5,
58:18, 59:9,
60:22, 60:24,
61:2, 61:3,
63:7, 63:25,
64:3, 67:19,
69:6, 71:8,
71:17, 72:6,
73:1, 73:10,
73:14, 74:17,
75:5, 76:1,
76:7, 77:3,
84:3, 101:16,
102:25, 103:13,
111:12, 121:6,
121:7, 133:24,
134:16, 134:17,
136:22, 137:2,
137:6, 137:7,
140:8, 140:15
**guide**
69:4
**guideline**
58:24, 59:23,
61:7, 61:20,
64:2, 64:21,
66:9, 67:3
**guidelines**
20:10, 69:3,
73:22, 122:6
**guiding**
50:1, 50:14,
50:15
**guys**
55:6, 133:5

**H**

**habit**
92:6

hand
9:10, 149:15
handle
89:19, 95:24
handled
36:12, 93:22
handling
46:14, 69:4,
76:6
hani
108:2
happened
26:6
happening
29:6
harassed
93:4
harassment
92:14, 93:17,
93:23
hard
44:18, 102:6,
102:15, 103:22,
105:8, 111:3,
124:5, 126:8,
135:15
hard-pressed
117:2
harder
107:22
hartkopf
114:21, 114:22,
115:5, 115:10,
117:21
hash
45:4
hats
16:2
head
10:21, 10:22
head-on
118:4
heads
123:4
hear
66:23, 122:19
heard
114:23

hearing
115:7
held
2:1, 27:2,
34:16
help
37:9, 37:17,
76:10
helpful
57:14, 68:5,
69:25, 90:13
helps
10:18, 87:16
herding
40:24
here
8:2, 23:3,
23:8, 27:24,
33:9, 34:22,
36:21, 39:23,
41:20, 43:20,
43:22, 46:10,
50:17, 56:2,
64:3, 64:25,
70:6, 87:5,
89:12, 90:8,
92:4, 92:17,
94:22, 98:24,
100:1, 101:3,
101:18, 105:14,
106:9, 107:5,
108:1, 112:21,
113:10, 116:8,
118:15, 119:18,
119:21, 120:3,
121:5, 121:18,
122:24, 124:1,
127:17, 129:7,
131:8, 138:5,
138:16, 141:6,
143:17
here's
37:5, 124:1
heynen
53:11, 53:20,
94:25, 96:15,
96:18, 119:22,
120:3, 141:3,

144:13
heynen's
54:4
hi
136:4
hickey
26:2
hidden
88:16, 100:19,
101:2, 106:11,
131:21
hide
19:1, 65:14,
65:15, 123:11,
123:15, 132:2
hiding
26:11, 64:22,
65:6, 65:20,
117:22, 123:7,
136:8
high
45:11, 76:15
highest
128:3
himself
95:3, 97:6
history
11:20, 61:17
hosain
108:2
hoslet
17:16, 35:17,
35:20, 56:15,
63:12, 74:24
hosting
87:9
however
17:6
hundred
131:24
hundreds
102:21, 129:6
hypocritical
105:25
hypothetical
124:6, 124:13,
124:21
_____
I
_____
id
124:18, 124:25

idea
33:9
ideally
88:11
identification
22:20, 25:8,
27:20, 30:1,
32:11, 35:8,
39:17, 44:11,
49:8, 55:23,
69:19, 79:17,
86:7, 94:11,
100:8, 104:24,
107:1, 108:20,
113:3, 117:8,
119:14, 122:13,
125:4, 130:24,
133:19, 135:12,
138:12, 140:20,
142:13, 144:6,
145:14
identified
125:24
identify
8:19
ignore
37:16
illegal
85:6
illness
125:24
illustrates
104:4
image
25:11
imagine
121:17
impacts
78:11
importance
128:24
important
33:15, 90:1,
94:5, 109:23,
109:24
impossible
110:19
improper
75:21

| improperly | individual's | 114:3, 115:14, | interest |
|---|---|---|---|
| 75:12, 76:12 | 111:25 | 116:11, 116:19, | 142:2, 143:4 |
| **improve** | **individuals** | 123:16, 126:12, | **interested** |
| 37:10 | 93:13, 96:5 | 132:5 | 128:18, 149:13 |
| **inaccurate** | **infection** | **instance** | **interim** |
| 68:11, 128:24 | 125:23 | 24:19, 29:9, | 5:11, 6:18, |
| **inadequate** | **inform** | 33:16, 38:8, | 15:5, 20:15, |
| 137:3 | 137:10 | 40:17, 41:19, | 52:14, 52:25, |
| **inappropriate** | **information** | 41:21, 43:2, | 56:4, 56:18, |
| 83:25, 91:14 | 23:23, 24:25, | 43:7, 45:1, | 57:9, 72:5, |
| **inappropriately** | 29:5, 33:13, | 45:4, 53:11, | 72:25, 73:14, |
| 75:15, 96:25 | 33:22, 34:19, | 62:18, 88:7, | 74:17, 75:4, |
| **inbound** | 34:24, 36:13, | 88:17, 93:15, | 84:3, 103:13, |
| 144:18 | 37:24, 38:8, | 101:19, 106:12, | 111:12, 122:6, |
| **incidents** | 42:11, 61:22, | 108:12, 110:2, | 133:23, 137:6, |
| 81:4 | 62:4, 62:12, | 110:6, 119:3, | 140:14 |
| **inciteful** | 68:8, 68:19, | 120:11, 120:17, | **interject** |
| 30:12, 30:20, | 84:21, 88:11, | 123:22, 126:16, | 66:15 |
| 91:15 | 90:15, 91:6, | 128:8, 134:20, | **internal** |
| **include** | 91:9, 95:12, | 140:3 | 13:17, 15:21, |
| 66:18 | 113:23, 119:9, | **instances** | 33:23 |
| **included** | 123:23, 124:17, | 58:15, 93:3, | **international** |
| 13:23, 71:22 | 124:24, 128:17, | 100:23 | 89:15 |
| **includes** | 128:25, 129:3, | **instead** | **interpretation** |
| 125:11, 127:13 | 129:15, 130:7, | 10:20, 131:22 | 104:11 |
| **including** | 137:22, 142:4, | **institution** | **interrogatories** |
| 85:19, 86:18, | 142:6, 143:5, | 14:1, 14:12, | 81:11 |
| 97:25 | 144:21 | 21:6, 33:15, | **interrogatory** |
| **inconsistent** | **informed** | 42:17, 47:22, | 81:12 |
| 76:1 | 142:8 | 88:8, 88:15, | **investigate** |
| **increasing** | **infrastructure** | 92:25, 93:20, | 93:12 |
| 89:2 | 28:25 | 95:10, 129:7, | **involve** |
| **incredibly** | **injurious** | 139:15, 139:25, | 14:17, 21:16, |
| 40:9 | 54:15, 54:21, | 142:1, 142:9 | 97:22 |
| **indecent** | 85:6 | **institution's** | **involved** |
| 70:19, 71:21 | **inquired** | 142:2 | 19:14, 24:18, |
| **indicate** | 67:25 | **institutional** | 28:22, 28:24, |
| 114:1 | **instagram** | 36:18, 40:19, | 40:20, 43:8, |
| **indicates** | 5:22, 5:24, | 54:10, 87:15 | 79:22, 81:21, |
| 61:20, 113:11, | 17:2, 17:6, | **institutions** | 119:5 |
| 113:21 | 19:5, 28:20, | 42:8 | **involvement** |
| **individual** | 77:11, 79:10, | **instruct** | 82:15 |
| 22:2, 63:4, | 81:14, 81:19, | 131:12 | **involves** |
| 74:2, 77:6, | 82:4, 82:19, | **intellectual** | 29:8, 40:10, |
| 85:4, 110:14, | 82:22, 83:2, | 85:8 | 90:10 |
| 111:18, 115:16, | 83:24, 84:18, | **intelligence** | **involving** |
| 125:12, 134:7, | 84:24, 95:2, | 91:3 | 131:5 |
| 141:2, 141:16 | 100:15, 105:3, | **intense** | **issuance** |
| | | 40:9, 41:12 | 66:9, 67:3 |

issue
23:5, 23:19,
24:12, 28:20,
36:25, 40:10,
40:20, 41:4,
41:20, 41:23,
41:25, 92:8,
92:13, 92:18,
118:24, 135:2
issued
51:4, 63:7
issues
12:19, 13:10,
14:15, 15:22,
21:7, 23:24,
76:20, 88:22,
95:16
itself
42:20, 102:9

**J**

jacob
95:17
jason
94:24, 96:14,
96:16
jeris
28:5, 67:11,
67:19, 67:22
jesper
114:19
jessica
2:8, 8:21, 9:22
job
1:22, 12:3,
12:16, 15:17,
17:19, 38:12,
54:3, 129:8
joe
22:13, 25:4,
27:10, 29:22,
30:6, 30:25,
31:25, 35:1,
37:3, 38:17,
44:8, 49:4,
55:19, 66:6,
68:5, 69:15,
69:23, 72:2,

79:13, 86:4,
87:3, 90:5,
90:12, 90:20,
90:25, 91:18,
98:18, 100:2,
104:21, 105:10,
106:23, 107:15,
117:10, 117:16,
118:7, 118:14,
122:16, 133:15,
135:9, 135:19,
136:15
jog
26:13
john
1:14, 2:1, 4:3,
8:3, 8:25, 9:12,
32:19, 60:13,
119:22, 138:24,
139:5, 146:17,
146:22, 147:11
joined
12:9
jon
80:1, 80:2,
80:8
jordana
30:8, 31:5,
90:11, 90:14,
91:2, 93:22,
117:19
joseph
3:16
jr
45:6
judge
10:4, 74:11,
106:9, 128:2
judgment
73:20, 74:1,
103:21, 112:1
jury
10:4
justice
3:8, 76:20

**K**

keep
123:8, 133:4

keeping
81:3
kelly
20:24, 23:12,
24:7, 26:3,
28:7, 29:4,
29:11, 31:4,
33:1, 33:2,
35:24, 36:20,
70:10, 86:18,
87:7, 87:12,
118:9, 130:9,
142:7, 142:18,
143:14
kenosha
95:18
key
24:7
killed
125:25
killing
41:19, 126:6,
127:5
kind
17:18, 24:1,
31:6, 36:2,
40:11, 40:24,
44:18, 50:12,
51:25, 61:6,
76:25, 102:15,
102:17, 103:22,
110:13, 110:19,
111:25, 118:15,
132:14
kirkpatrick
3:6
klein
16:11, 16:21,
18:14, 40:4,
42:22, 43:22,
67:19, 76:3,
116:3, 131:9,
131:12
kleppin
138:19
knowledge
53:1, 59:24,
60:25, 63:15,

63:20, 77:14,
77:23, 93:12,
97:8, 98:6,
116:18
krasno
1:4, 2:7, 3:14,
8:4, 8:22, 9:23,
26:17, 26:19,
26:23, 27:2,
28:11, 34:17,
78:18, 78:19,
78:22, 78:25,
79:3, 79:6,
79:8, 80:21,
81:16, 81:18,
82:9, 82:18,
83:18, 84:14,
84:23, 85:17,
87:1, 87:8,
89:6, 105:16,
114:24, 115:3,
116:18, 117:21
krasno's
27:25, 80:24,
81:13, 81:25,
82:3, 82:7,
82:13, 82:15,
83:15, 83:20,
83:23, 86:1,
105:24, 106:7,
106:9
kristina
94:25, 96:15,
96:16

**L**

lab
61:23, 62:5,
62:13, 80:22
laboratories
106:2
labs
83:15, 143:21,
144:2
laffey
2:9
language
30:20, 31:6

languish
106:1
large
76:16, 84:15,
88:4, 88:6,
95:11
last
52:16, 60:2,
144:20
lastly
11:3
late
81:14, 81:17
later
20:19
law
10:3
laws
85:9
lawsuit
20:3, 20:7,
66:14, 78:18,
86:1, 94:21,
96:22
layperson
72:8
layperson's
77:23, 78:4
lead
80:12, 127:12
leaders
130:18
learn
89:1
least
116:10
leave
98:7
led
134:19
left
46:13, 103:25,
104:2, 138:6,
142:7
legal
2:16, 20:15,
28:6, 50:14,
51:5, 51:13,

52:15, 52:21,
58:4, 58:20,
60:1, 61:3,
63:8, 63:16,
63:23, 78:2,
101:15, 118:8,
134:17, 147:2
leitner
2:9
lengthy
50:11
lenon
30:8, 90:11,
90:14, 90:21,
91:12, 92:3,
117:19, 118:1
lenon's
118:19, 118:25
leon
125:21
leonard
3:17, 8:15
lesser-restricti-
ve
131:17
let's
11:22, 11:23,
29:21, 37:1,
39:4, 68:3,
84:10, 90:4,
94:8, 104:20,
106:23, 112:25,
117:6, 119:12,
122:10, 125:2,
130:21, 132:17,
133:2, 138:7,
142:11, 144:4,
145:11
levan
94:25, 96:15
levine
80:1, 80:8
lieu
52:22
life
93:6
light
137:21

likelihood
145:1
likely
95:13, 136:4
likes
88:8, 92:7,
92:10
limit
97:1, 139:9,
140:4
limited
78:14, 96:25,
146:10
limits
45:17
line
30:18, 30:23,
62:22, 94:16,
96:5
lines
57:2
link
91:8, 142:23
linked
125:22
list
45:2, 46:12,
47:14, 116:6,
116:15, 116:25,
117:1, 126:19
listed
46:9
literally
102:21
litigation
60:7
little
17:19, 18:2,
20:19, 23:1,
25:14, 30:7,
31:1, 32:14,
48:12, 53:8,
56:9, 64:9,
65:1, 66:3,
66:6, 68:5,
69:25, 70:1,
73:6, 74:14,
74:15, 78:17,

85:22, 87:4,
91:1, 91:19,
105:11, 107:16,
107:22, 114:25,
118:6, 128:23
lives
37:10
living
111:4
location
65:3
locus
59:9
lodahl
3:5, 8:23,
8:24, 25:10,
25:15, 25:18,
55:10, 60:9,
60:17, 66:15,
78:1, 98:20,
99:3, 99:15,
113:17, 114:4,
114:6, 114:8,
114:14, 132:22,
132:25, 133:6,
146:9, 146:12,
146:14, 146:16,
146:19, 147:5,
147:18, 147:19,
147:25, 148:3,
148:4
long
20:14, 99:1,
108:1, 118:15
longer
96:12
look
37:1, 60:12,
99:3, 121:12,
121:21, 135:20,
136:12
looked
77:3
looking
53:22, 65:5,
71:19, 100:14,
101:3, 108:23,
122:24, 125:8,

131:3, 140:24,
142:15, 144:9
**looks**
22:24, 23:3,
24:1, 25:21,
26:1, 27:24,
28:4, 28:10,
35:12, 39:23,
40:2, 42:21,
43:7, 44:24,
70:15, 80:20,
81:15, 86:17,
90:8, 90:14,
90:21, 102:3,
105:14, 107:24,
113:11, 144:16,
145:18
**loop**
23:20, 36:2
**looped**
23:16, 24:4,
28:10, 28:15,
29:11
**lot**
48:17, 48:19,
138:9, 139:4
**lots**
104:11, 138:23
**lovicott**
90:23
**lucas**
1:14, 2:1, 4:3,
8:4, 8:25, 9:9,
9:12, 9:21,
32:19, 55:18,
70:3, 99:10,
99:25, 114:16,
133:15, 147:8,
147:11
**lucky**
109:13, 111:9
**lunch**
98:21
**luncheon**
99:21
**lyndahl**
4:7
**lynn**
3:5, 8:24,

132:19, 146:6

**M**

**ma'am**
27:17, 39:8,
129:20
**madam**
129:18
**made**
17:24, 18:4,
18:6, 18:24,
62:17, 70:21,
71:1, 71:4,
78:24, 84:2,
84:23, 137:13
**madeline**
1:4, 2:6, 3:14,
8:22, 9:22,
26:17, 27:25,
34:17, 78:18,
80:21, 86:25,
117:21
**madison**
3:10, 12:9,
12:11, 13:1,
13:17, 33:6,
38:2, 41:5,
42:16, 44:16,
44:25, 45:2,
51:15, 61:12,
68:11, 89:11,
90:23, 100:15,
103:16, 106:2,
135:25, 136:7,
143:4, 143:21,
144:22, 144:23,
145:5
**madison's**
29:19, 33:22,
42:10, 113:9
**magazine**
15:24
**magnified**
44:19, 44:21
**magnify**
105:7
**main**
3:9, 79:9

**mainly**
11:18, 12:18,
14:11, 18:7
**make**
19:22, 19:23,
25:10, 42:3,
58:7, 68:13,
74:3, 103:21,
110:19, 111:3,
144:18
**makes**
34:1
**making**
18:18, 19:9,
34:12, 101:13,
104:6, 121:14,
129:9, 129:13,
132:11, 134:8
**manage**
27:8
**managed**
13:16, 66:1
**management**
94:16
**manager**
65:14, 92:4,
92:24, 93:7,
95:5, 95:7,
97:20, 134:11
**managers**
61:8, 61:16,
62:23, 64:11,
65:9, 67:9,
68:12, 136:22,
137:10, 137:14,
140:4
**mandatory**
61:1, 63:2
**manifest**
87:25
**manner**
93:21
**manual**
110:22, 111:6,
114:1
**manually**
101:2, 114:9,
114:20

**many**
10:9, 13:5,
16:13, 17:9,
37:10, 37:16,
47:20, 97:10,
127:1, 127:2
**march**
1:16, 8:12,
149:5, 149:16
**mark**
90:23, 91:9
**marked**
22:19, 22:24,
25:7, 27:19,
29:25, 32:10,
32:16, 35:7,
35:11, 39:16,
39:25, 44:10,
44:13, 49:7,
49:12, 55:22,
56:2, 69:18,
69:22, 79:16,
79:20, 86:6,
86:10, 90:7,
94:10, 94:14,
100:7, 100:12,
104:23, 105:2,
106:25, 107:6,
108:19, 108:24,
113:2, 113:6,
117:7, 117:13,
119:13, 119:17,
122:12, 122:18,
122:21, 125:3,
125:8, 130:23,
131:3, 133:18,
135:11, 138:11,
138:16, 140:19,
140:25, 142:12,
142:16, 144:5,
144:10, 145:13,
145:17, 146:18
**marking**
133:16
**marks**
147:10
**mascot**
41:5

mask
24:10
material
118:18
matter
8:4, 9:23,
142:8
matters
36:4
maybe
63:3, 64:8,
64:25, 69:23,
69:25, 146:9
mcglone
32:21, 136:17
mean
13:2, 15:19,
20:10, 23:22,
33:21, 42:25,
47:25, 52:1,
52:2, 52:7,
52:24, 54:15,
59:19, 64:4,
64:15, 73:13,
74:19, 78:5,
83:17, 91:23,
92:23, 93:1,
95:6, 97:19,
98:2, 101:12,
101:22, 101:25,
104:3, 110:16,
110:18, 111:2,
111:14, 112:3,
113:13, 124:15,
126:24, 128:9,
128:19, 129:24,
131:23, 132:6,
140:13, 143:10
means
64:17, 84:9,
100:25
meant
54:25, 55:3,
120:5, 144:19
mechanics
131:25
mecklenburg
149:2, 149:22

media-wise
32:25
medicine
105:21
member
36:24, 62:18,
80:18, 89:10,
111:5
members
21:3
memo
5:11, 6:18,
51:4, 56:3,
57:3, 57:22,
66:25, 69:6,
71:8, 72:6,
77:3, 101:16,
102:24, 102:25,
111:12, 133:23
memorandum
146:22
memory
10:12, 26:13,
45:8, 139:21
memphis
12:7
mention
40:14
mentioned
10:14, 29:5,
40:7, 41:10,
58:17, 69:10,
73:25, 91:16,
96:18, 115:7,
130:16, 134:3,
139:6
mentions
125:15, 145:4
meredith
26:1, 32:20,
32:21, 136:4,
136:17
message
6:12, 6:14,
6:16, 7:3, 7:5,
7:7, 7:9, 7:11,
41:8, 95:4,
96:6, 97:3,

117:19, 136:13,
136:16
messages
6:21, 41:15,
42:24, 43:16,
43:19, 43:23,
44:3
microsoft
6:10, 6:14,
6:16, 7:3, 7:5,
7:7, 7:9, 7:11,
32:18, 40:1,
119:19, 122:25,
125:10, 131:4,
138:18, 141:1,
142:17, 144:11,
145:19
middle
31:2, 44:22,
76:17, 136:14,
136:19
might
31:7, 63:25,
98:21, 116:2,
124:16, 124:22,
146:3
mike
16:11, 16:21,
18:14, 24:22,
40:4, 42:22,
42:25, 43:5,
43:22, 44:6,
51:21, 59:2,
59:18, 61:13,
63:18, 67:18,
68:15, 75:19,
76:3, 97:18,
97:21, 98:14,
101:14, 131:9
milwaukee
2:12
mind
32:13, 39:7,
60:15, 66:5,
135:9
minute
55:7
minutes
99:8, 132:20,

133:5
misinform
141:25
misinformation
88:14, 128:17
misleading
68:11
missing
139:11
misstate
141:24
model
38:2, 89:12,
107:18, 128:22
moderate
18:12, 19:6,
64:12, 65:10,
75:12, 76:12,
78:25, 89:22,
97:14, 97:17,
102:20, 110:11,
129:9, 140:4
moderated
19:11, 45:17,
75:16, 77:5,
100:23, 102:13,
103:2, 103:9,
107:25, 108:2,
108:10, 108:13,
110:1, 110:6,
111:10, 111:15,
114:8, 114:19,
116:9, 123:21,
144:25
moderates
45:3
moderating
17:11, 18:14,
19:16, 19:19,
21:20, 26:24,
43:8, 50:22,
67:15, 77:16,
82:16, 109:23,
112:15, 137:15
moderation
5:12, 6:19,
14:23, 16:5,
17:21, 18:22,

18:24, 20:2,
20:6, 20:12,
23:4, 23:5,
23:17, 23:21,
23:23, 24:4,
29:14, 29:16,
31:15, 31:21,
43:4, 43:17,
44:4, 45:25,
46:1, 46:14,
47:13, 47:15,
48:7, 48:9,
50:24, 51:2,
51:23, 52:9,
56:4, 56:19,
56:21, 57:9,
57:12, 58:15,
59:16, 66:4,
66:7, 66:8,
66:10, 66:11,
67:1, 67:5,
67:8, 67:9,
67:24, 68:1,
69:12, 70:16,
72:6, 72:7,
74:3, 75:18,
75:25, 76:5,
77:25, 78:10,
81:18, 81:22,
95:3, 96:2,
96:11, 96:24,
98:15, 101:1,
101:13, 102:11,
110:22, 110:23,
111:1, 111:6,
111:8, 111:23,
112:11, 113:12,
113:22, 133:24,
136:23, 137:2,
145:9, 145:25

**moderations**
45:21, 46:25

**moderator**
63:4, 110:14,
111:18, 115:23

**moll**
16:11, 16:18,
18:13, 40:4,

46:5, 54:8,
67:14, 67:18,
67:25, 76:3,
82:1, 87:15,
94:17, 94:24,
97:1, 97:16,
116:3, 120:1,
120:25, 123:1,
125:12, 125:15,
126:11, 131:9,
142:18, 143:14,
144:12

**moll's**
46:14, 121:8,
144:17

**moment**
8:10, 101:6,
129:21, 132:12

**monitor**
8:13, 87:16,
87:19, 127:13,
129:8

**monitoring**
91:4, 127:17,
128:7, 141:7,
141:17, 143:1,
143:8, 143:11

**monkey**
142:22, 143:19

**monkeys**
110:6, 143:20

**months**
60:2

**monument**
139:15

**more**
13:10, 13:11,
14:13, 18:16,
20:13, 25:17,
27:1, 31:1,
46:4, 54:19,
57:2, 61:5,
69:25, 70:19,
71:13, 73:5,
73:9, 74:8,
76:9, 81:2,
89:22, 103:11,
114:25, 120:25,

126:18, 134:4,
134:5

**morning**
9:8, 9:21,
127:15

**most**
61:10, 88:24,
92:7, 92:10,
98:5, 98:7,
103:14

**mostly**
116:21

**move**
49:1, 94:8,
106:23, 108:16,
122:10, 139:15

**moved**
52:3

**moving**
10:21, 13:20,
14:7, 14:9, 15:2

**much**
18:16, 39:20,
41:4, 47:15,
102:19, 109:16,
112:12, 112:15

**must**
62:6, 62:20,
135:17

**mystery**
125:17, 125:21,
125:24, 126:22,
127:9

---

### N

**nadine**
28:4, 79:24,
80:2, 80:9,
130:17

**name**
8:15, 9:21,
36:17, 114:23,
115:7, 136:9,
139:16

**named**
33:4

**nate**
16:11, 16:18,

18:13, 24:22,
40:4, 46:5,
46:6, 46:13,
47:12, 48:7,
51:21, 54:8,
54:17, 59:2,
59:18, 61:13,
63:18, 65:25,
67:14, 67:18,
67:25, 68:2,
68:14, 75:19,
76:3, 87:14,
94:17, 94:24,
96:7, 97:2,
98:3, 101:14,
119:25, 120:1,
123:1, 125:11,
127:14, 131:9,
142:18, 143:14,
144:12

**nate's**
53:14

**nature**
59:6, 83:20,
123:6, 123:11,
123:13, 123:14,
141:25

**nd**
149:16

**near**
132:18

**nearing**
138:4

**necessarily**
24:13, 106:15,
111:15

**need**
11:4, 19:17,
24:4, 28:14,
64:8, 97:5,
144:25

**needed**
95:23, 98:9

**needs**
18:24

**negative**
30:12, 42:3,
92:13, 109:20,

109:23, 138:23,
139:4, 139:23,
143:15
**negativity**
92:20
**neither**
149:11
**neutral**
72:8
**neutrality**
89:25
**never**
117:1
**new**
20:16, 59:17,
67:4, 144:18
**news**
12:18, 14:10,
15:20, 21:4,
95:16, 97:22,
125:20, 139:20,
140:1
**newsletters**
13:18
**newspaper**
12:3, 12:4,
12:6, 12:7,
28:1, 85:16
**newspapers**
85:20
**next**
10:17, 13:1,
13:14, 13:19,
13:21, 14:9,
15:2, 133:16
**nick**
53:11, 94:25,
96:15, 96:18,
119:21, 141:2,
144:13
**nielsen**
136:16
**nights**
98:13
**non-social**
47:23, 48:1
**noon**
141:8

**normal**
46:22
**north**
149:1, 149:4,
149:16, 149:22
**notarial**
149:15
**notary**
149:3, 149:21,
149:23
**note**
39:24
**nothing**
9:15, 113:13
**notice**
51:9, 109:22
**notified**
32:24, 33:1,
33:2, 115:18,
116:1
**number**
8:3, 24:8,
24:9, 45:11,
76:16, 76:24,
81:11, 82:23,
83:5, 84:15,
87:15, 88:4,
93:3, 97:24,
112:4, 112:21,
122:15

**O**

**oath**
9:25
**object**
78:1
**obligation**
95:10
**obligations**
77:19
**obscene**
85:3
**observe**
57:16
**obtain**
124:25
**obviously**
41:5, 41:11,

57:25, 59:19
**occasion**
19:8, 19:12,
75:23, 85:16
**occasionally**
96:7
**occasions**
96:10
**occurred**
21:8, 81:16,
82:25
**off-topic**
82:4, 83:4,
84:15, 84:16,
101:15, 106:15,
109:21, 109:25,
123:6, 123:13
**offered**
29:16, 48:18
**office**
12:14, 20:15,
23:24, 24:6,
24:25, 28:6,
50:14, 51:5,
51:13, 52:15,
52:20, 58:3,
58:4, 58:20,
60:1, 61:2,
63:8, 63:16,
63:22, 80:10,
83:17, 85:18,
85:23, 91:8,
134:17, 147:1
**officer**
15:14
**official**
22:4, 22:7,
49:3, 49:22,
49:25, 89:18,
93:14
**oh**
27:15, 39:3,
79:25, 89:8,
114:2
**ola**
67:11, 67:20,
67:22
**on-line**
87:9

**on-topic**
45:13, 68:10,
78:13, 106:14
**onboarding**
51:21, 52:10
**once**
10:10, 40:7,
139:14
**oncologist**
105:20
**one**
8:10, 13:19,
18:25, 27:14,
27:15, 32:5,
35:5, 39:14,
53:21, 57:25,
65:23, 71:6,
71:7, 73:17,
92:19, 97:17,
101:4, 101:5,
101:12, 110:18,
120:15, 121:1,
125:15, 128:10,
135:2, 139:11,
146:9
**ones**
92:8, 130:10
**online**
8:18
**only**
11:4, 28:19,
82:17, 88:10,
95:10, 121:17,
138:5, 146:2
**open**
104:11
**openly**
118:4
**operated**
40:18
**operating**
140:7
**opinion**
20:5, 83:18,
84:14, 88:19,
101:11, 102:2,
106:8, 108:7
**opinions**
42:7

opposed
101:2
opposite
92:18
opted
98:6, 139:14
option
68:21, 68:22,
93:18
ordering
120:9
orders
107:19, 147:16
organization
61:23, 62:5,
62:13
organizations
85:12
original
105:12, 113:10
other
10:18, 14:14,
17:24, 18:4,
45:12, 58:4,
61:18, 67:10,
67:16, 69:8,
69:11, 84:20,
86:17, 88:2,
88:5, 92:20,
97:6, 112:9,
126:20, 145:4
others
53:15, 87:8,
87:22, 88:10,
130:13, 130:14,
130:17, 142:3,
144:1
otherwise
11:1, 45:14,
53:16, 60:20,
75:24, 140:14,
149:13
out
27:7, 36:8,
42:23, 43:1,
44:2, 50:23,
64:25, 68:23,
86:25, 90:19,

91:7, 105:11,
109:16, 123:25
outcome
118:19
outlets
139:21
outline
98:23
outreach
90:15
outright
131:18
outside
12:4, 130:12
over
10:12, 10:18,
11:19, 14:19,
20:10, 41:21,
58:24, 66:25,
76:14, 87:21,
95:12, 120:4,
133:1
overall
34:13, 106:18
oversaw
52:3
oversee
14:20, 14:21,
15:20, 16:7,
16:15, 61:11
overseeing
14:11, 14:13,
15:7, 16:25,
17:20, 50:6
oversees
75:1
oversight
13:23, 20:2
overwhelmed
76:22
overwhelming
50:12
own
17:5, 45:25,
58:16, 129:2,
129:5

**P**

page
4:3, 4:12, 5:3,

5:5, 6:2, 7:2,
17:5, 29:19,
30:21, 31:9,
44:15, 44:25,
45:10, 46:18,
46:22, 61:17,
61:21, 62:10,
113:9, 115:11,
117:22, 118:3,
135:21, 135:24,
136:15, 142:23
pages
1:23, 17:12,
37:4, 54:11,
61:18, 77:11,
91:15, 139:10
paid
127:25
palestine
123:5
pandemic
76:19, 95:9,
95:17, 96:1
paper
135:22, 136:4
papers
21:5
paragraph
37:11, 37:20,
64:6, 64:10,
65:8, 65:13,
81:1, 92:4
pardon
122:19
parentheses
27:14
parse
103:23
part
52:9, 54:25,
55:3, 88:17,
96:15
participant
53:24
participants
40:2, 119:20,
125:11, 131:5,
144:12

participate
67:23, 89:1
participated
54:2
particular
26:6, 29:14,
36:25, 41:22,
47:16, 48:4,
48:10, 50:24,
58:14, 64:10,
65:24, 72:11,
80:14, 81:15,
82:15, 85:25,
87:24, 109:4,
112:10, 113:15,
120:17, 121:5,
121:7, 121:13,
124:3, 129:25,
131:20, 140:2,
144:23, 144:24,
145:3
particularly
29:4, 33:11,
146:2
party
149:13
past
68:18, 82:10
pay
120:23
pays
127:21, 128:13
pending
11:5
people
27:7, 29:3,
36:3, 37:8,
37:17, 40:9,
47:4, 47:15,
47:20, 57:15,
77:20, 91:13,
91:14, 93:19,
112:4, 112:9,
115:21, 116:6,
116:16, 116:21,
117:1, 117:3,
122:4, 129:7,
132:19, 140:6,

**143:25**

**percent**
131:24

**perfect**
66:7, 99:15,
132:23, 133:6,
136:15

**perfectly**
106:20

**perform**
112:5

**performed**
126:14

**perhaps**
30:12, 43:3,
58:12, 69:9

**period**
14:24, 24:16,
76:14, 95:8,
112:23, 115:8

**permanent**
56:20, 56:24

**permissible**
51:10, 57:12,
137:16

**person**
24:8, 24:9,
41:2, 41:15,
91:6, 93:6,
95:21, 138:18,
141:6

**personal**
42:6

**personally**
42:5, 73:12,
75:13, 78:24,
93:3, 132:3

**persons**
50:23, 53:21

**pertaining**
134:5

**peta**
87:22, 91:17,
126:5, 126:9,
126:12, 126:25,
127:1, 141:7,
141:12, 141:17,
141:24, 143:18,

143:19, 143:25,
144:18, 144:21,
145:2

**peta's**
142:23, 143:1,
143:8

**peter**
138:19

**peterson**
102:1, 102:2

**petitioning**
134:14

**petitions**
46:20

**pfp**
23:4

**phonetic**
126:19

**photo**
13:23, 15:23

**picked**
10:22

**piece**
82:17, 135:2

**pieces**
130:1

**pitch**
96:7

**place**
18:19, 50:13,
103:25, 124:1,
142:1

**placing**
82:7

**plaintiff**
1:5, 2:6, 3:14,
4:12, 5:3, 6:2,
7:2, 8:22, 9:2,
9:22, 26:17,
34:17, 78:17

**plan**
56:23, 127:13

**planet**
8:16, 9:5

**platform**
145:8, 146:2

**please**
8:19, 9:6, 9:9,

10:14, 10:20,
10:25, 11:3,
22:14, 22:15,
25:5, 27:11,
29:23, 29:24,
32:1, 32:2,
38:17, 38:18,
38:19, 39:15,
44:9, 49:5,
49:6, 55:20,
66:18, 67:10,
69:16, 69:17,
79:13, 86:5,
87:4, 90:5,
94:9, 98:19,
100:3, 104:21,
104:22, 106:24,
108:18, 113:1,
117:6, 118:14,
119:12, 120:8,
122:11, 122:17,
125:2, 130:22,
138:8, 138:10,
140:18, 141:21,
142:11, 145:12,
146:21, 147:17,
148:3

**pls**
120:8

**plus**
126:12

**point**
14:1, 26:18,
40:21, 64:5,
64:18, 95:19,
97:2, 106:17,
110:18, 110:20,
111:2, 113:17,
127:16, 128:7,
146:10

**police**
90:24, 91:13,
93:9, 93:12

**policies**
49:2, 73:1,
96:1

**policy**
49:22, 49:25,

50:5, 50:9,
57:1, 61:5,
62:11, 69:5,
76:1, 122:3,
137:7, 140:8,
140:10

**political**
40:10, 41:11,
41:20, 41:23,
41:25, 103:6,
103:9, 123:6,
123:10, 123:14,
141:10, 141:17

**polling**
124:1, 124:18

**portion**
107:7, 107:9,
109:1, 123:1,
141:1, 145:18,
145:19

**portions**
107:22

**position**
11:23, 12:11,
12:17, 13:1,
13:14, 13:21,
15:3, 15:10,
16:4, 17:15,
17:22, 21:9,
28:18

**positive**
34:5, 104:3,
104:8, 137:21,
137:24

**possible**
31:8, 46:13,
63:25, 110:12,
131:23, 132:1,
137:5, 143:18

**post**
18:6, 18:11,
18:14, 19:7,
19:19, 26:21,
26:25, 31:22,
32:19, 46:17,
48:4, 48:10,
62:3, 62:6,
62:15, 63:2,

63:9, 65:10,
65:14, 65:15,
65:20, 68:10,
68:13, 68:16,
68:25, 70:21,
71:4, 77:4,
77:7, 78:15,
84:24, 85:1,
88:24, 96:9,
100:15, 102:9,
103:5, 103:7,
103:16, 103:19,
104:17, 105:3,
105:12, 105:14,
105:16, 105:19,
105:24, 107:8,
107:18, 108:1,
108:7, 108:25,
109:4, 109:10,
109:11, 109:21,
109:25, 110:5,
111:7, 112:13,
113:10, 114:8,
114:19, 114:20,
115:22, 123:12,
123:15, 123:18,
123:19, 123:23,
123:25, 124:6,
124:11, 124:23,
126:12, 126:25,
127:9, 127:18,
142:21, 143:17,
144:21, 145:2
**posted**
79:1, 84:17,
91:6, 92:9,
93:13, 95:23,
115:2, 115:9,
126:18, 126:21,
130:4, 132:15
**poster**
120:5, 121:5
**posters**
101:24, 102:16
**posting**
53:15, 79:9,
98:15, 108:13,
113:9, 113:15,

120:13, 129:25,
131:13, 134:19,
138:19, 146:3
**postings**
21:20, 53:22,
57:13, 128:1,
134:9
**posts**
17:23, 17:25,
18:18, 19:10,
21:4, 31:11,
45:13, 53:11,
53:18, 62:23,
64:22, 64:23,
65:7, 69:12,
75:15, 77:16,
78:12, 82:20,
83:2, 83:10,
83:20, 84:16,
84:18, 84:19,
85:5, 88:5,
88:16, 89:23,
93:25, 111:4,
112:22, 115:22,
116:22, 117:21,
120:4, 125:11,
126:13, 126:20,
127:1, 127:24,
131:14, 132:2,
145:3
**potential**
23:21, 28:12,
31:15, 143:24
**potentially**
27:5, 27:7,
115:7, 141:11
**power**
109:15
**practically**
46:24, 47:3
**practice**
52:19, 92:24,
132:4
**practices**
66:13, 75:25,
109:14
**preparation**
11:13

**prepare**
88:11
**prepared**
118:1
**presence**
37:8
**present**
3:13
**preserve**
77:19
**press**
87:25
**presumably**
44:16, 104:1,
119:21, 141:13
**prevalence**
128:21
**prevent**
45:12, 45:21
**prevented**
84:20
**prevents**
48:9
**previous**
102:8, 113:20
**previously**
69:10, 96:18,
130:17
**primarily**
61:13
**primary**
97:19
**primate**
25:23, 26:12,
80:8, 80:22,
89:3, 93:8
**primates**
47:17, 126:6
**prior**
11:25, 81:18
**privacy**
85:9
**privileged**
66:17, 66:24,
118:18
**pro**
33:17, 34:22,
37:22, 40:8,

42:14, 42:17,
123:20
**probably**
19:24, 24:22,
46:16, 68:18,
76:22, 93:5,
106:17, 128:2,
132:7, 138:9
**problem**
96:3
**proceeding**
10:17, 149:13
**proceedings**
55:14, 133:11
**process**
38:5, 50:11,
136:21
**processed**
135:17
**processes**
46:7
**produce**
14:12
**produced**
60:7, 60:11,
100:22, 133:22,
135:16
**producer**
145:22
**production**
15:20, 15:23
**profane**
85:1
**profanity**
67:10, 67:16
**professor**
28:23
**program**
33:8, 33:14,
33:17, 33:19,
33:23, 34:4,
34:7, 34:10,
34:13, 37:24,
38:9, 38:14,
42:10, 68:16,
68:19, 80:9,
80:13, 83:16,
89:11, 94:4,

**programs**
84:22, 85:12

**prohibit**
77:24

**promise**
138:4

**promote**
33:17, 137:19,
137:20

**promoting**
34:10, 88:24,
120:23

**promotion**
24:10, 85:11,
138:2

**proper**
93:24

**properties**
95:23

**property**
85:9

**proposed**
118:12, 118:19,
119:1

**protection**
57:18, 94:5

**protest**
102:4, 141:8,
141:9, 141:12

**provide**
33:13, 33:21,
34:19, 36:14,
38:12, 51:18,
58:23, 66:18,
73:9, 88:11,
95:11, 98:3,
124:18, 128:16,
137:5

**provided**
20:16, 99:6,
113:24, 128:17,
142:4

**provides**
51:9

**providing**
38:7, 68:8,

**119:6, 119:9,**
130:11

**public**
18:5, 19:11,
21:21, 34:19,
41:25, 42:12,
51:9, 57:13,
62:18, 75:12,
76:18, 77:10,
78:14, 80:13,
80:24, 81:1,
81:7, 90:15,
92:4, 95:12,
97:25, 122:1,
129:1, 149:4,
149:21

**public's**
57:18

**publicity**
28:17, 29:2

**publicized**
139:18

**publicly-availab-
le**
143:12

**publicly-voiced**
118:3

**publish**
126:4

**published**
125:20

**pull**
22:13, 25:4,
27:10, 31:25,
35:1, 38:17,
44:9, 49:4,
55:19, 69:15,
79:13, 86:5,
90:4, 98:18,
100:3, 140:17,
146:19

**pulling**
133:15, 135:10

**purpose**
61:21, 62:11,
62:19, 137:18

**purposes**
113:14

**pushing**
18:25, 65:23

**128:25, 136:21**

**put**
50:7, 86:25

**putting**
68:23, 68:24

---
**Q**
---

**quantifies**
107:18

**question**
10:15, 10:17,
10:24, 11:2,
11:5, 11:6,
18:13, 19:15,
19:20, 19:24,
24:21, 41:14,
44:23, 62:8,
63:19, 68:2,
98:11, 111:22,
113:19, 113:20,
124:9, 124:12,
126:24, 129:17,
129:19, 134:12,
144:17

**questions**
18:21, 45:14,
58:21, 63:24,
85:19, 85:24,
88:12, 95:25,
130:3, 136:18,
146:10, 147:6,
147:10

**quick**
55:7

**quite**
11:22, 16:2,
58:13, 105:25

**quote**
30:19, 42:22,
51:15, 61:8,
61:21, 70:17,
89:1, 98:3,
127:13

---
**R**
---

**rachel**
28:5, 67:11,
67:19, 67:21

**racial**
76:20

**racist**
139:17, 139:24

**raise**
9:9, 96:22

**range**
53:13, 63:23,
84:17, 97:21,
97:23, 128:20

**rare**
18:10, 18:22,
19:6, 105:22

**rather**
50:10, 81:3,
122:6

**rd**
147:2

**reacting**
94:2

**read**
31:12, 70:22,
101:8, 101:15,
105:8, 106:5,
107:12, 107:22,
129:22, 135:15,
138:9

**reading**
25:12, 71:2

**ready**
132:21

**real**
93:6

**reality**
110:13

**really**
12:23, 47:7,
48:17, 73:16,
82:14, 85:5,
92:23, 94:1,
103:22, 105:25,
106:2, 121:20,
124:10

**reason**
31:10, 51:16,
75:11, 104:17,
116:23, 123:15,
141:16, 141:19

**reasons**
120:9, 143:3

reassign
95:2
rebecca
35:16
recall
20:13, 23:18,
24:11, 26:7,
26:8, 26:9,
26:20, 27:1,
40:23, 46:11,
48:25, 51:20,
52:5, 53:4,
55:1, 55:4,
57:21, 59:3,
60:4, 60:8,
60:9, 79:2,
79:7, 82:8,
82:12, 82:18,
82:24, 83:6,
83:8, 89:20,
89:24, 93:15,
95:19, 105:15,
109:10, 126:2,
134:21
receive
79:5, 128:4
received
30:11, 48:15,
48:21, 48:23,
52:25, 57:21,
58:21, 72:15,
76:16, 88:5,
93:16, 95:13,
97:9, 106:19,
146:23, 147:1
receives
26:1, 36:12
receiving
23:10, 58:10,
84:21, 95:4,
112:23
recent
80:24, 81:1,
81:7, 88:24
recently
20:13, 20:25,
50:25, 51:4,
103:14

recess
55:14, 99:21,
133:11
recipients
86:18
recognize
30:15
recollection
53:6
record
39:25, 55:8,
55:13, 55:16,
99:20, 99:23,
100:1, 129:22,
132:6, 133:10,
133:13, 147:12,
147:14
records
11:18, 14:14
red
113:25
reddit
26:11
redress
78:7
refer
21:25, 43:3,
136:1, 142:22,
146:17
referenced
95:9, 102:25,
126:10
references
64:3, 126:11
referencing
50:3, 56:9,
60:13, 101:24,
102:4, 102:8,
136:1, 146:2
referring
35:5, 43:20,
47:23, 50:16,
51:4, 61:9,
61:16, 74:8,
81:8
refers
61:7, 64:21,
104:1, 110:25

reflect
102:11, 102:12
reform
35:13, 35:19
refresh
10:11
regard
96:1, 132:7
regarding
5:11, 6:18,
23:4, 28:11,
30:19, 56:4,
56:11, 63:17,
70:10, 80:21,
110:5, 117:22,
125:17, 133:23,
134:4
regent
8:5
regents
1:7, 3:3, 8:5
region-specific
107:19
register
124:1
registration
124:19, 149:23
regular
25:2, 132:15
regularity
25:1
regularly
89:17
reid
1:24, 9:4,
149:3, 149:21
reinstated
134:14
reiterate
66:22
relate
62:18, 91:16
related
11:18, 26:21,
29:9, 60:10,
61:22, 62:4,
62:12, 85:12,
91:17, 95:15,

115:3, 123:18,
128:3, 134:10,
149:12
relates
17:20, 23:5,
78:9
relating
29:8, 31:16,
69:9, 91:15
relation
34:20, 77:24,
114:23, 135:1,
145:7
relations
12:13, 13:4,
14:10, 15:22,
17:17, 74:21,
74:22, 74:25
relationship
12:21, 145:24
releases
12:19, 21:4,
88:1
relevant
48:15, 113:13,
144:22
religion
78:7
remain
113:16
remember
41:1, 41:13,
115:7, 118:25,
120:11, 120:15
remote
3:16, 22:15,
22:18, 25:6,
27:12, 27:17,
29:24, 32:2,
32:8, 35:3,
38:19, 38:22,
38:24, 39:8,
39:11, 39:15,
39:21, 44:20,
49:6, 55:21,
65:2, 69:17,
79:15, 90:6,
100:4, 100:6,

104:22, 108:18,
122:17, 122:20,
138:10, 140:18,
146:21, 147:25,
148:4, 148:7
**remotely**
2:2
**removal**
138:24
**remove**
48:14, 51:15,
54:14, 62:23,
70:17, 72:1,
103:6, 103:16,
104:17, 123:11,
139:14, 140:11
**removed**
62:6, 62:20,
63:3, 111:15
**removing**
64:22, 65:6,
65:20
**repeat**
129:17, 129:19
**repeated**
82:4
**rephrase**
10:25, 62:9
**replacing**
53:5
**replicated**
112:21
**replied**
68:18
**reply**
68:13, 68:16
**replying**
68:24
**report**
16:13, 16:16,
16:18, 17:15,
21:12, 22:2,
70:11
**reported**
1:24
**reporter**
9:3, 9:6, 9:8,
9:17, 10:19,

12:4, 12:7,
129:18, 129:20,
147:15, 147:21,
147:24, 149:3
**reporting**
31:7
**reports**
61:11, 77:15
**represent**
8:16, 8:20,
9:22, 26:10,
81:10, 88:23,
89:4, 89:14,
94:20, 100:21
**represented**
113:18
**representing**
8:25
**represents**
9:4, 36:22
**request**
35:13, 35:18,
36:3, 36:9,
36:11, 36:24,
58:7
**requested**
91:5
**requester**
36:14
**requesting**
89:21
**requests**
13:11, 14:14,
21:6, 58:3,
58:18, 60:14,
136:18
**research**
15:21, 20:21,
21:1, 21:7,
21:14, 21:15,
21:17, 22:10,
23:13, 24:2,
24:6, 24:13,
24:18, 26:12,
26:23, 27:3,
27:4, 27:5,
27:8, 28:22,
28:25, 31:16,

33:6, 36:4,
37:9, 37:16,
38:6, 43:13,
45:7, 65:18,
80:10, 89:3,
89:16, 89:17,
115:3, 119:4,
127:14, 127:17,
127:22, 128:1,
128:3, 129:1,
129:2, 129:5,
129:12, 130:11,
130:18, 142:1,
144:2, 144:23
**research-facebook**
25:23
**researchers**
28:21, 125:24,
126:6, 127:5
**reserved**
148:11
**reserving**
33:12
**resource**
73:3, 73:9
**resources**
69:3
**respect**
110:10
**respond**
33:25, 38:8,
68:13, 87:16,
87:19
**responded**
68:15, 81:12,
85:19
**responding**
24:19
**responds**
31:4, 120:25
**response**
23:10, 24:7,
26:7, 35:18,
35:23, 53:21,
92:9, 95:24,
144:16
**responses**
14:14, 81:11

**responsibilities**
13:5, 13:9,
20:21, 33:6,
53:15, 97:5
**responsibility**
16:25, 74:20
**responsible**
17:10, 21:3,
28:19, 53:21,
54:9, 74:16,
89:3, 96:24,
97:21
**responsive**
58:9, 60:14
**restrict**
84:14
**restricted**
72:11, 81:13,
82:3, 82:7,
82:9, 115:17,
116:12, 116:13,
116:16, 122:8,
126:13
**restriction**
83:9, 131:25
**restrictions**
82:13, 82:16,
115:20
**restroom**
11:4
**result**
20:3, 20:7,
145:3
**resulted**
121:18
**resume**
99:14
**retriever**
105:20
**retweeted**
89:18
**review**
11:12, 11:16,
18:11, 61:5,
75:18, 85:4,
111:6
**reviewed**
145:1

reviewing
17:23, 17:25,
53:10, 54:9,
60:8, 77:7,
105:15, 118:25
reviews
75:8
revise
89:9
revising
53:2
revision
60:1
revisions
52:11, 59:24
right
9:10, 16:4,
25:21, 30:15,
74:9, 90:16,
99:25, 104:7,
104:16, 114:2,
114:4, 114:11,
115:17, 130:20,
134:5, 136:20,
146:6, 146:17,
147:2, 147:4
rights
40:10, 40:14,
41:18, 42:2,
42:23, 43:18,
43:24, 44:3,
44:5, 57:19,
77:20, 78:6,
85:9, 113:15,
128:13, 134:22,
148:11
rights-related
141:13
ring
126:1
rise
86:12, 87:2
robert
3:17, 8:15
rock
138:24
role
13:16, 14:9,

18:7, 21:19,
24:3, 119:8
roles
52:3, 80:6
roman
45:5
room
47:15
roughly
14:5
round
99:13
roundtable
88:25
routes
47:21, 48:1
rpr
149:21
rule
59:22
rules
10:13, 11:9
running
76:4
runs
87:15
ryan
114:20, 114:22,
117:21

---
### S
safety
93:10, 93:18
said
21:15, 36:20,
67:2, 82:2,
102:15, 109:23,
113:21, 137:4,
143:19
saith
148:10
same
10:2, 13:5,
32:6, 66:11,
115:8, 144:20,
147:23
sanctuary
125:17, 125:22,

126:22, 127:8
say
14:21, 18:22,
19:10, 20:9,
21:14, 28:17,
29:7, 30:18,
33:18, 34:3,
34:6, 34:9,
34:18, 38:3,
38:11, 41:17,
41:24, 42:13,
42:16, 44:4,
47:9, 48:19,
49:2, 49:21,
50:22, 51:3,
51:24, 53:20,
53:24, 54:8,
60:21, 73:7,
76:21, 77:2,
82:14, 82:18,
83:3, 88:20,
91:13, 92:15,
93:2, 99:13,
101:19, 103:7,
103:18, 103:25,
104:10, 110:15,
120:8, 123:8,
126:17, 127:20,
128:12, 128:18,
130:9, 132:9,
136:17, 136:19,
137:18, 139:8,
142:21, 145:7
saying
43:22, 62:22,
65:14, 71:3,
94:25, 96:9,
103:24
says
25:22, 30:23,
32:19, 34:11,
37:7, 37:15,
42:22, 45:4,
54:14, 62:1,
65:7, 67:8,
68:9, 81:1,
86:11, 86:19,
87:14, 91:2,

95:3, 105:24,
118:1, 123:4,
127:12, 135:21,
136:3, 136:7,
136:20, 138:22,
139:3, 141:6
scale
106:18, 112:20
schoeller
120:4, 120:12
school
105:21
schools
109:16
science
22:8
science's
89:18
scientific
29:9
scientists
93:5, 93:19
scout
105:19
scratch
38:20
screen
23:8, 25:12,
40:3, 50:17,
64:25, 72:2,
145:19
screenshot
5:5, 39:24,
40:1, 44:14,
49:14, 107:7,
108:25, 113:8,
119:19, 125:10,
131:5, 141:1,
144:11
scroll
22:25, 30:6,
30:9, 31:1,
37:4, 64:8,
68:4, 68:6,
87:4, 90:13,
90:25, 91:18,
117:12, 117:17,
118:6, 118:10

scrolling
66:6, 118:14
scrutinize
89:22
seal
149:15
second
23:11, 37:11,
62:22, 67:7
section
66:7, 68:7,
100:14, 107:9,
109:2
sections
100:22
security
93:10, 93:18,
94:4
see
23:8, 23:11,
28:23, 29:21,
32:6, 37:12,
40:3, 43:24,
46:19, 49:13,
56:2, 60:13,
62:21, 62:22,
68:3, 70:3,
81:5, 93:25,
94:18, 99:5,
104:5, 105:11,
113:10, 117:19,
118:11, 118:17,
119:21, 120:22,
121:16, 123:13,
124:22, 131:8,
135:21, 135:23,
136:6, 136:10,
136:19, 136:24
seeing
44:18, 91:24,
124:6, 124:11,
143:17
seems
43:22, 86:24,
102:7, 111:23
seen
109:10, 116:17,
117:1, 136:4

selected
97:16
selectively
92:6
send
39:11, 88:1,
133:1, 136:16
sending
13:18
senior
13:3, 90:15
sense
25:1, 34:1,
143:23, 144:24
sent
36:24, 90:22
sentence
67:7, 67:8
separate
68:13, 68:16,
68:24, 115:19,
128:7
september
80:20, 81:14,
81:17
series
13:15
served
13:16, 80:12
service
13:11
services
84:22
services'
120:24
set
71:7
setting
140:2
settings
5:6, 44:15,
44:24, 67:15
settled
118:24
seven
16:16
several
40:18, 41:7

shaking
10:21
shame
131:13
share
23:23, 42:11,
53:18, 137:22
shared
18:9, 24:24,
27:5, 27:7,
34:20, 46:21,
60:1, 130:8,
143:5
shares
92:7, 92:10
sharing
31:5, 50:8,
59:14, 119:9,
137:24, 144:21
sheer
76:24
shift
112:5
short
33:10
should
19:10, 19:11,
25:16, 39:5,
39:13, 50:22,
60:21, 62:15,
65:17, 91:13,
99:6, 103:7,
103:25, 111:10,
112:12, 120:5,
132:20, 143:23,
146:12
shouldn't
49:2
show
137:21
shown
105:25
sic
42:23, 65:18
side
91:11, 92:19,
92:20
sides
92:18

sierra
125:21
sign
124:1
signature
148:11
signature-sc3
149:18
significance
10:2
similar
15:19, 69:3
simplify
95:1, 97:3,
98:7
simply
59:14, 88:16
since
52:12, 58:1,
91:7, 118:16
singled
50:23
sir
9:17
site
48:4, 79:1
sites
46:20, 92:5,
93:14, 139:20
situation
41:9, 83:7,
91:21, 95:17,
114:18, 124:7,
126:7, 134:10,
139:22
situations
58:14, 76:5
size
107:13
slc
8:9, 8:11
small
20:25, 24:25,
50:12, 70:1
snippet
32:17, 122:25,
138:17, 142:17,
144:11, 145:19

solution
96:3
some
10:12, 11:22,
24:3, 24:25,
30:4, 30:11,
36:13, 40:8,
43:3, 46:18,
46:19, 53:16,
57:1, 58:13,
81:17, 90:22,
100:18, 107:25,
112:8, 114:19,
117:20, 120:13,
121:17, 137:3
somebody
111:7
somehow
118:23
someone
14:22, 41:2,
45:21, 115:8,
120:20, 123:19,
124:2, 124:19
something
18:15, 28:15,
29:8, 29:9,
46:4, 59:17,
72:22, 74:6,
86:25, 98:9,
99:5, 103:11,
106:3, 111:13,
117:3, 123:19,
125:16, 139:14,
143:20, 144:22
sometimes
101:22, 102:15,
130:5
somewhere
15:11
sorry
22:5, 26:2,
26:9, 26:14,
27:5, 31:5,
39:1, 62:7,
62:15, 64:5,
65:2, 68:6,
69:6, 73:6,

80:25, 84:16,
89:5, 89:8,
111:21, 114:3,
115:23, 122:5,
124:10, 129:16
sort
13:24, 14:11,
15:6, 24:8,
36:23, 40:23,
43:3, 44:22,
47:12, 50:6,
52:24, 57:1,
59:8, 61:4,
87:23, 94:1,
98:5, 102:6,
102:7, 104:4,
111:4, 112:5,
120:13, 121:17,
121:18, 126:17,
130:1, 130:18,
132:11, 132:13
sought
63:22, 63:25,
67:19
sound
81:20, 126:3,
126:14
sounds
16:3, 55:10,
92:17, 141:12
space
21:8
spam
45:10, 72:17,
72:23, 73:12,
73:17, 73:23,
74:8, 84:12,
120:22
spamming
46:18
speak
19:1, 75:24,
85:5, 92:23,
143:18
speaking
46:24, 47:3,
89:6, 89:16,
100:13

spearhead
130:10
special
127:25
specialist
8:16, 12:14,
13:4, 22:8,
53:12, 96:19
specific
18:6, 19:7,
19:16, 19:19,
26:20, 27:1,
41:21, 46:7,
52:5, 61:23,
62:4, 63:9,
63:12, 63:17,
64:6, 81:4,
81:22, 82:18,
83:8, 93:15,
95:25, 105:16,
109:10, 112:1,
120:11, 120:21,
121:21, 124:7,
124:20, 124:23,
127:16, 130:4,
134:12
specifically
17:20, 23:18,
24:11, 33:7,
36:17, 46:11,
48:16, 51:20,
54:18, 54:21,
57:5, 57:23,
58:7, 60:3,
64:18, 67:23,
73:4, 78:9,
81:9, 82:24,
89:6, 95:19,
101:23, 109:22,
110:5, 115:6,
115:23, 116:1,
126:3, 126:8,
127:7, 127:8,
127:21, 128:13,
134:21
specifics
48:7
speculate
43:6

speech
54:15, 77:12,
77:20, 78:6,
119:6
spend
75:17
spoke
23:12, 82:1
spoken
102:25
spokesperson
80:12, 89:10
spread
46:23, 88:14
staff
13:19, 16:7,
16:15, 16:16,
17:24, 18:4,
18:6, 18:8,
21:23, 21:25,
50:13, 50:21,
94:6, 102:20,
111:5, 112:18,
122:2, 129:25
staffing
21:1
stakeholders
76:19
stand
22:15, 25:6,
29:24, 32:2,
38:19, 38:24,
39:15, 49:6,
69:17, 79:15,
86:21, 90:6,
104:22, 108:18,
122:17, 138:10,
140:18, 146:21
standard
36:23, 70:25,
71:6, 102:23,
106:21, 112:8,
148:13
standards
31:8, 70:19,
71:13, 72:21
start
10:15, 11:22,

11:23
**started**
40:8, 53:14,
79:9
**starting**
13:25
**starts**
64:10, 65:8
**state**
8:20, 41:20,
118:19, 149:1,
149:4, 149:22
**stated**
137:4, 141:19,
143:4
**statement**
5:9, 29:19,
34:22, 34:23,
36:8, 36:13,
36:19, 37:2,
37:5, 37:7,
37:14, 37:22,
38:5, 38:12,
49:3, 49:15,
49:19, 50:1,
50:14, 50:15,
51:8, 51:13,
51:19, 52:3,
52:8, 52:12,
52:18, 52:23,
53:3, 54:14,
54:24, 54:25,
55:3, 56:12,
56:16, 57:7,
57:8, 58:12,
58:19, 59:21,
61:6, 61:25,
69:5, 71:8,
71:10, 71:16,
71:20, 71:23,
72:5, 72:25,
74:17, 75:4,
84:3, 97:7,
103:13, 104:9,
104:16, 117:15,
118:2, 118:12,
118:20, 119:1,
122:6

**statements**
33:10
**states**
1:1, 8:6, 36:8,
44:2, 65:16,
92:3, 92:12
**stating**
117:20
**stayed**
66:11
**stenographer**
129:22
**step**
109:6
**steve_go_wild**
102:7
**steven**
3:6
**still**
106:11, 109:14
**stop**
65:17
**strategies**
53:18
**street**
2:10, 3:9
**strictly**
70:20, 71:14
**stringently**
71:14
**student**
12:19, 80:22,
85:16, 85:20
**studies**
21:5
**styrofoam**
109:15
**sub**
68:12
**subject**
30:18, 30:23,
94:15, 135:22,
136:3, 142:8
**subordinate**
75:25
**subscribed**
143:11
**sue**
135:5

**sued**
136:7
**sufficient**
123:11
**suggest**
31:11, 43:12,
132:23
**suggesting**
31:21
**suggests**
31:15, 97:3
**suit**
26:17, 28:16,
28:21, 29:3,
33:1, 33:5,
33:11, 34:1,
58:1, 79:3
**suite**
2:11
**summary**
31:20
**superiors**
19:11
**supersede**
52:17
**supervise**
51:19
**supervised**
58:24, 63:16
**supervision**
76:11
**supervisor**
17:16
**support**
33:14, 33:18,
34:12, 34:24,
38:1, 38:12,
38:14, 45:9,
97:18, 98:3,
98:10, 128:16,
143:20
**supported**
24:7
**supporter**
41:3
**supporting**
34:9
**supportive**
42:9, 92:8

**suppose**
60:10, 146:20
**sure**
15:4, 15:18,
16:10, 18:3,
20:23, 25:19,
55:9, 62:9,
80:7, 82:1,
87:20, 98:22,
98:25, 114:14,
131:24, 133:7,
141:22, 147:18
**surfacing**
82:21, 82:22,
83:5
**suspect**
136:20
**swear**
9:6
**swift**
65:15, 65:16
**switch**
48:12
**switching**
17:14, 20:18,
53:8, 74:14,
78:16
**sworn**
9:13, 9:24,
81:11, 149:7
**system**
113:24

---
**T**
---

**tag**
45:5, 88:4,
145:2
**tagged**
82:20
**tagging**
83:2
**take**
11:4, 11:6,
35:21, 37:1,
55:6, 60:12,
70:8, 97:6,
98:21, 99:2,
101:5, 132:20,

133:3, 147:19
**taken**
8:17
**takes**
142:1
**talk**
10:18, 20:18,
20:20, 48:13,
74:15, 78:17
**talked**
128:23
**talking**
56:10, 59:15,
65:6, 70:17,
80:24, 87:1,
92:1, 105:19,
110:10, 144:1
**talks**
109:5
**targeted**
43:17
**tasks**
76:22, 112:4
**taylor**
65:15, 65:16
**team**
26:16, 26:22,
76:21, 95:1,
132:10
**teams**
6:10, 6:14,
6:16, 7:3, 7:5,
7:7, 7:9, 7:11,
32:18, 40:2,
119:19, 122:25,
125:10, 131:4,
138:18, 141:1,
142:17, 144:11,
145:19
**technically**
13:2
**technician**
3:16, 10:14,
22:15, 22:18,
25:6, 27:12,
27:17, 29:24,
32:2, 32:8,
35:3, 38:19,

38:22, 38:24,
39:8, 39:11,
39:15, 39:21,
44:20, 49:6,
55:21, 65:2,
69:17, 79:15,
90:6, 100:4,
100:6, 104:22,
108:18, 122:17,
122:20, 138:10,
140:18, 146:21,
147:25, 148:4,
148:7
**tell**
101:23, 102:15,
110:21
**telling**
91:12, 91:13
**ten**
133:4
**tennessee**
12:7
**tens**
95:14, 97:9
**term**
54:18, 116:8,
116:9
**terms**
18:5, 57:12,
65:25, 67:1,
67:4, 76:5,
78:9, 102:14,
102:18, 111:23,
115:20, 142:5
**testified**
9:16
**testify**
9:14
**testifying**
10:3
**testimony**
11:13, 58:19,
149:10
**testing**
24:20, 29:8,
29:10, 33:18,
34:5, 34:16,
34:22, 37:22,

38:14, 41:24,
42:7, 42:14,
42:17, 45:6,
47:4, 47:5,
47:10, 47:17,
47:18, 48:2,
48:3, 68:16,
68:23, 83:16,
88:20, 88:22,
89:23, 108:13,
110:5, 119:6
**text**
4:25, 6:12,
6:21
**texts**
6:10
**th**
32:19, 80:20,
94:21, 94:22,
123:2
**thank**
9:17, 16:12,
25:18, 27:17,
27:22, 31:4,
32:8, 35:6,
37:6, 39:20,
49:10, 55:17,
55:25, 60:18,
65:11, 68:6,
72:2, 87:4,
90:20, 91:2,
100:6, 100:10,
105:9, 107:3,
107:20, 114:12,
116:13, 117:10,
118:14, 122:22,
125:6, 129:23,
131:1, 135:18,
138:14, 140:22,
147:7, 147:21,
147:24, 148:7
**thanks**
87:12, 123:9,
127:14, 133:8
**themselves**
8:19, 17:11,
73:22, 87:25
**therealandrewpet-
erson**
101:5

**therealandrewpet-
erson's**
103:19
**thereof**
149:14
**thereupon**
9:11, 149:7
**thing**
11:5
**things**
13:5, 15:19,
21:16, 23:20,
38:7, 73:18,
88:1, 95:1,
95:22, 97:4,
98:14, 111:4,
120:21, 125:15,
137:24
**think**
14:1, 14:5,
16:16, 19:4,
24:21, 24:24,
31:10, 33:9,
39:14, 40:22,
42:19, 47:14,
47:20, 47:25,
53:11, 54:2,
54:20, 56:23,
58:16, 59:8,
59:14, 59:21,
64:17, 64:24,
65:7, 68:17,
72:6, 73:18,
74:10, 76:13,
77:18, 96:8,
97:2, 98:4,
98:13, 111:19,
112:14, 112:17,
112:21, 115:17,
115:25, 116:24,
116:25, 118:22,
121:23, 122:2,
124:15, 124:22,
128:9, 128:16,
128:21, 130:16,
137:1, 138:5,
139:11, 139:19,
139:21

third
37:20, 80:25
third-party
69:2
thought
73:16
thousands
95:14, 97:10,
102:21, 106:1,
106:19, 127:2,
129:6, 132:13
thread
81:22, 91:24,
94:1, 121:16
threat
30:19, 93:17
threaten
135:5
threatening
70:18, 71:21,
84:23
threats
89:3
three
96:4, 98:4
through
23:23, 47:25,
50:11, 61:4,
111:6
thumb
59:22
time
8:13, 8:14,
11:22, 13:24,
14:19, 14:24,
20:10, 24:16,
41:3, 44:18,
50:6, 50:10,
53:14, 55:13,
55:16, 75:10,
75:17, 76:14,
80:21, 81:13,
87:21, 98:21,
99:20, 99:23,
102:6, 112:23,
115:8, 124:5,
133:10, 133:13,
137:1, 145:2,

times
10:9
tina
136:16
tip
116:13
title
13:3, 15:12,
22:4, 22:7,
23:3, 27:25,
53:12, 107:17,
117:15
titled
125:21
titles
22:6
today
9:4, 11:13,
99:7, 117:21,
125:16, 128:15,
128:23, 144:18
today's
8:12, 135:22,
136:3
together
53:17
tongue
116:14
tools
67:9
top
46:23, 69:24,
80:15
topic
41:25, 42:2,
43:18, 46:17,
47:1, 48:5,
57:24, 59:9,
59:10, 59:15,
59:16, 65:10,
71:3, 71:22,
72:16, 72:23,
73:13, 74:7,
77:4, 84:2,
101:11, 101:19,
101:20, 102:3,
102:15, 102:18,

102:23, 103:2,
106:7, 106:8,
106:10, 108:7,
108:8, 108:9,
109:19, 111:14,
111:24, 112:15,
112:16, 123:10,
123:14, 123:17,
124:24, 126:6,
126:20, 126:23,
127:6, 127:10,
127:23, 140:13
topics
45:2, 45:10,
45:12, 45:16,
45:22, 46:8,
46:17, 47:16,
47:21, 72:19,
72:20, 97:24,
127:2, 128:20
torrez
3:16
torturing
65:17
totally
39:9
touch
67:21, 93:8
toward
139:25
towards
42:21, 134:5,
135:20, 135:23,
136:14, 136:19
traffic
128:4
training
29:14, 29:15,
48:13, 48:15,
48:18, 48:21,
48:24, 51:20,
72:16, 72:18,
72:20
transcribing
10:19
transcript
10:23, 22:21,
25:9, 27:21,

30:2, 32:12,
35:9, 39:18,
44:12, 49:9,
55:24, 69:20,
79:18, 86:8,
94:12, 100:9,
104:25, 107:2,
108:21, 113:4,
117:9, 119:15,
122:14, 125:5,
130:25, 133:20,
135:13, 138:13,
140:21, 142:14,
144:7, 145:15,
147:20, 148:2,
149:9
treated
105:23
tried
123:19
tries
122:3, 139:9
trouble
25:11
true
42:12, 103:1,
149:9
trump
45:5, 45:6,
123:20
truth
9:14, 9:15
truthful
34:8
try
10:16, 39:4,
73:19, 88:3,
106:22, 140:4
trying
34:18, 76:18,
97:3, 102:20,
104:5, 110:11,
112:14, 112:17,
112:18, 124:17,
124:21, 128:16
twice
10:10
twitter
40:19, 60:4,

69:10, 88:24,
89:18, 91:15,
134:4, 134:5,
134:9, 134:13,
142:23, 143:1,
143:8, 145:7,
145:9
**two**
36:3, 41:14,
65:22, 95:21,
115:19, 146:9
**types**
18:8, 18:9,
18:17
**typically**
19:17, 23:20,
36:12, 67:21,
73:18
**tyrell's**
31:20
**tyrell**
20:24, 21:12,
21:19, 22:2,
23:12, 26:4,
28:7, 28:10,
28:14, 29:11,
29:13, 31:4,
31:14, 35:24,
36:8, 38:6,
70:10, 70:12,
70:13, 79:23,
86:19, 87:7,
87:12, 90:10,
118:9, 119:4,
130:9, 142:7,
142:18, 143:15

**U**

**uh-huh**
10:21, 32:9,
39:21, 94:19
**uh-uh**
10:21
**uk**
40:9, 40:20,
41:21
**ultimately**
118:5, 118:16

**umbrella**
21:16, 22:10,
74:25
**uncomfortable**
42:3
**under**
9:25, 21:9,
22:10, 76:11,
104:15, 112:19,
137:11, 149:15
**undergone**
59:23
**understand**
9:25, 10:25,
11:8, 11:9,
41:4, 42:11,
62:7, 78:5,
111:21, 114:17,
130:6, 143:5
**understanding**
48:8, 62:6,
62:14, 62:19,
66:25, 77:9,
78:4, 78:10,
78:12, 102:6,
115:21, 126:18
**understated**
139:22
**understood**
11:1, 66:20,
95:20
**unethical**
37:16
**unhappy**
92:19
**unidentified**
125:12
**uniformity**
121:25
**uniformly**
97:8, 97:13,
106:15, 112:7
**united**
1:1, 8:6
**units**
68:12
**universities**
65:17

**university**
1:8, 3:4, 5:8,
8:5, 12:13,
12:14, 13:3,
15:7, 16:25,
17:3, 17:7,
17:17, 20:6,
20:11, 28:18,
35:17, 36:4,
37:25, 38:13,
43:9, 45:15,
46:15, 49:24,
50:1, 52:13,
53:2, 53:9,
54:1, 54:14,
68:22, 70:24,
74:20, 74:22,
74:25, 75:1,
76:10, 76:17,
78:15, 83:14,
84:17, 84:21,
85:13, 93:5,
93:9, 96:17,
100:22, 100:24,
103:15, 103:20,
104:16, 105:4,
105:21, 108:4,
108:25, 110:10,
111:20, 112:14,
112:17, 113:8,
116:23, 127:20,
128:12, 135:5,
137:20, 137:23,
138:2, 139:3,
139:9, 139:10,
139:13, 140:3,
140:5, 140:12,
144:1, 145:23
**university's**
17:1, 19:3,
19:5, 38:14,
49:3, 49:14,
49:22, 54:10,
67:15, 77:10,
92:5, 92:9,
130:11
**unless**
146:7

**unmanageable**
95:21
**unprofessional**
84:7, 84:9
**unrelated**
70:20, 71:3,
71:15
**unrestricted**
134:15
**unsolicited**
88:6
**untagged**
83:10
**until**
20:24, 50:25,
51:3
**update**
94:16
**updated**
113:23, 123:8
**url**
31:9, 135:25
**use**
11:4, 38:1,
40:11, 40:15,
46:22, 50:21,
62:15, 69:2,
72:22, 110:11,
110:16
**user**
19:2, 48:4,
121:13, 132:4,
134:13
**users**
45:9, 45:13,
60:3, 68:10,
82:23, 83:5,
84:20, 88:4,
115:24
**uses**
50:21
**using**
65:18, 67:9,
74:1
**uw's**
48:4, 79:9,
81:11, 83:15,
93:14, 104:15,

115:11, 115:14
**uw(1**
4:22
**uw-madison**
89:18

---
**V**
---

**vaccine**
109:5
**vaccines**
24:10
**valuable**
37:8
**value**
103:21
**variety**
23:24
**vegan**
126:25
**verbally**
8:20
**version**
147:19
**versus**
34:15, 59:15,
111:24, 112:15,
114:1, 114:3
**veterinary**
105:21
**via**
8:17, 39:12
**vice**
13:11, 15:12,
17:17, 19:18,
74:24, 80:10
**video**
8:2, 8:3, 8:13,
8:16, 13:23,
15:23, 145:22,
147:10, 147:14
**videographer**
3:17, 8:2, 9:3,
55:12, 55:15,
99:16, 99:19,
99:22, 133:9,
133:12, 147:9
**videotaped**
1:13, 2:1,

148:12
**view**
42:4, 61:10,
64:18, 72:4,
72:10
**viewpoint**
34:15, 50:24,
64:3, 64:13,
64:14, 68:23,
72:8, 72:13,
89:25, 123:22,
124:3
**views**
27:3, 34:16,
47:4, 47:10,
47:16, 47:21,
47:24, 116:22
**vile**
126:19
**violate**
77:17
**violation**
31:8, 85:8,
122:5
**violence**
31:11, 121:17
**virtually**
1:15, 2:2
**virtues**
137:20, 137:24
**visible**
64:24
**vital**
37:9
**voice**
36:18
**volume**
84:19, 110:12,
128:10
**vote**
123:20, 123:25,
124:2
**voter**
124:18, 124:25
**voting**
123:18
**vs**
8:4

---
**W**
---

**walker**
45:5
**want**
17:18, 30:9,
30:25, 33:21,
43:5, 48:12,
55:6, 66:3,
66:23, 74:15,
78:16, 99:3,
107:23, 118:17,
132:25, 133:5,
144:17, 146:17,
147:16
**wanted**
20:20, 30:16,
33:16, 34:3,
70:7, 97:1,
118:2, 124:2
**warranted**
128:6
**wave**
126:11
**way**
15:11, 21:22,
69:11, 73:5,
82:19, 84:6,
84:10, 117:12,
118:10, 132:2,
137:3, 137:15,
144:20
**ways**
37:16, 47:24,
143:22
**we'll**
20:18, 133:16,
136:21, 147:19
**we're**
43:19, 43:20,
55:12, 55:15,
67:21, 98:23,
99:16, 99:19,
99:22, 100:14,
101:3, 122:24,
123:4, 132:18,
133:9, 133:12,
138:4, 142:15,

144:9
**we've**
35:25, 50:7,
63:22, 69:8,
107:5
**wearing**
24:10
**web**
29:19, 31:9,
54:11
**website**
53:12
**week**
43:24, 82:1
**weekend**
91:7
**weekends**
98:14
**welcome**
55:18, 133:15
**weren't**
73:7
**western**
1:2, 8:8
**whatever**
75:11, 116:23,
118:24
**whenever**
32:6, 60:16,
110:12
**whether**
19:9, 24:22,
26:20, 64:17,
67:4, 67:18,
71:2, 74:6,
85:25, 86:1,
87:22, 120:3,
121:12, 129:10
**whims**
111:25
**whoever**
36:12, 127:12
**whole**
9:14, 74:21,
111:20
**wi**
2:12, 3:10
**wide**
53:13, 63:23,

**83:5, 84:17,**
95:11, 128:20
**wider**
82:23, 97:21,
97:23
**widespread**
40:24
**wisconsin**
1:2, 1:8, 3:4,
3:8, 5:8, 8:6,
8:8, 98:24,
113:8
**wisconsin-madison**
76:10, 105:4,
107:8, 109:1
**wish**
106:2
**within**
31:10, 60:2,
95:1, 96:23
**without**
27:13, 27:14,
27:16, 124:6,
124:11, 126:17,
143:17
**witness**
8:25, 9:7,
44:22, 55:9,
66:16, 66:20,
78:3, 99:11,
105:7, 114:11,
129:23, 133:7
**wm**
131:14
**wnprc**
30:5, 30:8,
30:11, 30:20,
90:16, 117:20,
119:7
**wnprc's**
91:14
**wonder**
98:20
**word**
54:21, 62:15,
64:14, 115:17,
123:21
**words**
34:11, 45:25,

47:1, 47:5,
47:10, 47:15,
48:2, 48:9,
121:8
**work**
46:7, 47:13,
89:7, 99:10,
129:7
**worked**
11:21, 28:21,
50:13, 51:12,
80:22, 132:1
**working**
12:18, 13:10,
14:12, 21:3,
112:5
**works**
45:25, 54:5,
96:19, 133:4
**workshop**
86:13, 87:2,
87:9
**worth**
86:20
**wouldn't**
19:17, 43:5,
54:3, 66:5,
84:13, 106:20,
123:23, 135:9
**wrap**
99:6
**write**
71:18
**writer**
22:8
**writes**
80:19
**writing**
12:18, 69:11,
120:24

---
                 **Y**
---

**yeah**
14:8, 16:2,
40:16, 44:23,
46:6, 47:7,
60:20, 64:7,
69:25, 70:4,

74:10, 95:8,
98:11, 98:25,
99:9, 102:1,
102:10, 103:23,
107:20, 110:25,
120:14, 124:10,
124:14, 131:23,
132:22, 133:2,
135:18, 137:23,
143:25, 146:13
**year**
52:16
**years**
40:18, 41:7
**yellow**
100:25, 101:4,
102:12, 107:24,
113:11, 113:21,
113:25
**yep**
99:11, 114:6
**yourself**
26:3, 28:7,
40:4, 101:6,
123:1, 131:9,
141:2, 142:18,
144:13
**youtube**
138:23, 146:4

---
                 **Z**
---

**zoom**
8:17, 25:16,
64:25, 65:4,
69:23, 90:19,
105:11, 107:15,
107:21
**zooming**
32:13, 37:6,
135:19

---
                 **'**
---

**'academic**
120:23

---
                 **0**
---

**0001**
5:10

**0002**
5:7
**0006**
22:16
**00099**
1:6, 8:9
**001**
49:5
**002**
44:9
**0021**
4:24, 35:2
**0026**
5:19, 86:5
**0029**
4:22, 32:1,
32:3, 32:4
**0039**
4:18, 27:11,
27:16, 38:18
**0040**
3:11
**0066**
4:14, 22:14,
22:17, 22:18
**0076**
5:13, 55:20
**0082**
4:16, 25:5
**02**
136:13
**0218**
6:8, 112:25
**0297**
6:4, 106:24
**0313**
5:25, 104:20
**0317**
6:6, 108:17
**0341**
5:23, 98:19,
100:3
**0378**
7:8, 142:11
**0396**
6:13, 122:10
**0397**
5:15, 69:16

**0415**
7:4, 138:7
**0429**
6:11, 119:12
**0449**
6:15, 125:2
**0454**
39:1, 39:4
**0455**
4:25, 38:21,
38:22, 39:2
**0456**
39:1
**05**
1:17, 8:13,
38:25
**0525**
4:20, 29:23,
90:5
**054**
38:25
**0626**
5:21, 94:8
**0657**
5:17, 79:14
**0688**
6:17
**0696**
7:10, 144:4
**07**
133:10
**0716**
6:22, 132:17,
135:10
**0719**
7:12, 145:11
**0730**
6:9, 117:6
**0774**
7:6, 140:17
**0we**
146:19

_____
1
_____

**1**
27:13, 32:3,
35:2, 35:4,
99:13, 99:23

**10**
1:17, 4:5,
8:13, 55:7,
94:21, 125:21
**101**
5:22
**1041**
2:19
**106**
5:24
**108**
6:3
**109**
6:5
**11**
1:16, 8:12,
40:2, 55:8,
55:13, 55:16,
94:22, 119:19,
125:10, 131:5,
136:13, 144:12
**114**
6:7
**118**
6:9
**12**
55:13, 98:23,
99:20
**120**
6:10
**123**
6:12
**126**
6:14
**13**
120:3, 123:2
**132**
6:16
**134**
6:18
**136**
6:21
**139**
7:3
**141**
7:5
**143**
7:7

**145**
7:9
**146**
7:11
**147**
4:7
**149**
1:23
**15**
99:13
**16**
80:20, 99:23
**18**
32:19
**19**
107:18

_____
2
_____

**2**
32:4, 133:10,
133:13, 147:12,
148:12
**2-7**
6:20
**20**
131:14
**200**
2:11
**2001**
12:9, 12:12,
12:24
**20012210079**
149:23
**2008**
14:5
**2017**
92:12
**2020**
76:20, 80:20,
81:14, 95:16
**2021**
32:19, 76:21,
94:22, 94:23,
123:2
**2022**
1:16, 8:12,
133:25, 149:17
**2025**
149:5

**21**
1:6, 8:9, 35:4,
125:21
**22**
4:13, 6:20,
55:8, 55:16,
133:13, 149:16
**23**
4:24, 147:2
**25**
4:15, 16:15
**2533**
2:19
**257**
3:11
**26**
4:20, 99:20
**27**
4:17

_____
3
_____

**3-4-1**
100:4
**30**
4:19, 98:23
**312**
2:13
**32**
4:21
**325**
2:10
**35**
4:23
**39**
4:25, 27:13,
27:14
**398**
5:15

_____
4
_____

**40**
4:18
**409**
3:9
**414**
2:13
**43**
147:12

**436365**
1:22
**44**
148:12
**45**
5:5, 99:8
**455**
39:5

---
5
---

**50**
4:13, 5:8,
22:19, 23:2,
126:12
**51**
4:15, 25:7
**52**
4:17, 27:19
**525**
2:17
**53**
4:19, 29:25,
90:8
**53202**
2:12
**53703**
3:10
**54**
4:21, 32:10,
32:17
**55**
4:23, 35:7,
35:12
**56**
4:25, 5:11,
39:16, 39:25,
42:21
**57**
5:5, 44:10,
44:14
**58**
5:8, 49:7,
49:13, 50:18
**59**
5:11, 55:22,
56:3

---
6
---

**60**
5:14, 69:18,

69:22
**608**
3:11
**61**
5:16, 79:16,
79:21
**62**
5:18, 86:6,
86:11
**63**
5:20, 94:10,
94:15
**64**
5:22, 100:7,
100:13
**65**
5:24, 104:23,
105:3
**66**
6:3, 106:25,
107:6
**67**
6:5, 108:19,
108:24
**68**
6:7, 113:2,
113:7
**688**
130:21
**69**
6:9, 117:7,
117:14

---
7
---

**7-year-old**
105:20
**70**
5:14, 6:10,
119:13, 119:18
**7003**
2:13
**707**
2:19
**71**
6:12, 122:12,
122:18, 122:21,
122:22, 122:24
**72**
4:14, 6:14,

125:3, 125:9
**73**
6:16, 130:23,
131:4
**74**
6:18, 133:18,
133:23, 146:18
**75**
6:21, 135:11
**76**
7:3, 138:11,
138:17
**77**
7:5, 140:19,
140:25
**78**
7:7, 142:12,
142:16
**79**
7:9, 144:5,
144:10
**795**
2:19
**7th**
133:25, 146:23

---
8
---

**80**
5:16, 7:11,
145:13, 145:18
**87**
5:18

---
9
---

**92**
149:18
**94931**
2:18
**95**
5:20

---
@
---

**@uwmadison**
95:5