IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MADELINE KRASNO,

      Plaintiff,

      v.                           Case No. 21-CV-099-SLC

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN, et al.,

      Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

The University of Wisconsin-Madison, like other public universities, has created and administers Facebook and Instagram pages. These social media platforms allow UW-Madison to share stories from its campus community and to facilitate and participate in discussions about information and developments related to it. Those members of the public who have Facebook and Instagram accounts are able to make comments to the posts generated by UW-Madison. These interactive spaces, however, are not open for the discussion of any and all subjects. Instead of a free-for-all dialogue, UW-Madison has chosen to limit discussion to the topics of its underlying posts. If any comments are off-topic, the University may remove them. Thus, UW-Madison has created, on each

social media page, what courts have described as a "limited public forum." Under First Amendment free speech jurisprudence, the government may restrict the forum to certain subjects, as long as this regulation is viewpoint neutral and reasonable in light of the purpose served by the forum. That is what UW-Madison has done here.

The plaintiff, Madeline Krasno, a UW-Madison alum and former employee of a primate research lab on campus, disagrees. She has sued the Board of Regents, along with several UW-Madison officials. Krasno contends that she has a First Amendment right to make comments about her viewpoint against animal testing and research in response to *any* UW-Madison post. Her position is extreme. If approved by this Court, it would undermine the purpose of the limited public forum UW-Madison has created and converted its social media pages into Krasno's own personal soapbox. The Constitution does not require such an unreasonable outcome. UW-Madison may reasonably moderate Krasno's off-topic comments from the interactive spaces of its social media pages. Consequently, Krasno's First Amendment Free Speech Clause claims fail and summary judgment should be entered in the University's favor.

Krasno's First Amendment Petition Clause claims fare no better. First, it is indistinguishable from her free speech claims. Second, any reasonable regulation of Krasno's speech does not prevent her from petitioning UW-Madison for redress of her general grievance (i.e., her opposition to animal

testing on campus). Krasno is free to express her views on animal testing when it is on-topic to a UW-Madison post. She may send a letter to the University at any time. And she is not prohibited from calling the University or sending an email, as she has done before, making her views known. Indeed, Krasno admits that she has multiple other avenues to communicate her views to UW-Madison. So, her First Amendment Petition Clause claims also fail and summary judgment should be entered in the University's favor.

Alternatively, both of Krasno's First Amendment claims fail against Defendants Nate Moll, Mike Klein, and John Lucas, in their individual capacities, because these UW-Madison employees are protected by qualified immunity. Under the constantly developing First Amendment case law regarding public social media pages, Krasno cannot establish that she has any clearly established constitutional right to make off-topic comments to UW-Madison posts on its social media pages. In addition, even if she does, she cannot show that these three defendants should have known that when her comments were moderated. Moreover, under 42 U.S.C. § 1983, Klein and Lucas lack the requisite personal involvement in any constitutional violation to be found liable anyway. Finally, the Board of Regents is entitled to summary judgment because it is not a "person" under that federal statute and has Eleventh Amendment immunity too.

All the defendants are entitled to summary judgment. This case should be dismissed.

## ISSUES PRESENTED

1. Are Defendants entitled to summary judgment on Plaintiff Krasno's First Amendment Free Speech Clause claims?

2. Are Defendants entitled to summary judgment on Plaintiff Krasno's First Amendment Petition Clause claims?

3. Alternatively, are Defendants Lucas, Klein, and Moll, in their individual capacities, entitled to summary judgment on all claims based on qualified immunity?

4. Alternatively, are Defendants Klein and Lucas, in their individual capacities, entitled to summary judgment on all claims for lack of personal involvement under 42 U.S.C. § 1983?

5. Alternatively, is Defendant Board of Regents entitled to summary judgment on all claims because it is not a "person" under 42 U.S.C. § 1983 or because of Eleventh Amendment immunity?

## STATEMENT OF UNDISPUTED FACTS

The facts of this case are largely undisputed. In addition to the proposed Joint Stip.ulated facts, Defendants have proposed, and incorporate, findings of fact in support of their motion for summary judgment, entitled Defendants'

Proposed Finding of Facts (DPFOF), filed separately. The relevant proposed Joint Stip.ulations and findings of fact follow.

### *The parties*

Plaintiff Madeline Krasno is a graduate of UW-Madison. Proposed Joint Stipulation of Findings of Undisputed Material Facts. (("Joint Stip.") ¶ 3). She operates an Instagram account under the handle @madeline_krasno, and she maintains a Facebook profile under the name Madeline Krasno.  (Joint Stip. ¶ 3.) As a student, Krasno worked as a student primate caretaker at its Harlow Center for Biological Psychology ("Harlow Center"). (Joint Stip. ¶ 4.) Krasno creates social media posts on her pages opposing animal research, and also makes comments on the University's Instagram and Facebook pages. (Joint Stip. ¶ 4.)

Defendant Board of Regents of the University of Wisconsin System is a public corporation of the State of Wisconsin that governs the University of Wisconsin System, including the University of Wisconsin-Madison. (Joint Stip. ¶ 5.) The University conducts invasive research on animals, including invasive research on nonhuman primates at both the Harlow Center and the Wisconsin National Primate Research Center. (Joint Stip. ¶ 5.)

The University oversees and/or operates an official Instagram account under the username @uwmadison as well as its official Facebook Page at facebook.com/UWMadison ("@UWMadison"). (Joint Stip. ¶ 7.)

Defendant Charles Hoslet is the Vice Chancellor for University Relations, the department that oversees University Communications. (Joint Stip. ¶ 9.)

Defendant John Lucas is Assistant Vice Chancellor for University Communications, and he oversees the University's social media account communications, including its Instagram and Facebook accounts. (Joint Stip. ¶ 11.) Lucas very rarely reviews and moderates comments on UW-Madison's social media pages. (DPFOF ¶ 44.) Lucas has not made decisions about which comments made by Krasno on UW-Madison's social media pages should be moderated. (DPFOF ¶ 45.)

Defendant Mike Klein is Director for News Content and Editorial Projects at the University. (Joint Stip. ¶ 12.) Klein operates and/or oversees the University's social media account communications, including its Instagram and Facebook accounts. (Joint Stip. ¶ 12.) Alongside Defendant Nate Moll, Klein has ultimate responsibility for daily moderation decisions of comments on the University's Instagram and Facebook pages. (Joint Stip. ¶ 13.) However, Klein does not moderate UW-Madison's social media pages on a day-to-day basis. (DPFOF ¶ 42.) He supervises Nate Moll, but has only occasionally filled in for him as to direct moderation duties. (DPFOF ¶ 42.) Klein does not recall making a decision to moderate any comments made by Krasno on UW-Madison's social media pages. (DPFOF ¶ 43.)

6

Defendant Nate Moll is a Social Media Manager who operates the University's social media accounts, including its Instagram and Facebook accounts. (Joint Stip. ¶¶ 14–15.) Moll has primary responsibility for overseeing operations of the Instagram and Facebook social media accounts for UW-Madison. (Joint Stip. ¶ 16.) He has moderated comments made by Krasno. (Joint Stip. ¶ 17.)

### *Instagram*

Instagram is a social media platform that facilitates interactions between users by allowing them to share photos and videos, and to comment on and to reply to other users' shared content. (Joint Stip. ¶ 20.)

Instagram "users" are individuals or institutions that have created an account on the platform. When users create accounts, Instagram allows them to choose a unique username or "handle," such as "@uwmadison." (Joint Stip. ¶ 22.) Each handle has its own unique webpage associated with the user's account where they can "post" or publish images and videos for others to view. Each user's webpage contains its handle, a description of the user's account, and account-specific data including the amount of posts the account user has generated. (Joint Stip. ¶ 23.)

Each post created by a user is displayed as an icon on the user's webpage. By default, the posts are organized chronologically, so that a new photo or video will be accessible on the top left of a user's webpage. (Joint Stip. ¶ 24.)

7

When a user posts a new photo or video on Instagram, they may include text that will be displayed next to or below the image or video it is associated with. Other users can comment on the post and reply to comments made by other Instagram users. (Joint Stip. ¶ 25.)

Each time someone selects a posted image or video, beneath the accompanying text included by the user they can access the "comment thread," the space displaying any comments made on the post by other Instagram users. (Joint Stip. ¶ 28.) The comment thread is interactive. It is here that another Instagram user can participate in public debate and discourse by commenting both to the user who posted the image or video and in response to other users' comments. The Instagram user who published the post can, in turn, reply to all comments or even post their own standalone comment if they wish to. (Joint Stip. ¶ 29.)

A user can tag another Instagram user in their own account's posts by inserting the "@" symbol and their Instagram username in the post. When an Instagram user tags another user, their post typically shows up on the tagged user's Instagram account on a separate page containing all the posts that user has been tagged in. (Joint Stip. ¶ 31.)

When an Instagram user's webpage is public, any visitor to the page can see each post made by the user. (Joint Stip. ¶ 32.) Posts made by public accounts are visible to anyone who visits their unique webpage on Instagram,

8

even if the visitor does not have an Instagram account. (Joint Stip. ¶ 33.) Members of the public without an Instagram account are limited to the number of posts they can see without having an account and will only be able to view the photo or video of the posts they have access to. (Joint Stip. ¶ 34.) To view all posts and associated content, such as the comment threads, a non-member must create an Instagram account and log in to the site. (Joint Stip. ¶ 34.)

An Instagram user can opt to exclude all comments from the posts they make on their Instagram account. To do so, they simply select "Turn off commenting" for the individual posts they shared so that no comments can be made by other users to that post. (Joint Stip. ¶ 35.)

An Instagram user may also limit another user's interactions with an otherwise public account by "restricting" the user's comments on their posts. Restriction allows an Instagram account to hide all comments on the account's posts by specific users it chooses to restrict. Unlike blocking, restriction allows the user to choose whether to "approve" the restricted users' posts after prescreening its content and consequently allow the comment to be publicly viewable, or to continue to hide the comments from others' view. (Joint Stip. ¶ 37.) Restricted users can continue to post comments that will remain unseen by anyone but themselves. (Joint Stip. ¶ 39.)

### *Facebook*

Facebook is a social networking platform that allows users to connect with other members of the site and the general public by sharing messages, photos, videos, and information. (Joint Stip. ¶ 43.)

As with Instagram, when someone creates a Facebook account, they are given a webpage to display their posted content as well as display comments and interactions they have with other users. (Joint Stip. ¶ 45.) Atop a given Facebook page is an information section showing a picture chosen by the user as well as links to view content they publish, such as videos and photos, events, and a description of the account. (Joint Stip. ¶ 46.)

Under a Facebook account's information section, the right portion of the Facebook page displays all of its posts. Like Instagram posts, Facebook posts made by an account can contain photos or videos and associated text. Like Instagram, each Facebook post contains an interactive space for other users with Facebook accounts to comment on an account's posts, reply to each other's comments, and for the original poster to reply to them in turn. (Joint Stip. ¶ 47.) If a Facebook account is public, any member of the public—even those who are not logged into a Facebook account—can still view a limited number of posts and associated comments on the page. (Joint Stip. ¶ 47.)

Unlike Instagram, a Facebook account operating a Page can choose to individually hide or delete comments on its posts. (Joint Stip. ¶ 53.) Hiding a

comment removes it from view for everyone except the original commenter and their friends. (Joint Stip. ¶ 54.)  Deleting a comment, in contrast, removes it from permanent display to anyone who visits the post's comment thread. (Joint Stip. ¶ 55.)

### UW-Madison's social media accounts

The University's @uwmadison Instagram account is the official Instagram account for the University. (Joint Stip. ¶ 57.) The University also operates a public Facebook page, @uwmadison, also found at http://www.facebook.com/UWMadison/, that is the official Facebook Page for the University. (Joint Stip. ¶ 58.) The University's Facebook Page and Instagram account are used as channels to communicate official University announcements, events and policies to the public. (Joint Stip. ¶ 59.) The University makes posts to its social media pages on a wide range of University-related issues. (DPFOF ¶ 3; Joint Stip. ¶¶ 59, 66, 70.) One purpose of each page is to discuss information and developments related to the University's specific department, lab, or organization. (DPFOF ¶ 4.) Another purpose is to share stories from the university community. (DPFOF ¶ 5; Joint Stip. ¶ 65.) UW-Madison responds to users' comments when possible. (DPFOF ¶ 6.)

Importantly, the University reserves the comment sections of its Facebook and Instagram pages for the discussion of specific subjects and

requires that any user's comments relate to the underlying posts. (DPFOF ¶ 1.) Any user's comment that is unrelated to the underlying post could be removed as off-topic. (DPFOF ¶ 2.) Off-topic comments hinder and prevent UW-Madison's ability to participate in discussions and engage with users. (DPFOF ¶ 7.)

### @Uwmadison Instagram account

The University's Instagram account is popular among current students. (Joint Stip. ¶ 63.) The University counts as its audience current students, faculty, staff, prospective students, alumni, community members, and the public. (Joint Stip. ¶ 67.) It has over 2,400 posts. (Joint Stip. ¶ 69.) The Instagram page is accessible to anyone—even those without an Instagram account. (Joint Stip. ¶ 68.)

When an Instagram user "tags" UW-Madison by using "@UWMadison," the account administrator is notified that UW-Madison was tagged in a post or video. (DPFOF ¶ 16.) There is a section on UW-Madison's Instagram page, separate from the comment section, when a user can view tagged photos and videos where other users have tagged UW-Madison. (DPFOF ¶ 17.) UW-Madison can un-tag itself from any user's post. By un-tagging itself, that user's post will no longer appear in the tagged section of UW-Madison's Instagram page. (DPFOF ¶ 18.)

### @*uwmadison Facebook account*

The University's Facebook Page, @uwmadison, like its Instagram account, it is managed by staff of University Communications. (Joint Stip. ¶ 71.) The University's Facebook Page features posts containing university announcements and developments, news following the work or achievements of its student body and faculty, and public health and safety announcements for its student body and the general public. (Joint Stip. ¶ 73.) And like its Instagram account, the University counts as its audience on Facebook current students, faculty, staff, prospective students, alumni, community members, and the public. (Joint Stip. ¶ 73.)

Since the University's Facebook account is public, any member of the public—even those who are not logged into a Facebook account—can still view a limited number of posts and associated comments on the University's page. (Joint Stip. ¶ 48.)

### *Krasno's comments and UW-Madison's responses*

UW-Madison's social media managers monitor off-topic comments to University posts for words or phrases that are being repeated; these multiple comments are considered spam. (DPFOF ¶ 22.) Social media managers review thousands of comments to thousands of posts. (DPFOF ¶ 23; Joint Stip. ¶ 69.) Words or phrases consistently used in off-topic comments are added to an auto-moderated keyword list and removed on an as-needed basis. (DPFOF

¶ 24.) UW-Madison would not add a word or phrase to the auto-moderated keyword list for topics it posts about. (DPFOF ¶ 25.) A comment that is moderated by the keyword filter on Facebook can be manually unhidden. (DPFOF ¶ 26.)

The volume of off-topic comments made to the University's social media pages prevented and prevents other users from engaging with the University or receiving information about its programs or services. (DPFOF ¶¶ 7–8.) UW-Madison wants to be able to see on-topic comments made to its posts. (DPFOF ¶ 9.)

Krasno made off-topic comments typically on the topics of animal testing, funding that UW-Madison is getting for animal testing, and her own experience with animal testing. (DPFOF ¶¶ 8, 32.)

Krasno believes that any comment she makes about animal testing or research is on-topic to any post made by UW-Madison on its social media pages. (DPFOF ¶¶ 11, 33.)

Based on the number of off-topics comments made by Krasno, UW-Madison temporary restricted Krasno's Instagram account and prevented her from commenting to posts that she could still see without manual approval, it also manually hid at least one of her comments on Facebook. (Joint Stip. ¶ 8; DPFOF ¶¶ 12, 14–15, 52.)

UW-Madison also began to use a keyword filter, provided by Instagram and Facebook, to auto-moderate comments made to its social media pages. (DPFOF ¶ 21.) These words and phrases were based on those frequently included in the high volume of off-topic comments. (DPFOF ¶ 23.) The majority of off-topic comment spam campaigns that target UW-Madison's Instagram and Facebook pages relate to animal testing. (DPFOF ¶ 28.)

In September 2020, UW-Madison posted a photo of its new recreation center on campus on its Instagram page. In response, Krasno commented, "Thanks for continuing to delete my comments and untag yourself from my photos. Definitely showcases fear. I will continue to share the truth about what it was like working in one of your primate research labs and advocate for their closure. As I mentioned before, today is great day to shut down the primate research labs!" (DPFOF ¶ 48.)

In November 2020, UW-Madison posted on Instagram about its COVID-19 measures. In response, Krasno commented, "[C]lose down the primate labs!" DPFOF ¶ 49. That same month, UW-Madison posted on Instagram about Thanksgiving travel. In response, Krasno commented, "@uwmadison, close down your primate research labs!" (DPFOF ¶ 50.)

Also, UW-Madison made a Facebook post regarding #uwgrad profile photo filters by posting a photo of a badger with "PROUD#UWGRAD" superimposed on it. In response, Krasno commented, "University of

Wisconsin-Madison, are you really proud of all your graduates or just the ones who don't object to your barbaric treatment of monkeys in your research labs?" (DPFOF ¶ 51.)

Sometime in September 2020, the University un-tagged all tags Krasno made of the University's Instagram account on her Instagram posts, which removed her posts from UW-Madison's tagged section of its page. (DPFOF ¶¶ 18–19.) UW-Madison has not removed any of Krasno's tags since that time. (DPFOF ¶ 20.)

UW-Madison disabled all commenting on a series of its social media posts made during the 2021–22 holiday season because vacations and holidays left it short-staffed and monitoring its social media pages was not possible. (DPFOF ¶ 30.) No user has the ability to make comments to these certain posts. (DPFOF ¶ 31.)

Krasno admits that social media is not the only means by which she can contact UW-Madison and communicate her viewpoint on animal research. (DPFOF ¶ 36.) In fact, Krasno has communicated her views against UW-Madison's treatment of animals for research purposes by emailing the University. (DPFOF ¶ 34.)

Krasno has never been prevented from sending emails to UW-Madison expressing her viewpoint on animal research. (DPFOF ¶ 35.) Krasno has never been prohibited from sending letters to UW-Madison communicating her

viewpoint. (DPFOF ¶ 37.) Krasno has never been prohibited from telephoning to UW-Madison about her viewpoint. (DPFOF ¶ 38.) Krasno has never been prohibited from speaking publicly about her experiences at UW-Madison's Harlow Lab. (DPFOF ¶ 39.) Krasno has never been prohibited from generating posts on her own social media pages about her views on animal research. (DPFOF ¶ 40.) And Krasno was not prevented from filing this lawsuit. (DPFOF ¶ 41.)

### SUMMARY JUDGMENT STANDARD

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The trial court must review the evidence in the light reasonably most favorable to the non-moving party, giving him the benefit of reasonable inferences from the evidence. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir.) "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

I.  **Defendants are entitled to summary judgment on Krasno's First Amendment Free Speech Clause claims.**

A.  **The comment sections of UW-Madison's Instagram and Facebook pages are limited public fora; they are reserved for the discussion of topics related to the underlying posts.**

Krasno alleges that UW-Madison's Facebook and Instagram pages[1] are each a designated public forum. (Dkt. 17 ¶¶ 31, 104–05, 108.) Her First Amendment free speech claim is based on a faulty foundation because there is no designated public forum. Instead, UW-Madison has created limited public fora—at times called nonpublic fora by the courts—by opening up the comment sections[2] of its Facebook and Instagram pages only for the discussion of topics chosen by the University.

### 1.   The law on the limited public forum.

Under First Amendment jurisprudence, a forum "is a piece of public property usable for expressive activity by members of the public." *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719, 722–24 (7th Cir. 2009). The designation of a public forum is done through "purposeful governmental action" and is not satisfied by "inaction or by permitting limited

---

[1] This brief will often use "social media pages" as shorthand for the official Facebook and Instagram pages of UW-Madison. While UW-Madison has a Twitter page, that page is not at issue in this action.

[2] This space is also known as the "comment thread." (Joint Stip. ¶ 47.)

discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985). The law recognizes several different kinds of forum.

Traditional public fora are "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO,* 307 U.S. 496, 515 (1939)). "Designated public forums are locations or channels of communication that the government opens up for use by the public for expressive activity." *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). These are "created when the government opens a nontraditional public forum for public discourse." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006). The government may exclude speakers from these types of public fora "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.,* 473 U.S. 788, 800 (1985); *Christian Legal Soc'y*, 453 F.3d at 865.

Courts have also recognized the limited public forum. A limited public forum, in contrast to the traditional and designated public forum, is "public property that 'is not by tradition or designation a forum for public communication.'" *Christian Legal Soc'y*, 453 F.3d at 865 (quoting *Perry Educ.*

*Ass'n*, 460 U.S. at 46). And "[p]ublic property which is not by tradition or designation a forum for public communication is governed by different standards." *Perry Educ. Ass'n*, 460 U.S. at 46. Simply put, "[a] limited public forum . . . is a place the government has opened only for specific purposes or subjects; speech restrictions in a limited public forum need only be viewpoint-neutral and reasonable in light of the purpose served by the forum." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 783 n.3 (7th Cir. 2011) (citing *Christian Legal Soc'y,* 453 F.3d at 865–66 & n.2).

> **2.     The comment sections of UW-Madison's Facebook and Instagram pages are limited public fora; reservation for the discussion of topics chosen by UW-Madison, including the removal of off-topic comments, is reasonable.**

Based on the undisputed facts and binding case law, the comment sections of UW-Madison's Facebook and Instagram pages are limited public fora.

UW-Madison has reserved the comment sections of its social media pages for the discussion of certain subjects—the topics of the underlying posts it makes. This requires that any user's comments relate to the underlying posts. (DPFOF ¶ 2.) Any comment that is unrelated to the underlying post could be removed as off-topic. (DPFOF ¶ 3.) UW-Madison makes posts to these social media accounts on a wide range of University issues, from its receipt of COVID-19 vaccines to its 2020 virtual homecoming. (Dkt. 17 ¶¶ 20, 53;

19 ¶¶ 20, 53.) One "purpose of each page is to discuss information and developments related to a specific department, lab, or organization." (DPFOF ¶ 5.) A purpose of the Instagram page is to share stories from the UW-Madison community. (DPFOF ¶ 6.) And the University responds to comments when it can. (DPFOF ¶ 7.)

UW-Madison's regulation of speech is a reasonable one, as it keeps discussions focused on University-related subjects that the intended audience of its social media posts would be interested in. It also allows the University to see and respond to followers' questions or inquiries included in certain comments. Off-topic comments clog up the comment sections of the social media pages and hinder UW-Madison's ability to facilitate and participate in discussions it wants to engage in, which frustrates the primary purpose of communicating via social media. (DPFOF ¶ 7.) For example, if UW-Madison posts about upcoming public health guidance, and a student makes a comment asking specific questions, the University wants to see that comment so that it may understand questions its community has and, if necessary, answer them. (DPFOF ¶ 9.) In addition, the regulation is viewpoint neutral because it keeps the focus on the limited subject matter—the underlying topics. The particular viewpoints on those topics expressed in the comments are irrelevant.

**B.     UW-Madison's moderation of Krasno's off-topic comments does not violate her free speech rights.**

Because the comment sections of UW-Madison's Facebook and Instagram pages are limited public fora, "speech restrictions . . . need only be viewpoint-neutral and reasonable in light of the purpose served by the forum." *Milestone*, 665 F.3d at 783 n.3. The University's moderation of Krasno's off-topic comments does not violate her First Amendment free speech rights. Contrary to  her position, UW-Madison's moderation of some of her comments is not an effort to suppress Krasno's viewpoint against animal testing. Krasno is free to espouse her viewpoint, just not in a comment section of a UW-Madison social media post dedicated to a topic unrelated to animal testing or research.

Krasno's likely complaints fall into five main categories: (1) moderating her comments to posts on UW-Madison's Instagram and Facebook pages; (2) temporarily restricting her ability to make comments on UW-Madison's Instagram page; (3) removing "tags" of UW-Madison's Instagram account she had made on her posts; (4) using keyword filters (auto-moderation) that prevented some of her comments from appearing on the social media pages; and (5) disabling all commenting on a photo series of Instagram posts from December 27, 2021, to January 13, 2022. These will be addressed in turn. None are free speech violations.

1.     **Moderating her comments on Instagram and Facebook does not violate the First Amendment.**

Krasno generally complains about Defendants moderating her comments made to posts on UW-Madison's Facebook and Instagram pages. Defendants understand Krasno to be complaining about UW-Madison's temporary restriction of her Instagram account that prevented her from commenting to posts without manual approval, the University's manual hiding of her comments on Facebook,[3] and the auto-moderation of her comments as to both social media pages. (*See, e.g.*, Dkt. 17 ¶¶ 74–81, 91–93.) She claims such action is viewpoint discrimination, but she is wrong. As noted above, a limited public forum is "a public facility limited to the discussion of certain subjects or reserved for some types or classes of speaker." *Ill. Dunesland Pres. Soc'y*, 584 F.3d at 723. "The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of the Univ. of Virginia,* 515 U.S. 819, 829 (1995).

Defendants will address some of the comments it believes Krasno will raise in her motion for summary judgment. These comments were off-topic with respect to the initial social media posts made by UW-Madison on its social

---

[3] There is no ability to manually hide Instagram comments. (DPFOF ¶ 10.)

media pages, and thus it was not a First Amendment violation to moderate them.

In September 2020, UW-Madison posted a photo of its new recreation center on campus on its Instagram page. She commented: "Thanks for continuing to delete my comments and untag yourself from my photos. Definitely showcases fear. I will continue to share the truth about what it was like working in one of your primate research labs and advocate for their closure. As I mentioned before, today is great day to shut down the primate research labs!" This comment was hidden from public view. (DPFOF ¶ 48.)

Here, UW-Madison's original post was a photograph of a recreational center. Krasno's comment complained about the University's moderation of previous comments she had made and her history of working at the campus primate lab, and she called to shut down the primate lab. Given, that Krasno's comment was completely unrelated to the underlying post, it was properly removed from public view. And because UW-Madison opened up the comment section of its Instagram page for discussion related to topics of the posts it makes (i.e., a campus recreation center), Krasno's comment regarding the primate lab was off-topic. Because there is nothing to suggest the hiding was viewpoint-based, Defendants did not violate Krasno's free speech rights.

In November 2020, UW-Madison issued a post about its COVID-19 measures. Krasno commented, "Close down the primate labs!!" (DPFOF ¶ 49.) UW-Madison also issued an Instagram post about Thanksgiving travel. In response, Krasno commented, "@uwmadison, close down your primate research labs!" (DPFOF ¶ 50.)  Lastly, as to UW-Madison's Facebook page, UW-Madison made a post regarding #uwgrad profile photo filters. That is, UW-Madison posted a photo of a badger with "PROUD#UWGRAD" superimposed on it. (DPFOF ¶ 51.) Krasno commented with, "University of Wisconsin-Madison, are you really proud of all your graduates or just the ones who don't object to your barbaric treatment of monkeys in your research labs?" (DPFOF ¶ 51.)

These comments were properly removed from public view. Again, there is no relationship—direct or indirect—between these several original posts and Krasno's comments. Thus, they do not qualify for inclusion in the comment section of the University's Facebook and Instagram pages. Because there is no suggestion that the hiding was viewpoint-based, Defendants' regulation of Krasno's speech was reasonable in light of the purpose of the limited public fora and they did not violate the First Amendment.

> **2.   Temporarily restricting her ability to make comments on UW-Madison's Instagram page did not violate the First Amendment.**

Krasno also specifically complains about Defendants restricting her Instagram account from September 28, 2020, to January 2021. This action Defendants took occurred in the past. There is no current account restriction. (DPFOF ¶¶ 12, 52.)

Regardless, Krasno may argue that the First Amendment prevented Defendants from restricting her ability to comment because some federal courts, such as this one, have held that a Twitter block is unconstitutional. The Instagram account-level restriction that occurred here can be easily distinguished from a Twitter block.

In *One Wisconsin Now v. Kremer*, three Wisconsin legislators blocked the plaintiff from their Twitter pages. 354 F. Supp. 3d 940, 941 (W.D. Wis. 2019). Because of this blocking, the plaintiff was unable to make any comments on their pages. *Id.* at 946. And the plaintiff could not see or reply to the blocking users' tweets, or retweet the blocking users' tweets, among other things. *Id.* In short, the legislators made their Twitter pages inaccessible to the plaintiff. *Id.*

Here, on the other hand, the Instagram account-level restriction imposed against Krasno still allowed UW-Madison to see comments that she made. (DPFOF ¶ 13.) And Krasno could still see the UW-Madison Instagram page,

including posts and comments. (DPFOF ¶ 14.) While the public could not see the comments, Krasno could craft on-topic comments if she so desired. And then UW-Madison could see those comments and determine whether they were on-topic and, if so, make them visible to the Instagram page for the public viewing. (DPFOF ¶ 15.) The plaintiff in *One Wisconsin Now* had no ability to speak in the forum while blocked, but Krasno had the ability to speak in the forum here, as long as she made comments that followed its rules—comments had to be on-topic to the underlying post—and the University decided to make them public.

These distinctions are important because they illustrate the difference between viewpoint and content restriction. In *One Wisconsin Now*, this Court held that the Twitter blocks were content-based restrictions. 354 F. Supp. 3d at 956. The legislators "blocked plaintiff because of its prior speech or identity" and "indicated, either directly or indirectly, that they do not approve of plaintiff's liberal perspective." *Id.* Here, however, the University's restriction on Krasno was content-neutral, which is permissible. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) ("Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'"). The account-level restriction here only occurred here because Krasno had, prior to the restriction, made so many off-topic comments on the Instagram page as to constitute a pattern.

(DPFOF ¶ 53.) These multiple off-topic comments, therefore, violated the rules—and purpose—of the forum.

Further, due to the large volume of off-topic comments generated by Krasno, the account-level restriction was a reasonable method to moderate the forum in an efficient way. (DPFOF ¶ 54.)

Consequently, the temporary account-level restriction that allowed UW-Madison to release for public view any on-topic comments Krasno made was justified, content neutral, and thus a reasonable restriction of her free speech.

### 3.   Removing Krasno's "tags" of UW-Madison's Instagram account does not violate the First Amendment.

Krasno also alleges a First Amendment free speech violation based on Defendants removing "tags" of UW-Madison's Instagram account she had made on her posts. This part of her claim is without merit.

An Instagram user can tag any other Instagram user in her own account's posts by inserting the "@" symbol and the other user's username in the posts. When an Instagram user tags another user, her post shows up on the tagged user's Instagram account on a separate page containing all the posts that tagged user has been tagged in. (Joint Stip. ¶ 31; Moll Dep., March 9, 2022, pp. 38-40.) When a user does this to "@UWMadison," the account administrator of UW-Madison's Instagram account is notified that the

University was tagged in a post or video. (DPFOF ¶ 16.) UW-Madison, like any Instagram user, can then un-tag itself in the user's post. (DPFOF ¶ 18.) Un-tagging hides the tagging user's post from appearing on the tagged section of tagged user's page; that is, Krasno's post tagging UW-Madison would no longer appear on the tagged section of UW-Madison's page. (DPFOF ¶¶ 18–19.)

In September 2020, UW-Madison "un-tagged" "tags" Krasno made of the University's Instagram account on her Instagram posts, thereby removing Krasno's posts from the "tagged" section of the University's Instagram page.[4] (DPFOF ¶ 19.) Based on these undisputed facts, Krasno's free speech claims fail as matter of law because the action at issue did not occur in the comments section of UW-Madison's Instagram page, which is the only forum at issue here. *See One Wisconsin Now*, 354 F. Supp. 3d at 953 (holding that the "interactive portions" of Twitter pages are the fora for First Amendment analysis).[5] Defendants know of no case law holding that the government creates any kind of forum—traditional, designated, or limited—in the "tagged" section of its Instagram page. In short, without a forum in the first instance,

_____

[4] UW-Madison has not removed any of Krasno's tags since that time. (DPFOF ¶ 20.)

[5] This Court held that an "interactive portion" of a Twitter page is the portion where followers can reply to tweets and, thus, is intended for public discourse. *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 953–55 (W.D. Wis. 2019). Only this interactive portion of the Twitter page is the public forum. *Id.*

Defendants could not have unconstitutionally violated Krasno's speech based on viewpoint at all.

Moreover, Krasno's argument would force public entities to host other users' posts on the entity's pages. This would infringe on UW-Madison's speech. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*

*v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245–46 (2015) (citing *Pleasant Grove City* 555 U.S. at 467–68). Also included in this principle is the right to associate with whom one chooses. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (freedom of association includes the right to "identify the people who constitute the association."). Preventing UW-Madison from removing Krasno's tags from its Instagram page infringes upon its own important First Amendment rights to post (i.e., to speak) what it chooses and to associate with whom it chooses. The First Amendment does not require UW-Madison to provide a forum for Krasno's speech on its social media pages outside of their interactive portions.

### 4. Using keyword filters (auto-moderation) does not violate the First Amendment.

Krasno also complains that Defendants use keyword filters as an auto-moderation tool for UW-Madison's social media pages. She claims that words and phrases that are blocked limit her speech based on viewpoint. This is incorrect. Defendants' use of the keyword filter tool is a reasonable and viewpoint neutral way to moderate the plethora of comments made to UW-Madison's social media pages.

Defendants employ a keyword filter tool to assist in moderating the University's social media pages, a tool that Instagram and Facebook provide to all account holders. (DPFOF ¶ 21.) Because UW-Madison wants to limit the topics of discussion in the comment sections of its social media pages, this auto-moderation tool provides an effective and efficient way to prevent off-topic comments from inundating the interactive space of the pages, which in turn impedes the purpose of the comment section in the first place.

The keyword filter premise is simple. Social media managers monitor off-topic comments for words or phrases that are being repeated and that can be considered "spam." DPFOF ¶ 22.) In this review, social media managers comb through hundreds if not thousands of comments to posts. (DPFOF ¶ 23.) Due to the overwhelming volume of comments generated, manual moderation can be overwhelming during spam campaigns. (DPFOF ¶ 54.) Words or

phrases consistently used in off-topic comments are then added to the keyword list—and removed on an as-needed basis. (DPFOF ¶24.) Importantly, UW-Madison would not add a word or phrase to the auto-moderated keyword list for topics it posts about. (DPFOF ¶ 25.) Also, a comment that is moderated by the keyword filter on Facebook can be manually unhidden. (DPFOF ¶ 26.)

Krasno complains that the words and phrases in the keyword filters are weighted with those relevant to her viewpoint against animal testing and research and, as a result, many of her comments were hidden from public view.[6] But there was good reason: the majority of off-topic spam campaigns related to animal testing. (DPFOF ¶ 28.) And importantly, no UW-Madison posts concerned animal testing in the first instance. If UW-Madison posted about animal research, then comments about animal research would not be considered off-topic. (DPFOF ¶ 29.)

Thus, the University reasonably used the keyword filter tool in a viewpoint neutral manner to help moderate the comment sections of its social media pages. The University should be able to continue to use this tool as one way to keep comments on-topic and fulfill the purpose of the forum. UW-Madison's use of keyword filters is not a First Amendment free speech violation.

---

[6] Krasno's Facebook friends could see her comments on UW-Madison's Facebook page. (DPFOF ¶ 27.)

**5.    Disabling all commenting on a series of Instagram posts for under three weeks did not violate the First Amendment.**

 Next, Krasno may complain about Defendants' disabling all commenting to a series of UW-Madison Instagram posts from December 27, 2021, through January 13, 2022. This complaint would lack merit.

UW-Madison disabled all commenting on a photo series of individual posts made during the 2021–22 holiday season on its Instagram page. (DPFOF ¶ 30.) The decision was both content and viewpoint neutral. Because of vacations and holidays, UW-Madison was short-staffed with social media managers during this time, making it difficult to monitor the popular posts on its Instagram page. (DPFOF ¶ 30.) Disabling commenting only occurred for about three weeks, and no member of the public was able to make comments to the posts, not just Krasno. (DPFOF ¶¶ 30–31.)

Moreover, any complaint about disabling commenting would lack merit because, as a matter of law, the forum no longer existed during this time in question. That is, because UW-Madison disabled *all* commenting to a series of posts, the "interactive portions" of the UW-Madison social media pages no longer existed, and without the forum, the First Amendment simply is not implicated. To the extent Krasno may argue that Defendants were required to provide her with a forum, that argument can be rejected out of hand. Even under Krasno's theory that the comment sections of UW-Madison's social

media accounts are designated public fora, the state is not required to retain the open character of a designated public forum indefinitely. *Perry Educ. Ass'n*, 460 U.S. at 46. Defendants, therefore, were not required by the Constitution to keep the forum open during UW-Madison's winter break. *See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir. 2015) ("The forum question is not a static inquiry.").

Further, the action of disabling all commenting did not target Krasno; it applied to everyone, for legitimate, non-discriminatory reasons. *Davenport v. Wash. Educ. Ass'n,* 551 U.S. 177, 189 (2007) (restrictions in nonpublic fora are permitted so long as they do not discriminate on the basis of viewpoint and are reasonable in light of the purposes for which the forum was established). Lastly, there is no evidence that Krasno even attempted to comment during this period, in any event. As a result, Defendants did not violate Krasno's free speech rights through the disabling of commenting on a series of Instagram posts over this past winter break.

> ### 6. Krasno has no constitutional right to make her viewpoint on animal testing known by commenting on any of UW-Madison's social media pages' posts.

Lastly, Krasno takes issue with Defendants restricting her ability to comment altogether. That is, she believes that she has a constitutional right to make her viewpoint against animal testing known in the comment

sections of any and all posts UW-Madison makes on its social media pages. (DPFOF ¶¶ 35 & 36.) She is incorrect.

The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. v. Greenburgh Civic Ass'n,* 453 U.S. 114, 130 (1981). "In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise." *Perry Educ. Ass'n,* 460 U.S. at 46. The Supreme Court has stated that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *Greenburgh,* 453 U.S. at 129).

Here, Krasno wants the comment sections of UW-Madison's Facebook and Instagram pages to be reserved for her speech espousing her views against animal testing and research, regardless of the topic of the post. (DPFOF ¶¶ 11, 33.) And she wants "an injunction requiring Defendants to remove the restrictions on [her] ability to participate in comments on" UW-Madison's social media pages. (Dkt. 17 ¶ 35.) In Krasno's mind, any and all comments about animal testing and research are on-topic to the underlying UW-Madison posts. The reason? The posts are made by UW-Madison and UW-Madison conducts animal research. (DPFOF ¶ 11.) This position is extreme. To require UW-Madison to allow Krasno to comment about animal testing and research

to *any* post it makes would completely render useless the purpose of the limited public fora in the first place. For example, Krasno wants to comment about animal testing in response to a post UW-Madison makes about the varsity band's Spring Concert. The First Amendment does not require this outcome. In the limited public fora UW-Madison has created, Krasno, like everyone else, must keep her comments on topic to the underlying posts and must expect off-topic comments to be hidden or restricted. The First Amendment Free Speech Clause does not allow Krasno to hijack the University's social media pages to serve as her personal soapbox.

***

Krasno asserts that Defendants' moderation of her comments is a viewpoint-based restriction on her speech. (Dkt. 17 ¶ 104.) She is wrong. Defendants moderate off-topic comments to fulfill the purpose of the limited public forum it has created, which is a permissible regulation of speech under the First Amendment.

Because UW-Madison's regulation of Krasno's speech in the comment sections of its social media pages is viewpoint-neutral and reasonable in light of the purpose served, Krasno's free speech claims fail and summary judgment should be entered in favor of Defendants.

## II.   Defendants are entitled to summary judgment on Krasno's First Amendment Petition Clause claims.

Krasno also brings a First Amendment petition for redress of grievances claim.[7] (Dkt. 17 ¶¶ 109–14.) This claim is without merit and judgment should be entered for Defendants.

### A.   The law on a petition for redress of grievances claim.

The First Amendment to the United States Constitution protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const., Amend. 1.

This First Amendment right to petition is different that the right to free speech. The Supreme Court has explained, "[t]he right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). It continued, "[b]eyond the political sphere, both speech and petition advance personal expression, *although the right to petition is generally concerned with expression directed to the government seeking redress of a grievance.*" *Id.* (emphasis added). Specifically, "[a] petition conveys

---

[7] The First Amendment right to petition the government includes state government through the Fourteenth Amendment. *Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016).

the special concerns of its author to the government and, in its usual form, re-quests action by the government to address those concerns." *Id.* at 388–89.

Nonetheless, "while the government may not interfere with the right to petition . . . it need not grant the petition, no matter how meritorious it is." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (citations omitted). The Seventh Circuit has held "that the right is merely a right to petition the appropriate government entity." *Id.* And it points this out to remind plaintiff that they "may have other avenues of redress." *Id.*

### B.  Summary judgment should be granted to Defendants on Krasno's petition for redress of grievances claim.

Krasno states that Defendants took the following actions allegedly infringing on her right to petition the government: removing "tags" she made on the university's official Instagram account on her Instagram posts; being unable to re-tag the university; hiding or deleting comments she made on the University's Instagram and Facebook pages; imposing account restrictions on her Instagram account thereby automatically hiding all comments to university posts; disabling all commenting on the university's Instagram posts; hiding a reply she made to another commenter on a university Instagram post; failing to review all comments hidden through keyword filters on the university's Instagram and Facebook accounts; and forcing her to alter plain English in her comments to avoid the keyword filter. (DPFOF ¶¶ 46–47.)

However, despite UW-Madison's moderation of her off-topic comments on social media accounts, Krasno admits that the university has not restricted her ability to make posts on her own Instagram and Facebook accounts in any way. (DPFOF ¶ 40.) And she also admits that the university has not restricted her ability to send letters (DPFOF ¶ 37), emails (DPFOF ¶ 35), speak publicly (DPFOF ¶ 39), or call the university (DPFOF ¶ 38) about her disagreement with its animal research on campus. Krasno also admits that the university did not restrict her ability to file this lawsuit. (DPFOF ¶ 41.) Thus, Krasno admits she can communicate her viewpoint on animal research to UW-Madison in ways other than through off-topic social media comments (DPFOF ¶ 36), which forecloses her claim.

The Seventh Circuit's decision in *Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1064 (7th Cir. 2020), supports the Defendants' position. In *Shipley*, the plaintiffs complained that they were prevented from publicly commenting at a proclamation meeting about alleged fraud and irregularities during a post-election audit before the Board of Election Commissioners certified election returns. *Id.* at 1058, 1064. The court, however, pointed out that the plaintiffs also alleged in their complaint that they "voiced their objections at the Board" before the meeting, and submitted their observations in writing in advance of the public meeting. *Id.* at 1064. Thus, the plaintiffs' own allegations doomed their claim. *Id.* The court

39

explained that plaintiffs were "in fact able to petition the Board for redress of their grievances." *Id.* The plaintiffs "only complaint is that they were not able to petition the Board at their desired time and place, not that they were prohibited from petitioning the government." *Id.* The court affirmed the district court's judgment that the plaintiffs failed to state a right to petition the government claim. *Id.* Here, like the unsuccessful plaintiffs in *Shipley*, Krasno's other multiple avenues to petition the Board about her anti-animal testing position dooms her claim. *Id.*

Moreover, Krasno's "petition" claim appears to be indistinguishable from her "free speech" claim. Most, if not all, of Krasno's comments complain about the University's animal testing on primates. In response to Defendants' contention interrogatory asking her to provide the factual basis for her assertions that Defendants' restrictions on her from the comments sections of the social media pages at issue "hindered her ability to petition the government for redress of grievances," she referred to her "animal advocacy-related speech" and "comments related to animal advocacy." (DPFOF ¶ 46.) These are references to speech generally, not specifically to any petition seeking a redress of a grievance. Thus, Krasno's petition and speech are one in the same.

Finally, to the extent Krasno is complaining about the University not ceasing animal testing on campus based on her complaint, such a theory is a nonstarter. "[W]hile the government may not interfere with the right to

petition . . . it need not grant the petition, no matter how meritorious it is." *Hilton*, 209 F.3d at 1007 (citations omitted). Also, "a citizen's right to petition the government does not guarantee . . . the right to compel government officials to . . . adopt a citizen's views." *Apple v. Glenn,* 183 F.3d 477, 479 (6th Cir. 1999). "Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Min. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984). Therefore, Krasno is not entitled to any defendant adopting her anti-animal testing position.

"A petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." *Borough of Duryea*, 564 U.S. at 388–89. Therefore, because Krasno has merely a disagreement with the University's animal testing and no real petition for a redress of any grievance, and she has the ability to petition the Board of Regents (and any other state government entities and officials) about that complaint, summary judgment should be entered for Defendants on her right to petition claim.

III.  **Alternatively, Defendants are entitled to summary judgment on Krasno's individual capacity claims for nominal damages against Defendants Lucas, Klein, and Moll based on qualified immunity.**

Krasno has brought First Amendment claims against Defendants Lucas, Klein, and Moll in their individual capacities for nominal damages. (Dkt. 17 ¶¶ 13–15; 17:35.) All claims should be dismissed on the basis of qualified immunity.

A.  **The law of qualified immunity.**

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly,* 580 S. Ct. 548, 551 (2017) (*per curiam*) (internal quotations omitted). Put another way, state officials are entitled to qualified immunity under Section 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *Reichle v. Howards,* 566 U.S. 658, 664 (2012). Courts have discretion on which question to answer first. *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017).

The Supreme Court has continually reiterated that "'clearly established law' should not be defined 'at a high level of generality.'" *Pauly*, 137 S. Ct. at 552 (citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* at 552 (citation omitted). "Otherwise, '[p]laintiffs

would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)). "Clearly established" means that, at the time of the official's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). "Existing caselaw must 'dictate the resolution of the parties' dispute.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 472 (7th Cir. 2018)). Although a case directly on point is not required, "precedent must have placed the . . . constitutional question beyond debate." *White*, 137 S. Ct. at 551 (quotation marks omitted).

The plaintiff has the burden to establish that a defendant's action violated a clearly established right. *Kemp v. Liebel,* 877 F.3d 346, 351 (7th Cir. 2017). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198, (2004) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**B.  Lucas, Klein, and Moll are entitled to qualified immunity as to Krasno's First Amendment claims.**

Here, the undisputed facts and case law show that Lucas, Klein, and Moll were neither plainly incompetent nor knowingly violated Krasno's rights under the Free Speech and Petition Clauses.

First, as to her free speech claim, Krasno cannot point to clearly established law that the comments sections of a government entity's Facebook and Instagram accounts are public fora. Indeed, neither "the Supreme Court nor any Circuit has squarely addressed whether, and in what circumstances, a governmental social media page . . . constitutes a public forum." *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019). Thus, Krasno cannot meet her burden to establish that she has a clearly established First Amendment right to comment on UW's Facebook and Instagram accounts.

Second, even assuming the comments section of the University's accounts are public fora, there is no clearly established law that a government entity has no ability to moderate the comments sections of social media pages to ensure that only comments that are on topic to the underlying post are permitted. Krasno cannot point to any clearly established law that, under the particular facts here, she had a right comment on the issue of animal testing or research on social media accounts that did not concern animal testing or research in the first instance. In other words, neither Lucas, Klein, nor Moll

44

would have known that they would have been violating Krasno's First Amendment free speech rights by moderating her comments that they considered to be off-topic (either through manual or auto-moderation or account-level restricting).

Third, Krasno's petition claims fail because she cannot show a clearly established right under the Petition Clause to make comments in the interaction portions of a governmental entity's social media pages, whether on- topic or off-topic to the underlying posts. Further, even assuming Lucas, Klein, and Moll violated such a First Amendment right, it has not been clearly established that the law was sufficiently clear that every reasonable official would understand that what he was doing was unlawful. *Ashcroft v. al–Kidd,* 563 U.S. at 741. This is especially true because it is undisputed that Krasno has several other avenues to inform UW-Madison about her views against animal testing.

Finally, although Moll moderated Krasno's comments, neither Klein nor Lucas took any specific action against Krasno that amounted to a clearly established First Amendment violation.

Klein does not moderate the social media sites on a day-to-day basis. Klein is more of a supervisor of Moll but has filled in for him occasionally. (DPFOF ¶ 42.) However, Klein does not recall making a decision to moderate any comments made by Krasno on UW's social media sites. (DPFOF ¶ 43.)

Like Klein, it would be rare for Lucas to actively review comments to a post and moderate them. (DPFOF ¶ 44.) Lucas also has not made decisions about which comments by Krasno should be moderated. (DPFOF ¶ 45.) In other words, Klein and Lucas were not on notice that simply supervising Moll could have made them liable to Krasno's claims under the First Amendment.

Moreover, even putting aside Klein's and Lucas's lack of personal involvement in moderating Krasno's comments,[8] "[s]everal courts have held that public officials who allegedly deleted comments and blocked individuals from their campaign or official pages were entitled to qualified immunity because the law was not clearly established." *Sgaggio v. Weiser*, 2022 WL 252325, at *7 (D. Colorado Jan. 27, 2022) (citing *Lloyd v. City of Streetsboro*, 18–3485, 2018 WL 11298664, at *4–5 (6th Cir. Dec. 20, 2018) (city employee using official city page); *Garnier v. Poway Unified Sch. Dist.*, 17–CV–2215–W (JLB), 2019 WL 4736208, at *5 (S.D. Cal. Sept. 26, 2019) (school board members using campaign and official pages); *Hyman v. Kirksey*, 3:18–CV–230–DPM, 2019 WL 2323864, at *2 (E.D. Ark. May 30, 2019) (police chief using police department's official page); *Price v. City of New York*, 2018 WL 3117507 at *18 (S.D.N.Y. June 25, 2018) (city employees using official

---

[8] The individual capacity claims against Klein and Lucas could also be dismissed for lack of personal involvement under 42 U.S.C. § 1983 jurisprudence. *See infra* sec. IV.

city pages)). Courts "should be cautious in applying . . . free speech precedents to the internet" and "should proceed circumspectly, taking one step at a time." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, J., concurring).

Because First Amendment law was not clearly established at the time of Moll's, Klein's, and Lucas's conduct, they are entitled to qualified immunity on Krasno's individual capacity claims for money damages against them.

## IV. Alternatively, Defendants Klein and Lucas, in their individual capacities, are entitled to summary judgment all claims for lack of personal involvement.

"[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010). And individual liability cannot be based on an official's supervisory role over another. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325 (1981). Here, other than directly and indirectly supervising Nate Moll, there is no evidence that Klein and Lucas had direct involvement in moderating Krasno's comments made to UW-Madison's Facebook and Instagram pages. Neither Klein nor Lucas decided to hide or delete any comments Krasno made to UW-Madison's social media pages, to temporarily restrict her ability to comment on an account level, or to remove "tags," or to use certain words or phrases in keyword filters. Thus, Klein and Lucas lack the requisite personal involvement to satisfy individual liability under Section 1983 as to Krasno's

free speech and petition claims. As a result, Krasno's individual capacity claims against Klein and Lucas can be dismissed for lack of personal involvement, separate and apart from the grounds asserted above.

## V.   Alternatively, Krasno's claims against the Board of Regents should be dismissed because it is not a "person" under 42 U.S.C. § 1983 and also possesses Eleventh Amendment immunity.

In addition to the reasons for summary judgment explained above, Krasno's First Amendment claims against the Board, brought via 42 U.S.C. § 1983, can also be dismissed on two separate grounds. First, the Board is not a "person" under Section 1983. Second, the Board possesses Eleventh Amendment immunity. Under either theory, dismissal and summary judgment in its favor are proper.

### A.   The Board should be dismissed for lack of personhood under 42 U.S.C. § 1983.

Krasno brings her claims against the Board via 42 U.S.C. § 1983.[9] (Dkt. 17 ¶¶ 103–14.) A state, state agency, or an arm of the state is not a "person" under § 1983 and, therefore, such an entity is not subject to such a

---

[9]  42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

claim. *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 69 (1997); *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989); *Sebesta v. Davis*, 878 F.3d 226, 231 (7th Cir. 2017). The Seventh Circuit has held that the Board is an arm of the State of Wisconsin. *Joseph v. Bd. of Regents of Univ. of Wisconsin Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). Therefore, the Board is not a "person" under § 1983. Accordingly, Krasno's First Amendment Section 1983 claims against the Board must be dismissed and judgment entered against her and in the Board's favor.

### B.   The Board can be dismissed based on Eleventh Amendment immunity.

That the Board is not a "person" under Section 1983 is sufficient for dismissal of Krasno's constitutional claims against it, but these First Amendment claims also fail by way of the Board's Eleventh Amendment immunity.[10]

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."  U.S. Const. amend. 11.  Despite its

---

[10] The Seventh Circuit had held that district courts should dismiss Section 1983 claims based on lack of personhood grounds before addressing the Eleventh Amendment. *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000) (citing *Ver. Agency of Nat. Res.s v. United States ex rel. Stevens*, 529 U.S. 1858 (2000)).

language, this amendment bars suits against a state brought by one of its own citizens. *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996). o,   the Eleventh Amendment "bars   private   litigants'   suits   against nonconsenting states in federal courts, with the exception of causes of action where Congress has abrogated the states' traditional immunity through its powers under the Fourteenth Amendment." *Joseph*, 432 F.3d at 748. State agencies, as "arms of the state," are also immune from suit under the Eleventh Amendment.

*Id.* (citing *Will,* 491 U.S. at 70–71).

"The Board is an arm of the state for Eleventh Amendment purposes." *Joseph*, 432 F.3d at 748 (internal quotations omitted). And Krasno is obviously a private litigant. (Joint Stip. ¶ 3.) Thus, the Board can claim Eleventh Amendment immunity as if Krasno "had named the State itself as a defendant." *Tadder v. Univ. of Wisconsin-Rock Cnty.*, 2013 WL 3943498, *4 (W.D. Wis.). Finally, the Supreme Court has already held that Congress has *not* abrogated the states' immunity in Section 1983 suits. *Quern v. Jordan,* 440 U.S. 332, 341–45 (1979).

Thus, Krasno's First Amendment claims can be dismissed against the Board on Eleventh Amendment immunity grounds and summary judgment entered in its favor.

## CONCLUSION

Defendants ask this Court to grant its motion for summary judgment on all of Plaintiff's claims and dismiss the action.

Dated this 18th day of May 2022.

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Steven C. Kilpatrick
STEVEN C. KILPATRICK
Assistant Attorney General
State Bar #1025452
BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792 (SCK)
(608) 266-0020 (BPK)
(608) 294-2907 (Fax)
kilpatricksc@doj.state.wi.us
keenanbp@doj.state.wi.us