# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| MADELINE KRASNO,<br><br>        Plaintiff,<br><br>    vs.<br><br>BOARD OF REGENTS OF THE<br>UNIVERSITY OF WISCONSIN, et al.,<br><br>        Defendants. | Case No. 21-CV-00099-SLC |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................II

INTRODUCTION .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................ 3

LEGAL STANDARD...................................................................................... 20

ARGUMENT ................................................................................................ 20

    I.    THE UNIVERSITY'S FACEBOOK PAGE AND INSTAGRAM ACCOUNT ARE PUBLIC FORUMS. ................................................................................ 21

        A.    The Interactive Comment Threads of The University's Facebook Page and Instagram Account are Designated Public Forums. ................................ 21

    II.    THE UNIVERSITY'S SOCIAL MEDIA PRACTICES VIOLATE KRASNO'S FIRST AMENDMENT RIGHTS. ................................................................. 27

        A.    Krasno's Speech is the Essence of Protected Expression........................... 28

        B.    The University's Moderation Practices Unconstitutionally Discriminate on the Basis of Viewpoint. ................................................................................ 30

        C.    The University's Restriction of Krasno's Account and Keyword Filter Censorship Are Content-Based Discrimination.......................................... 43

        D.    Regardless of forum, the University's social media censorship is neither viewpoint neutral nor reasonable.................................................................. 52

    III.    THE UNIVERSITY VIOLATES KRASNO'S FIRST AMENDMENT RIGHT TO PETITON. ........................................................................................... 55

    IV.    THIS COURT HAS JURISDICTION OVER KRASNO'S CLAIMS. ........................ 57

        A.    Krasno has Standing. ................................................................................ 57

        B.    Defendants Are "Persons" Under § 1983 Acting Under Color of State Law............ 58

        C.    Eleventh Amendment Immunity Does Not Bar Krasno's Claims............................ 60

CONCLUSION.............................................................................................. 61

# TABLE OF AUTHORITIES

**Cases**

*ACT-UP v. Walp*, 755 F. Supp. 1281 (M.D. Pa. 1991) ..................................................... 49

*Ameritech Corp. v. McCann*, 297 F.3d 582 (7th Cir. 2002) ............................................ 60

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 20

*Boos v. Barry*, 485 U.S. 312 (1988) ................................................................................. 44

*Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000) ................................................... 59

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ..................................................... 50

*Carey v. Brown*, 447 U.S. 455 (1980) .............................................................................. 51

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 20

*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006) .......................................................................................... 43, 53

*City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Rels. Comm'n*, 429 U.S. 167 (1976) ............................................................................................................ 52

*Cohoon v. Konrath*, No. 20-CV-0620-BHL, 2021 WL 4356069 (E.D. Wis. Sept. 24, 2021) ........................................................................................................ 30, 57, 60

*Connick v. Myers*, 461 U.S. 138 (1983) ........................................................................... 28

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530 (1980) ........................................................................................................ 48

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ... 22, 23, 52, 55

*Crue v. Aiken*, 204 F. Supp. 2d 1130 (C.D. Ill. 2002) ..................................................... 44

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) ................................................................... 30

*Czosnyka v. Gardiner*, No. 21-CV-3240, 2022 WL 407651 (N.D. Ill. Feb. 10, 2022) .... 24

*Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702 (E.D. Va. 2017) ....... 25

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ........................................... 23, 24, 27, 60

*DeBoer v. Vill. of Oak Park*, 267 F.3d 558 (7th Cir. 2001) ................................................ 31

*Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc*., 365 U.S. 127 (1961) ........................................................................................................................ 56

*Elrod v. Burn*s, 427 U.S. 347 (1976) ...................................................................... 57

*Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006) ................................... 50

*Ex Parte Young*, 209 U.S. 123 (1908) .................................................................. 61

*Fair v. Esserman*, No. 3:15-CV-681 (SRU), 2017 WL 2979685 (D. Conn. July 12, 2017) ........................................................................................................................ 49

*Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020).................................................... 27

*Felts v. Reed*, 504 F. Supp. 3d 978 (E.D. Mo. 2020)............................................. 21, 22, 24

*Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013).................................................... 44

*Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208 (S.D. Cal. Sep. 26, 2019)......................................................................................................... 27

*Hansen v. Bennett*, No. 88 C 6936, 1990 WL 207452 (N.D. Ill. Nov. 30, 1990)............. 55

*Healy v. James*, 408 U.S. 169 (1972) ................................................................... 43

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001).................................................... 26

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019)......................................................... 38

*Kentucky v. Graham*, 473 U.S. 159 (1985)......................................................... 61

*Kimsey v. City of Sammamish*, No. C21-1264 MJP, 2021 WL 5447913 (W.D. Wash. Nov. 22, 2021) ...................................................................................................... passim

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) ......................................................................................................... 29, 58

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019)27, 31

*Knutson v. Wisconsin Air Nat. Guard*, 995 F.2d 765 (7th Cir. 1993)............................... 60

*Lugar v. Edmondson Oil Co*., 457 U.S. 922 (1982)......................................................... 59

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ........................................................ 22, 35, 36, 38

*McCullen v. Coakley*, 573 U.S. 464 (2014) ....................................................................... 51

*Meyer v. Grant*, 486 U.S. 414 (1988) ................................................................................. 30

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ........................................................ 53

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179 (1988) ................................. 59

*Ne. Pennsylvania Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424 (3d Cir. 2019) ....................................................................................................................... 49

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................................... 29

*Ogurek v. Gabor*, 827 F.3d 567 (7th Cir. 2016) ................................................................. 55

*One Wisc. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019).......................... passim

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ........................................ vi, 23, 55

*People for Ethical Treatment of Animals, Inc. v. Shore Transit*, No. CV JKB-21-02083, 2022 WL 170645 (D. Md. Jan. 18, 2022) ................................................................. 29, 54

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ............. 23, 44, 52

*Popp v. Monroe Cnty. Sheriff*, No. 119CV03664JPHDML, 2020 WL 8872811 (S.D. Ind. Mar. 31, 2020)........................................................................................................... 35, 60

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)................................................. 37, 49

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)......................................................... 50

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) 22, 30, 37, 38

*Snyder v. Phelps*, 562 U.S. 443 (2011) ........................................................................ 28, 29

*Southworth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 307 F.3d 566 (7th Cir. 2002) 43, 53

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..................................................................... 57

*St. v. New York*, 394 U.S. 576 (1969) ................................................................................ 34

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977) .............................................. 55

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ...................................................... 22, 44, 48

*Swart v. City of Chicago*, 440 F. Supp. 3d 926 (N.D. Ill. 2020)........................................ 57

*Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080 (E.D. Ark. Sep. 30, 2021) ....................................................................................................... 27, 38

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................................... 34

*The Fla. Star v. B.J.F.*, 491 U.S. 524 (1989) .................................................... 47

*Theyerl v. Manitowoc Cty.*, 41 F. Supp. 3d 737 (E.D. Wis. 2014) ................................... 48

*Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) .............................. 48

*United States v. Grace*, 461 U.S. 171 (1983).................................................... 27

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ........................................... 58

*West v. Atkins*, 487 U.S. 42 (1988) ............................................................ 58

*Widmar v. Vincent*, 454 U.S. 263 (1981)..................................................... 24, 28

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)........................................ 58

**Statutes**

Animal Welfare Act, 7 U.S.C. § 2131 .......................................................... 3

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................... 20

## INTRODUCTION

When Defendants[1] (collectively, "the University") created official Instagram and Facebook accounts for the University of Wisconsin-Madison and opted to invite any member of the public to interact within those spaces, they became hosts of one of the "'vast democratic forums of the Internet.'" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)). The University's accounts are public forums that historically accommodate discussion on a vast array of topics within the comment threads appended to the University's posts. Except for animal testing. The University has singled out **one** category of speech for censorship: speech critical of the University's animal research program.

The University extensively suppresses the speech of an alumna, Plaintiff Madeline Krasno ("Krasno" or "Plaintiff"), to sterilize its social media accounts of animal research criticism. The University secretly blocked her from commenting on its Instagram account for over four months after Krasno, a former animal caretaker at one of its primate research facilities, criticized the University's animal research practices. The University continues to specially censor discussion about animal research by employing keyword filters that automatically hide every comment by any user that contains words such as "monkeys," "vivisection," and "primates." In effect, the University ferrets out speech that casts it in a negative light in the forums it created for interaction with the public. These actions are unconstitutional viewpoint and content-based discrimination, and this Court should accordingly grant summary judgment in Krasno's favor.

---

[1] Plaintiff does not move against the Board of Regents, but the remaining Defendants. All references to "the University" or "Defendants" should thus be construed to include Defendants Rebecca Blank, Charles Hoslet, John Lucas, Mike Klein, and Nate Moll.

Viewpoint discrimination permeates the University's use of social media moderation—its decisions on when and how to delete or hide comments or block a user's account—in the otherwise public forums created within its social media pages. To protect its animal testing program, the University selectively employs moderation guidelines that allow its employees to remove on a case-by-case basis comments they determine may be "off-topic" to a University post or constitute "spam." Through these practices the University hides or bars comments primarily containing anti-animal testing sentiment, hiding behind the assertion that animal advocacy-related speech is almost always repetitive or unrelated to the University's posts.

The material facts establishing this are undisputed. The University penalized Krasno by restricting her account for purported off-topic commenting, resulting in the wholesale suppression of her comments from the University's Instagram comment threads for four months regardless of whether they related to the University's posts. Her comments remain hidden despite no identifiable rationale for their continued suppression and the University's admission that many were on-topic to the University's chosen speech. The University deploys keyword filters crafted in response to previous speakers' messages advocating against animal testing that operate to automatically censor all comments, including Krasno's, which contain words associated with that advocacy—unrelated to the University's posts or not. Yet the keyword filters leave animal testing proponents' speech and other unrelated speech untouched. Finally, the University manually hides comments for being off-topic but focuses its efforts on identifying and hiding animal testing-related speech while leaving other unrelated comments visible. Each type of moderation decision is performed under the University's discretionary guidelines, which are so inconsistent in every respect aside from a singular concern over hiding animal advocacy-related messaging. The guidelines cannot protect against viewpoint-discriminatory application and were not crafted to do so.

2

Without limits on who may comment nor defined and enforced policies on topics that are acceptable for inclusion within these spaces, the broad principles governing First Amendment protected speech in public forums apply to the commenting space of the University's Facebook and Instagram pages. Yet it continues to burden the speech of animal advocates like Krasno for the purported reason that there is too much advocacy against the University's animal testing. The justification is insufficient, and because the University cannot offer *any* rationale that sanctions its penalization of such speech, Plaintiff respectfully requests that the Court enter summary judgment in her favor.

## FACTUAL BACKGROUND

### I.     THE UNIVERSITY'S STORIED TESTING ON ANIMALS.

The University of Wisconsin-Madison is a public corporation of the State of Wisconsin. (Joint Stipulation of Facts ("JSOF") ¶ 5). It is known for its invasive research on animals, including on nonhuman primates, that it conducts at its Harlow Center and the federally funded Wisconsin National Primate Research Center. *Id*. The animal research program has been the subject of multiple previous enforcement actions by the United States Department of Agriculture ("USDA"), the federal agency tasked with ensuring the humane care of animals used in research under the Animal Welfare Act, 7 U.S.C. § 2131 *et seq*. ("AWA"). This includes a $74,000 fine the USDA issued against the University in April 2020 for AWA violations that included a traumatic injury to a primate. (JSOF ¶ 6). This followed a 2014 settlement the University entered into with the USDA for several other AWA violations, including violations directly implicating the welfare of animals used in its research program. *Id*. It has also been the frequent recipient of criticism regarding its testing in the public sphere, including by individuals like Krasno who advocate against animal testing through social media platforms.

II.   **THE UNIVERSITY'S @UWMADISON INSTAGRAM ACCOUNT AND FACEBOOK PAGE.**

The University believes that social media platforms "provide a tremendous opportunity to promote the UW-Madison brand" and offer "an immediate (and public) way for the university to reach key audiences and for stakeholders to access the university." (JSOF ¶ 61). To that end, the University has operated its @uwmadison Instagram account and Facebook page to reach and engage with members of the public. (JSOF ¶¶ 57-60, 67).

A.   **The University's @uwmadison Instagram account.**

The @uwmadison Instagram account is the University's official Instagram account. (JSOF ¶¶ 57, 62). The University created the account as Instagram became popular among its student body. (JSOF ¶ 63). Other than stating it is the "[o]fficial Instagram account of UW-Madison," at the time this lawsuit was initiated the only purpose of the University's Instagram account that a viewer to the page would see described it as a "[c]ollection of your #UWMadison pics and those of University Communications staff." (JSOF ¶¶ 62, 65). This has since been changed to state: "sharing stories from the #UWMadison community, #OnWisconsin." (JSOF ¶ 65).

By its very nature Instagram is a social media platform that facilitates interactions between users by allowing them to share photos and videos. (JSOF ¶ 20). Any "user"—an individual or institution that has created an account on the platform—can post content on that user's unique webpage, the collection of posts that user has published for others to view. (JSOF ¶¶ 22-23). Each user's webpage contains its account name, like "@uwmadison," a description of the user's account, and account-specific data including the amount of posts the user has published. (JSOF ¶ 23).

The University's Instagram account is accessible to anyone, and the University takes no steps to limit access to it. (JSOF ¶ 68); (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 3).

Even those without an Instagram account can view a limited amount of its posts, though viewers are required to login to view the full history of posts and associated content. (JSOF ¶¶ 32-34).

The University's Instagram account is used as a channel to communicate official University announcements, events, and policies to the public. (JSOF ¶¶ 59, 67). When the University issues a post on the account, it represents the official voice of the University so that any viewer can read statements by its Chancellor or announcements of official university policy, for example, as statements from the University itself. (JSOF ¶ 60). It has used the account to disseminate its voice, with its 2,400 posts featuring announcements from university students and staff providing updates and information impacting campus life—from COVID-19 protection measures employed by the University, to announcements of university closures, to the medical care provided by its veterinary or engineering schools to featured animals. (JSOF ¶ 69).

When a user with a public account like the University's posts an image or video on Instagram, other Instagram users can comment on the post and reply to each other's comments. (JSOF ¶¶ 25, 28). The space where users can comment on another user's post and reply to each other's comments is called a "comment thread." (JSOF ¶¶ 28-29). An example of comments to a post and replies within the comment thread among Instagram users is below.



Members of the public who have a generally available Instagram account can directly communicate with the University and each other in the comment threads associated with each of the University's Instagram posts, exchanging views and discussing topics with one another. (JSOF ¶¶ 69-70). This interaction was encouraged since the account's creation, with one of the University's first posts made on September 22, 2012, featuring a photo of its football field. Other Instagram users replied to the post in its comment thread, and the University responded in turn to some of those comments. (JSOF ¶ 64).

Users can interact in other ways outside of commenting or replying in the comment threads. (*See, e.g.*, JSOF ¶ 31) ("liking"). A user can tag another user's account in their own Instagram account's posts by inserting the "@" symbol and the username of the account they want to tag. (JSOF ¶ 31). When another account is "tagged," the post typically shows up on the tagged user's Instagram account on a separate page containing all the posts that user has been tagged in. *Id*. When, for example, Krasno inserts "@uwmadison" within a post she publishes on her Instagram account @madeline_krasno, that post populates on a separate page on the University's Instagram

account. (PPFOF ¶ 85). A user whose account is "tagged" can remove the tag, which removes the post from the tagged section of their Instagram account. (PPFOF ¶¶ 85-86).

Instagram also allows users to subscribe to another user's posts by "following" the account. (JSOF ¶ 68). To follow an account, a user can select a blue button on that user's Instagram webpage. (JSOF ¶ 25). Posts from "followed" accounts are generated in a "feed" that populates the first page a user will see when they log in to Instagram. (JSOF ¶ 26). Though not every follower of the University's account will receive new posts it makes in their news feeds, it is the primary means that the University's posts are delivered to other users. (JSOF ¶ 27).

**B.      The University's @uwmadison Facebook page.**

The University also operates a public Facebook page, @uwmadison, that is the official Facebook Page for the University. (JSOF ¶ 7). The University describes the page as "[t]he official Facebook page for the University of Wisconsin–Madison. Managed by staff of University Communications, a unit located within the Office of University Relations." (JSOF ¶ 71).

Facebook is a social networking platform that, like Instagram, allows users to connect with other members of the platform and the general public by sharing messages, photos, videos, and information. (JSOF ¶ 43). As with Instagram, when someone creates a Facebook account, they are given a webpage to display their posted content as well as display comments and interactions they have with other users. (JSOF ¶¶ 45-46). Like Instagram posts, Facebook posts made by an account can contain photos or videos and associated text. (JSOF ¶ 47). And like Instagram, each Facebook post contains an interactive space for other users with Facebook accounts to comment on an account's posts, reply to each other's comments, and for the original poster to reply to them in turn. *Id*. Users can also "like" another user's individual post, comment, or reply, which places a small "thumbs up" icon on the bottom of the box containing the liked text. (JSOF ¶ 51).

7

Like its Instagram account, the University's Facebook page is public, so any member of the public can view it. (JSOF ¶ 48). The University does not take any steps to limit access to its Facebook page. (PPFOF ¶ 5). Even those who are not logged into a Facebook account can view a limited number of posts and associated comments. (JSOF ¶ 48).

The University's Facebook page's purpose is to share stories from the University's community. (JSOF ¶ 72). To that end, it features posts containing university announcements and developments, news following the work or achievements of its student body and faculty, and public health and safety announcements for its student body and the general public. (JSOF ¶ 73). The University counts as its audience current students, faculty, staff, prospective students, alumni, community members, and the public. (JSOF ¶ 76).

Users regularly engage within the comment threads of the University's Facebook page, congratulating students on their graduation, commenting on the expense associated with the University's online courses, critiquing fees paid by the University to invited speakers, debating the willingness of the campus community to wear face masks, and posing questions about ongoing research announced in a University post. (JSOF ¶ 74). In response to a Facebook post made by the University on December 15, 2020, describing its mobile COVID-19 testing facility, for example, over 50 comments and replies were made debating the necessity, rationale, and efficacy of the University's testing as well as comments alluding to the University's ability to track the whereabouts of its students. *Id*.

In general, the University does not remove or restrict criticisms from the comment threads associated with its Facebook posts, even when such comments are directed to University practices on topics such as holding in-person classes or expending money on guest speakers or art. Even comments criticizing the University's spending in response to its solicitation of donations from

8

members of the public to fund student fees, for example, remain visible to anyone who accesses the page. (JSOF ¶ 78).

Users can interact with a Facebook account in other ways beyond commenting, such as subscribing to the account's posts so that the posts are included in the News Feed of that user. (JSOF ¶¶ 50, 77).

## III.    INSTAGRAM AND FACEBOOK'S TOOLS FOR MODERATING SPEECH.

As platforms, Instagram and Facebook both provide optional tools to any user who wishes to moderate the comments made on their account or the users who can see, comment on, or otherwise interact with their posts.

### A.    Instagram.

An Instagram account has several options to limit comments on their posts or remove comments made by other users. First, an account can opt to exclude all comments from the posts they publish on their Instagram account. To do so, they simply select "[t]urn off commenting" for the individual posts they share. (JSOF ¶ 35).

Second, an account can elect to hide comments containing certain words or phrases through Instagram's custom keyword filter. Through keyword filters, an account can add a word or phrase such as "monkey" to the keyword filter list. When a commentor uses that word or phrase in their comment, the comment will automatically be hidden. (PPFOF ¶ 68). A user that makes a comment captured by the keyword filter receives no notice that their comment is invisible to others. (*See, e.g.*, PPFOF ¶ 111).

Finally*,* an account can impose an account level restriction on another user to render all of that user's comments invisible. (JSOF ¶ 37). During an account restriction, all comments on the account's posts by the restricted user are automatically hidden from public view until the restriction is removed. During restriction, an account has the option to choose to manually

"approve" the restricted users' posts after prescreening their content and can then consequently allow the comment to be publicly viewable. (JSOF ¶ 37). If a restricted account's comment is not affirmatively approved, the comment remains hidden from others' view. (JSOF ¶ 37). Instagram does not provide any notice to a user that they are subject to an account restriction by another account. (JSOF ¶ 38). Restricted users can continue posting comments that will remain invisible to anyone but themselves, and thus they will not receive any replies or responses to their comments from any other Instagram user. (JSOF ¶¶ 39-41).

     **B.**    **Facebook.**

     A Facebook account also has several tools to limit comments or users from interaction with their pages. First, an account can exclude all comments from the posts they publish on their account. (PPFOF ¶ 2). This effectively blocks all commenters from responding to the account's post or otherwise commenting within its commenting section. *Id*.

     Second, a Facebook account can manually hide or delete comments made by other users after the comment is published on a particular post. (JSOF ¶ 53). Hiding a comment removes it from view for everyone except the original commenter and their friends. (JSOF ¶ 54). Deleting a comment, in contrast, removes it from permanent display to anyone who visits the post's comment thread. (JSOF ¶ 55).

     Finally, as on Instagram, a Facebook account can utilize a custom keyword filter by manually entering specific words or phrases for automatic blocking. Any user's comment containing a keyword filter term is automatically rendered invisible from public view and only visible to the commenter and their Facebook friends. (PPFOF ¶ 78). The restricting account may manually unhide a comment hidden by a keyword filter. *Id*. Comments hidden through this process on Facebook are visible to the commenters' Facebook friends. *Id*.

## IV.   THE UNIVERSITY'S MODERATION PRACTICES TARGET ANIMAL ADVOCACY RELATED SPEECH.

The University has generally opened the interactive spaces of its social media accounts to the public to engage with itself and each other by not limiting the public's access to its social media pages. (JSOF ¶¶ 48, 68). It has simultaneously utilized the platform's tools to selectively hide speech related to animal advocacy.

### A.   The University's Moderation Guidelines and Discretionary Enforcement.

The University has no social media policy that governs how its employees moderate comments. (PPFOF ¶ 6). As a matter of custom, at the time this lawsuit was filed on February 10, 2021, the University's only relevant guidance for social media moderation has been a Social Media Statement published around 2010. (PPFOF ¶ 7). The Social Media Statement is posted on the University's website, but its contents are not directly available on the University's social media account pages. (PPFOF ¶¶ 8-9). A user can only access the Social Media Statement by following a series of links on the University's Instagram account or by clicking on a "Privacy Policy" on the University's Facebook page. (PPFOF ¶¶ 9-11).

The Social Media Statement does not provide for the removal of any comments—it merely purports that the University may remove comments that violate the policy. (PPFOF ¶ 12). In fact, it expressly states content is not reviewed for removal: "UW-Madison does **not** regularly review content posted to social media sites." *Id.* (emphasis added). While preserving "the right to remove any content for any reason," including content that is "threatening," "profane," "off-topic," promoting "organizations or programs not related to or affiliated with the university," or that are "injurious or illegal," *id.*, the University itself has no expectation that as a matter of practice each and every comment will be reviewed. (PPFOF ¶ 29).

The University focuses its moderation of animal advocacy content on the "off topic" category. (PPFOF ¶ 54). It specially scrutinizes comments on the University's posts that are critical of animal research to determine compliance with the Social Media Statement. *Id*. In fact, its employee responsible for moderation monitors its Instagram account for "animal rights" and "animal research comments" that he believes are "almost always off topic" to the University's posts. (PPFOF ¶ 64); (*See also* PPFOF ¶ 55).

In 2021, after Krasno filed this lawsuit, the University issued internal Interim Guidance to social media staff on the moderation of off-topic comments, using as an illustration of a comment that is unrelated to a University post one that advocated for animals. (PPFOF ¶¶ 18-19). The Interim Guidance is not publicly available. (PPFOF ¶ 18). Like the Social Media Statement issued in 2010, the Interim Guidance provides broad moderation discretion by permitting *but not requiring* the removal of any comments, even if deemed "off topic" in the eyes of the moderator. (PPFOF ¶ 20).

The University's moderation of comments under these guidelines is largely left to the discretion of the individual responsible for moderation that day. (PPFOF ¶¶ 25, 27). In practice, this exercise of discretion results in inconsistent application of what is and is not moderated on the University's social media accounts. For example, the University sometimes removes or hides comments for reasons not articulated in the Social Media Statement, (PPFOF ¶ 14), such as content deemed "political" (PPFOF ¶ 15), "harmful" (PPFOF ¶ 16), or "spam"—a term not found in either the Social Media Statement or the Interim Guidance.  (PPFOF ¶ 17). And since the guidelines provide no instruction for the type of moderation required for comments deemed to violate the University's Social Media Statement, (PPFOF ¶¶ 12, 19-20), the decision of whether and what moderation action to take—e.g., whether to allow a comment to remain visible or hide, delete, or

reply to it—is left to the discretion of the employees responsible for moderation at the time a comment is being reviewed. (PPFOF ¶¶ 25, 27-28, 47-48).

The University admits it does not apply its off-topic criteria consistently. (PPFOF ¶ 32). It further does not audit its social media managers' moderation decisions to verify moderation of content is done pursuant to its Social Media Statement. (PPFOF ¶ 51). As a matter of custom, the University's social media manager in charge of moderation decides to remove an off-topic comment depending on whether they have time to review the comments in question among other factors. (PPFOF ¶¶ 27, 48). In other words, the decision is entirely in the hands of the individual making the moderation decision. (PPFOF ¶ 47).

### B. Use of Keyword Filters.

The University relies heavily on keyword filters to automatically hide comments containing certain words or phrases it has selected for moderation on both of its social media pages. As of April 21, 2022, the University's Facebook and Instagram pages included the following keywords:

13

| **Facebook** | **Instagram** |
|---|---|
| Animal laboratories | #freebabycocoa |
| Animal testing | #releasecornelius |
| Barbaric | @peta |
| Cruelty | Abusing |
| Experimenting on | Animal testing |
| Macaques | Cornelius |
| Monkeys | Cruelty |
| Primate | Kill animals |
| Primates | Lab |
| Research animals | Monsters |
| Testing on animals | Monstros |
| Torture | Shame on |
| Torturing | Testing cats |
| Vivisection | Testing on animals |
| wnrpc | Testing on cats |
| | Tests on cats |
| | Torture |
| | Torturing |
| | Vivisection |
| | WNPRC |
| | You guys are sick |

(PPFOF ¶ 69).

The University maintains its keyword filter lists by adding new words related to animal advocacy when facing what its social media manager, Defendant Nathan Moll, calls a "spam campaign"—i.e. a surge of public interest relating to the University's animal research program. (PPFOF ¶ 72). Moll believes that the "vast majority" of such comments are "related to animal testing." (PPFOF ¶ 75). For example, Defendant Moll added the word "Cornelias" (a misspelling of the name of one of the primates involved with research at the University) to the keyword filter for the University's Instagram account after several concerned members of the public made comments about Cornelius on a post containing a commencement video. (PPFOF ¶ 73).

The Social Media Statement does not provide any guidance to the University's social media moderators for the use of keyword filters. (PPFOF ¶¶ 7, 12, 77). The 2021 Interim Guidance only

lists "profanity" as a basis to use a keyword filter. (PPFOF ¶ 18). The decision to add or remove a word or phrase to the keyword filters is thus "situation dependent," (PPFOF ¶ 76), oftentimes made solely by the social media manager. (*See, e.g.*, PPFOF ¶ 73). The University is mindful enough, however, not to filter keywords that it uses itself or wants to use for its own messaging. (PPFOF ¶ 74). The keyword filter lists are reviewed on an ad hoc basis to assess their use. (PPFOF ¶ 76). And the University has no process to review comments captured by the keyword filters to determine if they were erroneously hidden under its moderation practices. (PPFOF ¶ 79).

## V.  THE UNIVERSITY'S MODERATION OF KRASNO.

As a social media user who criticizes the University's animal testing program, Krasno is one of many advocates whose speech is excluded by the University's arbitrary moderation practices. The University positions itself on its social media pages to protect its animal testing program. (PPFOF ¶¶ 53-59, 63-67). To do so, the University monitors animal research content and campaigns that other users such as the People for the Ethical Treatment of Animals (PETA) conduct on their own social media accounts. (PPFOF ¶¶ 55-62, 64). These efforts support Defendant John Lucas's vision of the Communications Department as performing a duty to the University's animal research program. (PPFOF ¶ 66). This duty extends to promoting the program since the information the University shares about it is, in Lucas' view, what is "accurate and true." (PPFOF ¶ 67).

### A.  The University Monitors Krasno's Animal Advocacy on Social Media.

Krasno is an alumna of the University. (JSOF ¶ 4). As a student there interested in a career involving animals, Krasno worked at its Harlow Center caring for nonhuman primates used in experimentation. *Id*. Her experience traumatized her and led her to conclude that animal testing was inhumane. *Id*. In early September 2020, prior to her first posting on the University's Instagram account or Facebook page, Krasno decided to talk publicly about her experience working within

the University's primate testing program. She began to tag the University's Instagram account in her own Instagram posts criticizing the University's animal testing program. (PPFOF ¶ 82).

The University took note. On September 16, 2020, employees involved in primate research at the University, including the former Director of the Harlow Primate Laboratory ("HPL"), and members of the University's Research Communications team[2] circulated an email regarding Krasno's social media posts, noting "the conversation involves some comments re HPL." (PPFOF ¶ 84). Defendant Lucas, who oversees the University's social media account communications, similarly became aware of her posts, and found it concerning as they "were surfacing in front of a wide number of users." (PPFOF ¶ 83). By September 17, 2020, the University erased the tags from Krasno's posts, which removed them from the "Tagged" section of the University's Instagram account. (PPFOF ¶¶ 85-86).

### B.   The University Restricts Krasno's Instagram Account.

Krasno made her first comment on a University social media account on September 18, 2020, writing "stop exploiting animals. Get with the future and the future is consistent anti-oppression. Shut down the labs and eat plants!" She made the comment on a University Instagram post about dairy cows used for research at its Dairy Cattle Center. Within the same post, Krasno also replied to another individual's comment about stopping animal experimentation and said, "I used to work in one of their labs. I made a bunch of posts and tagged them in it and they hid all of them." The University hid both Krasno's comment and reply from public view. (PPFOF ¶ 87).

On September 28, 2020, Krasno commented a second time on a University Instagram post about the opening of a recreation center. She stated, "[t]hanks for continuing to delete my comments and untag yourself from my photos. Definitely showcases fear. I will continue to share

---

[2]The Research Communications team consists of employees within the Communications Department who cover communications that involve animal research. (PPFOF ¶ 60).

the truth about what it was like working in one of your primate research labs and advocate for their closure. As I mentioned before, today is a great day to shut down the primate research labs!" The University then hid Krasno's comment from public view. (PPFOF ¶ 88).

By the time Krasno made her second comment on a University post, the University had restricted Krasno's Instagram account so that all of her comments on its Instagram account were automatically hidden from public view. (PPFOF ¶ 89); (JSOF ¶ 8). Defendant Moll, who restricted her account, did so due to "a consistent pattern of off-topic comments," though he cannot recall if each of Krasno's comments were in fact off-topic. (PPFOF ¶ 91). Since her account was restricted, each comment Krasno subsequently made on the University's Instagram account was automatically hidden from public view:

- On October 3, 2020, Krasno commented on a University Instagram post about the birthday of its mascot, Bucky. She commented "close down the primate labs! @uwmadison." Krasno's comment was hidden from public view. (PPFOF ¶ 92).

- On October 29, 2020, Krasno commented on a University Instagram post about University efforts during the COVID-19 pandemic. She commented "@uwmadison stop testing on monkeys!" Krasno's comment was hidden from public view. (PPFOF ¶ 93).

- On November 17, 2020, Krasno commented on a University Instagram post about COVID-19 measures. She commented "close down the primate labs!" Krasno's comment was hidden from public view. (PPFOF ¶ 94).

- November 23, 2020, Krasno commented on a University Instagram post about Thanksgiving travel. She commented "@uwmadison, close down your primate research labs!" Krasno's comment was hidden from public view. (PPFOF ¶ 95).

- On December 22, 2020, Krasno commented on a University Instagram post about a dog being treated for cancer at the University's veterinary hospital. She commented "It is really quite hypocritical the compassion shown to this dog while thousands of animals languish in laboratories at @uwmadison. I really wish you would acknowledge this and do something about it." Krasno's comment was hidden from public view. (PPFOF ¶ 96).

No other Instagram user could view or respond to Krasno's comments on the University's Instagram posts during her account restriction. (JSOF ¶ 40). In January 2021, the University removed the account restriction, (PPFOF ¶ 107), but all comments Krasno made during that period

remain hidden. (PPFOF ¶ 98). The University gave no prior warning to Krasno that her account would be restricted. (PPFOF ¶ 113).

In addition to restricting Krasno's comments and account, the University actively monitored her activities on her own social media profile. (*See, e.g.*, PPFOF ¶ 104). In January 2021, Defendant Moll forwarded a posting of an event at which Krasno was speaking about her experience working at the University's primate lab. He sent the message to employees of its Research Communications team "since it involved the primate lab." (PPFOF ¶ 106). The Research Communications team similarly monitored her presentations and sent this information to Defendant Moll. (PPFOF ¶ 103). Internally, Defendants Moll and Klein referred to Krasno as "our friend" and joked about creating a fake account to sneak into one of her presentations. (PPFOF ¶ 105).

### C. The University's Keyword Filters Hide Krasno's Animal Advocacy-Related Speech.

The University's keyword filters frequently hide comments Krasno makes on its Instagram account and Facebook page relating to animal advocacy. The filters hid Krasno's speech on December 13, 2020, for example, when she commented on a University Facebook post about winter commencement and the future. She wrote: "I wish you would think about the future in new ways too and stop testing on monkeys. Working in one of those labs during college showed me how important it is that we create a just world. Animal research is not the way to accomplish this." (PPFOF ¶ 111). The comment includes the word "monkeys" which is on the University's Facebook keyword filter list. (PPFOF ¶ 69). Krasno's comment was hidden from public view, and only Krasno and her Facebook friends could view it. (PPFOF ¶¶ 111-112).

Similarly, on March 11, 2022, Krasno commented on a University Instagram post regarding having a safe and happy spring break. She commented "I bet the monkeys and other

sentient beings in your labs would like a break or better yet, freedom @UWMadison." Another user, seth_genteman, replied to Krasno's comment in support of animal research stating, "animals may end up saving your life from the research conducted." Krasno and seth_genteman engaged in a series of replies within the comment thread in which seth_genteman remarked "[e]veryone would love an easier way to obtain said results," to which Krasno issued a final reply that referenced her time in the University's "primate lab." Krasno's final reply to seth_genteman contained the word "lab" which is on the University's Instagram keyword filter list. Krasno's reply was hidden from view, while seth_genteman's comments advocating for animal testing remain visible. (PPFOF ¶ 109).

Krasno has advocated for animal rights in comments replying to the University's social media posts by modifying the spelling and spacing of certain words. For example, on May 9, 2021, Krasno commented on an Instagram post discussing Mother's Day, "What about all the mothers you have in cages on campus? Celebrating them too after ripping their babies away from them? A n l m a l t e s t l n g is cruel." (PPFOF ¶ 116). This comment was not hidden from view. *Id*. Krasno finds this process burdensome as she must try to remember what words are currently listed on the University's keyword filters in formulating her messages. (PPFOF ¶ 118). She also cannot use plain language to convey her views to other readers, which she believes dilutes the effectiveness of her messaging. *Id*.

### D. The University Manually Hides Krasno's Facebook Comments.

The University has also manually hidden comments Krasno made on its Facebook page. (JSOF ¶ 8). On December 9, 2020, Krasno commented on a University post about proud alumni, remarking: "University of Wisconsin-Madison, are you really proud of all of your graduates or just the ones who didn't object to your barbaric treatment of monkeys in your research labs?" (PPFOF ¶ 110). The University manually hid Krasno's comment from public view for being

19

allegedly "off topic." *Id*. Only Krasno and her Facebook friends can view that comment. *Id*. The University gave no prior warning to Krasno that it would remove her comment. (PPFOF ¶ 113).

## LEGAL STANDARD

Summary Judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant summary judgment, the court must view all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). Disputes over material facts may impede summary judgment, but only if the facts "might affect the outcome of the suit" under the applicable law. *Id*. at 248. The moving party bears an initial burden to set forth the basis for its motion and the relevant, undisputed evidence in its support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also One Wisc. Now v. Kremer*, 354 F. Supp. 3d 940, 949 (W.D. Wis. 2019) (same).

## ARGUMENT

The University social media pages are public forums, spaces where it has invited the public to interact within its commenting threads on a wide range of topics. In practice, these forums host nearly unfettered discussion and debate, while arbitrarily applying discretionary guidelines to specifically moderate comments—such as those by Krasno—that criticize the University's animal research program. The University has doggedly moderated criticism of its animal research program by, among other things: imposing a penalty and prior restraint on Krasno's speech for four months through an account restriction that hid all comments she made on its Instagram account; manually hiding Krasno's comments; and utilizing a keyword filter that automatically silences all of her speech that contains words relating to advocacy against animal research. By disfavoring Krasno's speech, the University has imposed viewpoint and content-based restrictions on a quintessential example of protected expression in violation of the First Amendment. Moreover, because the

University admittedly performs these actions without clear guidelines that could cabin the viewpoint-discriminatory nature of its moderation practices, its actions are unreasonable and unconstitutional in any type of forum.

## I.  THE UNIVERSITY'S FACEBOOK PAGE AND INSTAGRAM ACCOUNT ARE PUBLIC FORUMS.

The University created public forums when it established its official social media pages and operated them as channels for virtually unfettered discussion and debate. Indeed, "[t]he majority of courts that have addressed the issue have concluded that when a government official uses a social media account for official business, and when the interactive portions of the account are open for public comment, those interactive portions are a public forum." *Felts v. Reed*, 504 F. Supp. 3d 978, 985 (E.D. Mo. 2020) (collecting cases), *motion to certify appeal denied*, No. 4:20-CV-00821 JAR, 2021 WL 168746 (E.D. Mo. Jan. 19, 2021).

### A.  The Interactive Comment Threads of The University's Facebook Page and Instagram Account are Designated Public Forums.

The University's interactive portions of its Facebook page and Instagram account—the spaces the University has opened for any user to interact within its posts through comments, likes, and replies between and among each other—are designated public forums. The University chose to create a public Facebook page and Instagram account to harness the interactive nature of those platforms. It has used the platforms to host public discussion without nearly any limitation on who may view or comment on the posts it issues. Apart from selectively ferreting out animal advocacy-related speech that criticizes its animal testing practices, the University's policy and practice of hosting a wide of array of topics and speakers within the comment threads of its social media accounts have created designated forums.

1.      **Public Forum Doctrine.**

The First Amendment cabins government regulation over its property depending on the nature of the forum. There are (1) "[t]raditional public forums," such as public streets and parks, characterized by "a long history of being devoted to assembly and debate;" and (2) designated public forums which are the physical spaces or "channels of communication" that the government "opens up for use by the public for expressive activity." *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). Designated forums exist in metaphysical spaces as well as concrete locations, and have been found in fundraising campaigns, *see, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) (federal workplace campaign for charity fundraising a public forum), student funding allotments, *see, e.g., Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (finding school funding "is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable"), and on social media platforms, *Felts*, 504 F. Supp. 3d at 985 (collecting cases). Government property that is not open by historical use or designation are a third type: (3) nonpublic or limited forums. *Surita*, 665 F.3d at 869.

The type of forum determines the resulting level of scrutiny applied to government limitations of speech. Viewpoint discrimination is prohibited regardless of the type of forum the government creates. *Rosenberger*, 515 U.S. at 829–30 (noting "viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations"); *see also Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in nonpublic forum). Content-based exclusion of speech in traditional and designated forums is subject to strict scrutiny. *Surita*, 665 F.3d at 870 (quoting *Perry Educ. Ass'n,* 460 U.S. at 45). Restrictions of speech in nonpublic forums must be "reasonable in light of the purpose served by the forum" and viewpoint-neutral. *Cornelius*, 473 U.S. at 806.

2.     **The University's Facebook and Instagram's Comment Threads are Designated Public Forums.**

To find a designated public forum exists, the Court looks to "the nature of the property and its compatibility with expressive activity" as well as "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U.S. at 801-02 (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983)). Both analyses show the University has created a designated forum within the confines of the interactive spaces on its Instagram account and Facebook page.

The comment threads that adhere to each post the University makes on its social media pages contain the interactive space wherein any member of the public may choose to engage in wide array of topics of speech with a wide range of individuals. It is this comment thread space— and not the University's Instagram account and Facebook page in their entirety—that are the forums at issue. *See Cornelius*, 473 U.S. at 801 (Where "limited access" by a speaker "is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property."); *see also Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (interactive components of Facebook page public forums "even though [government official's] curation of and posts to the Chair's Facebook Page amount to government speech"), *as amended* (Jan. 9, 2019).

This interactive space of the comment threads is plainly compatible with expressive activity. The Supreme Court itself has singled out as one of the most important places for the exchange of views "the 'vast democratic forums of the Internet,'" and "social media in particular." *Packingham*, 137 S. Ct. at 1735 (citing *Reno*, 521 U.S. at 868). Both platforms are billed as offering a place for free expression and connection with other individuals who choose to use the sites. *See* (JSOF ¶ 44) (Facebook is "a service for more than 2 billion people to freely express themselves");

(JSOF ¶ 21) (Instagram is an "authentic and safe place for inspiration and expression").[3] As the University has stated, "[n]ever before has there been such an immediate (and public) way for the university to reach key audiences and for stakeholders to access the university." (JSOF ¶ 61).

Nearly every court to consider the issue has confirmed the compatibility of the interactive spaces of social media accounts like those hosted on Instagram and Facebook with expressive activity. *See, e.g., One Wisc. Now*, 354 F. Supp. 3d at 953 ("Given the nature of Twitter and its compatibility with expressive activity, . . . the interactive portions of defendants' respective Twitter accounts plainly constitute designated public forums.") (citation omitted); *Davison*, 912 F.3d at 682 (Facebook page's interactive page constituted a public forum); *Felts*, 504 F. Supp. 3d at 986 (same for Twitter); *see also Czosnyka v. Gardiner*, No. 21-CV-3240, 2022 WL 407651, at *2 (N.D. Ill. Feb. 10, 2022) (noting "federal courts have concluded that when the government or a government official uses a social media account for official business, the interactive portions of the social media platforms are public forums for First Amendment purposes").

The University's practice of hosting public participation in the interactive space of its Instagram account and Facebook page evinces its intent to designate them as public forums. A public university already embodies many of the characteristics of public forums, *Widmar v. Vincent*, 454 U.S. 263, 267 n. 5 (1981), and it designates an additional space for expressive conduct by creating a social media account that it holds out as a channel of communication for its students, alumni, and the public. The University's decision to intentionally create its Instagram account and Facebook page to serve this communicative function alone strongly weighs in favor of finding the University designated the interactive spaces of its comment threads as public forums. (JSOF ¶¶ 59, 61, 63, 72); *see Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 716 (E.D. Va.

---

[3] The Court may take judicial notice of the information contained in the help pages of Instagram and Facebook's websites. *See Rowe v. Gibson*, 798 F.3d 622, 630 (7th Cir. 2015) (judicial notice of third-party website).

2017) ("When one creates a Facebook page, one generally opens a digital space for the exchange of ideas and information."), *aff'd sub nom. Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), *as amended* (Jan. 9, 2019).

The University has consistently operated the comment threads on its Instagram account and Facebook page as accessible outlets for public interaction. The accounts are public and allow even those without an Instagram or Facebook account to view some of its content. (JSOF ¶¶ 48, 68). The University, in turn, uses the pages to engage with students, alumni, and the public about significant events related to the University. (JSOF ¶¶ 59-60, 69, 73). Any user—aside from those few the University restricts—can utilize this channel of communication to communicate with each other or the University by sharing a wide range of topics within its comment threads. (JSOF ¶¶ 70, 74-75); (PFFOF ¶ 4). By allowing comments by virtually any user of the platform at all, the University ceded its opportunity to utilize the platforms solely as channels for its own speech. (*See* PPFOF ¶ 2) (comments can be effectively disabled on Facebook by choosing which profiles and pages may comment on a post, and declining to choose any); (JSOF ¶ 35) (comments can be disabled on Instagram on individual posts). As a matter of practice, then, the University has invited the public to comment on and engage within the commenting threads of either platform. *See Kimsey v. City of Sammamish*, No. C21-1264 MJP, 2021 WL 5447913, at *5 (W.D. Wash. Nov. 22, 2021) ("By enabling comments to City Council meetings or City posts in the first place, the City invited the public to comment on the posts and City Council meetings.").

Users take advantage of the permissive comment threads by engaging with the University and each other on a wide range of topics, many of which are not "on topic" with the University's posts. Users have requested that the University protect its marginalized communities, (PPFOF ¶ 38) (comments by users "sarah.cheney" and "jatzzy"), critiqued decisions made by the

University, (PPFOF ¶ 33) (comment by user "Deidre Mead" on reducing class offerings); (PPFOF ¶ 88) (comments by users on tuition spent for renovation of recreation center), and pleaded with the University to admit them. (PPFOF ¶ 94) (comment by user "lili_varela"); (PPFOF ¶ 87) (comment by user "rollietimothy"). The threads host lengthy debates with series of replies among commenters themselves. (JSOF ¶ 75) (Ex. 1, discussing masking study). Some comments address the University's posts, *id.* (Ex. 2, discussing COVID measures), others address each others' comments, *id.* (Ex. 3, discussing vaccine breakthrough in dozens of comments and replies).

The University does not have any policy that limits or diminishes the public nature of the forum. (PPFOF ¶ 6) (Corporate designee testifying "The University does not have any policies regarding social media."). While the University has removed some comments for being "off topic," it only does so pursuant to discretionarily applied guidelines that *permit* the removal of comments for any reason while *not requiring* the removal of any comment. (PPFOF ¶¶ 12, 20). Moreover, to the extent that some kind of standard can even be gleaned from the University's practices, moderation is careless except with regards to speech related to animal advocacy. (*See, e.g.*, PPFOF ¶ 19) (Interim Guidance geared toward moderation of "off topic" animal advocacy); (PPFOF ¶ 54) (specific attention paid to off topic anti-animal research comments); (PPFOF ¶ 69) (keyword filters).[4] Indeed, if "an abstract policy statement purporting to restrict access to a forum is not enough" to disprove designation of a forum, neither is inconsistently applied guidance that does not bar access to particular speakers or topics. *Hopper v. City of Pasco*, 241 F.3d 1067, 1075–76 (9th Cir. 2001) (quoting *Cornelius*, 473 U.S. at 804–05 (citations omitted)).

---

[4] As discussed *infra* Part II.D., even if the University's practices and guidelines form a policy that limits the forums to subjects or topics, the University's practices in implementing those limitations are so inconsistently applied that the result is almost exclusive removal of animal advocacy-related content. Such unbridled decision-making is not only unreasonable, it bears the hallmarks of viewpoint discrimination.

Further, what little moderation is achieved does not bar the public's access to the University's social media pages. (JSOF ¶¶ 48, 68); *see also Kimsey*, 2021 WL 5447913, at *4 (finding interactive space of government's Facebook page a designated public forum as "while there are rules for comments after they have been made, they do not constrain the public's initial access"). In effect, the University has not limited access of speakers or topics within the interactive spaces of its Instagram account and Facebook page in any defined, clear manner capable of transforming them into limited or nonpublic forums. It may not "by its own *ipse dixit* destroy the 'public forum'" status the comment threads have assumed. *United States v. Grace*, 461 U.S. 171, 180 (1983) (citation omitted).

Courts considering the issue have agreed that the interactive space hosted within a government actor's social media accounts are public forums. *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021); *Davison*, 912 F.3d at 687; *Kimsey*, 2021 WL 5447913, at *4; *Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080, at *2 (E.D. Ark. Sep. 30, 2021); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020); *One Wisc. Now*, 354 F. Supp. 3d at 955; *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2019 WL 4736208, at *10–11 (S.D. Cal. Sep. 26, 2019). Just as these decisions have recognized, the University's choice to open its comment threads to public participation and allow robust discussion and debate to occur within them renders its Instagram account and Facebook page public forums.

## II.   THE UNIVERSITY'S SOCIAL MEDIA PRACTICES VIOLATE KRASNO'S FIRST AMENDMENT RIGHTS.

It is undisputed that the University excluded Krasno's speech related to animal advocacy within the interactive spaces of its Instagram account and Facebook page. Krasno's speech falls

within the protected categories of speech—that of political debate and issues of public import—the exclusion of which prompts constitutional scrutiny. The University unconstitutionally censored Krasno by basing this exclusion on the viewpoint and content of her protected speech in an otherwise public forum. *See Widmar*, 454 U.S. at 267–68 ("The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place.").

### A. Krasno's Speech is the Essence of Protected Expression.

It is clear that Krasno's speech advocating against animal testing is protected. The First Amendment protects speech on issues of public concern—that which "relat[es] to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and internal quotations omitted). Indeed, discussion of public affairs is a part of the "unfettered interchange of ideas for the bringing about of political and social changes" the First Amendment ensures, such that the Supreme Court aptly deemed it the "essence of self-government" that occupies "the 'highest rung of the hierarchy of First Amendment values.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations omitted).

Krasno's comments are the essence of protected expression. The University is a public entity conducting taxpayer-funded research on animals—including animals who have died from illegal animal handling. (JSOF ¶¶ 5-6). It is undisputed her comments deal with her concern with the University's animal testing, and the funding that is diverted from other public aims to continue its experimentation on animals. *See, e.g.*, (PPFOF ¶¶ 92, 94) (urging the University to "close down the primate labs!"); (PPFOF ¶ 87) (commenting "stop exploiting animals."); (PPFOF ¶ 96) (commenting "It is really quite hypocritical the compassion shown to this dog while thousands of animals languish in laboratories at @uwmadison. I really wish you would acknowledge this and do something about it."); (PPFOF ¶ 110) (commenting "University of Wisconsin-Madison, are

you really proud of all of your graduates or just the ones who didn't object to your barbaric treatment of monkeys in your research labs?"). Such is core speech on an issue of public concern. *See People for Ethical Treatment of Animals, Inc. v. Shore Transit*, No. CV JKB-21-02083, 2022 WL 170645, at *3 (D. Md. Jan. 18, 2022) (proposed advertisements relating to animal rights protected speech).

This is true regardless of the University's taste for the viewpoint she expresses. Krasno's criticisms of the University's animal testing practices and her perception of the University's hypocrisy in advocating for certain issues of social concern are part and parcel of the exchange of views that form core, protected speech. *See, e.g.*, *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 565 (S.D.N.Y. 2018) ("readily conclud[ing] the speech in which individual plaintiffs seek to engage" that criticized policies and practices of the President "is protected speech"), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021). Indeed, it is well established that protected speech includes mockery of the U.S. President, *Knight*, 302 F. Supp. 3d at 553, 565, to signs denigrating national tragedies, *see, e.g.*, *Snyder*, 562 U.S. at 454 (finding while signs reading "God Hates the USA/Thank God for 9/11" may "fall short of refined social or political commentary, the issues they highlight . . . are matters of public import.").

For a similar reason, the University's perception of Krasno's speech as critical is irrelevant to the protections it is afforded. (PPFOF ¶ 100). Speech that criticizes the choices of government officials includes "vehement, caustic, and sometimes unpleasantly sharp attacks" on public officials, a feature that does not render the speech any less valuable. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (noting "principle that debate on public issues should be uninhibited, robust, and wide-open"). The "arguably 'inappropriate or controversial character of a

statement is irrelevant to the question whether it deals with a matter of public concern.'" *Snyder*, 562 U.S. at 453 (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)). The interests of the University in combatting critical speech is thus inapposite to its protected status. *See Crue v. Aiken*, 370 F.3d 668, 680 (7th Cir. 2004) ("The free-speech interest of the plaintiffs—members of a major public university community—in questioning what they see as blatant racial stereotyping is substantial" and "not outweighed by fear that an athletic association might not approve of what they say").

Urging social change, including exhortations to others within the University's comment threads that such change is needed, does not lessen the protections afforded to Krasno's speech. These actions are the functional equivalent to the circulation of petitions that the Supreme Court has found constitute the "type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Nor does "[l]abeling censorship societally beneficial," like the University's suppression of Krasno's speech to give ground to the preferred viewpoints of others, "render it lawful. If it did, nearly all censorship would evade First Amendment scrutiny." *Cohoon v. Konrath*, No. 20-CV-0620-BHL, 2021 WL 4356069, at *4 (E.D. Wis. Sept. 24, 2021) (preference of government to avoid discussion of COVID-19 diagnosis "did not give them authority to hunt down and eradicate inconvenient Instagram posts"). As such, this Court should find Krasno's speech is entitled to the full protections of the First Amendment.

## B. The University's Moderation Practices Unconstitutionally Discriminate on the Basis of Viewpoint.

It is "axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828 (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96, 92 (1972)). "Viewpoint discrimination is thus an egregious form of

content discrimination." *Rosenberger*, 515 U.S. at 829. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. (citing *Perry*, 460 U.S. at 46).

The University applies its moderation guidelines to identify and diminish speech related to animal advocacy on its social media pages, including that of Krasno's. It penalized Krasno by restricting her Instagram account for four months from any interaction within the commenting threads, solely due to her identity as a speaker opposed to its animal testing program. It manually deleted her comments on its Facebook posts, simultaneously barring her participation in that forum. It continues to burden her expression on both platforms by using keyword filters that selectively hide speech Krasno makes with an anti-animal testing perspective. Each action is targeted to silence her viewpoint and identity as an animal advocate, and as such each is impermissible viewpoint discrimination in any forum. *See DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 567 (7th Cir. 2001) (regardless of forum, "the Village still could not deny access in a manner that discriminated against a speaker based on his viewpoint"); *Knight*, 928 F.3d at 237 ("If the Account is a forum—public or otherwise—viewpoint discrimination is not permitted by the government.") (citations omitted).

### 1. The University Engaged in Viewpoint Discrimination in Barring Krasno's Speech from its Instagram Account.

The University targeted Krasno's speech in late September 2020 on the basis of her identity as a speaker critical of the University's animal testing program by restricting her account. The University purports to have imposed the restriction due to a "consistent pattern of off-topic comments," yet the University's stated rationale is at odds with the undisputed facts. (PPFOF ¶ 91). Krasno first commented on the University's Instagram account on September 18, 2020, after it issued a post regarding the return of cows to its Dairy Cow Center—an animal research center—

31

to which she urged the University to "stop exploiting animals." (PPFOF ¶ 87). Her comment related to the use of the cows at the University, yet it was hidden from view along with a reply she made to another commenter urging the University to end animal experimentation. *Id*. Though the University does not recall the exact date in September that Krasno's account was restricted, the only other comment Krasno made that month was on September 28, 2020, in which she thanked the University for deleting her prior comments. This comment was also hidden from public view. (PPFOF ¶ 88). Her account was restricted in late September 2020, so that comments Krasno then made in October, November, and December were automatically hidden from the public. (PPFOF ¶¶ 89, 92-96, 98).

Even assuming the University could justify its discriminatory restriction, the University's contention that Krasno was properly restricted under its moderation guidelines is untenable. The University asserts the volume of Krasno's comments "prevented other users from engaging with the university or receiving information about our programs or services," yet Krasno's first post was engaging with the University on the use of their dairy cows for research—a topic they introduced. (PPFOF ¶ 87). Her second was made on a post that generated nearly 200 other comments, none of which have been moderated out of the University's concern that its messaging and engagement will be diluted. (PPFOF ¶ 88). Further diminishing its rationale for the restriction, as discussed *infra* Part II.C.2., the very nature of Instagram shields the University's messaging from ever being diluted by the type or amount of comments made to a post since the University's messaging will always remain in view. (*See, e.g.*, PPFOF ¶ 88) (showing University post with nearly 200 messages appended).

The context of her restriction shows the University simply didn't like Krasno's viewpoint. The penalty imposed on Krasno's speech alone establishes a desire to silence her perspective since

Krasno's account is the *only account* the University can recall restricting from participation in its Instagram comment threads in the past two years. (PPFOF ¶ 90). This does not comport with the University's treatment of other users who comment on multiple posts, or who—unlike Krasno— repeatedly comment on the same post on issues unrelated to the University's messaging. *See, e.g.*, (PPFOF ¶ 102) (no moderation of user "steve_go_wild" despite commenting twice criticizing other comments within the thread). This finding alone supports the assertion of selective disapproval of Krasno's speech or identity. *One Wisc. Now*, 354 F. Supp. 3d at 956 (defendants' blocking of only "a select number of Twitter accounts" supported finding "that defendants selectively blocked plaintiff for a specific reason and not as a matter of happenstance").

The University's moderation of its social media pages demonstrates that it restricted Krasno's account due to her criticisms of its animal research program. The University positions itself to protect its animal testing program through its arbitrary moderation practices. (PPFOF ¶¶ 53-54, 63, 66-67). Its employees look for "animal research comments" before they even appear for potential moderation, a category that notably **does not** include comments in support of animal research. (PPFOF ¶ 64). They track animal research campaigns that users conduct on their own social media accounts. Defendant Lucas, who oversees the University's social media accounts, for instance, subscribes to the People for the Ethical Treatment of Animals' (PETA) Twitter account so he can observe its activities in case they relate to the University's animal testing program. (PPFOF ¶ 56). Defendant Lucas then alerts Defendant Moll to PETA's posts so Moll can monitor the University's social media accounts for content PETA's messaging may inspire, and Defendant Moll in turn enlists employees of the University's Research Communications team to review and sometimes assist in moderation decisions of comments criticizing animal research. (PPFOF ¶¶ 57- 62). Monitoring "anti-animal research comments" even appears as a daily agenda item for the

University's staff in charge of social media moderation. (PPFOF ¶ 55). When comments from animal advocacy campaigns appear, they are quickly sifted for hiding. On the date of Krasno's first post on the University's Instagram account, for instance, Defendant Moll even advised another moderator of the University's Facebook page that they were "welcome to hide/delete any comments relating to monkey research, shutting down the WNPRC . . ., 'you guys are monsters, stop the vivisection,' etc. etc." (PPFOF ¶ 65).

The attention paid to silencing anti-animal testing speech is mimicked in the University's treatment of Krasno. Her identity as an alumna and former caretaker at the University's primate research center sparked concern at the University. As Krasno referenced her experience working at the primate center in her own social media posts, the University began to monitor her activities. (PPFOF ¶ 84). Defendant Moll disapproved of her stance on animal testing, deeming her comments "critical." (PPFOF ¶ 100). Defendant Lucas was concerned that her content was reaching a large audience, (PPFOF ¶ 83), though Defendant Moll could not recall if the University received any complaints about her interactions on its social media pages. (PPFOF ¶ 99). The concern led to tracking events Krasno hosted on animal testing even during her account restriction and joking about sneaking in to attend her presentations. (PPFOF ¶¶ 103-106).

Whether Krasno's account was restricted due the critical nature of her comments regarding the University's animal testing or her viewpoint against animal testing generally, the University's penalization on her speech is viewpoint discriminatory. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also St. v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are

themselves offensive to some of their hearers."). "Giving offense is a viewpoint," *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017), and suppression of offensive speech is axiomatic viewpoint-based censorship.

### 2. The University Manually Censored Krasno's Speech on Facebook on the Basis of Viewpoint.

During Krasno's restriction on Instagram, the University also manually hid her comment on Facebook. On December 9, 2020, Krasno commented for the first time on the University's Facebook account, responding to a post about proud alumni stating: "University of Wisconsin-Madison, are you really proud of all of your graduates or just the ones who didn't object to your barbaric treatment of monkeys in your research labs?" (PPFOF ¶ 110). Her comment was manually hidden from public view for being "off topic," despite its relation to the University's post. *Id*. Only Krasno and her Facebook friends could view the comment, limiting her interaction with other users on the platform. *Id*. For the same reasons as articulated above, the context surrounding the University's restriction—including the incredible contention that Krasno's comment was off-topic to the post—demonstrates the University's moderation was meant to silence Krasno's viewpoint. *See Popp v. Monroe Cnty. Sheriff*, No. 119CV03664JPHDML, 2020 WL 8872811, at *1 (S.D. Ind. Mar. 31, 2020) (noting "'hiding' comments on the interactive portion of an official government Facebook page may be unconstitutional viewpoint discrimination").

### 3. The University's Keyword Filters Target Krasno's Speech on the Basis of Viewpoint.

Underlaying its identification of Krasno as a speaker whose animal advocacy-related speech they disliked, the University similarly censors Krasno and other proponents of similar viewpoints on both its Instagram account and Facebook page through keyword filters that automatically bar speech critical of animal testing. Viewpoint discrimination occurs when the government "has singled out a subset of messages for disfavor based on the views expressed."

*Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring). By prohibiting only those words associated with advocates who advance views critical of animal testing, the University has chosen to censor speech on the basis of viewpoint.

The University selected to automatically hide comments containing words used to advocate against animal testing. These include "animal testing," "lab," "animal laboratories," "experimenting on," "testing on animals," "testing on cats," "tests on cats," and "vivisection." (PPFOF ¶ 69). The filters even prohibit the discussion of primates, censoring the words "primate," "primates," "macaques," "monkeys," and its primate research center "wnrpc" from discussion. *Id*. Particular animals used in experimentation—and featured in campaigns brought by animal rights organizations such as PETA—are similarly blocked from discussion through use of the keyword filters "#freebabycocoa," "#releasecornelius," "@peta," and "Cornelius." *Id*.[5]

Each word or phrase is indicative of speech used by activists such as Krasno when they advocate against the University's animal testing. (*See, e.g.*, PPFOF ¶¶ 80-81, 111). One could not, as Krasno has for example, comment on a post regarding the veterinary treatments afforded to patients of the University's veterinary college remarking "It is really quite hypocritical the compassion shown to this dog while thousands of animals languish in *laboratories* at @uwmadison," (PPFOF ¶ 96) (emphasis added to denote keyword filter term), but could applaud the progress of purported advancements in COVID-19 research that was conducted on animals without triggering a keyword filter. (*See, e.g.*, PPFOF ¶ 109); (JSOF ¶ 75, Ex. 3) (showing comments applauding vaccine research). The University apparently admits its keyword filters are

---

[5] The University also chooses to single out messages concerning profanity and mentions of political figures such as "Biden" and "Trump" on both its Instagram and Facebook keyword filter lists. (PPFOF ¶¶ 69-71). Messages related to law enforcement are also included in its Facebook filter. However, 21 of the 28 words listed on the University's Instagram keyword filter and 17 of the 46 words and phrases on its Facebook keyword filter are directly related to animal advocacy. (*See* PPFOF ¶ 69).

viewpoint discriminatory, noting it would not add content to the filters for topics the University itself posts about, and may remove a word or phrase from the filters if the University desires to include the same language in its own posts. (PPFOF ¶¶ 74, 77).

To the extent the University contends only a subject matter is barred from conversation, it is not animal testing in general that is prohibited from discussion within the University's social media accounts. Words such as "specimens," "subjects," "models" that refer to animals as objects or could be used as technical jargon in support of conducting more animal research are not censored from the University's comment threads. (*See* PPFOF ¶ 69). The University instead selectively targets phrases and words used in comments that criticize animal research. It is obvious that phrases such as "#releasecornelius," "animal testing" and "testing on animals" communicate a "message of hostility" unique to an anti-animal testing viewpoint. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 393 (1992).[6] The results of moderation lay the discriminatory application bare, with comments advocating for animal testing with words such as "results" and "research" visible within the University's comment threads, but comments containing the words "lab" filtered out. (*See* PPFOF ¶ 109) (comments by user seth_genteman remain unhidden while comment by Krasno containing the word "lab" hidden). In essence, the University's keyword filters "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392.

The automatic censorship of speech containing words associated with animal testing is at bottom an impermissible restriction on speakers because of past speech—often the past speech of

---

[6] Even if the filters captured an array of opinions on animal testing, that too is viewpoint based discrimination, as it singles out for disfavored treatment speech advocating a perspective on animal testing. *Rosenberger*, 515 U.S. at 831 (University "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints" which provided a "specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered."). But "exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831.

different speakers. By targeting words used to advocate against the University's animal testing, the University burdens advocates like Krasno from speaking in public forums. *See Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 WL 4502080, at *4 (E.D. Ark. Sept. 30, 2021) (finding "no plausible explanation for the words 'pig', 'pigs', 'copper', and 'jerk'" on keyword filters "other than impermissible viewpoint discrimination"). The selective, disfavored treatment is unconstitutional. *Rosenberger*, 515 U.S. at 831.

### 4. The University's Social Media Moderation Practices Enable Discriminatory Censorship.

In an attempt to confine its obligations of protecting against viewpoint discrimination in its designated public forums, the University contends that any moderation of Krasno's comments—through account restriction, manually hiding comments, or use of keyword filters—is permissible in accordance with its social media practices. (PPFOF ¶¶ 91, 110-111). It does so on the basis that the speech moderated is "off-topic" to the posts they are made, and thus subject to removal under its moderation guidelines. The justification is insufficient, at bottom, as viewpoint discrimination is impermissible in public forums. *See Matal*, 137 S. Ct. at 1768 ("It is telling that the Court's precedents have recognized just one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf.") (Kenney, J., concurring in part); *see also Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (a "finding of viewpoint bias end[s] the matter").

In practice and form, the University's "off topic" moderation is geared to ferret out the animal advocacy-related speech it disagrees with. As a factual matter, the University has no social media policy governing moderation. (PPFOF ¶¶ 6, 21). The guidance available at the time this lawsuit was filed allows for permissive moderation of, among other categories, "off topic" content, but does not require it. (PPFOF ¶ 20). No policy in effect at the time of Krasno's exclusion defined

an "off-topic" comment, required its removal, or confined University staff's discretion in moderating, responding to, or managing comments deemed "off topic." (PPFOF ¶¶ 12-13, 20, 25-27). Even after the University adopted additional nonpublic guidance on moderating off-topic comments in response to this lawsuit, that Interim Guidance does not require "off topic" comments' removal much less provide clear standards for classifying what constitutes off topic content or what moderation action to perform on comments thus identified. (PPFOF ¶¶ 19-20). It actually defines a social media *page* itself as providing the relevant "topic" for comments to be compared to, (PPFOF ¶ 19) (animal research social media page the "purpose" a comment should be compared to), in contrast to the currently applied analysis of whether a comment relates to a *post* on a social media page, (*See, e.g.*, PPFOF ¶ 35) (Moll assessing whether comment related to a particular post). (*See also* PPFOF ¶ 24) (University looks to content of comment against the topic of a *post*). And with the aid of these guidelines, Defendant Moll cannot even determine if many comments moderated by the University would be on topic or off topic to the University's posts. (PPFOF ¶ 40).

In this void of clear, enforceable policies on moderation is the discretionary decision-making of employees who consider it their duty to protect the image of its animal testing program. (PPFOF ¶¶ 63, 66-67). Defendant Moll, the employee responsible for manually hiding comments or restricting accounts on the University's social media pages, believes "animal research comments" are "almost always off topic." (PPFOF ¶ 64). Defendant Lucas pays specific attention to anti-animal research comments and to animal research campaigns, (PPFOF ¶ 54), and monitors "animal rights" and "animal research comments" expressed by organizations such as PETA and individuals such as Krasno on their own social media accounts in anticipation of moderating future comments that contain similar points of view. (PPFOF ¶¶ 55-62). Most damning to its suggestion

that moderation of animal advocacy-related speech is an innocent byproduct of its social media practices, the University crafted its keyword filters to capture specific anti-animal research comments it encountered on its pages. (PPFOF ¶¶ 72-73, 75). Those filters were never removed, left to collect any subsequent comments on its social media pages that referenced "on" or "off-topic" animal advocacy. (PPFOF ¶¶ 69); (*See also* PPFOF ¶¶ 80-81) (comments by users filtered for use of "monkeys"). And no process exists for review of whether words captured by those filters are wrongly hidden. (PPFOF ¶ 79).

The University frequently moderates critical comments from Krasno under these guidelines even when they relate to the University's posts:

- On September 18, 2020, Krasno commented for the first time on the University's Instagram account on its post welcoming back cows used at its cattle research center. Krasno commented, "stop exploiting animals. Get with the future and the future is consistent anti-oppression. Shut down the labs and eat plants!" The University hid her comment along with several other users' comments criticizing animal research despite their relation to the University's message. (PPFOF ¶ 87).

- On December 9, 2020, Krasno commented on a University Facebook post about proud alumni by asking, "are you really proud of all of your graduates or just the ones who didn't object to your barbaric treatment of monkeys in your research labs." The University manually hid that comment from public view for being "off topic." (PPFOF ¶ 110).

- December 22, 2020, Krasno commented on a University Instagram post detailing the University's treatment of a dog for cancer, noting, "It is really quite hypocritical the compassion shown to this dog while thousands of animals languish in laboratories at @uwmadison. I really wish you would acknowledge this and do something about it." The University admitted Krasno's comment was on topic to the post but remained hidden pursuant to her restriction from commenting. (PPFOF ¶¶ 96-97).

While Krasno's comments were hidden, other individuals' off topic comments remained. A user's comment on the University's post about dairy cows that "Hopefully I will be admitted next year, fingers crossed!" remains visible, but Krasno's comment relating to the exploitation of the cows was hidden. (PPFOF ¶ 87) (comment by user "rollietimothy"). On the University's Instagram post regarding COVID-19 safety, several comments urging it to "protect your BIPOC"

students remain visible but Krasno's comment to "close down your primate research labs" was hidden. (PPFOF ¶¶ 38-39). The University admits that it would have deemed all three comments off-topic, but the University only moderated the comment relating to animal testing. (PPFOF ¶ 39). Similarly, the restriction of Krasno's Instagram account hid her November 17, 2020, comment on a University post about COVID-19 protections, but left another user's unrelated plea to "Please accept me :))." (PPFOF ¶ 94) (comment by user "lili_varela"). During her account restriction on Instagram, the University admittedly did not monitor *any* of Krasno's hidden comments for approval, leaving them to be automatically hidden pursuant to the penalty it had imposed on Krasno as a speaker three months prior. (PPFOF ¶ 98).

The University's keyword filters are particularly unsuitable to the suggestion that the University uses them to capture off-topic comments. Several of Krasno's comments have been caught by the filters despite their relation to the University's posts. Krasno commented on a University Facebook containing a speech by Defendant Blank regarding the future, writing: "I wish you would think about the future in new ways too and stop testing on monkeys. Working in one of those labs during college showed me how important it is that we create a just world. Animal research is not the way to accomplish this." The comment, which related to the topic of the University's post, includes the word "monkeys" which is on the University's Facebook keyword filter list and thus was hidden from public view. (PPFOF ¶ 111); (*See also* PPFOF ¶ 69).

By operating to hide any and all comments containing keywords chosen by the University, what the keyword filters achieve is the consistent suppression of anti-animal testing comments at the expense of elevating other unrelated speech, including that supportive of animal research. For instance, a reply by Krasno to another Instagram user, seth_genteman, on a University Instagram post relating to spring break was hidden for containing the word "lab." The exchange between

Krasno and seth_genteman involved a debate on the usefulness of animal testing, but the University's keyword filters resulted in only Krasno's reply being hidden—not that of seth_genteman, who advocated in support of testing. (PPFOF ¶ 109). The University's filters have similarly hidden comments on posts related to COVID-19 social distancing modeling that contained the words "monkeys" and "experimenting on," for example, while leaving a comment unrelated to the post that asked, "Do you have experience certificate equivalencies with a university degree?" (PPFOF ¶ 80).

While the University aggressively censors Krasno and other animal advocates regardless of their relation to its posts, it leaves a vast catalog of other types of off-topic comments visible and unmoderated. Comments to a University Facebook post promoting a data start-up that asked about the TV show Young Sheldon remain visible, (PPFOF ¶ 37) (comment by Barbara Luebke Merten), but comments to the same post that referenced this lawsuit do not. *Id*. (comment by Raven Flores). Even when Krasno responded to a University Instagram post stating "something innocuous," a comment Defendant Moll could not determine related to the original post but agreed did not relate to animal advocacy, it remained visible. (PPFOF ¶ 34).

The only other justification for the University's moderation of Krasno's comments is the reduction of "spam," but this too falls short. The University's guidelines do not prohibit spam, mention spam, or define the contours of when spam can and cannot be moderated. (PPFOF ¶ 17). Instead, University employees create their own definition, and apply their "best judgment" on a "case-by-case basis" to find it occurred. *Id*. Even the definition of Defendant Moll, who imposed Krasno's account restriction, that spam is a "wave of comments that are typically encouraged or . . . directed by . . . a campaign or a viral news story or any . . . media that's trying to . . . encourage others to go and . . . comment," does not capture the circumstances of Krasno's interactions on the

University's Instagram account preceding her restriction. (PPFOF ¶¶ 87-88). It is undisputed Krasno commented of her own accord, to petition the University to end practices she viewed as inhumane. (JSOF ¶ 4).[7]

The result of the University's moderation practices is not incidental burdens on her speech, it is patent viewpoint discrimination. *See Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Sch*., 457 F.3d 376, 384 (4th Cir. 2006) (finding "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to protect against the improper exclusion of viewpoints"). *See also Southworth v. Bd. of Regents of Univ. of Wisconsin Sys*., 307 F.3d 566, 579 (7th Cir. 2002) (applying the constitutional mandate of "viewpoint neutrality").

### C.     The University's Restriction of Krasno's Account and Keyword Filter Censorship Are Content-Based Discrimination.

The University's restriction of Krasno's Instagram account, deletion of her comments, and use of keyword filters to suppress speech related to animal testing are also the essence of impermissible content-based discrimination. The University applies its moderation practices— particularly by sporadically removing "off-topic" comments—to prohibit speech and speakers such as Krasno critical of animal-testing. It is undisputed that these University's moderation decisions, whether through manual moderation of individual comments, account restrictions, or use of keyword filters, occur solely by reference to content. (PPFOF ¶ 12) (describing content subject to removal); (*See also* PPFOF ¶¶ 16, 22, 24) (noting Defendant Moll and the University review the "contents" of comments to determine if it is off topic). Its restriction of anti-animal

---

[7] The University seems concerned that Krasno is affiliated with other groups advocating for animals, such as PETA, whose social media activities it actively monitors. Even if this concern motivated its moderation of her comments, however, it is still a violation of Krasno's First Amendment rights. *See Healy v. James*, 408 U.S. 169, 185–86 (1972) ("[T]he Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization.").

testing speech through these moderation practices is thus content based. *See Boos v. Barry*, 485 U.S. 312, 319 (1988) (signs critical of foreign governments content based as government prohibited discussion of "an entire category of speech"); *Surita v. Hyde*, 665 F.3d 860, 871 (7th Cir. 2011) (when government "intentionally barred Surita from speaking he "barred the content of [that] speech," regardless of its agreement with its viewpoint); *Crue v. Aiken*, 204 F. Supp. 2d 1130, 1138–39 (C.D. Ill. 2002) (ban on student outreach to prospective students on issue of racial justice "indicates that the ban was in fact content-based, as it unquestionably imposed a substantial burden on a particular type of expressive activity"), *aff'd*, 370 F.3d 668 (7th Cir. 2004).

As the University has opened its interactive commenting threads on its Instagram account and Facebook page as a designated public forum, *see supra* Part I, any content-based prohibition on speech is subject to strict scrutiny. This requires the University show its exclusions are necessary to serve a compelling state interest and are narrowly drawn to achieve that end, *Surita*, 665 F.3d at 870 (citing *Perry Educ. Ass'n*, 460 U.S. at 45)—an exacting standard, *see Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 314–15 (2013) ("Strict scrutiny must not be strict in theory but feeble in fact;" "a university must make a showing that its plan is narrowly tailored to achieve the only interest that this Court has approved").

### 1. The University's social media accounts are designated public forums, warranting strict scrutiny.

To the extent the University seeks a less stringent standard of review by arguing its social media practices have cabined the interactive spaces of its Instagram account and Facebook Page to nonpublic forums, that argument fails. The government may establish a forum that reserves the right to speak to certain individuals or subjects, as long as its limitations on speech are viewpoint-neutral and reasonable. *See Perry*, 460 U.S. at 45 ("[T]he state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable

and not an effort to suppress expression merely because public officials oppose the speaker's view.") (citing *United States Postal Service v. Greenburgh Civic Ass'n*, 453 U.S., at 131, n. 7). Yet reality voids a finding that the University has consistently limited the topics or speakers entitled to comment within the interactive space of its social media pages.

As a matter of practice, the University has not adopted much less applied any limitations on who may speak and on what topics within the comment threads of its social media pages. *See supra* Part I.A.2. No consistently applied policy is articulated on the University's social media pages that Krasno's speech on anti-animal testing or animal advocacy more broadly is prohibited from the forums. (PPFOF ¶¶ 6, 9). The University's Instagram and Facebook pages do not contain notice of any prohibited topics or subjects nor even define for users the scope of permissible comments. (PPFOF ¶¶ 9-11). The University's bare Social Media Statement—guidance not articulated on the social media pages themselves—expressly disavows that comments are routinely reviewed for compliance with any limitations on topics. (PPFOF ¶ 12). There is no policy that instructs users like Krasno that they must cabin their speech to particular topics when communicating through the sites' interactive spaces, nor any warning that a posted comment has been deemed to violate those same prohibitions. (PPFOF ¶ 6).

Rather, what guidance on social media moderation that does exist is discretionary, providing neither users with notice that their conduct will warrant its removal or deletion, nor employees performing moderation using workable standards by which to consistently remove or hide off-topic comments. *See infra* Part II.D. The University rejects the notion it expects that each individual comment will be reviewed at all, and admits the result is that some comments that it deems have violated a guideline's tenant, such as off topic comments, remain. (PPFOF ¶ 29-30, 32-34, 37-39).

45

The lack of consistent practice in limiting the forums forecloses any suggestion that the government did not intend to designate public forums. The Western District of Washington, confronted with a similar argument that an "off topic" policy limited the scope of the government's forum, determined an inconsistently applied rule barring off-topic comments "weigh[ed] heavily in favor of finding a designated forum." *Kimsey*, 2021 WL 5447913, at *4; *see id.* (noting "an unevenly enforced rule is no policy at all for the purposes of public forum analysis." (internal citations omitted)). The argument against such a finding weighs more heavily here, where the University cannot even point to a policy or prohibition barring particular comments in the first place. Strict scrutiny properly applies to the University's use of discretionary practices to suppress Krasno's speech.

### 2. The University cannot show its censorship of Krasno's animal-related speech survives strict scrutiny.

The University's application of its social media practices to monitor for and remove animal research-related comments occurs in designated public forums, and is evaluated under strict scrutiny. Namely, the University bears "the extraordinarily high burden of proving exclusion is 'necessary to serve a compelling state interest and that it is narrowly drawn to achieve that interest[].'" *One Wisc. Now*, 354 F. Supp. 3d at 955 (citing *Perry Educ. Assn.*, 460 U.S. at 45). It cannot meet this burden.

First, the University's interest in suppressing speech related to animal advocacy is not compelling. The University's stated rationale for restricting Krasno's Instagram account is her purported "pattern" of "off topic comments," (PPFOF ¶ 91), which its employees claim prevented other users from engaging with the University and learning about its programs and services. (PPFOF ¶ 101). Seriously undercutting this contention is the fact that Krasno's "pattern" of "off topic comments" prompting her account restriction occurred after at most three comments by

46

Krasno—one of which urged the University to "stop exploiting animals" on a post regarding research on cows. (PPFOF ¶¶ 87-89).

The very nature of interaction on Instagram and Facebook cannot support the University's concern over its ability to communicate with the public. The dissemination of the University's own posts is uninhibited by the comment threads they host, which remain visible to any viewer who can quickly scroll through comments to find those that relate to the post if they wish. No efficiency of government process is lost—there is no government entity captive to a speaker's off-topic speech. *See Kimsey*, 2021 WL 5447913, at *5 (Governmental interest of "avoid[ing] distraction from and dilution of governmental posts about public safety and upcoming events" by prohibiting off-topic comments "does not appear to be a compelling governmental interest."). And by using the same navigation process as any viewer of the comment threads, the University can quickly identify and engage with any speaker it wishes to. It has—even where Krasno has been able to visibly comment on a University post. (*See, e.g.*, PPFOF ¶ 117) (University responding to user's question on post). As a factual matter, much of the University's interaction with the public occurs through receipt of direct messages that any user can privately send to the University and that the University reviews more frequently than comments, diminishing its purported use of the comment threads as a means of communication. (PPFOF ¶¶ 49-50). Indeed, the University does not claim to review each comment made to its social media accounts—a necessary predicate to engaging with users. (PPFOF ¶¶ 12, 29). *See The Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989) ("Florida's policy against disclosure of rape victims' identities, reflected in § 794.03, was undercut by the Department's failure to abide by this policy.").

Even taking the rationale at face value, the University's interest is insufficient to warrant the penalty imposed: blocking all future comments by a particular speaker from the interactive

threads of its social media pages. "Penalties for speech protected under the First Amendment are forbidden." *Surita*, 665 F.3d at 871 (citing *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)). The Seventh Circuit's decision in *Surita v. Hyde* illustrates this point. In *Surita*, a mayor barred a speaker from participation at a city council meeting because of that speaker's confrontation with another individual two days prior. The Seventh Circuit dismissed the notion that penalizing a speaker for prior conduct constitutes a compelling government interest, finding the use of "prior speech to prohibit subsequent protected speech" and "absolute prohibition" on the speaker's expression "fails the strict-scrutiny test." *Surita*, 665 F.3d at 872; *see also Theyerl v. Manitowoc Cty.*, 41 F. Supp. 3d 737, 744 (E.D. Wis. 2014) (ban on speaker for presumed repetitive speech fails strict scrutiny, where "the government's interest in prohibiting a minute or two of repetitive speech is not a 'compelling' one that would justify an outright ban on the speaker himself").

Nor is the University's use of keyword filters to bar all comments containing words associated with animal advocacy supported by a compelling interest. The University's purported rationale of minimizing the workload associated with moderating comments and the perceived threat that its communications with students will be lost both have no basis in fact. As stated above, the University's notion that off-topic comments impede its ability to communicate with students through its posts or engage with users is factually unsupported. *See supra*. In other words, "[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980). Further, any workload constraints caused by the University's concern over suppressing anti-animal sentiments cannot serve as a compelling government interest. *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir. 1996) (concluding "time spent by [plaintiff's] supervisor trying to restrict his religious speech does not constitute disruption"). The distraction identified by the University

48

appears to be its own preoccupation with animal advocacy messaging that both permeates its comment moderation decisions, (PPFOF ¶¶ 54-55, 64-65), keyword filters, (PPFOF ¶¶ 69, 72-73, 75), and internal communications, none of which is compelling. (PPFOF ¶¶ 56-62).

What the University is concerned about is silencing speech it deems harmful to its reputation, including that of its animal research program. The University's practices in policing its social media threads for incidents of anti-animal testing related speech reveal its intent to minimize the topic's appearance within its social media accounts. *See R.A.V.*, 505 U.S. at 395–96 (finding "the only interest distinctively served by the content limitation is that of displaying the city council's special hostility towards the particular biases thus singled out"). The concern has even led to the temporary shut-down of the forum to avoid an influx of animal advocacy related comments, a particularly pernicious example of its unbounded suppression of animal advocacy sentiments. (PPFOF ¶¶ 44-45); *see Ne. Pennsylvania Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 438 (3d Cir. 2019) (goal to "avoid disruption by excluding categories of speech it believes likely to inflame passions . . . invites a heckler's veto by signaling that the government will suppress unpopular speech if the public behaves badly"); *see also Fair v. Esserman*, No. 3:15-CV-681 (SRU), 2017 WL 2979685, at *7–8 (D. Conn. July 12, 2017) ("a temporary shutdown intended to stifle discussion on a particular topic, with plans to reopen the forum after controversy surrounding that topic had been suppressed constitutes impermissible censorship under any First Amendment analysis—indeed, such conduct is 'the spitting image of prior restraint'") (citations omitted); *see also ACT-UP v. Walp*, 755 F. Supp. 1281 (M.D. Pa. 1991) (same). The concern is far from compelling and provides a reasoned basis for finding the University's suppression of speech related to animal advocacy fails strict scrutiny.

49

Second, assuming the University's interests were compelling, its identification of animal advocacy related speech as the means to achieve its interests are underinclusive, and thus not narrowly tailored. Among the significant influences the University allows to affect its interest in maintaining open lines of communication with its audience are the universe of non-animal advocacy-related off-topic comments left to proliferate under its moderation practices. (*See, e.g.*, PPFOF ¶¶ 33-34, 37-38); (*See also* PPFOF ¶ 32) (noting the University does not apply its off-topic policy consistently). Further, excluding only off-topic comments—which the University does not actually do in practice—does not achieve the University's purported interests of minimizing distractions with its messaging, as it leaves open limitless comments deemed "on topic" under its social media practices that bear the same "distractive and dilutive effect" as off-topic comments. *See, e.g.,* (JSOF ¶ 75, Exh. 3) (displaying nearly a hundred comments and replies). *See also Kimsey*, 2021 WL 5447913, at *5 (off-topic Facebook moderation policy not narrowly tailored); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171–72 (2015) (town ordinance "hopelessly underinclusive" where it allows "unlimited proliferation of larger ideological signs while strictly limiting the number, size, and duration of smaller directional ones"). Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Since the University's restrictions of Krasno and use of keyword filters capture on-topic comments, its moderation is also overbroad. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 649 (7th Cir. 2006) (statute restricting sale of sexually explicit video games to minors overbroad since it reached constitutionally protected conduct, including sale of games with serious social values for minors); (*See also* PPFOF ¶ 81) (animal advocacy comment on topic but filtered). The

University is even aware that its practices silence comments such as Krasno's that do not violate its inconsistently applied off-topic guidelines, yet the comments remain unhidden. (*See, e.g.*, PPFOF ¶¶ 35-36) (comments by users "Suzie Cook" and "veganstonerprincess" moderated but on-topic); (PPFOF ¶¶ 96-97) (Krasno's comment moderated but on-topic). Such overinclusiveness undermines the University's stated interest in moderating off-topic comments from its social media pages. *See Carey v. Brown*, 447 U.S. 455, 465 (1980) (Over inclusiveness of statute's restriction on nonlabor picketing "would seem largely to undermine appellant's claim that the prohibition of all nonlabor picketing can be justified by reference to the State's interest in maintaining domestic tranquility.").

Less restrictive means are available to address the University's purported concerns with adherence to its discretionary comment guidelines. The University could warn Krasno that any comment it deems off-topic violates its practices, providing her an opportunity to delete or modify her comment. It could report comments it associated with violating its (sporadically applied) social media policy to the platforms themselves, which would have determined if they violated the guidelines established by a third-party entity for passive policing of its own norms. (JSOF ¶¶ 42, 56). It could reply to her comments. (PPFOF ¶¶ 46-48). It could urge all commenters to engage with the topics of the page or the posts it makes. Instead, the University chooses to employ the crude measures of account restriction, comment deletion, and keyword filters to ease its administrative burden in targeting disfavored speech. Not only is this interest impermissible, "the prime objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). Narrow tailoring requires a demonstration that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the

51

chosen route is easier." *Id.* The University cannot make this showing, and thus cannot establish

that moderation practices that unduly burden animal advocacy-relate speech survive strict scrutiny.

> **D.      Regardless of forum, the University's social media censorship is neither viewpoint neutral nor reasonable.**

Under even the standards that apply to limited or nonpublic forums where some content-

based restrictions on speech are tolerated, the University's moderation of Krasno is impermissible.

The government may have an interest in regulating topics and speakers within forums that, unlike

the University's Instagram and Facebook pages, are not otherwise opened to the public. *See City*

*of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Rels. Comm'n*, 429 U.S. 167, 180 (1976) (a

governmental body should not be restricted "in trying to best serve its informational needs while

rationing its time") (Stewart, J., concurring). Even in these spaces, however, the government's

restrictions on speech must be "reasonable in light of the purpose served by the forum" and

viewpoint-neutral. *Cornelius*, 473 U.S. at 806.

First, as detailed above, the University's blanket censorship of Krasno's Instagram account,

comment deletion, and its keyword filters' selective targeting of animal advocacy-related speech

constitute viewpoint discrimination. *See supra* Part II.B. Such conduct is impermissible in any

forum. *See Perry*, 460 U.S. at 45 ("[T]he state may reserve the forum for its intended purposes,

communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to

suppress expression merely because public officials oppose the speaker's view.") (citing *United*

*States Postal Service v. Greenburgh Civic Ass'n*, 453 U.S., at 131, n.7). By denying access to the

University's interactive portions of its Facebook and Instagram pages, the University has violated

Krasno's First Amendment rights by censoring her participation solely to silence her perspective

on animal testing. *See Cornelius*, 473 U.S. at 806 ("the government violates the First Amendment

when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.").

Second, the University's suppression of anti-animal testing speech through account restriction, manual moderation, and keyword filters is not reasonable in light of the purposes its Instagram account and Facebook page serve. To be found "reasonable," the University's moderation practices must work toward a "permissible objective," *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018), and be cabined in application through "objective, workable standards," *id*. at 1891. Practices like the University's that permit state actors to suppress speech "for any reason" or under "[in]sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 387 (4th Cir. 2006); *see also Southworth v. Bd. Of Regents of Univ. of Wisconsin Sys.*, 307 F.3d 566, 580 (7th Cir. 2002) ("[T]he Constitution prohibits the government from providing decisionmakers with unbridled discretion for granting access to the forum.").

As stated above, the University's interest in ferreting out speech critical of animal testing cannot serve as a permissible objective. *See supra* Part II.C.2. For this reason alone, the University's conduct remains unconstitutional.

Assuming the interest was permissible, the University still fails the reasonable inquiry's "forgiving test" through its complete lack of workable standards to guide its moderation decisions. *Minn. Voters All.*, 138 S. Ct. at 1888. It is undisputed that the University has no policy to control moderation of its social media pages, and no prohibition on any category of speech or class of speaker. What guidelines exist are optional, providing no workable standards for an employee to determine if a comment is off topic or not, or whether to remove it. (*See* PPFOF ¶¶ 12-13, 18-20). The sole guidance provided to employees that attempts to describe off topic moderation was

circulated following Krasno's restriction in response to this lawsuit. (PPFOF ¶ 19). It does not address when comments should be moderated or when an account can be restricted or banned. (*See* PPFOF ¶ 18). It is not mandatory, and its terms are not closely followed; for example, it provides for the use of keyword filters for profanity, but otherwise does not authorize their use for speech related to animal advocacy. *Id*. Yet those filters remain. And what moderation it authorizes as permissible for being "off topic" only applies to comments that are off topic to a social media *page*; it does not allow removal of comments that are off topic to *posts*. (PPFOF ¶ 19).

The lack of clear principles and guidelines to cabin University employees' discretion allows them to assess what is "off topic" on a case-by-case basis and remove or hide such comments based on no guidance at all. (PPFOF ¶¶ 22-31). They consequently invent categories such as "spam" that aren't addressed in any written guidance but inform their decisions to add words for automatic censorship in the University's keyword filters. (PPFOF ¶¶ 17, 72). The conditions are the breeding ground of discriminatory treatment. *See People for Ethical Treatment of Animals, Inc.*, 2022 WL 170645, at *10 (Lack of clear guidelines on excluding "offensive" advertisements provides "ample opportunity for Defendants to improperly exclude speech on the basis of viewpoint."). Those responsible for moderation agree; Defendant Klein even noted this lawsuit "will probably result in us changing and maybe being more specific about our comment moderation, *which is probably good*." (PPFOF ¶ 52) (emphasis added).

The University's flippant use of its moderation guidelines has even led to the temporarily closure of the interactive commenting space of its Instagram account despite no indication the moderation is sanctioned by any guidance on comment moderation. This move has occurred five times in the past two years, with three occasions meant to silence anti-animal testing advocates. (PPFOF ¶ 44). On one occasion, commenting was disabled despite Defendant Moll's admission

that the animal advocacy comments may have been on-topic to the post. (PPFOF ¶ 45). The reason: he "did not have the mental capacity to just handle those types of comments." *Id*.

The University's haphazard application of discretionary standards *admittedly* results in inconsistent moderation, including of the "off topic" prohibition it asserts forms the basis of the challenged decisions in this case. *See supra* Part II.D. (PPFOF ¶ 32). The scattering of on and off topic comments moderated on its social media pages demonstrates the absence of safeguards against arbitrary decision-making. *See supra* Parts II.C.2 (describing underinclusive and overinclusive moderation decisions). The risk of arbitrary enforcement is real, with the absence of clear policy resulting in the targeted use of its "off-topic" prohibition to capture almost entirely anti-animal testing viewpoints. *See supra* Part II.B. The University cannot excuse the use of moderation guidelines that are "in reality a façade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 806, 809–11 (1985) (citations omitted).

## III. THE UNIVERSITY VIOLATES KRASNO'S FIRST AMENDMENT RIGHT TO PETITON.

The University's moderation practices further place an unconstitutional burden on Krasno's right to petition the Government for a redress of grievances. U.S. Const. amdt. I. The right to petition is among "'the most precious of the liberties safeguarded by the Bill of Rights.'" *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1342 (7th Cir. 1977) (quoting *United Mine Workers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 222, (1967)). Like letters to a government official, *Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016), or attendance at a council meeting, *Hansen v. Bennett*, No. 88 C 6936, 1990 WL 207452, at *2 (N.D. Ill. Nov. 30, 1990), social media pages are considered a channel through which members of the public may appeal to government actors for social change or a remedy for personal complaints, *Packingham*, 137 S. Ct. at 1735 (noting "on Twitter, users can petition their elected representatives and otherwise engage

with them in a direct manner."). The University's restriction of Krasno's account, deletion of her comment, and ongoing filtering of her speech directly threatens this interest by burdening her ability to channel her concerns to the University and others through its social media pages.

It is without question that Krasno utilizes the social media pages of the University in part to seek reform of inadequacies she witnessed in the University's animal testing program. (JSOF ¶ 4). The University concedes its social media pages are meant to create channels of communication to "stakeholders" and the public. (JSOF ¶ 61). These channels are generally open, and the University is interested in hearing from and communicating with the users who access its pages. (JSOF ¶¶ 48, 68-69). Except for moderated speech. The University does *not* regularly monitor or read comments it moderates under its keyword filters, for example, effectively closing the channel of communication to the select few whose speech it disagrees with, such as Krasno. PPFOF ¶ 79.

The University's hiding of Krasno's comments through its moderation practices further burdens Krasno's right to coalesce support from other users. The right to petition includes the right to gather unput from other members of the public—a petition is, at bottom, "[a] written request signed by many people who seek a reform or other change." PETITION, Black's Law Dictionary (11th ed. 2019). By hiding her comments to members of the public, the University bars Krasno's ability to gather likes, replies, and other comments from other users. (JSOF ¶¶ 39-41, 54). This interference strikes at the heart of Krasno's ability to petition the University through her social media advocacy. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc*., 365 U.S. 127, 137–138 (1961) (noting railroads' publicity campaign designed to advocate for laws to

harm the trucking industry and change public perception of same was not proscribed by the Sherman Act as it implicated the railroads' right of petition).

The University's decision to restrict Krasno's right to petition through its moderation of speech critical of animal research is viewpoint based, and thus it is unconstitutional in any forum. *See supra* Part II.B. Even if found not to be viewpoint based, however, the denial of her access to the channels cannot survive scrutiny. Its purported rationale for diminishing or barring Krasno's speech—the unshown distraction that comments criticizing animal testing create within the comment threads—is insufficient to warrant the denial of Krasno's right to issue complaints to the University. *See Swart v. City of Chicago*, 440 F. Supp. 3d 926, 941 (N.D. Ill. 2020) (granting preliminary injunction against city's limitation on groups' gathering at park to circulate petitions, finding protection of other "visitors from [the groups'] artistic disruptions" not a compelling interest).

## IV.   THIS COURT HAS JURISDICTION OVER KRASNO'S CLAIMS.

### A.   Krasno has Standing.

Krasno has standing to obtain relief. She has suffered "injury in fact" that is "fairly traceable" to the University's conduct, and a favorable judicial decision in this case would redress her injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (Article III standing established by showing an (1) injury in fact, (2) fairly traceable to defendant's conduct, and (3) likely to be redressed by a favorable judicial decision.).

Krasno has suffered injury in fact as it is undisputed that the University has censored her speech in public forums, a clear constitutional injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Cohoon v. Konrath,* No. 20-CV-0620-BHL, 2021 WL 4356069, at *3 (E.D. Wis. Sept. 24, 2021) (Injury shown where the plaintiff's social media "posts

were silenced as a result of Defendants' conduct.") (internal citations omitted). Krasno suffered—and still suffers—injury, since comments the University manually moderated or hid through an account restriction and its keyword filters remain invisible. (PPFOF ¶¶ 98, 112). The keyword filters impose ongoing injury; they cause Krasno to alter her messaging against animal research to avoid further censorship and burden her ability to effectively communicate her speech to the University and other users of its social media accounts. (PPFOF ¶¶ 108-109, 116-118).

Krasno's injuries are directly traceable to the University, and capable of redress through declaratory and injunctive relief and nominal damages. *See Knight First Amend. Inst.*, 302 F. Supp. 3d at 549 (noting declaratory judgment will redress a First-Amendment harm as "government officials are presumed to follow the law as has been declared"); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021) ("[F]or the purpose of Article III standing, nominal damages provide the necessary redress for a [] violation of a legal right.). Krasno accordingly has standing to obtain relief.

### B.     Defendants Are "Persons" Under § 1983 Acting Under Color of State Law.

The University's deprivation of Krasno's First Amendment rights is properly before this Court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The Defendants—state officials acting within their official capacities—are persons within the meaning of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (noting "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

The suppression of Krasno's speech through the University's moderation practices has similarly occurred under the color of state law. *See Lugar v. Edmondson Oil Co*., 457 U.S. 922, 939 (1982) ("[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."). This inquiry demands both that the deprivation "be caused by the exercise of some right or privilege created by the State," and that it can be attributed to "a person who may fairly be said to be a state actor," such as a "state official." *Id.*

Each Defendant is a state actor. As a basic precept, "[a] state university without question is a state actor." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988). Each Defendant's misconduct occurred under the color of state law within this state system, either by "set[ting] in motion a series of events that [they] knew or reasonably should have known would cause others to deprive [a] plaintiff of constitutional rights," directing the conduct causing the deprivation, or merely knowing it occurred. *Brokaw v. Mercer Cty*., 235 F.3d 1000, 1012 (7th Cir. 2000). Defendant Chancellor Rebecca Blank controls the customs and operations of the University of Wisconsin-Madison—a public university. (PPFOF ¶ 1). Defendant Charles Hoslet oversees the University Relations Department that, together with Defendant Lucas, is responsible for "set[ting] in motion" the University's implementation of its comment moderation practices. *Brokaw*, 235 F.3d at 1012; *see also* (JSOF ¶¶ 9-11) (The University Communications Department which Defendant Hoslet oversees is "responsible for ensuring that the social media guidelines that guide comment moderation on the University's social media sites are complied with.").

Since Defendants Moll, Lucas, and Mike Klein directly act in their official capacities to hide comments and bar users such as Krasno from participation in the comment threads of its social media accounts, their conduct is "fairly attributable to the State." *Lugar*, 457 U.S. at 937.

Defendant Lucas and his supervisees, Defendants Moll and Klein, directly oversee the challenged practices that have silenced Krasno's participation on the social media accounts. (JSOF ¶¶ 11-14). Defendants Moll and Klein performed moderation activities and corresponded, in the course of their official responsibilities, on moderation decisions such as when to hide, ban, or restrict comments and users. (JSOF ¶¶ 14, 16). Each was able to perform these actions because of their official status as University employees in a way private citizens' status could not. *See, e.g.*, (JSOF ¶¶ 17-19) (Moll granted responsibility over moderation of Krasno's comments in course of duties as state employee). *See also Davison*, 912 F.3d at 680 ("When a defendant's 'status' as a public official 'enabled [her] to execute [a challenged action] in a manner that private citizens never could have,' then the action also is more likely to be treated as attributable to the state."), *as amended* (Jan. 9, 2019) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003)).

In sum, this is a "straightforward case of state officers exercising their state authority," in this instance by unconstitutionally barring Krasno's access to a public forum created by the University. *See Knutson v. Wisconsin Air Nat. Guard*, 995 F.2d 765, 768 (7th Cir. 1993) (finding challenged termination of employee constituted action "under color of state law").

## C.   Eleventh Amendment Immunity Does Not Bar Krasno's Claims.

As Krasno has suffered a deprivation of her First Amendment rights through the University's actions, she is entitled to declaratory and injunctive relief. *See e.g., Cohoon*, 2021 WL 4356069, at *3; *Popp*, 2020 WL 8872811, at *1 (finding declaratory judgment supported by the weight of authority in case concerning government hiding of comments on a Sheriff's Office Facebook page); *Ameritech Corp. v. McCann*, 297 F.3d 582, 589 (7th Cir. 2002) (holding Eleventh Amendment did not bar lawsuit "which seeks prospective injunctive relief for an ongoing violation of federal law"). Sovereign immunity does not bar Krasno's action for prospective relief against state officials such as Defendants Blank, Hoslet, Lucas, Klein and Moll. *See Ex Parte Young*, 209

U.S. 123, 159–160 (1908) (Eleventh Amendment does not bar injunctive relief against state Attorney General enjoining conduct allegedly violative of the Fourteenth Amendment).

Krasno is further entitled to nominal damages against Defendants Moll, Klein, and Lucas in their personal capacities. All three individuals acted under color of state law when they participated in the unconstitutional deprivation of Krasno's First Amendment rights. *See supra*. Sovereign immunity thus does not bar Krasno's request for monetary relief. *See generally Kentucky v. Graham*, 473 U.S. 159, 167-168 (1985) (Personal capacity suits against state officials are treated as "a victory against the individual defendant, rather than against the entity that employs him.").

## CONCLUSION

Having opted to create an Instagram account and Facebook Page "and benefit from [their] broad, public reach," the University "cannot now divorce [itself] from its First Amendment implications and responsibilities as [a] state actor[]." *One Wisc. Now*, 354 F. Supp. 3d at 954. The University ceded its responsibilities to ensure Krasno's right to free speech and to petition were not infringed in its social media pages by applying and continuing to apply moderation practices that seek to penalize protected expression advocating for animals. The result is viewpoint and content based discrimination. The Court should accordingly grant Plaintiff's motion for summary judgment.

Dated: May 18, 2022.

/s/ *Caitlin Foley*
Caitlin M. Foley

ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
Tel: (707) 795-2533 ext. 1043

Fac: (707) 795-7280
Email: cfoley@aldf.org

Christopher A. Berry
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
Tel: (707) 795-2533 ext. 1041
Fax: (707) 795-7280
Email: cberry@aldf.org

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
LAFFEY, LEITNER & GOODE
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003
(414) 755-7089 (facsimile)
jgoode@llgmke.com
mleitner@llgmke.com
jfarley@llgmke.com