IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MADELINE KRASNO,

      Plaintiff,

    v.                         Case No. 21-CV-099-SLC

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN, et al.,

      Defendants.

---

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

---

## ARGUMENT

**I.    Defendants are entitled to summary judgment on Krasno's First Amendment free speech claims.**

    **A.    The comment thread sections of UW-Madison's Instagram and Facebook pages are limited public fora; they are reserved for the discussion of subjects related to the underlying posts.**

The interactive spaces of UW-Madison's Facebook and Instagram social media pages are limited public fora. Krasno claims they are designated public fora. She is wrong, as explained in Defendant's response brief (*See* Dkt. 41:2–10) and below.

1. **The University has a "policy" reserving the comment thread sections of its social media pages to on-topic comments.**

Krasno argues that because the University admits it has no official policy regarding social media, this means it has not created limited public fora. This argument is wrong. The University's Social Media Statement expressly references off-topic comments. Any comment that is unrelated to the underlying post could be removed as off-topic. (Dkt. 49 (Defs.' Replies DPFOF) ¶ 2.) And the Interim Guidance states: "UW-Madison social media managers may engage in content moderation of social media pages based on one criterion: whether posted content is on vs. off topic." (Dkt. 32-2 (Kilpatrick Decl.) ¶ 4.) These rules combine to form an unofficial "policy"[1] that any user's comments must relate to the University's underlying posts.

Krasno argues that because language in these documents does not flat-out *require* moderation of off-topic comments, it weakens the policy. (Dkt. 47:10.) This is not so. The absence of such mandatory language does not mean the University restricts speech without any particular standards. The University does not require social media managers to moderate off-topic comments they first see because there may be uncertainty whether some comments are off-topic or not and, as a result, they are encouraged to contact

---

[1] Defendants have testified that no official University "policy," as that term is understood internally, exists. (Dkt. 25 (Lucas Dep. 49:21–50:14).)

the University's Office of Legal Affairs for advice. (Dkt. 28 (Moll Corp. Desig. 75:9–14, 77:20–78:3).) The lack of a mandatory moderation directive is the result of reasonable caution. This is wholly unlike the Chicago Transit Authority's policy—that the Seventh Circuit rejected—confining advertising spaces to non-controversial material that Krasno suggests is similar. *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985).

Also, the fact that the University's Social Media Statement and Interim Guidance do not *require* social media managers to promptly remove all off-topic comments does not mean that the University has opened the comment thread sections on its social media pages for any and all topics, and neither does a purpose of the social media pages to allow students, alumni, and other stakeholders to "share stories." (Dkt. 40 ¶¶ 65, 72.) The University's public-facing Social Media Statement expressly warns users that off-topic comments can be removed. (Dkt. 49 ¶ 2.) It is not unreasonable to believe that users understand that a comment that is not related the topic of the post will be considered "off-topic." And while Krasno claims that the Interim Guidance "was clearly created to allow the removal of animal testing advocacy," (Dkt. 47:12), that claim is entirely conclusory and ignores that the guidance addresses off-topic comments and guides social media managers' actions.

Krasno further claims that the University's moderation of her anti-animal testing speech does not preserve "the forum's communicative role." (Dkt. 47:13.) She says that the University should be welcoming her views, not silencing them. (Dkt. 47:13.) This argument, however, merely reveals that Krasno believes that what she has to say is always on-topic. (*See* Dkt. 33:35–36; 41:17.) This position also fails as a matter of law. The University may reserve, and has reserved, a forum for specific subjects and purposes. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983); *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 783 n.3 (7th Cir. 2011). (Dkt. 49 ¶ 1.)

### 2.   The University's practice limits off-topic comments.

In an attempt to show that the University does not practice what it preaches, Krasno points out that the University opens up its social media pages to anyone for an exchange of ideas. (Dkt. 47:14.) But that the general population may engage in commenting on the University's social media pages does not preclude the interactive spaces from being limited public fora. Again, the law is clear that the government may limit a public forum for "specific purposes or subjects," *Milestone*, 665 F.3d at 783 n.3, and that is what the University has done here. Krasno's argument that UW-Madison created a designated public forum merely because it did not restrict the public at large

from access in the first instance has no support in the law. Indeed, Krasno fails to cite any decisions so holding.

Krasno next makes an assertion that is not supported by the evidence. She claims that the speech the University primarily restricts is related to animal testing. (Dkt. 47:15.) But she has not performed a comprehensive analysis of all of the University's posts and all of the comments—or even a proper scientific sample—to determine what percentage of off-topic comments are properly moderated. Rather, she merely cherry-picks off-topic comments that were not moderated. She has no evidence that the University's moderation is "a hopelessly underinclusive effort." (Dkt. 47:15.)

She also claims that the University's moderation effort is "slapdash" because, according to her, it targets and excludes speech related to animal testing. (Dkt. 47:16.) Again, Krasno fails to account for the fact that the majority of spam campaigns run on the University's Facebook and Instagram pages are anti-animal testing comments. (Dkt. 49 ¶ 28; 43 ¶¶ 3–4; 25 (Lucas Dep. 87:21–88:7); 26 (Tyrrell Dep., 64:15–65:25).) And she also fails to recognize that certain comments are more easily understood to be off-topic than others, which can lead to questionable off-topic comments remaining on the pages. (Dkt. 41:9.) She also does not consider the sheer volume of comments and that the passage to time can lead to off-topic comments remaining in public view on stale posts. (Dkt. 41:5–7.)

The University's social media managers moderate what they believe are off-topic comments through manual and auto-moderation. Krasno may criticize the job the University does to keep its social media pages as limited public fora, but she does not want the University to do a *better* job, she simply wants them not to moderate at all.

## B. The University's moderation of Krasno's comments is not viewpoint discrimination under a limited public forum standard.

### 1. Removing Krasno's comments is not viewpoint discriminatory.

Krasno attempts to paint a picture of the University laser-focused on her and her viewpoint against its animal research program and, in turn, taking prompt action to prevent the world from seeing her comments. (Dkt. 47:18–19.) Krasno's viewpoint is not as important to the University as she thinks it is.

UW-Madison, unsurprisingly, knew when social media comments and other comments were being made about it and its animal research program. (Dkt. 25 (Lucas Dep., 87:21–88:15).) The University had discovered that an anti-animal research activist group had infiltrated one of its labs and obtained materials, and, and later made untrue and misleading statements about animals in the lab. (Dkt. 27 (Tyrrell Dep., 64:9–65:25).) Krasno somehow finds the University's response to this alarming. But there is nothing wrong with UW-Madison taking measures to monitor what is said on-line about one of its

6

programs, especially when those statements may be untrue, so that it can respond accordingly. (Dkt. 25 (Lucas Dep., 88:8–15).)

As to her comments, her attempt to paint one as on-topic fails. Krasno points to her September 18, 2020, comment that was moderated. She says, "The University does not conjure an explanation for why Krasno's response to a post announcing the *opening* of a recreation center that it was 'a great day to *shut down* the primate research labs!' is unrelated to the thread, (Dkt. 39, PPFOF ¶ 88) (emphasis added)." (Dkt. 47:20.) If Krasno's comment about closing down primate research labs to a post about a new recreation center on campus is not off-topic, then no comment is off topic. Krasno's argument that the comment was on-topic because it used the words "shut down" and the post included the word "opening," is not a colorable one. That aspect of Krasno's comment is "mere window dressing." *Davison v. Plowman*, 247 F. Supp. 3d 767, 777 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018). Common sense must be a factor in what is on-topic, and the University reasonably employed it here when it moderated her September 18 comment. This is yet another example of Krasno's position that she has a First Amendment right to use the University's social media pages to espouse her views at any time. Because the University intends that the interactive space of its social media pages be devoted to specific subjects, and has thus created limited public fora, Krasno has no such boundless right to free speech here.

Krasno next complains that the University should not rely upon her Instagram comments from November 2020 as evidence it moderates off-topic comments because they were moderated by way of the account-level restriction. (Dkt. 47:20–21.) While it is true that this is how the November comments were moderated, that does not mean that Krasno's comments were not off-topic—as she disputes (Dkt. 47:21)—and could have been properly moderated as such.

Lastly as to Krasno's opposition to the University's moderation of her comments, she asserts that its failure to moderate other users' off-topic comments on the same comment thread shows viewpoint discrimination. As an initial matter, Krasno's assertion is somewhat hypocritical in that she assumes that all of her comments are on-topic but that none of the other users' comments are on-topic. (Dkt. 47:21.) She bends over backwards to explain why her comments are on-topic but is quick to call other users' comments off-topic and then chastises the University for not moderating them. Nonetheless, Defendants have explained in detail why her comments were off-topic and moderated, (*see* Dkt. 33:24–25; 41:12, 19; 49 ¶¶ 48–51), and why some other users' off-topic comments remain (*see* Dkt. 41:5–9), and respectfully directs the Court to those arguments rather than repeat them here. In any event, the University does moderate other users' off-topic comments generally. (Dkt. 43 ¶¶ 1–2.)

In the end, Krasno cannot show viewpoint discrimination through the moderation of her comments because they were off-topic, and the University removes off-topic comments when it can. The University removes such comments to preserve its limited public fora and allow for proper discussion and participation in the subjects it chooses.  Again, the University's social media pages are not open for free-for-all discussion and debate about whatever topics its users, like Krasno, desire.

### 2.   Use of the keyword filter auto-moderation tool is not viewpoint discriminatory.

Krasno complains that the University's use of the keyword filter auto-moderation tool is facially obvious viewpoint discriminatory because of the inclusion of words related to her viewpoint against animal testing and research. (Dkt. 47:27–31.) Krasno's reference to *Tanner v. Ziegenhorn*, No. 4:17-CV-780-DPM, 2021 WL 4502080, (E.D. Ark. Sept. 30, 2021) is unhelpful to her. In that case, the court held that the interactive space of the social media page at issue was a designated public forum. *Tanner*, 2021 WL 4502080, at *2. The court determined that certain terms were included due to viewpoint discrimination and not to fulfill the government's purpose of limiting the subjects of the forum. The terms were included in the auto-moderation filter in *Tanner* merely because they were "disrespectful," but the First

Amendment protects disrespectful speech. *Tanner*, 2021 WL 4502080, at *4.[2] Here, however, the University includes words because they appear in spam campaigns (i.e., numerous off-topic comments at one time) targeted toward its social media pages. (Dkt. 49 ¶¶ 21, 28; 43 ¶¶ 3–4.) *Tanner* is distinguishable.

Krasno dismisses this reason because "spam" is not defined by the University in any written document related to social media moderation. That argument fails. Whether or not the University has defined "spam," the point of including words in the keyword filter was to combat the multitude of off-topic comments that were being poured onto its social media pages on a coordinated basis. The University adds and removes key words on an as-needed basis to combat this type of "spam." (Dkt. 49 ¶¶ 23–24; 43 ¶¶ 3–4.) Unfortunately for Krasno, groups with views that she endorses frequently engage in such spam campaigns. Contrary to her contention, (Dkt. 47:29–30), the University's use of the keyword filter auto-moderation tool that has prevented spam campaigns with an anti-animal testing viewpoint does not "target" Krasno. (Dkt. 49 ¶ 28.) Again, the University uses the keyword filter as a means of keeping the

---

[2] Krasno's discussion of *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992), is equally unhelpful. That case concerned whether a city ordinance prohibiting certain fighting words was overbroad. *Id.* at 379–81. The issue here is about a keyword filter auto-moderation tool used to moderate the interactive space on a university's social media pages. The particular words in the filter here were based on previous spam campaigns, not viewpoint (i.e., whether supportive or against animal research and testing) as in *R.A.V.* The Supreme Court decision is simply inapposite.

interactive spaces as limited public fora, and free from numerous off-topic comments, not to discriminate against Krasno's viewpoint.

And Krasno's example against the University's use of a keyword filter does not help her cause. She complains about moderation of a comment she made, that included the word "monkey," espousing her anti-animal research viewpoint. This comment, however, was made to a University post *about winter commencement.* (Dkt. 47:28–29.) Thus, regardless of any keyword filter, her comment was off-topic (as would be any comment about monkeys). Krasno was not injured by the University's action in that instance.

Krasno next argues that the University's rationale for deploying the keyword filter does not fit with its use. (Dkt. 47:30.) It is not apparent what she really means, but at bottom, Krasno is upset that the keyword filter prevents her from making comments about her desired subject.[3] She believes that any potential comment from her about the University's treatment of primates in its research lab would be on-topic to a University post about an animal, such as a dog or cow, or medicine, such as the COVID-19 vaccine. (Dkt. 47:30–31; 49 ¶ 33.) Krasno's view of what is or is not on-topic would

---

[3] For example, Krasno says that her off-topic comments critiquing the University's animal research program should be "of interest" to the social media pages' users because they concern the University. (Dkt. 47:35.)

render the University's on-topic rule and the designation of the pages as limited public fora meaningless.

In the limited public fora of the comment thread sections of its social media pages, the University's use of the keyword filter auto-moderation tool is not viewpoint discrimination. It is a reasonable moderation tool based on known spam campaigns of off-topic comments. It is content-neutral and serves the purpose of the fora.

### 3. The account-level restriction of Krasno's Instagram account is a claim barred by the Eleventh Amendment.

Krasno begins her argument about the University's past account-level restriction of her Instagram account with a reference to the dispute between the parties. On one hand, the University says that the restriction occurred because of the number of off-topic comments she made on its social media pages. (Dkt. 47:22.) Krasno, on the other hand, claims to have made only two comments before her account was restricted. (Dkt. 47:21.) This creates a genuine dispute of fact.[4] However, as Defendants have already explained, it

---

[4] Krasno asks this Court to make a finding that the reason for the account-level restriction was motivated by the University's disapproval of her speech. (Dkt. 47:21.) But the Court must decline because it is not allowed to weigh the evidence on summary judgment. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." (citation omitted)).

does not prevent this Court from granting summary judgment to them on Krasno's free speech claim related to this account-level restriction. (*See* Dkt. 41:10–12.)

In response, Krasno claims that there is an ongoing First Amendment violation, obviating any Eleventh Amendment defense, because the comments that were hidden by the account-level restriction remain hidden from public view. (Dkt. 47:26–27.) This argument fails because it assumes that Krasno has a First Amendment speech right to continuously speak on social media pages *through old comments* years after the University's post was generated. Unsurprisingly, Krasno has provided no case law in support of this novel position (Dkt. 47:26–27), so it can be ignored. *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived" (citation omitted)). The alleged constitutional violation she complains about is the account-level restriction itself, which, for a short period of time, did not enable her to generate a comment on the University's social media pages in the first instance (without "release" of the comments by social media managers). And that restriction ceased in January 2021. (Dkt. 49 ¶ 12.) Because declaratory or

prospective injunctive relief is only proper when there is a *continuing* violation of a federal law, and there is none here, the Eleventh Amendment bars this specific claim. *Green v. Mansour*, 474 U.S. 64, 73 (1985). Resolution of the claim would only serve the purpose of establishing liability, which is prohibited under Eleventh Amendment jurisprudence. *Ill. Dunesland Pres. Soc'y v. Ill. Dept. of Nat. Res.*, 584 F.3d 719, 721 (7th Cir. 2009).

There is no ongoing violation of federal law because the account-level restriction does not exist and has not existed for well over a year. (Dkt. 49 ¶ 12.) Accordingly, the Eleventh Amendment requires the Court to grant summary judgment to Defendants on Krasno's First Amendment free speech claim based on this past alleged violation.

### C.    The University's moderation of Krasno's comments is reasonable.

Since the comment thread sections of the University's social media pages are limited public fora, not designated public fora, the legal standard is not a strict one. "[S]peech restrictions in a limited public forum need only be viewpoint-neutral and reasonable in light of the purpose served by the forum." *Milestone*, 665 F.3d at 783 n.3; *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985). A requirement that comments not be off-topic is reasonable and serves the purpose of the limited public forum. *Davison*,

14

247 F. Supp. 3d at 777. UW-Madison's moderation practices comply with that constitutional standard.

Krasno claims that the University's moderation is not reasonable because it opens up its social media pages for a "vast array of topics" that is "virtually limitless". (Dkt. 47:32.) But simply because the University wants to host discussions about a "specific department, lab, or organization" or encourages its users to "share stories," (Dkt. 49 ¶¶ 4–5), does not mean that it cannot also limit those discussions and stories *to the subject of its posts*. Contrary to Krasno's belief, her comments about the University's primate lab are not on-topic simply because it is *the University's* primate lab. (Dkt. 47:32–33.) Unlike the Twitter pages of the state legislators in *One Wisconsin Now* or of President Trump in *Knight*, the interactive spaces here constitute limited public fora. The University may limit comments to those on-topic to the underlying posts.

Krasno also argues that it is harmless to the University's pages if her comments are not moderated. Put another way, her few comments won't clog up the interactive space and frustrate the University's ability to facilitate and participate in discussions. (Dkt. 47:32–33.) Such an argument ignores the purpose of the limited public forum in the first instance and hints at a desire for special treatment. One cannot reasonably argue that the University cannot exclude off-topic comments from its limited public fora because a few such

comments would not make much of a difference. Extrapolating that reasoning to other users' off-topic comments would lead to no comment restriction at all.

Krasno further contends that the University should not be so concerned about off-topic comments because social media platforms are designed to host many comments. (Dkt. 47:33–34.) She continues that, if the University is concerned that such volumes could interfere with its ability to find comments from users asking for its assistance, then it should turn off commenting altogether after a certain number of comments. However, Krasno takes the exact opposite position in the same brief when she claims that disabling commenting is itself a viewpoint restriction of free speech. (Dkt. 47:29.) She cannot have it both ways. Moreover, Krasno ignores that under her scenario an on-topic comment would be blocked after the threshold is met.

The University's moderation practices keep off-topic comments out of the interactive space, which in turn to frees up that space for on-topic discussion and communication. Moderation of off-topic comments is integral to the purpose of the limited public fora. The University sets the agenda by limiting discussion to subjects of the underlying posts and allows users to participate in such discussion on those subjects. (Dkt. 49 ¶¶ 6–7.) The off-topic restriction serves "to limit discussion to those matters presented and to thus preserve the forum for its intended purpose." *Davison*, 247 F. Supp. 3d at 777.

*** 

16

Krasno asserts that the University's moderation of her comments is a viewpoint and content-based restriction on her speech. She is wrong. The moderation of Krasno's off-topic comments fulfill the purpose of the limited public fora the University has created—to allow for the discussion of subjects the University, not Krasno, chooses to discuss. Off-topic comments clog the forum the University has created, and this restriction is a permissible regulation of speech under the First Amendment. Because UW-Madison's regulation of Krasno's speech in the comment thread sections of its social media pages is viewpoint-neutral and reasonable in light of the purpose served, Krasno's free speech claims against all Defendants fail and summary judgment should be entered in their favor.

## II. Defendants are entitled to summary judgment on Krasno's First Amendment Petition Clause claim.

Krasno's First Amendment petition for redress of grievances claim is without merit and summary judgment should be entered for Defendants.

Krasno discusses two decisions in her response brief. One is an out of state federal district court decision that began with a warning that it was "not able to squarely reach the merits of the issues" in the motion to dismiss, *Leuthy v. LePage*, No. 1:17-CV-00296-JAW, 2018 WL 4134628, at *1 (D. Me. Aug. 29, 2018). And the other is a recent, binding Seventh Circuit decision, *Shipley v. Chic. Bd. of Election Comm'rs*, 947 F.3d 1056, 1064 (7th Cir. 2020), that goes

against her. At bottom, neither decision supports her First Amendment Petition Clause claim.

Krasno cites a passage from *Leuthy* which explains that the defendant governor cited no authority, and the court found none, for the view that alternative channels for petition render a Petition Clause claim nonviable. (Dkt. 47:42 (citing 2018 WL 4134628, at *17).) This point is meaningless. For one, that the *Leuthy* court did not find any decision over four years ago is not binding on this Court. And two, subsequent to *Leuthy*, the Seventh Circuit Court of Appeals did issue an opinion that does stand for the position that alternate channels for petition render a Petition Clause claim nonviable— *Shipley*.

Further, Krasno's attempts to minimize the *Shipley* decision fall short. (Dkt. 47:42.) Krasno contends that *Shipley*'s analysis should be given little weight because the plaintiffs' arguments were undeveloped. (Dkt. 47:42.). Despite inadequate briefing by the plaintiffs, the Seventh Circuit wrote, "Even if we were to forgive the waiver, Plaintiffs fare no better on the merits. Plaintiffs have failed to state a plausible claim that the Board violated their right to freely associate or their right to petition the government." *Shipley*, 947 F.3d at 1063. That is forceful language of a holding that no litigant or lower court can ignore.

18

Next, Krasno tries to distinguish *Shipley* based on the difference between an in-person public meeting and social media platforms, suggesting that alternate means of petition are not important to social media cases. (Dkt. 47:42.) But the *Shipley* court's reasoning infers no such distinction. The Seventh Circuit noted that while the plaintiffs complained that they were prevented from publicly commenting at a meeting to a board, they had "voiced their objections to the Board . . . before the meeting" and also submitted written observations beforehand. *Shipley*, 947 F.3d at 1064. These allegations, the court held, "doom[ed] their claim." *Id*. The court continued: "Plaintiffs' only complaint is that they were not able to petition the Board *at their desired time and place*, not that they were prohibited from petitioning the government." *Id*. (emphasis added). Despite Kranso's take on the decision, the Seventh Circuit dismissed the plaintiffs' claim because other avenues to petition were available, one of which was written submissions. *Id*. The fact that *Shipley* also concerned an in-person board meeting was not important to the ultimate holding.

As Defendants have shown, Krasno has multiple other ways to petition the University about her complaints on animal testing and her demands to close down the primate labs. (Dkt. 49 ¶¶ 35–41.) In fact, she has taken advantage of some. Indeed, Krasno cannot dispute that she sent an email to the University and some of her comments made on the University's social

media sites were *not* moderated. (Dkt. 49 ¶ 34.) As a consequence, like the unsuccessful plaintiffs in *Shipley*, the undisputed fact that Kranso has other avenues to petition the University (and has used some of them) dooms her claim. Krasno's "only complaint is that [she was] not able to petition the [University] at [her] desired time and place, not that [she was] prohibited from petitioning the government." *Shipley*, 947 F.3d at 1064.

To state the obvious, *Shipley* controls, not *Leuthy*. Summary judgment should be granted to Defendants on Krasno's First Amendment petition claim.

## III. Alternatively, Defendants Lucas, Klein, and Moll are entitled to summary judgment on Krasno's individual capacity claims for nominal damages based on qualified immunity.

Krasno contends that Lucas, Klein, and Moll, in their individual capacities, are not immune from liability for nominal damages based on qualified immunity. (Dkt. 47:44–48.) Her arguments lack merit. Qualified immunity protects these defendants and summary judgment should be entered in their favor.

### A. Krasno's references to cases establishing what is "clearly established" are outdated.

As the party responding to the defense of qualified immunity, Krasno has the burden to establish that these defendants' actions violated a clearly established constitutional right. *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017). "To be clearly established at the time of the challenged conduct,

the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015) (citation omitted). "[T]he crucial question [is] whether the official acted reasonably *in the particular circumstances* that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (emphasis added).

To determine whether a right has been clearly established, courts first look to controlling Supreme Court precedent and their own circuit decisions on the issue. *Jacobs v. City of Chi.*, 215 F.3d 758, 767 (7th Cir. 2000). If no controlling precedent exists, courts look to all relevant caselaw to determine whether any "clear trend in the caselaw" existed that "recognition of the right by a controlling precedent was merely a question of time." *Id.* (citation omitted).

Here, while Krasno cites several decisions for the contours of the "clearly established right," none of them are after 2005 and so this Court may ignore them. (Dkt. 47:44–45.) In recent years, the Supreme Court has continually reiterated that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) ("the clearly established right must be defined with specificity"). Similarly, the Seventh Circuit holds that "[e]xisting

caselaw must 'dictate the resolution of the parties' dispute.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 472 (7th Cir. 2018)). Although a case directly on point is not required, "precedent must have placed the . . . constitutional question *beyond debate*." *White*, 137 S. Ct. at 551 (emphasis added). Krasno cites none of these decisions in her brief.

## B.   Case law did not establish that social media pages are public fora.

Krasno claims that, by 2019, holdings established that government social media accounts are public forums. (Dkt. 47:46–47.) As much as she wishes it were true, it was not.

Here, notably, Krasno points to no Supreme Court precedent that will defeat the defense of qualified immunity. She merely resorts to the oft-quoted statement in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017), that social media is "one of the most important places to exchange views." These now obvious words do nothing to show that the law clearly established that interactive spaces of government social media pages were public fora.

Also, as Defendants have already explained, the Fourth Circuit, in 2019, stated that neither "the Supreme Court nor any Circuit has squarely addressed whether, and in what circumstances, a governmental social media page . . . constitutes a public forum." *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir.

22

2019). This means that when the *Davison* court held, in January 2019, that
the interactive space of social media accounts were public fora, *see id.* at 687,
it was the first circuit court of appeals to do so. And while Krasno cites the
Second Circuit's *Knight First Amendment Institute* decision from July 2019 in
support of her argument, that decision is unhelpful. (Dkt. 47:46 (citing *Knight
First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019),
*cert. granted, judgment vacated on mootness grounds sub nom. Biden v. Knight
First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021)).) The Supreme
Court vacated that decision, and this precludes Krasno from using it in support
of any "clearly established" argument for qualified immunity purposes. *See
Camreta v. Greene*, 563 U.S. 692, 713 (2011) ("Vacatur then rightly 'strips the
decision below of its binding effect,' . . . and 'clears the path for future
relitigation[.]'") (citations omitted)).

Importantly, neither *Davison* nor *Knight* are Seventh Circuit decisions.
Since Krasno points to no Supreme Court or Seventh Circuit binding case law
in support of her argument, she must point to other relevant caselaw to
determine whether any "clear trend in the caselaw" existed that "recognition
of the right by a controlling precedent was merely a question of time." *Jacobs*,
215 F.3d at 767. This she has not done. Krasno has cited only three federal

23

district court decisions[5] and one circuit court of appeals decision for the proposition that the interactive space of social media pages serve as public fora. (Dkt. 47:46–47.) Krasno has failed to prove that she had any "clearly established right" through a "clear trend" by way of non-binding federal court decisions.

### C.    Krasno's qualified immunity argument is made at too high a level of generality.

Even assuming it was clearly established by 2020 that the interactive spaces on social media pages were public fora by way of a "clear trend," it does not help Krasno defeat qualified immunity here. Importantly, none of the decisions cited by Krasno addressed a government entity moderating questionably off-topic comments in a *limited public forum*. The vacated decision in *Knight* does not address any argument by President Trump that his Twitter page was intended to be a limited public forum, as Defendants do here. And Krasno does not argue that any of the other decisions she cites does either.

Apart from the public forum analysis, Krasno also argues that the law was clearly established that viewpoint and content-based discrimination under the First Amendment applied to public fora. (Dkt. 47:47.) This argument is the

---

[5] Defendants do not consider, for qualified immunity purposes, decisions in which a court *assumed* a social media account was a public forum or that were decided on motion to dismiss grounds. (*See* Dkt. 47:47.)

kind that the Supreme Court holds insufficient. Under qualified immunity, "'clearly established law' should not be defined 'at a high level of generality.'" *Pauly*, 137 S. Ct. at 552 (citation omitted). "[C]learly established law must be 'particularized' to the facts of the case." *Id.* (citation omitted). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)).

That is exactly what Krasno is trying to do here. Again, Krasno points to no decisions holding that a government violates a plaintiff's clearly established First Amendment speech or petition rights based on the specific facts of her case: when Moll placed an account-level restriction on an Instagram user's account, deleted or hid comments that are questionably off-topic to the underlying posts in a limited public forum, and used a keyword filter auto-moderation tool to restrict comments for the purpose of preventing spam comments from clogging up the interactive spaces on the social media pages. In other words, the defendants could not have known the actions they took within the University's limited public fora would have violated any clearly established First Amendment rights held by Krasno. Under the particular circumstances here, Krasno has failed to meet her burden to defeat qualified immunity.

### D.    Moll's knowledge of the *Knight* decision does not defeat qualified immunity.

Krasno further argues that Moll "understood" that the University's social media pages were public fora. (Dkt. 47:47.) She claims that because Moll—not an attorney—viewed the *Knight* decision as applying to the University's action of blocking users on social media in general, this helps defeat his qualified immunity defense. That is not reasonable.

Unsurprisingly, Krasno cites no case law in support of the proposition that a defendant's own view of a non-binding court decision can create a clearly established right. Thus, this Court can ignore it. *See Crespo*, 824 F.3d at 673. Regardless, the *Knight* decision cannot support Krasno's clearly established right argument for qualified immunity purposes because the Supreme Court vacated it, it is not a Supreme Court or Seventh Circuit decision anyway, and, as a Twitter case, it is distinguishable from the particular facts of the case here, for the same reason *One Wisconsin Now* is (*see* Dkt. 33:26–27).

Since Moll, Klein, and Lucas have raised the qualified immunity defense to the First Amendment claims against them, it is Krasno's burden to overcome it. She has failed to show that at the time she was restricted, the interactive spaces of social media pages were clearly established as public fora. And she has not shown any clearly established right to post questionably off-topic comments to the University's Facebook and Instagram pages that were

designed to be limited public fora. Moll, Klein, and Lucas were not put on notice by case law that, at the time of any of their actions that led to those comments from not publicly appearing, they were violating Krasno's First Amendment rights.[6]

Summary judgment should be entered in these defendants favor on Krasno's First Amendment claims based on qualified immunity.

## IV.   Alternatively, Klein and Lucas, in their individual capacities, are entitled to summary judgment for lack of personal involvement.

Defendants argue that Klein and Lucas are entitled to summary judgment because there is a lack of evidence that they had sufficient personal involvement in any alleged constitutional violation against Krasno. (Dkt. 33:47–48.) Krasno responds by arguing that Defendants' argument—that these defendants merely supervise Moll and therefore cannot be subject to liability—ignores specific action they have taken. (Dkt. 47:48–50.) Her response is unpersuasive.

Despite the many tasks that Krasno shows Klein and Lucas perform, none of them are specific to any allegations against *her*. "[I]ndividual liability under § 1983 requires 'personal involvement *in the alleged constitutional deprivation*." *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010)

---

[6] Defendants do not concede their argument that Klein and Lucas did not take any specific action against Krasno that amounted to a clearly established First Amendment violation. (Dkt. 33:45–46; *see infra* sec. IV.)

(emphasis added) (citation omitted). At best, Krasno merely shows that Klein and Lucas do their jobs. (Dkt. 47:49.) And that alone does not subject them to liability for any violation of *Krasno's* First Amendment rights. She has presented no evidence that these two defendants moderated any of her comments through manual- or auto-moderation, decided to include any specific words or phrases in the keyword auto-moderation tool, or decided to impose an account-level restriction on her Instagram account.[7] (Dkt. 49 ¶¶ 42–45.) And some of the involvement Krasno points to—for example, Lucas training Moll, sharing information about potential incoming comments, and Klein informing Moll that Krasno was making an online presentation (Dkt. 47:49)—are not alleged to be constitutional violations. Despite her contention that Klein and Lucas are directly responsible for the social media moderation activity that led to the alleged illegal account and comment restrictions, she has produced no specific evidence to that effect.

Defendants Klein and Lucas, in their individual capacities, are entitled to summary judgment based on lack of personal involvement under Section 1983.

---

[7] In fact, Krasno has conceded that "Lucas was not involved in the decisions to moderate Krasno's individual comments." (Dkt. 46 ¶ 45.)

## V.   Alternatively, the Board of Regents is entitled to summary judgment.

In Defendants' opening brief, they argued that Kranso's claims against the Board of Regents failed because this defendant was not a "person" under 42 U.S.C. § 1983 and it also possesses Eleventh Amendment immunity. (Dkt. 33:48–50.) In her response brief, Krasno did not respond to these arguments. (*See generally* Dkt. 47.) This silence is not surprising given that the case law is so clear. Further evidence of Krasno's concession on these points is that she chose not to move for summary judgment against the Board. (Dkt. 35:7 n.1.) So, Krasno has conceded Defendants' arguments. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)) ("Failure to respond to an argument . . . results in waiver."). Accordingly, the Board of Regents is entitled to summary judgment on all claims in its favor.

## CONCLUSION

Defendants[8] ask this Court to grant their motion for summary judgment on all Plaintiff's claims and dismiss the action.[9]

---

[8] Rebecca Blank was named a defendant in her official capacity as chancellor of UW-Madison. She is no longer in that position. Jennifer L. Mnookin will be the chancellor-designee beginning August 4, 2022. The interim chancellor is John Karl Scholz. *See* https://chancellorsearch.wisc.edu/ and https://www.wisc.edu/about/leadership/ (last visited Jun 18, 2022). As a result, Scholz should be substituted for Blank until August 4. *See* Fed. R. Civ. P. 25(d).

[9] In the event this Court finds Defendants liable as to any claim, Defendants respectfully ask this Court to order the parties to brief the issue of proper remedies, in particular whether any injunction is required. Such briefing would not be unique

Dated this 20th day of June 2022.

> JOSHUA L. KAUL
> Attorney General of Wisconsin
>
> Electronically signed by:
>
> s/ Steven C. Kilpatrick
> STEVEN C. KILPATRICK
> Assistant Attorney General
> State Bar #1025452
>
> BRIAN P. KEENAN
> Assistant Attorney General
> State Bar #1056525
>
> Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1792 (SCK)
(608) 266-0020 (BPK)
(608) 294-2907 (Fax)
kilpatricksc@doj.state.wi.us
keenanbp@doj.state.wi.us

---

to First Amendment social media cases. *See One Wisconsin Now v. Kremer*, No. 17-CV-820-WMC, 2019 WL 2162231, at *1 (W.D. Wis. May 17, 2019) ("The court then directed the parties to submit briefs on the appropriate relief in light of this finding of liability.").