**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| MADELINE KRASNO,<br><br>             Plaintiff,<br><br>     vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY<br>OF WISCONSIN, et al.,<br><br>             Defendants. | Case No. 21-CV-00099-SLC |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT ...................................................................................................................... 2

I.    THE UNIVERSITY'S SUPPRESSION OF KRASNO'S SPEECH IS
VIEWPOINT DISCRIMINATORY ............................................................................... 2

    A.    The University's Account Restriction is Based on Undisputed Evidence and
Continues to Suppress Krasno's Speech. ......................................................... 3

    B.    The University Deleted Krasno's Comments to Suppress Her "On Topic"
Speech. ......................................................................................................... 7

    C.    The University Created and Deploys its Keyword Filters in Response to
Speech Criticizing its Animal Testing Program. ............................................. 9

II.    THE UNIVERSITY'S CENSORSHIP OF KRASNO IS UNCONSTITUTIONAL
CONTENT-BASED DISCRIMINATION. ..................................................................... 13

    A.    The University's Social Media Pages Are Designated Public Forums ...................... 13

    B.    The University's Suppression of Krasno's Speech Fails Strict Scrutiny ................... 21

III.    THE UNIVERSITY'S SUPPRESSION OF KRASNO'S SPEECH IS
UNCONSTITUTIONAL IN ANY FORUM. .................................................................. 21

    A.    The University's Moderation Practices are Viewpoint Discriminatory. ................... 21

    B.    The University's Moderation of "Off Topic" Speech is Unreasonable. ................... 26

IV.    THE UNIVERSITY'S CLOSURE OF ITS SOCIAL MEDIA PAGES TO
KRASNO VIOLATED KRASNO'S RIGHT TO PETITION. ........................................ 32

V.    KRASNO IS ENTITLED TO NOMINAL DAMAGES. ................................................. 35

CONCLUSION ................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases**

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*,
   45 F.3d 1144 (7th Cir. 1995) .................................................................. *passim*

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*,
   978 F.3d 481 (6th Cir. 2020) ........................................................................... 25

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................... 3

*Ark. Educ. Television Comm'n v. Forbes*,
   523 U.S. 666 (1998) ................................................................................... 14, 18

*BE & K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002) ................................................................................... 32, 33

*Boelk v. AT & T Teleholdings, Inc.*,
   No. 12-CV-40-BBC, 2013 WL 3777251 (W.D. Wis. July 19, 2013) ........................... 21

*Borough of Duryea, Pa. v. Guarnieri*,
   564 U.S. 379 (2011) ......................................................................................... 32

*Christian Legal Soc'y v. Walker*,
   453 F.3d 853 (7th Cir. 2006) ............................................................................ 13

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ......................................................................................... 30

*Cleveland v. Porca Co.*,
   38 F.3d 289 (7th Cir. 1994) ............................................................................... 3

*Cohoon v. Konrath*,
   563 F. Supp. 3d 881 (E.D. Wis. 2021) ............................................................... 24

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) ................................................................................. *passim*

*Elliott v. Hinds*,
   786 F.2d 298 (7th Cir. 1986) ............................................................................. 5

*Faison v. Jones*,
   440 F. Supp. 3d 1123 (E.D. Cal. 2020) ........................................................ 17, 18

*Forsyth Cnty., Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992) ............................................................................ 29

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .............................................................................. 6

*Green v. Mansour,*
    474 U.S. 64 (1985) ............................................................................... 5

*Greer v. Spock,*
    424 U.S. 828 (1976) ............................................................................ 19

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.,*
    63 F.3d 581 (7th Cir. 1995) ................................................................ 24

*Hilton v. City of Wheeling,*
    209 F.3d 1005 (7th Cir. 2000) ...................................................... 32, 34

*Hopper v. City of Pasco,*
    241 F.3d 1067 (9th Cir. 2001) ...................................................... 18, 20

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) .......................................................... 11, 12, 26

*Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.,*
    584 F.3d 719 (7th Cir. 2009) ............................................................... 5

*In re RH,*
    170 Cal. App. 4th 678 (2009) ............................................................ 33

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
    994 F.3d 602 (7th Cir. 2021) ............................................................. 18

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ........................................................................... 22

*Lynch v. Huberman,*
    No. 10 C 1783, 2010 WL 3156006 (N.D. Ill. Mar. 26, 2010) ........... 18

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .............................................................. 9, 11, 12

*MCI Telecomms. Corp. v. Ill. Bell Tel. Co.,*
    222 F.3d 323 (7th Cir. 2000) ............................................................... 5

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ...................................................................................... 21, 27, 30

*Mirabella v. Villard*,
    853 F.3d 641 (3rd Cir. 2017) ........................................................................................ 33

*One Wisc. Now v. Kremer*,
    354 F. Supp. 3d 940 (W.D. Wis. 2019) .................................................................. 15, 16

*One Wisc. Now v. Kremer*,
    No. 17-CV-820-WMC, 2019 WL 2162231 (W.D. Wis. May 17, 2019) ........................ 5

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) ...................................................................................................... 10

*Powers v. Dole*,
    782 F.2d 689 (7th Cir. 1986) .......................................................................................... 3

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................................................................................. 2, 8, 11

*Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*,
    307 F.3d 566 (7th Cir. 2002) .................................................................................. 23, 26

*Stewart v. D.C. Armory Bd.*,
    863 F.2d 1013 (D.C. Cir. 1988) .................................................................................... 14

*Tong v. Chicago Park Dist.*,
    316 F. Supp. 2d 645 (N.D. Ill. 2004) ............................................................................ 22

*United States v. Alvarez*,
    567 U.S. 709 (2012) ...................................................................................................... 24

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003) ...................................................................................................... 31

*United States v. Kokinda*,
    497 U.S. 720 (1990) ...................................................................................................... 31

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................................................................ 7

*White Coat Waste Project v. Greater Richmond Transit Co.*,
    35 F.4th 179 (4th Cir. 2022) .............................................................................. 28, 29, 31

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ............................................................................................. 21

*Zukerman v. United States Postal Serv.*,
  961 F.3d 431 (D.C. Cir. 2020).............................................................................. 4

**Other Authorities**

16A Am. Jur. 2d Constitutional Law § 572 ..................................................... 33

*Lost Rights and the Importance of Audience*,
  49 Tulsa Law Rev. 421 (2013)............................................................................. 33

## INTRODUCTION

The University goes to great lengths to demonstrate that its suppression of Plaintiff Madeline Krasno's ("Krasno") speech is merely a consequence of "off topic" moderation practices designed to limit discussion within the comment threads of its Instagram and Facebook pages. That promise of viewpoint neutral moderation offers a palatable excuse for why so much anti-animal testing speech disappears from its comment threads on a daily basis. But the promise is empty. The inescapable fact is that the University has no policy requiring removal of off topic comments. Through three courses of briefing, the University has failed to show how the "social media guidelines" that substitute for a policy and give it discretion to remove comments for "any reason" have resulted in the viewpoint neutral exclusion of Krasno's speech. Or for that matter have been a consistent and recognizable limitation on the subject matter permitted within its social media pages' comment threads sufficient to render them nonpublic forums. Instead, the record shows an unmistakable pattern of the University specially targeting animal research criticism for removal. University employees have actively monitored Krasno and other animal advocates' social media accounts, colluded about sneaking into an event held by Krasno, and bent their undefined and loose rules on social media moderation to intentionally suppress Krasno's speech (even though they don't actually apply). Its actions are hardly reflective of viewpoint neutrality.

The University does not dispute these underlying facts. Instead, the University contends all of its inconsistent moderation and focus on animal advocates like Krasno are necessary. It must devote significant resources and time to ferreting out anti-animal testing speech so that it can find and respond to *real* concerns within its comment threads by *real* members of its audience. In other words, it would rather spend significant amounts of time removing on and off topic speech by animal advocates like Krasno—an alumna—than simply reviewing comment threads for the speech it wishes to hear. The rationale is hardly rational, and definitively unreasonable.

1

The University's pattern and practice of moderating its social media pages reflects its inconsistent treatment of on and off topic comments depending on the speech and speaker, an insufficient and impermissible means of limiting the otherwise open character of the designated public forums. By giving itself discretion to moderate these forums however it sees fit and by actually using that discretion to single out Krasno's animal research criticism for special moderation treatment, the University has engaged in unconstitutional viewpoint and content-based discrimination. Moreover, the University's suppression of anti-animal testing speech has violated Krasno's right to petition by burdening her ability to effectively petition the University, which has identified no countervailing government interest.

## FACTUAL BACKGROUND

The material facts remain undisputed. Plaintiff addresses Defendants' objections to Plaintiff's proposed findings of fact (Dkt. 54), and supplies responses to Defendants' Additional Proposed Findings of Fact ("DAPFOF") (Dkt. 53), filed herewith. References to "PPFOF" and "DAPFOF" are intended to include all responses and replies unless otherwise noted. Plaintiff also incorporates the facts in the parties' Joint Stipulation of Facts ("JSOF") (Dkt. 40) by reference.

## ARGUMENT

### I.   THE UNIVERSITY'S SUPPRESSION OF KRASNO'S SPEECH IS VIEWPOINT DISCRIMINATORY.

In any forum, the University is barred from censoring speech based on the viewpoint it expresses. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Krasno has set forth uncontradicted evidence establishing the viewpoint discrimination evident in the University's moderation of her speech, from details of the University searching for and suppressing anti-animal testing viewpoints before they are made, to tracking her activities online before she ever posted on its social media pages. (Dkt. 35, Pl.'s Br. pp. 30-43,). The University

contradicts none of this, instead retreating to excuses for why its use of a toolbox of moderation practices for targeting animal advocacy is viewpoint neutral. Those excuses are baseless, and none alter Krasno's showing of discriminatory intent.

### A.  The University's Account Restriction is Based on Undisputed Evidence and Continues to Suppress Krasno's Speech.

The University's first excuse for its imposition of a restriction on Krasno's Instagram account is an attempt to dispute undisputed facts. The record shows Krasno commented twice— on September 18, 2020, and September 28, 2020—before her Instagram account was restricted. (Dkt. 54, PPFOF ¶¶ 87-88). Yet the University asserts there is a conflict surrounding these undisputed facts because its moderators have a bare recollection that Krasno had "a history of multiple off-topic comments." (Dkt. 41, Defs.' Opp. pp. 10-11). A bare assertion is not evidence. The University has no documents, deposition testimony, or other evidence in the record showing *any* comments made by Krasno before Sept. 18, 2020. The University's cited testimony says nothing about when Krasno began commenting, but instead asserts **without mentioning any dates** that the University restricted her account due to a "pattern." *See* (Dkt. 36, DPFOF ¶ 53). Even if the cited testimony did establish that Krasno commented before her September 18, 2020 post— which she did not—"[s]tatements of 'beliefs' or 'opinions' are insufficient to create a genuine issue of material fact." *Cleveland v. Porca Co*., 38 F.3d 289, 295 (7th Cir. 1994)*; see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific *facts* showing that there is a genuine issue for trial.") (emphasis added). "Conclusory allegations that have no factual support are insufficient to create a genuine issue of material fact." *Powers v. Dole*, 782 F.2d 689, 695 (7th Cir. 1986). They certainly do not create one here.

Nothing in the record exists to dispute that the "pattern" of comments prompting the University's account restriction consists of Krasno's comments on only two posts: on September 18th and 28th. The University essentially admits this, not disputing that her September 28, 2020 comment was her *second* comment on the University's Instagram account. *See* (Dkt. 54, PPFOF ¶ 88). In fact, the University disputes almost no facts surrounding the account restriction. *See* (Dkt. 54, PPFOF ¶¶ 82-83, 85-89, 91-100) (undisputed facts surrounding restriction). Krasno does not dispute that a "pattern of off-topic comments" is the rationale the University assigned for imposing the account restriction, (Dkt. 54, PPFOF ¶ 91), she simply asserts the rationale is a pretext for viewpoint discrimination given the undisputed evidence of her limited (and on topic) commenting on the University's social media pages.

The University quickly pivots to argue that Krasno's claim fails because its undisputed suppression of her speech during the account restriction is in the past, barring her entitlement to prospective relief. This is a misunderstanding of both the facts and law. Factually, it is undisputed that Krasno's First Amendment rights remain burdened, because each comment Krasno made during the University's intentional account restriction remains hidden to any viewer to the University's Instagram account except for Krasno and the University. *See* (Dkt. 54, PPFOF ¶ 98). This includes at least one comment Krasno made that was automatically hidden and remained hidden despite Defendant Nate Moll's testimony that it related to the University's posts. (Dkt. 54, PPFOF ¶¶ 96-97). Her injury "persist[s]" with every day. *See Zukerman v. United States Postal Serv.*, 961 F.3d 431, 443 (D.C. Cir. 2020) (finding "the effects of the alleged violation" of denying publication of postage stamp containing plaintiff's drawing under prior regime for approval "persist" as he "still does not have his stamps").

The University is also wrong on the law. Its cited support that Krasno should have no relief for the University's restriction of her account, *Green v. Mansour*, 474 U.S. 64, 67 (1985) and *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719 (7th Cir. 2009), is inapposite as both concern a plaintiff's attempt to obtain *monetary relief* through injunctive or declaratory remedies, which is not at issue in this case. Krasno *does not* seek an injunction for the removal of the account restriction. She does seek: (1) a declaration that the continued suppression of her speech, including comments made during her account restriction that remain hidden, violates her constitutional rights, and (2) injunctive relief ordering the comments' reinstatement and barring future violations of her First Amendment rights.[1] These remedies are prospective in nature, and not barred by the Eleventh Amendment. *See MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000) (challenge to state officials' approval of industry agreement that sought to have the officials "conform their future actions . . . with federal law" and where "[t]he challenged determinations [we]re still in place" is "precisely the type [of relief] contemplated by the *Ex parte Young* doctrine"). *See also Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) (wrongful discharge of professor a continuing violation of federal law "as long as the state official keeps him out of his allegedly tenured position" and injunctive relief of reinstatement and expungement of personnel records "clearly prospective"). Indeed, the University itself claims social media "never sleeps," (Dkt. 41, Defs.' Opp. p. 6), yet users are still unable to see, respond, like, or otherwise interact with the comments the University hid during Krasno's account restriction. *See* (Dkt. 47, Pl.'s Opp. pp. 20-21); (Dkt. 40, JSOF ¶¶ 39-40). None of Krasno's requested relief against the official

---

[1] Though Krasno is entitled to injunctive relief, she understands some authority exists finding declaratory relief can result in similar outcomes. *See, e.g., One Wisc. Now v. Kremer*, No. 17-CV-820-WMC, 2019 WL 2162231, at *2 (W.D. Wis. May 17, 2019) (awarding declaratory relief for account ban despite Defendants' lift of ban following entry of summary judgment).

capacity Defendants implicate the receipt of monetary damages or constitute the type of retrospective relief the Eleventh Amendment bars.

To the extent the University contends that prospective relief is foreclosed because violations of Krasno's First Amendment rights will not reoccur, that argument fails as well. First, the University continues to violate Krasno's rights by hiding the comments she made during the account restriction. That harm is undisputedly ongoing. Second, the University's only statement disclaiming further violations is nothing but. It cites to records in which Defendant Moll instructed other employees to not **ban** users, an action Krasno has not alleged occurred in this lawsuit. (Dkt. 41, Defs.' Opp. p. 12). *Compare* (Dkt. 54, PPFOF ¶ 43) (Moll describing "bans"), *with* (Dkt. 54, PPFOF ¶ 89) (Moll restricted Krasno's account).[2] The University has never asserted that further violations of Krasno's rights will not reoccur, and its cited evidence on imposing "bans" is entirely irrelevant to the penalty it continues to impose on Krasno's speech. The University has not made it absolutely certain it will not violate Krasno's First Amendment rights through an account restriction in the future. *Cf. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 190 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."). It has not even removed the consequences of its prior restriction—the continued suppression of comments Krasno made while her account was restricted.

---

[2] As explained in the parties' joint stipulation of facts, bans (or "blocking") and account restrictions are functionally distinct moderation actions on Instagram. Blocking allows an account to automatically bar all comments by specific users it designates from making comments on any of the account's posts. (Dkt. 40, JSOF ¶ 36). Restriction allows an Instagram account to *hide* all comments made by specific users it chooses to restrict. Unlike blocking, restriction allows the user to choose whether to "approve" the restricted users' posts after prescreening its content and then allow the comment to be publicly viewable, or to continue to hide the comments from others' view. (Dkt. 40, JSOF ¶ 37).

The University offers no other arguments to refute the context surrounding Krasno's account restriction and its imposition as a penalty for her prior speech. As such, it has offered no basis to deny Krasno's motion. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

**B.      The University Deleted Krasno's Comments to Suppress Her "On Topic" Speech.**

Aside from attempting to construe Krasno's comment about "proud . . . graduates" as off topic to a post about "PROUD#UWGRAD"—a facially untenable position—the University offers only one point to justify its deletion of Krasno's first comment to its Facebook page: her comment was not speech the University's post was "designed to elicit." (Dkt. 41, Defs.' Opp. p. 13) (interpreting the post's design to elicit a user to "Add a Frame to your Profile Picture"). The contention is yet another novel basis for the University to remove speech, and is an admission that the perspective and content of Krasno's comment determined whether it would be allowed in the University's comment threads.

The University's selectivity in deciding a comment is "off topic" and whether to moderate a comment as "off topic" creates fertile grounds for the exercise of viewpoint discriminatory practices. For instance, the rationale that it may restrict comments the University did not intend to elicit is at odds with the University's approval of other comments that the University could not have hoped to receive, such as the message "Bravo" by user "Love Carolina," or "Emma Cooper" by user "Lynn Cooper," both visible in the same comment thread appended to the University's "PROUD#UWGRAD" post. *See* (Dkt. 32-6). The comments are not "users" who decided to "'Add a Frame to your Profile Picture," the function for which the University states the post was designed. (Dkt. 41, Defs.' Opp. p. 13).

The University's invocation of yet another interpretation of what type of comments its social media posts allow appears to be novel, because its comment threads contain no evidence of that standard. Contrary to policing threads for comments it "designed to elicit," the University often leaves comments visible despite not understanding their content. Comments containing unknown complaints, (Dkt. 54, PPFOF ¶ 38), or emojis the University does not know how to construe, (Dkt. 45, PAPFOF ¶¶ 1-2), appear on a variety of the University's posts. Given the context, the University's justification for targeting Krasno's comments as outside the type of comments it meant "to elicit[]" is hard to believe. (Dkt. 41, Defs.' Opp. p. 13). It looks more like the University targeting "particular views taken by speakers on a subject" and not "subject matter," rendering "the violation of the First Amendment . . . all the more blatant." *Rosenberger*, 515 U.S. at 829.

Yet even if the justification was valid, the University would still be engaging in prohibited viewpoint discrimination. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 812 (1985) (accepting "the validity and reasonableness of the justifications offered by [the government] for excluding advocacy groups from" a federal workplace fundraising stream, but finding "those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"). A showing Krasno has repeatedly made.

The University does not address Krasno's allegations regarding the other comments the University deleted—despite their relation to the University's posts, penalties for the anti-animal testing viewpoint she expounded both in the comments themselves and in her prior social media activism on her own Instagram account. As Krasno explained in prior briefing, the context surrounding each moderation decision demonstrates the University's viewpoint discrimination motivated their erasure. (Dkt. 35, Pl.'s Br. pp. 31-32); (Dkt. 47, Pl.'s Opp. pp. 12-15).

C.     **The University Created and Deploys its Keyword Filters in Response to Speech Criticizing its Animal Testing Program.**

The University does not cite even one case to support its position that its automatic suppression of all comments containing a list of anti-animal testing words and phrases is not viewpoint discriminatory. It instead offers explanations it posits excuse its use of keyword filters. None are convincing, and each has been rejected as a basis for singling out speech it disagrees with.

First, the University attempts to shield its removal of anti-animal testing speech by claiming it also automatically removes other speech. Targeting more than one viewpoint does not render an action viewpoint neutral. *See Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) ("To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so.") (Kennedy, J., concurring). Krasno's speech advocates against animal testing at the University, and thus her speech is burdened and barred by the University's inclusion of words associated with an anti-animal testing perspective. Further, a mere glance at the lists shows the speech the University is concerned with. In addition to anti-animal testing speech, for instance, the Instagram list moderates only seven other words or phrases. *See* (Dkt. 54, PPFOF ¶ 71).

Second, Krasno has explained at length why the University's practices in adding and removing words to the keyword filters are evidence of discriminatory intent, as well as unreasonable. (Dkt. 47, Pl.'s Opp. pp. 21-23). But the University's alteration of the keyword filters based on its own anticipated speech confuses its right to speak within its posts with the actual function of the comment threads where others speak. The comment threads are spaces where it has allowed other users to engage in public discourse—a function liberally afforded. They do not contain the University's speech and are thus not spaces for the University to expect and curate speech it agrees with based on viewpoint, even if it was a nonpublic forum. *See Pleasant Grove*

*City, Utah v. Summum*, 555 U.S. 460, 469 (2009) ("While government speech is not restricted by the Free Speech Clause, the government does not have a free hand to regulate private speech on government property.").

Indeed, the fact that the University did not remove words or phrases relating to an anti-animal testing viewpoint from the filters when it posted about its Dairy Cattle Research Center exposes the viewpoint discriminatory curation of the list. *See* (Dkt. 54, PPFOF ¶ 87). The post promoted the University's research on cows, yet the University must not have considered words on its keyword filter lists relevant to its speech. *See* (Dkt. 54, PPFOF ¶ 77). It would not, since the viewpoint of the University is promotion of its animal testing program. *See, e.g.*, (Dkt. 54, PPFOF ¶ 67). The University's premise that the keyword filters help ensure on topic comments are visible to its posts is diminished by this fact, as Krasno explained elsewhere. (Dkt. 47, Pl.'s Opp. pp. 23-25).

Third, the University's contention that volume compels its deployment of anti-animal research keyword filters or advances the purposes of the forum are mere conclusory statements. What's more, the University does not respond to Krasno's argument that its allowance of unlimited volumes of "on topic" comments have the same "dilutive" effect to the forums' purported purposes. (Dkt. 35, Pl.'s Br. pp. 41-42). The lack of fit between alleged government interest and remedial action taken compels a finding of viewpoint discrimination. *Id*. The University's admitted policing of anti-animal testing sentiment to create the filters further goes unaddressed by the University, making their viewpoint discriminatory nature clear. *See* (Dkt. 47, Pl.'s Opp. pp. 23-24).

Fourth, the University argues that the viewpoint of the words included within the keyword filter is not obvious, such that their inclusion is evidence of viewpoint discrimination. Krasno has

10

addressed this argument at length elsewhere and incorporates that response here. (Dkt. 47, Pl.'s Opp. pp. 21-23). While contending that it is not obvious that words and phrases such as "#releasecornelius" or "kill animals" are linked to an anti-animal testing viewpoint, the University ignores its admission that it created the filters to hide anti-animal testing comments—comments containing a particular viewpoint. (Dkt. 54, PPFOF ¶¶ 73, 75). The meaning of the banned words, such as "vivisection," "cruelty," or "testing on animals," is "not mysterious." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). This is shown in the discriminatory capture of anti-animal testing viewpoints, such as Krasno's moderation in a debate with a **pro**-animal testing user whose comments remain **fully visible** in the University's comment threads, while Krasno's were hidden. *See* (Pl.'s Br. pp. 41-42, Dkt. 35). *See also* (Dkt. 54, PPFOF ¶ 109) (comment by user "seth_genteman" that "animals may end up saving your life from the research conducted" visible). Indeed, the record is replete with examples of anti-animal testing sentiments moderated by the University, *see, e.g.,* (Dkt. 54, PPFOF ¶¶ 35-37), but none showing a pro-animal testing perspective hidden. Even so, as Krasno explained, capture of more than one viewpoint on animal testing would still support a finding of viewpoint discrimination. *See Rosenberger*, 515 U.S. at 831 (the exclusion of multiple views on an issue "is just as offensive to the First Amendment as exclusion of only one"); *Matal*, 137 S. Ct. at 1766 ("The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses.") (Kennedy, J., concurring). This argument goes unaddressed by the University.

Finally, the University's novel suggestion that the volume of comments it experiences necessitates auto-moderation's use essentially proposes a balancing test for sanctioning viewpoint discrimination. Approval of the University's continued use of keyword filters asks that

inconsistencies in the filters' capture of "on topic" anti-animal testing comments be disregarded or weighed against the University's desire for their use. (Dkt. 41, Defs.' Opp. pp. 15-16). The contention is contrary to settled law. In *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019), for example, the Supreme Court rejected the argument that the Lanham's Act's prohibition on "immoral[] or scandalous matter" in trademark registration could stand where unconstitutional applications were "not 'substantial' relative to 'the statute's plainly legitimate sweep.'" *Id*. at 2302 (citation omitted). The Court had "never applied that kind of analysis to a viewpoint-discriminatory law," rather a "finding of viewpoint bias ended the matter." *Id*. Nor can the University's stated desire to apply an admittedly imperfect tool to moderate anti-animal testing speech be justified by a purported hope to reduce off topic comments on its social media pages—the capture of even a majority of "off topic" speech is irrelevant when the "tool" for suppression is designed to target viewpoint. *See id*. ("Once we have found that a law 'aim[s] at the suppression of' views, why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute?") (quoting *Matal*, 137 S. Ct. at 1766) (Kennedy, J., concurring).

There is no justification for the University's viewpoint discrimination. Moreover, most— of not all—of Krasno's arguments remain on the table, unaddressed. The University does not address the notion that anti-animal speech is considered "spam"—a classification rife with viewpoint discrimination in itself—the history of their addition to keyword filters, or the overinclusive capture of anti-animal testing speech. Its viewpoint discriminatory suppression of Krasno's speech is clear.

12

II.     **THE UNIVERSITY'S CENSORSHIP OF KRASNO IS UNCONSTITUTIONAL CONTENT-BASED DISCRIMINATION.**

The University contends the social media pages are nonpublic forums,[3] as opposed to the designated public forums Krasno has shown. As Krasno explained in her summary judgment brief, both analyses unequivocally point to the University's social media pages being designated public forums where content-based restrictions compel application of strict scrutiny—an exacting showing the University does not even attempt to meet. (Dkt. 35, Pl.'s Br. pp. 23-27).

A.      **The University's Social Media Pages Are Designated Public Forums.**

The University glosses over the first inquiry of determining intent to create a public forum: "the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 802 (the inquiry for determining a forum's status looks to the nature of the forum and its compatibility with expressive activity as well as the government's policy and practice in operating it). It thus concedes the interactive comment sections of its Instagram account and Facebook page are compatible with expressive activity, as it should.

The University does no better to show its policy and practice has been to consistently limit the comment threads of its social media pages to particular subjects or topics. While the University offers a post-hoc conclusion that the comment threads of the forums were created with an intention to limit the speech within them to the topics of each post, it cites **no** evidence to support this assertion. (Dkt. 41, Defs.' Opp. pp. 2-3). The rationale, articulated only during this litigation, is entitled to little deference. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1153 (7th Cir. 1995) ("the government's stated policy, without more, is not

---

[3] As explained in Krasno's Opposition to the University's own motion for summary judgment, (Dkt. 47, Pl.'s Opp. p. 3 n.2), the University's use of the term "limited public forum" may create confusion between a nonpublic forum and a subtype of designated public forum recognized in some jurisdictions. Krasno interprets the University's argument as relating to a nonpublic forum and employs that terminology. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006) (discussing confusion).

dispositive with respect to the government's intent in a given forum"). Instead, its intent hinges on the University's consistent policy and practice, an inquiry designed to "guard[] against the dangers of post-hoc policy formulation or the discretionary enforcement of an effectively inoperative policy." *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1153. *See also Stewart v. D.C. Armory Bd*., 863 F.2d 1013, 1017 (D.C. Cir. 1988). Both concerns exist in the University's portrayal of its purpose in opening the forums.

The University's "policy" is an undefined combination of two guidelines that by their very terms exclude no topics or speakers from the forums. *See* (Dkt. 54, PPFOF ¶¶ 12, 19). Neither require the removal of off topic content. *See* (Dkt. 54, PPFOF ¶ 20). There is no written statement, public or not, that limits the content of its social media pages to the topics of the posts (or any topic at all). *See* (Dkt. 46, DPFOF ¶ 1). The only other apparent purposes of the University's Instagram account and Facebook page cycle between messages of open, communicative intent: a "[c]ollection of your #UWMadison pics and those of University Communications staff," "sharing stories from the #UWMadison community, #OnWisconsin," (Dkt. 40, JSOF ¶ 65, p. 15), or "[t]he official Facebook page for the University of Wisconsin–Madison. Managed by staff of University Communications, a unit located within the Office of University Relations," (Dkt. 40, JSOF ¶ 71). They effectively open the forum to indiscriminate use, and the University points to **no** articulated limitation on any topics or speech to suggest otherwise. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) (distinguishing between "general access" of a designated public forum and "selective access" of a nonpublic forum where the government "does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission" for access) (cleaned up).

The University cites to an undisputed fact that it uses its pages to engage with students about University events, (Dkt. 41, Defs.' Opp. pp. 2-3), but that fact relates to the University's speech—not the types and scope of speech the University has allowed other users to engage in within the comment threads. A similar argument has been refuted as a basis for finding a nonpublic forum has been created in this district previously. In *One Wisconsin Now*, several state legislators argued that they had not intended to designate the interactive comment threads of their Twitter accounts as public forums, but rather "'to get their messages out to their constituents.'" 354 F. Supp. 3d 940, 954 (W.D. Wis. 2019) (citation omitted). The court rejected the argument that this determined their intent in creating the forums, noting even if that formed the sole reason they had created the accounts they had not taken any steps to "limit access to their accounts to their constituents" nor "limited access by the general public." *Id*. It did not matter if they created the accounts out of a desire to convey "news and information related to their roles as public officials"—they opted to open channels of discourse to the public within their Twitter accounts, an inherently interactive social media platform. *Id*. The accounts' *mere creation* dispelled the notion that they had "no intention to create a space for public interaction and discourse," *id*., post-hoc rationales notwithstanding.[4]

*One Wisconsin* demonstrates that the mere act of creating a public social media page on an interactive platform itself is dispositive of intent to create a designated public forum. The University's creation of a public Facebook page and Instagram account is sufficient to confer intent

---

[4] The University is correct that a nonpublic forum may be created by limiting speakers or subjects and it concedes it does not limit speakers (aside from Krasno). (Dkt. 41, Defs.' Opp. p. 3). Yet its attempt to distinguish Krasno's citation of *One Wisconsin* based on the fact that the University claims to limit access to the comment threads based on subjects, not speakers, is unconvincing. Nonpublic forums limit **access**—either to selective speakers, and/or subject matters. *See Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity."). The inquiry into whether the government actually effectuates that exclusion is the same, *see id*., and the University does not offer legal authority to suggest otherwise.

to designate a public forum. *See, e.g.*, (Dkt. 40, JSOF ¶ 58). Further, the *One Wisconsin* court's consideration that the legislators' stated intent to limit their Twitter pages to specific persons—their constituents—was not borne out in the record is equally applicable to the University's failure to take any steps to "limit access" to its social media pages to "on topic" content.[5] *One Wisc. Now*, 354 F. Supp. 3d at 954. Regardless of the University's reason for opting to create social media pages, its decision to do so itself establishes their nature as designated public forums.

 The University tries to steer wide of this reality, pointing to its Social Media Statement and Interim Guidance as the University's "policy" limiting access to the comment threads—the first time it has contended it has a policy at all, which it undisputedly does not.[6] *See* (Dkt. 41, Defs.' Opp. pp. 4-5); (Dkt. 54, PPFOF ¶ 6) ("The University has no social media policy that governs how social media staff moderate comments."). But "[t]he government may not 'create' a policy to implement its newly-discovered desire to suppress a particular message," nor "invoke an otherwise unenforced policy to justify that suppression." *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1153. Both problems permeate the University's "policy." The latter Interim Guidance was formed to advise on the optional removal of off topic content following the initiation of this litigation, with little applicability to many of the University's initial actions suppressing Krasno's speech and little relevance to the University's history of moderation practices in its comment threads. *See* (Dkt. 38-5, p. 2) (Interim Guidance dated May 6, 2021). Neither the Social Media Statement nor the Interim Guidance deny access to the discussion of any topics or subjects. They prohibit **nothing**, (Dkt. 54, PPFOF ¶ 20), and so cannot be consistently enforced. The University is left with a homespun

---

[5] The University suggests Krasno cites only two decisions in support of her argument that the interactive spaces of its comment threads are designated public forums but it omits mention of the other cases cited in support. *See* (Dkt. 35, Pl.'s Br. pp. 24, 27). There is no dearth of authority finding that the comment threads of the government's public social media pages are designated public forums. *See id.*

[6] The existence of a policy is not material for determining Krasno's claims. Whether the University has a policy or simply has guidelines that inform its moderation practices, it leads to the same result: inconsistent moderation of off topic content and targeted suppression of Krasno's speech.

prohibition of off topic content that is unwritten and undefined but articulated for purposes of this litigation. That is hardly sufficient to find it has limited a public forum.

The University's "*actual* policy—as gleaned from the *consistent* practice with regard to various speakers," is targeted removal of anti-animal testing speech. *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1154 (emphasis in original). The University would like its review of some comments for removal as off topic to be sufficient for cabining its First Amendment obligations, but aside from an attempt to remove anti-animal testing perspectives it has not shown a consistent policy or practice exists. In practice, any Instagram or Facebook user can comment and interact with other users within the comment threads on the University's posts without limitation, (Dkt. 40, JSOF ¶ 68), (Dkt. 54, PPFOF ¶ 5), apart from users whose comments contain words or phrases included in the University's keyword filters, the majority of which relate to anti-animal testing sentiment, (Dkt. 54, PPFOF ¶ 69), or those penalized for their perspective and speech like Krasno. "In other words, members of the public are free to comment on [the University's] posts *until* [it] chooses" to suppress their speech. *Faison v. Jones*, 440 F. Supp. 3d 1123, 1135 (E.D. Cal. 2020). This choice is made when anti-animal speech is concerned.

Yet a limited forum is not created by denying access to the discussion of perspectives the University disagrees with.[7] *See Stewart*, 863 F.2d at 1017 (noting "the very fact that the government *has* restricted speech in the manner challenged in a forum case does *not* of its own weight demonstrate that the government did not intend to designate a public forum") (emphases in original). *See also Faison*, 440 F. Supp. 3d at 1135 ("[T]he fact that Defendant banned other users from the page does not diminish its status as a public forum;" rather, "such censorship only

---

[7] Even if the University excluded some speech under its off topic guidance, that exclusion would still serve as evidence of a designated public forum. "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, *or for the discussion of certain subjects*." *Cornelius*, 473 U.S. at 802 (emphasis added).

worsens the Court's concerns."). The exclusion of anti-animal testing speech under the guise of an off topic prohibition is not sufficient to alter the comment threads' open access nature. Consistency is, and that the University has not shown.

Indeed, "consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001) ("A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted."). Because of this, designated public forums have been found where the government adopts a policy purporting to limit access to the relevant property but fails to consistently effectuate access by its terms. *See, e.g., Faison*, 440 F. Supp. 3d at 1135 (designated public forum created in government's Facebook comment threads despite fact that it "exercised editorial control over what appears on the page by using a profanity filter, limit[ed] who can make direct posts, hid[] and delet[ed] some comments, and bann[ed] numerous profiles from the page"); *Lynch v. Huberman*, No. 10 C 1783, 2010 WL 3156006, at *6 (N.D. Ill. Mar. 26, 2010) (designated public forum created in use of school grounds despite policy limiting access to specific outside organizations where "in practice, the Board has opened its campuses for a wide range of public discourse"). In contrast, "[r]equiring permission, limiting access, and having 'extensive admission criteria' . . . are signs that the government has not created a designated public forum." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 711 (2021).

Though Krasno does not contend perfection is required, the University's failure to limit the comment threads to particular topics is far afield from the tight control over speakers and subjects found in recognized nonpublic forums. *See, e.g., Ark. Educ. Television Comm'n*, 523 U.S. at 680

(nonpublic forum created in broadcast of debate where government "reserved eligibility for participation . . . to candidates for the Third Congressional District seat" and "made candidate-by-candidate determinations as to which of the eligible candidates would participate in the debate"); *Cornelius*, 473 U.S. at 804 (government's "consistent policy" limiting access of charitable organizations to federal fundraising drive including "requir[ing] agencies seeking admission to obtain permission" to get access supports nonpublic forum status); *Greer v. Spock*, 424 U.S. 828, 831 (1976) (regulation barring access to military reservation for political speeches constitutional where "[t]he regulation has been rigidly enforced: Prior to this litigation, no political campaign speech had ever been given at Fort Dix").

Acknowledging its inconsistent moderation of off topic comments, the University explains why it is undisputed many off topic comments remain on its social media pages as a way to shove the issue under the rug. It contends there are too many comments to sift through, and that it cannot consistently look for unrelated comments made weeks to months after a post was made and doesn't want to. (Dkt. 41, Defs.' Opp. pp. 5-7). It explains that unlike a physical public meeting, moderating comments on social media is laborious. (Dkt. 41, Defs.' Opp. p. 7). But each explanation *supports* Krasno's contention that the forums are not consistently closed to off topic speech. Even if they did not, they fail to explain the proliferation of unrelated comments made to posts within the same week of their publication. *See, e.g.*, (Dkt. 38-29) (showing dozens of unrelated comments within a week of post); (Dkt. 38-32) (unrelated comments within week of post); (Dkt. 38-34, p. 3) (comment by "lili_varela" within week of post); (Dkt. 38-36, p. 3) (same). Or why its time is better spent looking for and silencing anti-animal testing speech than identifying

more comments that are truly off topic to its posts, (Dkt. 54, PPFOF ¶¶ 54, 56-64, 83, 103-106).[8] Far from cherry picking, Krasno identified numerous examples of inconsistent application of the University's off topic moderation. (Dkt. 54, PPFOF ¶¶ 33-34, 37-38, 40). *See also* (Dkt. 45, PAPFOF ¶¶ 1-2). Many from posts Krasno herself commented on, and the University took pains to censor her from. (Dkt. 54, PPFOF ¶¶ 38-39, 87, 88, 94, 109).

Its final excuse for its inconsistent exclusion of off topic speech rests on its moderators' caution for removing content it isn't sure is off topic. Aside from explicitly stating "the University's Social Media Statement and Interim Guidance do not *require* social media managers to remove all off-topic comments that they see," (Dkt. 41, Defs.' Opp. p. 9) (emphasis in original)—all that needs to be said—its moderators' indecision only supports a finding that its "policy" of off topic moderation is incapable of consistent enforcement that would limit the confines of the forum. The University explains that its own moderators are unsure when some comments violate its off topic guidelines and cautiously allow them to remain as a result.[9] (Dkt. 41, Defs.' Opp. p. 9). But "'standards for inclusion and exclusion' in a limited public forum 'must be unambiguous and definite.'" *Hopper*, 241 F.3d at 1077 (citation omitted). The University's off topic moderation is exactly the "subjective" and "overly general criteria" courts have found insufficient to limit the character of a designated public forum. *Hopper*, 241 F.3d at 1077. Indeed, the absence of "objective standards" creates the conditions for viewpoint discrimination that are apparent in the University's censorship of Krasno. *See Hopper*, 241 F.3d at 1077.

---

[8] The better question may be why devote time at all to inconsistent removal of off topic speech when the University can spend that time reviewing all comments for the ones it desires to engage with. The time would be better spent, and violate less individuals' constitutional rights.

[9] The University has declined to contact its legal affairs team even when its moderators are unsure if a comment is off topic. *See, e.g.,* (Dkt. 54, PPFOF ¶ 34); (PAPFOF ¶¶ 1-2, 4-5). The rationale for its inconsistent application is mere pretext to viewpoint discrimination.

What the University proposes is sanctioned moderation of anti-animal testing speech that will always result in its overinclusive suppression of on topic comments, and underinclusive allowance of unrelated comments so long as they do not advocate against animal testing. Simply put, that limitation is viewpoint discrimination. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981) (University rule prohibiting use of its facilities "for purposes of religious worship or religious teaching" unconstitutional, as it "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion").

**B.     The University's Suppression of Krasno's Speech Fails Strict Scrutiny.**

The University does not address Krasno's showing that the University's suppression of her speech constitutes content-based discrimination. (Dkt. 35, Pl.'s Br. pp. 43-52). It accordingly waived this argument. *Boelk v. AT & T Teleholdings, Inc*., No. 12-CV-40-BBC, 2013 WL 3777251, at *1 (W.D. Wis. July 19, 2013) (a party's "fail[ure] to respond to . . . arguments" raised in a motion for summary judgment "waive[s] any argument in opposition" to those claims) (citing *Bonte v. U.S. Bank, N.A*., 624 F.3d 461, 466 (7th Cir. 2010)). Krasno is thus entitled to summary judgment on this claim.

**III.    THE UNIVERSITY'S SUPPRESSION OF KRASNO'S SPEECH IS UNCONSTITUTIONAL IN ANY FORUM.**

Even in the nonpublic forum the University asserts it created—but has not—its actions are unconstitutional because the University has not demonstrated its conduct was viewpoint neutral and reasonable. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

**A.     The University's Moderation Practices are Viewpoint Discriminatory.**

The University again cites no cases in its attempt to counter Krasno's contention that its moderation practices promote the viewpoint-based suppression of her speech. Instead, the

University again offers a litany of explanations that have no bearing on a finding of viewpoint discrimination. Krasno responds briefly to a few.

The University repeatedly contends that removal of Krasno's and other animal activists' speech is viewpoint neutral since it is achieved through moderation of off topic content, which just happens to be (in its opinion) largely anti-animal testing speech. (Defs.' Opp. p. 19, Dkt. 41). Its argument "mischaracterizes the relevant inquiry." *Tong v. Chicago Park Dist*., 316 F. Supp. 2d 645, 657 (N.D. Ill. 2004). The appropriate focus "examines whether the proposed speech dealt with a subject that was 'otherwise permissible' in a given forum." *Air Line Pilots Ass'n, Int'l*, 45 F.3d at 1159 (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384, 393 (1993)). *See also Lamb's Chapel*, 508 U.S. at 393 ("That all religions and all uses for religious purposes are treated alike . . . does not answer the critical question whether it discriminates on the basis of viewpoint to permit . . . all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint"). By using keyword filters and targeting manual moderation and account restriction against anti-animal testing speech, the University denies Krasno the right to comment on *every topic* the University posts from her desired perspective. The University does not deny this is the result of its moderation of Krasno's speech. (Dkt. 54, PPFOF ¶¶ 87-89, 92-96, 98, 109-112).

There is no justification for viewpoint discrimination, yet the University attempts to resurrect the obvious bias inherent in its moderation practices by explaining that its Interim Guidance—the nonbinding suggestions on off topic moderation it created after Krasno filed suit— is sufficient to protect against viewpoint discrimination. The Interim Guidance's statement that viewpoint discrimination is barred in off topic moderation is not dispositive of whether viewpoint discrimination occurred. *See, e.g., Southworth v. Bd. of Regents of Univ. of Wisc. Sys*., 307 F.3d

566, 592 (7th Cir. 2002) (aspects of funding policy that expressly prohibited viewpoint discrimination held viewpoint discriminatory). Even if it was, the Interim Guidance is not mandatory; it interprets the University's Social Media Statement which expressly allows removal of any content "for any reason." (Dkt. 54, PPFOF ¶ 12). As explained *infra*, that limitless authority—without guidance of its interpretation and application—renders it incapable of viewpoint neutral application.

As Krasno explained *supra* Part II.A., the inconsistency in defining off topic speech and suppressing such speech when it is unrelated to animal testing is evidence of viewpoint bias. The University does little to justify this divide. It does not even provide an excuse for its suppression of Krasno's on topic comments, merely stating Krasno has "issued off-topic comments, too." (Dkt. 41, Defs.' Opp. p. 19). There is no legal authority cited to support the inference that some protected activity can be sacrificed to the government's attempts to remove other types of speech—the University is not arguing its moderation of Krasno's comments are incidental impacts of restrictions on non-expressive activity. The University uses its off topic moderation to penalize Krasno despite on topic comments.[10] Indeed, the University used its very moderation practices to remove Krasno's speech related to its post relating to animal testing. (Dkt. 54, PPFOF ¶ 87). And even if some of Krasno's comments were off topic, the University penalized Krasno her in a way it did not penalize other speakers by imposing a four-month bar on her speech. *See, e.g.*, (Dkt. 54, PPFOF ¶ 102).

The University seems to concede that it has focused its attention on Krasno, a feature of Krasno's argument that the University targeted her speech based on her prior speech and identity.

---

[10] A surprising use of their purportedly strained resources. Indeed, they have so little time to implement a viewpoint neutral policy of moderation, but so much time to discuss Krasno's comments and monitor for anti-animal speech that has not yet occurred.

(Dkt. 35, Pl.'s Br. pp. 15-16, 31-34). While contending the University's focus on Krasno before, (Dkt. 54, PPFOF ¶¶ 83, 85-86), and during, (Dkt. 54, PPFOF ¶¶ 104-106), its suppression of her speech is "easily explained," the University does not explain it. (Dkt. 41, Defs.' Opp. p. 18). It instead turns to an attempt to shrug off the undisputed attention the University generally pays to anti-animal speech in anticipation of its moderation, attention it now claims focuses on false speech. (Dkt. 41, Defs.' Opp. pp. 18-19). The argument hardly dispels concern; the University has never contended that Krasno's speech was suppressed for being false, (Dkt. 54, PPFOF ¶¶ 91, 101), yet the University has repeatedly silenced it. Even so, the University "had every opportunity to counter" Krasno and other animal activists' speech had the concern existed. *Cohoon v. Konrath*, 563 F. Supp. 3d 881, 889 (E.D. Wis. 2021). "[B]ut it opted instead to engage in the objectionable practice of censorship." *Id*. Even false speech is protected expression, and government concern over its results is remedied by counter-speech, not censorship. *See United States v. Alvarez*, 567 U.S. 709, 727 (2012) ("The remedy for speech that is false is speech that is true.").

Nor does the University's attempt to minimize the prevalence of unrelated speech within its comment threads suffice to justify suppression of Krasno's speech. This is not a matter of "off topic" comments that "slip by." (Dkt. 41, Defs.' Opp. p. 20). The Court need not even look to other undisputed evidence of unrelated comments in the record, *see, e.g.*, (Dkt. 54, PPFOF ¶¶ 33-34, 37-38), but to the posts where the University suppressed Krasno's speech but left other unrelated comments visible, *see, e.g.,* (Dkt. 54, PPFOF ¶¶ 38-39, 87, 88, 94, 109). These comments are not a few samples of a missed opportunity—they survive because they passed through moderation practices designed to silence anti-animal testing speech. *See Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 63 F.3d 581, 591–92 (7th Cir. 1995) (exclusion of religious displays on government property viewpoint discriminatory where only reason for exclusion was religious

viewpoint of organization). *See also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 498 (6th Cir. 2020) ("When the government discriminates based on viewpoint" by permitting "some private speech on the subject and only disfavors certain points of view" it suggests that the government's speech restriction is not designed to preserve a government-owned property 'for the use to which it is lawfully dedicated.'") (quoting *Adderley v. State of Fla*., 385 U.S. 39, 47 (1966)). The only evidence that the University applies its moderation practices to remove off topic comments lives in its concerted effort to suppress anti-animal testing speech like Krasno's. That it both deems anti-animal testing speech more off topic than not *and actively seeks to remove it* is the exercise of viewpoint discrimination, as Krasno explained in prior briefing. (Dkt. 47, Pl.'s Opp. pp. 23-24).

Finally, ridding its forums of anti-animal testing speech on the basis that such speech is "spam" by its very operation excludes it from access to the comment threads, and thus cannot be viewpoint neutral. *See Southworth*, 307 F.3d at 593 the Seventh Circuit has repeatedly concluded that "in determining access to a forum the criteria considered must be unrelated to the content of the speech and must not have the effect of excluding unpopular or minority viewpoints"). It does not address this, nor why "the University's purpose for the comment thread sections would be lost" if "spam" was permitted, while thousands of comments it deems "on topic" remain to "clog up the comment sections." (Dkt. 41, Defs.' Opp. p. 20). *See also* (Dkt. 35, Pl.'s Br. pp. 40-42). It does not address how suppressing *Krasno's* speech through keyword filters achieves its goal of removing spam. (Dkt. 35, Pl.'s Br. pp. 42-43). The University instead admits it has no policy governing the removing of "spam," (Dkt. 41, Defs.' Opp. p. 20), the rationale provided for automatically suppressing anti-animal testing speech through its keyword filters. Yet this actually helps explain how its viewpoint discriminatory effect was achieved since there is nothing

protecting a viewpoint neutral application of its terms. *See Southworth*, 307 F.3d at 592 (without "criteria governing the award of travel grants," funding standards of student groups "cannot fully operate to protect viewpoint neutrality"). In sum, the University's excuses are irrelevant to the viewpoint discrimination inquiry.

The University's practices and "policy" governing social media moderation are a tool for suppressing anti-animal speech like Krasno's. That "end[s] the matter." *Brunetti*, 139 S. Ct. at 2302.

> **B.   The University's Moderation of "Off Topic" Speech is Unreasonable.**

The University does not address the bulk of Krasno's arguments that its moderation practices cannot survive even under the forgiving standard applied to government restrictions of speech in nonpublic forums, such as the impermissible objective of the University's moderation practices. (Dkt. 35, Pl.'s Br. p. 53). There are also no undisputed facts underpinning Krasno's contention that the University's off topic moderation of her speech is not reasonable. In fact, the University's opposition is based entirely on its assertion that the broad discretion its moderators have to exclude comments for being off topic is reasonable. The reason: that discretion is limited by the option to remove off topic content. (Dkt. 41, Defs.' Opp. pp. 21-22) ("The requirement here that comments be related to the original post creates a limitation on the discretionary decision to moderate.").

The University confuses the purported prohibited content—off topic speech—with standards guiding interpretation and application of what that means. (Dkt. 41, Defs.' Opp. p. 22). Tautology aside, it is undisputed there is no requirement under any guidance that moderators remove off topic content. (Dkt. 54, PPFOF ¶ 20). That decision to remove a comment is subject to discretion. (Dkt. 54, PPFOF ¶ 25). What is left to determine then is whether the discretion of moderators to find a comment is off topic is reasonable. The answer is a resounding no.

26

Determining what is off topic is not guided by *any* standards. The only guidance the University can point to is its Interim Guidance, but that did not exist when the University hid Krasno's first comments and restricted her account, nor when the University created the keyword filters that bar Krasno's speech. *Compare* (Dkt. 54, PPFOF ¶¶ 87-96, 110-111) (moderation prior to May 2021), *with* (Dkt. 38-5, p. 2) (Interim Guidance dated May 6, 2021). And the University offers no other "objective, workable standards" that cabined its decision to exclude Krasno's—or any other individual's—speech. *Minn. Voters All.*, 138 S. Ct. at 1881.

Even so, the Interim Guidance is no help. What is most troubling about the University's contention that the Interim Guidance provides objective, workable standards for its off topic moderation is the fact that under the Interim Guidance, Krasno's moderated speech is definitely "on topic." The Guidance provides a comment cannot be removed if it "is related to the topic of the page." (Dkt. 54, PPFOF ¶ 19). The topic of the University's social media pages are variations of sharing "stories from the #UWMadison community." (Dkt. 40, JSOF ¶ 65) (Instagram); (*Id.* at ¶ 72) (Facebook). Krasno's comments shared stories from her time as student caretaker at the University's Harlow Center. *See, e.g.,* (Dkt. 54, PPFOF ¶ 87) ("I used to work in one of their labs."); (Dkt. 54, PPFOF ¶ 88) ("I will continue to share the truth about what it was like working in one of your primate research labs and advocate for their closure."); (Dkt. 54, PPFOF ¶ 109) (referencing time working in "primate lab"); (Dkt. 54, PPFOF ¶ 111) ("Working in one of those labs during college showed me how important it is that we create a just world."). Yet they were deleted or automatically hidden due to an account restriction or keyword filter—and remain hidden.

Though this shows the Interim Guidance is not even followed, prospectively, the Guidance does not change the game by helping moderators decide what stays in and what stays out under its

off topic moderation. Even the University admits the Interim Guidance is unclear in defining what it regulates. (Dkt. 41, Defs.' Opp. p. 18) ("[T]the Interim Guidance does not consistently properly use the terms of 'posts,' 'comments,' and 'pages'" . . .").[11] It is also inconsistent with prior practice. The University argues the Interim Guidance has a suggested limitation that "content moderation of social media pages [be] based on *one* criterion: whether posted content is on vs. off topic," (Dkt. 38-5, Exh. 1, p. 2), but fails to note that this in fact conflicts with its Social Media Guidance it interprets, which again allows removal of *any* content for *any* reason. (Dkt. 38-1, Exh. 1); (Dkt. 54, PPFOF ¶¶ 12, 14). It also conflicts with practice—the University removes comments for being "political" and "harmful," even "spam," whether they are on topic or off. (Dkt. 54, PPFOF ¶¶ 15-17). Such discretion, unmoored from any clear standards, is the essence of unreasonable decision-making. *See White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 201 (4th Cir. 2022) (transit authority's rejection of organization's advertisement as "political" unreasonable where basis for exclusion was "nowhere to be found in [the authority's] advertising policy").

The Fourth Circuit's decision in *White Coat Waste Project* demonstrates why the University's moderation practices are incapable of reasoned application. There, the court dismantled the workability of a transit authority's prohibition of "political" content from inclusion in its advertising, a rule that had "no formal definition of 'political,' and no written guidelines clarifying how the standard [wa]s to be applied." 35 F.4th at 199. As a result, the employees forced to apply the prohibition had accepted political advertisements in the past, confusingly applied a definition of "political" of their own making, and expanded the scope of what content they could consider outside the corners of the ads themselves to determine if it, or its submitter, was

---

[11] The University does not sufficiently clarify how the Interim Guidance assists in moderation, claiming it authorizes removal of off topic content including pages and posts. (Dkt. 41, Defs.' Opp. p. 18). The interpretation raises more questions than it answers, such as what would a page be off topic to?

"political." *Id*. at 200-201. The court held this unclear morass unreasonable, as it provided no "'objective, workable standards' by which a decisionmaker or would-be advertiser can distinguish 'what may come in from what must stay out.'" *Id*. at 201 (quoting *Mansky*, 138 S. Ct. at 1891). Out of the advertising policy's "broad, undefined standard" the court found the employees "ha[d] done their best to flesh out a reasonable test," but "ha[d] fallen short." *Id*. at 199.

The University's application of its off topic moderation practices have similarly "fallen short." It is undisputed that the decision to remove an "off topic" comment is made by the University's social media manager in charge of moderation at that time and depends, among other factors, on whether they have time to review the comments in question. (Dkt. 54, PPFOF ¶ 27). There is no definition in the Social Media Statement of "off topic." (Dkt. 54, PPFOF ¶ 13). When Defendant Moll is at the helm, he uses his judgment to determine if additional research is needed to assess whether a comment is related to a post, (Dkt. 54, PPFOF ¶ 26), or hide a comment or respond to it, (Dkt. 54, PPFOF ¶¶ 47-48). He adds additional criteria as bases to remove comments, (Dkt. 54, PPFOF ¶¶ 15-16), and alters his preferred moderation techniques depending on whether a comment is on Facebook or Instagram, (Dkt. 54, PPFOF ¶ 28). These decisions are not assisted nor cemented in any written or unwritten guidance—there are no "narrowly drawn, reasonable and definite standards, guiding the hand" of moderators. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 132–33 (1992) (unbridled discretion governing "[t]he decision [of] how much to charge for police protection or administrative time—or even whether to charge at all," where lack of objective standards left the decision "to the whim of the administrator").

The undisputed case-by-case evaluation that the University uses to implement the off topic moderation is yet another attribute of its unreasonable practices, namely the failure to set "objective" standards. (Dkt. 41, Defs.' Opp. p. 22). And it has measurable results. The

inconsistencies produced by the University's interpretation of its moderation guidelines demonstrate their unworkability. It is undisputed that comments unrelated to the University's posts remain visible on its social media accounts. *See, e.g.*, (Dkt. 54, PPFOF ¶¶ 33-34). It is also undisputed that the University suppresses comments relating to animal testing even when they were considered on topic to the posts. *See, e.g.*, (Dkt. 54, PPFOF ¶¶ 35-36). It is not "breathing room," (Dkt. 41, Defs.' Opp. p. 22), it is a vacuum where uninhibited discretion makes it impossible to determine "what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1891.

Without guideposts governing its moderation practices, the University has adopted "shifting" and "illegitimate criteria" to exclude anti-animal testing speech, including Krasno's. *City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 758 (1988) ("Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech."). The University has no policy governing social media moderation, (Dkt. 54, PPFOF ¶ 6), but suppressed Krasno's speech through a variety of tools under a Social Media Statement that has no prohibited content and no guideposts for its application, (Dkt. 54, PPFOF ¶¶ 7, 12-13, 20). After this suit was filed, it issued an Interim Guidance that also has no prohibited content and no guideposts for its application, *see supra*. The Interim Guidance purportedly changed Defendant Moll's understanding that a comment could be on topic to a post even if it included off topic content, (Dkt. 54, PPFOF ¶ 23), suggesting much of the University's challenged conduct occurred under a different, and presumably more stringent, analysis. Yet it hardly solves the problem. The Interim Guidance does not mention what type of moderation to apply (hiding a comment, restricting an account, or responding to a comment), does not address account restriction at all, and limits the use of keyword filters to solely profanity. *See* (Dkt. 38-5, pp. 2-3). It does not state the University can close the forums if it cannot handle

comments that may be on topic to its posts. *Id*. The University does not address any of these features, though those moderation actions are prevalent. "[T]aken together," then, the University's "vaguely defined policies and even vaguer unwritten rules make it impossible for a reasonable person to identify what violates their . . . policy and what does not." *White Coat Waste Project*, 35 F.4th at 201. They are unreasonable at first glance.

The University's imperfect moderation is problematic since the undisputed purpose of the forums is expression—often related to the University. Unfortunately, the University experiments on animals. (Dkt. 40, JSOF ¶ 5). That experimentation has led to federal sanctions, and rebuke by members of the public concerned about the animals' welfare. (Dkt. 40, JSOF ¶ 6).  It follows that speech encompassing their concerns—like Krasno's—is clearly encompassed within the expressive activity the University has allowed within its comment threads and therefore advances the purposes of the forums. Indeed, this distinguishes the constitutional implications of the University's decisions from instances where government action has led to inconsistent impacts on different viewpoints in forums dedicated to *non-expressive* activity. *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 732 (1990) (restriction on solicitation but not other speech on postal service premises reasonable where purpose of the forum "to accomplish the most efficient and effective postal delivery system"); *United States v. Am. Libr. Ass'n, Inc*., 539 U.S. 194, 206 (2003) (rejecting risk of anti-pornography software in public libraries capturing other speech and noting purpose of internet access is "not to 'encourage a diversity of views from private speakers,'" but "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality").

31

Finally, it is not for Krasno to craft a viewpoint neutral and reasonable moderation policy for the University. Regardless, she suggested several measures that would not pose the same problem as the University's current regime. (Dkt. 35, Pl.'s Br. p. 51).

In sum, the University has placed nothing in contention regarding the reasonableness of its moderation practices.

## IV. THE UNIVERSITY'S CLOSURE OF ITS SOCIAL MEDIA PAGES TO KRASNO VIOLATED KRASNO'S RIGHT TO PETITION.

The right to petition is important and distinct from the freedom of speech but the University's analysis effectively renders the Petition Clause empty words that offer no protection beyond what is already found in the Free Speech Clause. *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) (directing that "[c]ourts should not presume there is always an essential equivalence in the [Free Speech and Petition] Clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims.").

Although the University doesn't articulate a specific standard, it seems to believe that the Petition Clause is satisfied as long as an individual has some means to convey their grievances to the government. *See* (Dkt. 41, Defs.' Opp. pp. 26-27); *see also* (Dkt. 33, Defs.' Br. pp. 38-40). Under that framework, "one of the most precious liberties safeguarded by the Bill of Rights"—the right to petition the government for a redress of grievances—would be satisfied if the government simply maintained a P.O. Box where people could mail their grievances but otherwise shut down every other conceivable means of contact. *See BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002).[12]

---

[12] The University inappropriately cites *Hilton v. City of Wheeling* for the proposition that "the [Petition Clause] right is merely a right to petition the appropriate government entity." (Dkt. 41, Defs.' Opp. p. 24, citing 209 F.3d 1005, 1007 (7th Cir. 2000)). The *Hilton* court was simply stating that the plaintiff's right to petition should be directed to the district attorney rather than "police on the beat" that were the target of the lawsuit. *See* 209 F.3d at 1007. This issue of a mistaken government audience is not apt in this case where there is no question that the social media accounts in question are the official accounts for the University. (Dkt. 33, JSOF ¶ 7.)

Instead, the Court must determine whether the University's burden on Krasno's ability to petition the government is narrowly drawn to advance a countervailing government interest. *See Mirabella v. Villard*, 853 F.3d 641, 654 (3rd Cir. 2017) (to answer Petition Clause question, courts must ask "whether the government may 'nevertheless burden' the right to petition, given countervailing government interests.") (quoting *BE & K Constr.*, 536 U.S. at 535). *See also* 16A AM. JUR. 2D CONSTITUTIONAL LAW § 572 (observing that "any impairment of the constitutional right to petition the government for redress of grievance must be narrowly drawn"), citing *In re RH*, 170 Cal. App. 4th 678, 668 (2009).

Applying that standard to this case, the undisputed record shows that the University significantly burdens Krasno's right to petition and that burden is not justified by any countervailing interest. As detailed extensively throughout this series of summary judgment briefs, the University burdens Krasno's ability to petition the government by hiding her comments on its social media pages, rendering them publicly or totally invisible, and by previously restricting her Instagram account. *See supra* Part I. These restrictions prevent Krasno from petitioning the University directly and publicly on its social media pages. *Id.*

The University's social media controls also burden Krasno's ability to petition the government by restricting her ability to join with others who could view, "like," and otherwise amplify her petition. *See supra* Part I.A. Both the plain meaning of "petition" and its tradition in our democracy contemplates group action and not just individual complaints. *See* PETITION, Black's Law Dictionary (11th ed. 2019) (defining "petition" as "[a] written request signed by many people who seek a reform or other change"). *See also Lost Rights and the Importance of Audience*, 49 TULSA LAW REV. at 428. In fact, within the First Amendment the right to petition is coupled along with the right of the people to peaceably assemble. U.S. Const., Amend. I (protecting "the

right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). The interests are intertwined.

While the University faults Krasno for the dearth of legal authority on this point and others (Dkt. 41, Defs.' Opp. pp. 24-26), one of its own cases plainly recognizes that "there are few cases construing the right-to-petition clause[.]" *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). Be that as it may, the Court should not mistake this thin body of Petition Clause precedent as precedent that Krasno's Petition Clause argument is thin.

The University's attempts to minimize Krasno's burden only underscore the strength of Krasno's arguments. The University suggests that Krasno can utilize alternative means "such as letters, emails, and phone calls." (Dkt. 41, Defs.' Opp. p. 26.) However, those alternatives involve individual actions that are not publicly received, and therefore simply highlight the inferiority of the alternatives.

Likewise, the University argues that "Krasno admits that she has written comments by using spaces in words that appear on the keyword filter lists to purposefully avoid being moderated" and therefore "her 'petition' reaches the University in the end." (Dkt. 41, Defs.' Opp. 25.) However, Krasno finds that process burdensome because she must try to remember what words are filtered in formulating her messages, and she cannot use plain language to convey her views to other readers which dilutes the effectiveness of her messaging. (Dkt. 54, PPFOF ¶ 118.) It is as though the government allowed a mass demonstration at the steps of the capitol, but only if the demonstrators wore clown makeup. Importantly, the fact that the University relies on this ridiculous workaround to save it from a Petition Clause violation simply underscores the fact that the burden advances no legitimate government interest.

The University does not articulate any countervailing interest that justifies the significant burdens on Krasno's right to petition. The University's purported interest in reducing "spam" (Dkt. 41, Defs.' Opp. pp. 15, 19-20) is no more than a thinly guised interest in silencing Krasno's ability to effectively petition the government for a redress in grievances. *See* (Dkt. 47, Pl.'s Opp. pp. 27-30) (debunking the University's concern about too many comments harming the University's ability to manage its social media account).

In addition to burdening Krasno's right to petition without a countervailing interest, the University is also violating her Petition Clause rights by engaging in viewpoint based discrimination as explained in great detail throughout this series of briefing.

## V.    KRASNO IS ENTITLED TO NOMINAL DAMAGES.

As the University has referenced its own summary judgment briefing in this regard, Krasno similarly incorporates her arguments that she is entitled to nominal damages from her corresponding opposition briefing. (Dkt. 47, Pl.'s Opp. pp. 38-42).

### CONCLUSION[13]

For the reasons stated in this brief and its initial brief, this Court should grant Plaintiff's motion for summary judgment.


Dated: June 21, 2022.

                                        */s/ Caitlin Foley*
                                        Caitlin M. Foley

                                        ANIMAL LEGAL DEFENSE FUND
                                        150 South Wacker Drive, Suite 2400
                                        Chicago, IL 60606
                                        Tel: (707) 795-2533 ext. 1043
                                        Fac: (707) 795-7280
                                        Email: cfoley@aldf.org

---

[13] Krasno does not oppose dismissal of the Board of Regents of the University of Wisconsin as a Defendant in this case, and has filed an unopposed motion for voluntary dismissal for the Court's consideration. *See* (Dkt. 52).

Christopher A. Berry
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
Tel: (707) 795-2533 ext. 1041
Fax: (707) 795-7280
Email: cberry@aldf.org


Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
LAFFEY, LEITNER & GOODE LLC
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003
(414) 755-7089 (facsimile)
jgoode@llgmke.com
mleitner@llgmke.com
jfarley@llgmke.com